## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| |
|---|
| **JOHN DOE,** |
| *Plaintiff,* |
| **v.** |
| **YALE UNIVERSITY, YALE UNIVERSITY BOARD OF TRUSTEES, WENDY TSUNG** in her individual and official capacity, **K. GEERT ROUWENHORST** in his individual and official capacity, **JACOB THOMAS** in his individual and official capacity, **SHERILYN SCULLY** in her individual and official capacity, **JAMES CHOI** in his individual and official capacity, and **ANJANI JAIN** in his individual and official capacity, |
| *Defendants.* |

**Civil Action No. _____**

**COMPLAINT AND**
**JURY DEMAND**

Plaintiff John Doe[1] ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, and for his Complaint against Defendants Yale University ("Yale"), Yale University Board of Trustees (the "Board" or "Board of Trustees"), K. Geert Rouwenhorst ("Professor Rouwenhorst"), in his individual and official capacity, Jacob Thomas ("Professor Thomas"), in his individual and official capacity, Sherilyn Scully ("Dean Scully"), in her individual and official capacity, James Choi ("Chairman Choi"), in his individual and official capacity, and Anjani Jain ("Dean Jain"), in his individual and official capacity, alleges as follows:

### THE NATURE OF THE ACTION

1.       Graduating from the Yale School of Management is an extraordinary honor that requires dedication and self-sacrifice. In exchange for completing a rigorous courseload over two years, students receive a degree that brings life-changing opportunities. To protect the integrity of the degree, the Yale School of Management and all students promise to follow a set of rules regarding academic conduct and discipline. All students must follow the rules in order to graduate.

---

[1] Plaintiff files a motion to proceed pseudonymously herewith.

And likewise, the Yale School of Management must itself follow the rules before a student can be removed from the program and deprived of a degree. The rules enforce fairness, protect students, and ensure that no student is deprived of a degree wrongfully.

2.      In this case, the Yale School of Management violated the rules and wrongfully suspended a student, depriving him of his degree.

3.      Specifically, this case arises out of the acts and omissions of Defendants, and their employees and/or agents, against Plaintiff, a student in Yale School of Management's ("SOM") Executive Master of Business Administration Program ("EMBA") program, resulting in erroneous findings of a Yale Honor Code[2] ("Honor Code") violation, a one-year suspension from the EMBA program, and a grade of "F" in a course.

4.      Yale's Honor Committee conducted a disciplinary process that was neither thorough nor impartial, and deprived Plaintiff of his fundamental rights to a fair proceeding, proper notice of the evidence against him, including exculpatory evidence, and the opportunity to present his case to impartial hearing and appeal panels.

5.      During the investigation, Plaintiff was wrongfully pressured to falsely confess to cheating on his final exam by Dean Scully, and Chair Choi. Plaintiff was not given the documents that constituted evidence against him until after the original hearing date, and has never received all of those documents. Defendants also failed to produce exculpatory materials, as required under the rules.

6.      Defendants used AI detection tools that they knew were not reliable —and that Yale's own policy forbid using—against Plaintiff.

---

[2] Yale School of Management Honor Code, 2024-25, https://bulletin.yale.edu/bulletins/som/rights-and-responsibilities-students (last visited January 1, 2025).

7.      Contrary to the rules, on the day of Plaintiff's hearing, the Honor Committee demanded that Plaintiff return for a second hearing that same day, without reasonable notice, and when Plaintiff was not on campus or available. Rather than schedule a date and time, and provide Plaintiff with notice of that second hearing, as required under the rules, the Committee held the meeting anyway, without providing Plaintiff with an opportunity to attend, and made a decision against him at that meeting.

8.      On the basis of Yale's erroneous, biased decision, Yale first issued Plaintiff a finding of responsibility for "not being forthcoming" and suspended him for one year, but made no finding as to the underlying charge of "improperly utilized Artificial Intelligence on the final exam in the course". Yale did not follow the required procedural rules in bringing this new charge of "not being forthcoming". Plaintiff was not given fair notice or opportunity to defend the new charge of "not being forthcoming" against him.

9.      Defendants continued to violate the rules during the appellate process. During Plaintiff's appeal, in violation of the rules, his case was unilaterally sent back to the Honor Committee to "continue deliberating" on a new *third* charge of "violation of the examination rules". Plaintiff was not afforded notice or opportunity to participate, or any required procedure with respect to this third charge.

10.      The Honor Committee then issued a penalty of an "F" in the course on this third charge. The Honor Committee made this determination without providing Plaintiff with any basis for its decision, with no analysis of the facts and rules that supported such determination, and with no conclusions made that he "improperly utilized Artificial Intelligence on the final exam".

11.      Even though the Committee claimed to have made a determination on the original allegation that Plaintiff "improperly utilized Artificial Intelligence on the final exam", the

Committee made no findings of fact, and made no analysis of those facts against the Honor Code rules, or conclusions that Plaintiff had "improperly utilized Artificial Intelligence on the final exam". The Honor Committee instead issued a finding that Plaintiff had violated the third charge of violating the rules of the final exam.

12.    In addition to violating the rules in the adjudicative process, the penalty that Defendants imposed also violated the rules. The rules allow for a "Mandatory F in course" or "Suspension of one or more terms + mandatory F in course" or "other sanctions of intermediate severity". In this case, Defendants imposed two separate penalties 1) of being "suspended for one year" and 2) "F" in the class.

13.    As a result of Defendant's conduct, Plaintiff currently cannot continue his education in Yale's EMBA program, and has lost at least one year of the financial benefits that accompanied attending the prestigious program. Plaintiff's reputation has been wrongfully harmed and his relationship permanently altered for the worse, with his Yale peers, his professors and instructors. Plaintiff will no longer be able to graduate from his EMBA program with his classmates, nor will he finish in the top of his class as was his trajectory. Delaying Plaintiff's graduation will remove his ability to proudly earn this once-in-a-lifetime distinction. No amount of money can remedy that loss. Plaintiff has been severely emotionally harmed by the unfair and unreasonable process, and the unjust results. As a result of Defendant's conduct, Plaintiff will suffer enduring and significant impact to his future career, education, and potential earnings.

14.    Plaintiff therefore brings this action to obtain relief based on causes of action for breach of contract, breach of an implied covenant of good faith and fair dealing, discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, retaliation for complaint of discrimination based on national origin in violation of Title VI of the Civil Rights

Act of 1964, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## THE PARTIES

15.     Plaintiff John Doe is a natural person, a citizen of France, and a resident of Texas. During the events relevant to this action, Plaintiff was enrolled as a student in the Yale School of Management, Masters of Business Administration for Executives program.

16.     Defendant Yale University is a large, private, Ivy League, research university. Yale's EMBA program was ranked 16th in the country in 2024.[3] Yale is located in the city of New Haven, Connecticut.

17.     Upon information and belief, Defendant Board of Trustees is the principal governing body of Yale University. The Board selects Yale's President, who oversees the Board. Ten (10) of the Trustees on the Board are appointed as Successor Trustees, selected by the Board from Yale alumni who serve up to two (2) six (6) year terms. Six (6) of the Trustees are Alumni Fellows who are elected by Yale alumni and serve one six (6) year term. Connecticut's Governor and Lt. Governor serve as Ex Officio members of the Board. Defendant Board of Trustees oversees and approves Yale's Policies and Procedures, including, upon information and belief, the Yale School of Management Honor Code,[4] and the Policies and Procedures of Yale and the Honor Committee (collectively the "Policies" and/or "Procedures").[5]

18.     Defendant Dean Wendy Tsung is, upon information and belief, the Assistant Dean of Yale's EMBA Program, was on the Honor Committee's investigatory team relevant to this action, and is a resident of Connecticut.

---

[3] U.S. News and World Report, Best Graduate Schools, 2024, https://www.usnews.com/best-graduate-schools/top-business-schools/yale-university-01257/executive (last visited December 4, 2024).
[4] Yale School of Management Honor Code, *supra*.
[5] *Id.*, p. 66.

19.    Defendant Professor Geert Rouwenhorst is, upon information and belief, the previous Chair of the Yale SOM Honor Committee, a Professor in the Yale EMBA program, and is a resident of Connecticut.

20.    Defendant Professor Jake Thomas, is, upon information and belief, a Professor in the Yale EMBA program, is a member of the Faculty Review Board ("FRB") that hears appeals from the Honor Committee, and is a resident of Connecticut.

21.    Defendant Dean Sherilyn Scully was, upon information and belief, the Dean of Students of the Yale School of Management during time periods relevant to this action, was a member of the Honor Committee investigatory team relevant to this action, and is, upon information and belief, a resident of Connecticut.

22.    Defendant Chair James Choi, is, upon information and belief, a Professor of Finance in the Yale School of Management, the Chair of the Honor Committee investigatory team relevant to this action, and is, upon information and belief, a resident of Connecticut.

23.    Defendant Dean Anjani Jain, is, upon information and belief, the Deputy Dean for Academic Programs at the Yale School of Management, oversees the FRB which handles appeals of student disciplinary matters from the Honor Committee, and is, upon information and belief, a resident of Connecticut.

## JURISDICTION AND VENUE

24.    This Court has diversity, federal question, and supplemental jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) Plaintiff is a citizen of a foreign state, and Defendants are citizens of a US state, and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the federal law claim arises under the Constitution and Statues of the United States of America; and (iii) the state law claims

are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

25.     This Court has personal jurisdiction over Defendant Yale on the grounds that is conducting business within the State of Connecticut.

26.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants' principal place of business is in this district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

***Plaintiff's Background***

27.     Plaintiff is an entrepreneur and investor who is originally from France.

28.     Plaintiff earned a French Baccalauréat Diploma in science and mathematics, graduating with the highest honors (a "Mention Tres Bien"), from the Awty International School in Houston, Texas.

29.     He received dual degrees, a B.S.E in Biomedical Engineering and a B.A. in Political Science, from Rice University in May 2012.

30.     In order to develop and advance his career —and life— Plaintiff applied to the Yale University School of Management Master of Business Education for Executives program. Plaintiff was accepted into the program, for which Plaintiff was extraordinarily honored. Plaintiff hoped to graduate in the Spring of 2025.

31.     Plaintiff began the Yale EMBA program in July 2023. Plaintiff developed close relationships with his professors and classmates and cherished being in the program. Plaintiff completed all of his coursework to date with his 2025 graduating cohort, excelled academically, and was on track to be the Student Marshall/Valedictorian for his class.

32.    The total cost of tuition for Plaintiff's EMBA program at Yale is approximately two hundred and eight thousand, five hundred dollars ($208,500).

## *Yale's Policies and Procedures*

33.    The Yale School of Management 2024-25 Bulletin contains the Rights and Responsibilities of students, the Yale SOM Honor Code, and the Procedures of the Honor Committee.[6]

34.    These Policies and Procedures were in effect during the year 2024, and at the time of the alleged incidents in this complaint.

35.    The Honor Code stresses to "students, faculty, and staff" that honesty is "fundamental to the profession and practice of management", that honesty is the "bedrock premise" of education at Yale, and that "honesty and integrity build the trust essential to a free and lively exchange of ideas".[7] The Honor Code applies to students, faculty, and staff.

36.    The Honor Code grants authority over alleged code violations, such as those at issue here, to the Honor Committee.[8]

37.    The Honor Code says that it values "inclusivity" and celebrates "diverse backgrounds" as a "hallmark" of SOM community members.[9] Yale's SOM presents itself as a "center of integrity and fair dealing".

38.    Yale's SOM stresses that "All forms of discrimination fall outside the bounds of expected behavior" of its students, faculty and staff.

---

[6] *Id.*
[7] *Id.*, Guiding Principles.
[8] *Id.*
[9] *Id.*, Community Standards.

39.     The Procedures of the Honor Committee state that it is responsible for collecting facts pertaining to alleged violations of the code, making judgments about those facts, and making determinations as to appropriate punishment.[10]

40.     The Honor Committee consists of members who are appointed by the Deputy Dean for Academic Programs, including four (4) faculty members, six (6) SOM students, and the Dean of Students (who is non-voting and acts as the secretary), and for cases involving students in the M.B.A. for Executives program, the assistant dean for the M.B.A. for Executives program.[11]

41.     At the beginning of the investigation, the chair of the Honor Committee is required to ask any members to "excuse themselves" if there is a conflict of interest. The Procedures also require the chair to inform the student under investigation of the names of the members of the committee who will consider the student's disciplinary matter. After such notice, the student only has one (1) day to object to any members of the committee and ask for their recusal.[12]

42.     A disciplinary investigation typically begins through notice to the chair of the Honor Committee by a faculty, student or staff member of a probable code violation. The reporting party signs a written statement and produces any relevant materials to the chair. The chair then decides whether the allegations and facts are sufficient to submit to the full Honor Committee.[13]

43.     For disciplinary matters that are referred by the chair to the full Honor Committee, the student who is the subject of the complaint must be informed of the charges against him or her, as well as the student's right to attend the hearing, to be accompanied by an adviser, and to examine

---

[10] *Id.*, Procedures of the Honor Committee - Composition and Charge; Process.
[11] *Id.*
[12] *Id.*, Procedures of the Honor Committee - Review (1).
[13] *Id.*, Procedures of the Honor Committee - Process (1-2).

"any and all written materials being provided to the committee as soon as possible" so that the student has "ample opportunity to question or refute them".[14]

44.     The Honor Committee has the limited authority to issue penalties for a finding of violation of the code, including an exoneration, warning, probation, a mandatory F in the course, suspension from one or more terms plus a mandatory F in the course, or expulsion from Yale SOM (or other sanctions of intermediate severity).[15]

45.     Any disciplinary penalty given by the Honor Committee to a student remains in that student's file at Yale SOM and with the Honor Committee. Suspension for a full semester or longer will appear on the student's transcript.[16]

46.     The Honor Committee is required to seek consistency in its decisions, and study and publish the outcomes of proceedings in prior years.[17]

47.     The findings of the Honor Committee may not be appealed within Yale, but a student may appeal the severity of the penalty within five (5) business days of the decision to the Faculty Review Board ("FRB"), which consists of the cognizant Academic Dean, and two faculty members who were not part of the full committee.[18]

### *Plaintiff's Exam Paper Singled Out For Disciplinary Investigation*

48.     Although Plaintiff was unaware at the time, his exam paper in his Sourcing and Managing Funds course (MGT423E) was singled out by his professors for additional scrutiny. His exam was the only one among his classmates that was flagged.

---

[14] *Id.*, Procedures of the Honor Committee - Process (2).
[15] *Id.*
[16] *Id.*, Procedures of the Honor Committee - Process (5).
[17] *Id.*
[18] *Id.*, Procedures of the Honor Committee - Review (4).

49.    On June 11, 2024, Professor Rouwenhorst sent a letter to Dean Tsung and copied Professor Thomas. Professor Rouwenhorst "refer[red] this [final exam] to the Honor Committee for further investigation", alleging "improper use of AI."

50.    Professor Rouwenhorst further stated that "one of the [Teaching Assistants ("TA")] flagged an exam that appeared unusually *long and elaborate* in formatting in answering the questions", with "*near perfect punctuation and grammar* " (emphasis added).

Professor Rouwehorst also stated:

> These are our observations:
>
> The exam was set for 4 hours, self-timed, Open book, but closed internet and no use of AI tools, honor code applies. (see attached exam and syllabus)
>
> *Some answers to essay type questions on the exam score high on the likelihood of being AI generated using ChatGPTzero as a detection tool* (see 3 attached examples; we did not do a full check and there are likely other examples).
>
> At least one answer shows substantial overlap with answers to simple prompts on ChatGPT (see attached word file example. We did not do a deep dive, and there may be other examples)
> The student performed relatively poorly on question 5, where AI tools were the least helpful.
>
> We questioned, but not investigated, whether the amount of time necessary to produce the exam answers by the student in terms of length, *near perfect punctuation and grammar and elaborate formatting*, would exceed the 4 hour limit set for the exam. (emphasis added).

51.    Plaintiff is a highly educated and accomplished professional, as outlined in detail above, who was on track to be the top of his class in Yale's competitive EMBA program. Thus, it is not "unusual" that his writing on his final exam would be "long and elaborate", or that it would have "near perfect punctuation and grammar."

52.     In addition, as a foreign student, and a non-native English speaker and writer, it is natural that Plaintiff's writing may stand out from others in his class. It would be reasonable and prudent for Professor Rouwenhorst, who knew that Plaintiff was a foreign student, to take this fact into consideration when reviewing his final exam.

53.     In violation of the rules, Professor Rouwenhorst had already taken it upon himself to run his own investigation of Plaintiff's exam before the matter was referred to the Honor Committee.

54.     Professor Rouwenhorst's investigation relied upon methods that violated Yale's policies. Specifically, Professor Rouwenhorst used AI surveillance and detection technology. However, Yale's own policies impugn the very tools that Professor Rouwenhorst used.

55.     For background, Yale had briefly used AI surveillance and detection software in the past called Turnitin, that checked all exams that were submitted to its internal Canvas system. However, Yale determined that such technology was "unreliable", and made a policy decision to discontinue its use. Yale states this policy on its website: "Controlling the use of AI writing through surveillance or detection technology is not feasible. TurnItIn has acknowledged a *reliability problem* with its detection tool software and Yale has *not enabled* this feature in Canvas. We believe there are more fruitful ways to engage writing processes and expectations than to rely on predictions that will probably be outpaced by further AI development."[19]

56.     As Yale's policy notes, AI detection tools like GPTZero are considered to be unreliable. OpenAI, the company that built ChatGPT, released an AI detection tool in January

---

[19] Yale, *AI Guidance for Teachers*, Guidance for Teachers (2), https://poorvucenter.yale.edu/AIguidance (bold emphasis in original; italics emphasis added).

2023 that was discontinued five months later "due to its low rate of accuracy."[20] Scott Aaronson, a prominent Computer Science professor and one of the main figures behind OpenAI's original AI detection tool, confirmed that tools like GPTZero (the program used against Plaintiff in this case)Honor Committee against Plaintiff) are *not reliable*.

57.    Likewise, the creator of GPTZero, Edward Tian, has acknowledged the "implicit bias" in the program, which leads to false positives of AI use.[21]

58.    In a 2023 study, published in the International Journal for Educational Integrity, the reliability of GPTZero was evaluated, among other similar AI surveillance and detection tools. The study found that "when applied to human-written control responses, the tools exhibited inconsistencies, producing false positives and uncertain classifications."[22]

59.    Five computer scientists at the University of Maryland also did a study on AI surveillance and detection tools, and determined "both theoretically and empirically, that these state-of-the-art detectors cannot reliably detect [AI tool] outputs in practical scenarios".[23]

60.    Even the GPTZero website states that the program was not intended to be used to create evidence of the use of AI in an educational setting, but rather, that the tool should be used more to initially "flag situations in which a conversation can be started" merely to "drive further

---

[20] OpenAI announced on January 21, 2023: New AI classifier for indicating AI-written text, and then discontinued that tool on July 20, 2023 "due to its low rate of accuracy". OpenAI, January 21, 2023, https://openai.com/index/new-ai-classifier-for-indicating-ai-written-text/
[21] Tangermann, Victor, *Futurism*, There's a Problem With That App That Detects GPT-Written Text: It's Not Very Accurate. The media seized on a good story, but the numbers don't add up., January 9, 2023, https://futurism.com/gptzero-accuracy.
[22] Ahmed M. Elkhatat, Khaled Elsaid & Saeed Almeer, Evaluating the efficacy of AI content detection tools in differentiating between human and AI-generated text, International Journal for Educational Integrity, September 1, 2023, https://edintegrity.biomedcentral.com/articles/10.1007/s40979-023-00140-5.
[23] Vinu Sankar Sadasivan, Aounon Kumar, Sriram Balasubramanian, Wenxiao Wang, Soheil Feizi, Can AI-Generated Text be Reliably Detected?, March 17, 2023 (revised February 19, 2024), https://arxiv.org/abs/2303.11156.

inquiry and spread awareness of the risks of using AI in written work".[24] In fact, the creators of GPTZero state, in no uncertain terms: "[T]hese results should not be used to punish students."[25]

61.     Shockingly, the above language from GPTZero's website is even stated clearly on the reports that Professor Rouwenhorst created and submitted to the Honor Committee to use as evidence against Plaintiff.

62.     In addition, these AI surveillance and detection tools are known to unfairly target non-native English speakers and writers such as Plaintiff. In a Stanford University article, authors from the Departments of Computer Science, Electrical Engineering, and Biomedical Data Science wrote: "GPT detectors frequently misclassify non-native English writing as AI generated, raising concerns about fairness and robustness. Addressing the biases in these detectors is crucial to prevent the marginalization of non-native English speakers in evaluative and educational settings and to create a more equitable digital landscape."[26]

63.     In sum, despite this thorough repudiation of AI surveillance and detection technology—and Yale's own policy against the technology due to its known "unreliability"— the Honor Committee relied upon the reports that Professor Rouwenhorst had created using the GPTZero program as "evidence" against Plaintiff.

***Plaintiff Learns his Exam Was Flagged***

64.     Plaintiff first learned that his final exam was flagged on June 12, 2024, in a letter from Dean Wendy Tsung, Assistant Dean of Yale's EMBA Program, informing him that he had an Incomplete grade in his Sourcing and Managing Funds (MGT423E) course. Plaintiff asked for more substantive information, which he did not receive.

---

[24] GPTZero website, When should I use GPTZero, https://gptzero.me/faq.
[25] What are the limitations of the classifier?, *Id.*
[26] Weixin Liang, Mert Yuksekgonul, Yining Mao, Eric Wu, James Zou, *Patterns*, (Opinion) GPT detectors are biased against non-native English writers, https://www.sciencedirect.com/science/article/pii/S2666389923001307.

65.    Frustrated with the lack of information, Plaintiff corresponded with the Professors of his Sourcing and Managing Funds course, Professor Geert Rouwenhorst and Professor Jacob Thomas, to ask them directly about the Incomplete. He was informed that his final exam paper was "flagged" for possible use of Artificial Intelligence ("AI") technology in completing the exam. If true, the use of AI would be a violation of the rules of the exam, and the Yale Honor Code. Plaintiff was also informed that Professors Rouwenhorst and Thomas had referred the matter to the SOM Honor Committee.

66.    Plaintiff requested all written materials that were provided to the Committee at least three (3) separate times, and received nothing. Upon information and belief, at the time of these requests there were at least 6 pieces of documentation that had already been provided to the Committee.[27]

67.    On July 19, 2024, Sherilyn Scully, who at the time was the SOM Dean of Students,[28] informed Plaintiff that "it is the decision of the chair of the Honor Committee if this inquiry is formally referred to the Honor Committee." Although the matter had been referred to the chair of the Honor Committee for review, and a determination was made to formally refer it to the full Committee, Plaintiff still had not received any of the documents that the chair had considered.

---

[27] Upon information and belief, at the time of Plaintiff's requests, the following documents were available and withheld from Plaintiff: Complaint letter, SMF Final exam, ChatGPT prompt, GPTZero report #1, GPTZero report #2, GPTZero report #3.

[28] Upon information and belief, Dean Sherilyn Scully is no longer employed at Yale. *See* Yale School of Management, Headlines, Dean of Students Sherilyn Scully Departs After 17 Years ..., https://som.yale.edu/story/2024/dean-students-sherilyn-scully-departs-after-17-years-heart-som-community (last visited December 5, 2024).

*__Dean Scully Pressures Plaintiff to Falsely Confess__*

68.    The Yale School of Management Honor Code states that "Honesty is fundamental to the profession and practice of management. It is therefore the bedrock premise of management education at Yale. To the community of students, faculty, and staff of the Yale School of Management, honesty and integrity build the trust essential to a free and lively exchange of ideas."

69.    In violation of these principles, the Yale administration made dishonest threats to Plaintiff in an attempt to coerce a confession. The Yale administration also pressured Plaintiff to exhibit dishonesty by promising leniency if he would make a false confession.

70.    On July 24, 2024, Plaintiff attended a meeting with Deans Tsung and Scully, to discuss Plaintiff's Honor Code charge.

71.    Dean Scully made multiple attempts to coerce Plaintiff into making a false confession of violating the Honor Code. First, she hypothesized that Plaintiff may have inadvertently violated the Honor Code by using Grammarly or a similar tool, explaining that Grammarly has an AI component that can alter text style and voice. Plaintiff stated that he was unfamiliar with Grammarly and had not used it for his exam. Dean Scully then asked if Plaintiff had inadvertently spoken with other students or TAs about the exam before, during, or after he took it, which Plaintiff denied. Plaintiff added that he didn't discuss any of the allowed resources with other students or staff either. Dean Scully asked if Plaintiff might have been confused about the exam's instructions, especially about permitted resources or tools, which Plaintiff denied. Plaintiff made clear that that the instructions on the exam cover page were clear and that he followed them strictly.

72.    Dean Scully attempted to use the fear of deportation to convince Plaintiff to change his story and confess to violating the Honor Code. Dean Scully suggested to Plaintiff that his F1

visa could be revoked, and he could be deported, as a result of the Honor Committee investigation. Plaintiff informed her that he is in the United States on an E2 investor visa and not a student F1 visa.

73.    Plaintiff later researched and confirmed that what Dean Scully told Plaintiff was wrong. The United States does *not* revoke student visas when a student is suspended or expelled. Students have the ability to re-enroll at another institution and remain in the United States.

74.    Dean Scully made another attempt to coerce a false confession out of Plaintiff, stating that in her experience cases tend to have better outcomes when students confess. She suggested that the penalty would be worse for Plaintiff if he was found to be dishonest or that he attempted a cover-up. Dean Scully suggested that a confession would make the Honor Committee go easy on him. She stressed that the Honor Committee values transparency. Plaintiff reiterated multiple times that he did not use AI on the final exam, and expressed confidence in his adherence to the exam guidelines. Plaintiff refused to confess to something he didn't do, and then left the meeting in shock.

75.    Plaintiff later spoke with another student who had gone through an Honor Code investigation, leading Plaintiff to believe that these "confession" meetings for international students, who are coerced to crack under the threat of deportation, are common at Yale SOM.

76.    In addition to the dishonest and coercive behavior described above, Dean Scully also made a series of damaging admissions regarding the flimsiness of Yale's allegations against Plaintiff.

77.    Dean Scully informed Plaintiff that his final exam was the only one in his class that was flagged for possible AI usage out of the approximately seventy-one (71) other students in his program. Dean Scully also told Plaintiff that the professors were *only* supposed to "flag" exams

that they suspected had used AI, rather than investigate any possible concerns. This is not what happened in Plaintiff's case. In his case, the professors also ran his exam through an unreliable AI surveillance and detection program, and obtained reports that were submitted to the Honor Committee as "evidence" against Plaintiff.

78.    Dean Scully also said that Yale "heavily suspected" that Plaintiff had used AI to complete his exam answers, telling him "your answer looks very different than the other 71 submissions in a unique way" and that it "read very differently." Again, as a foreign student and non-native English speaker, and as the top student in his program, it is not unusual that Plaintiff's final exam might *look* and *read* differently from his classmates.

### *Honor Committee Chair James Choi Pressures Plaintiff to Falsely Confess*

79.    The dishonest attempts to coerce a confession continued with the Chairman of the Honor Committee, James Choi ("Chairman Choi").

80.    On August 10, 2024, Chairman Choi sent Plaintiff an email stating: "I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale."

81.    On August 16, 2024, Plaintiff responded: "Until now, Wendy and Dean Scully have told me that this matter has not been formally referred to the Honor Committee. Further, I was told that you had already received a copy of the submitted exam. I am of course happy to comply with the SOM Policies at all times. If you believe I have not followed any policy, can you please let me know which one so I can respond appropriately?" Plaintiff concluded, "I am always happy to cooperate with your process as appropriate."

82.    Plaintiff never received a response from Chairman Choi regarding what policy he was not following.

83.    In the morning of August 16, 2024, Chairman Choi escalated the pressure for a false confession, stating: "failure to cooperate would be viewed by the Honor Committee as an extraordinary violation of the Honor Code."

84.    In the evening of August 16, 2024, Chairman Choi sent Plaintiff another email stating: "I have expanded my investigation into your case to deliverables you submitted for other courses." The expansion of the investigation to all other classes is in violation of the Honor Code procedure.

85.    Chairman Choi continues the threats for Plaintiff to revise his statements and make a false confession, stating: "If you would like to revise your statement to Deans Scully and Tsung about your Sourcing and Managing Funds final exam, you still have an opportunity to do so. The Honor Committee has historically been lenient with respect to revisions students make to their stories prior to their appearance before the Committee."

86.    Due to the intense pressure to falsely confess that Plaintiff received from both Dean Scully and Chairman Choi, Plaintiff felt like he had only two options: 1) "revise" his statement and falsely confess to an offense he did not commit, so that the Committee would be "lenient"; or 2) refuse to falsely confess and be expelled.

87.    At this point in the process, Plaintiff still had not received any documentation about the charge against him. Moreover, he now faced the threat that he would have to defend himself against an investigation of hundreds of assignments in all of his courses, in complete violation of the rules of the Honor Code.

**_The Honor Committee Formally Announces the Charge; Alleged AI use on Sourcing and Managing Funds Final Exam_**

88.     On September 8, 2024, Plaintiff finally received the official notification letter from Dean Tsung. This letter stated that "the allegation is [Plaintiff] improperly utilized AI on the final exam in the course [Sourcing and Managing Funds (MGT423E)]".

**_Yale Deprives Plaintiff of the Right to Object to Committee Members_**

89.     Under the Yale School of Management rules, the formal notification of a charge triggers procedural requirements that Yale must follow regarding the composition of the Honor Committee. Here, Yale violated those procedural requirements.

90.     First, under the Yale SOM Policies and Procedure, Yale is required to notify an accused student of the composition of the Honor Committee ("[T]he chair or chair's designee will notify the student of the membership of the [Honor] committee."). Here, Yale failed to notify Plaintiff of the membership of the Honor Committee. Rather, Dean Tsung's letter stated that the Honor Committee members had not been chosen, but would be "updated" soon, stating: "A list of the student Honor Committee members and faculty members can be found here and will be updated very soon once the new committee members have been selected."

91.     At no point before the hearing did Yale _ever_ notify Plaintiff of the members of the Honor Committee as required by Yale policy.

92.     Additionally, Yale deprived Plaintiff of the right to request recusal of the Honor Committee members as required under the rules. The Yale SOM Policies and Procedures require a student to object to the composition of the Honor Committee within one day of notice of the charge. ("Within one day after receiving that notification, the student may object that a member is prejudiced by stating in writing the basis for this objection.").

93.     Here, Yale failed to provide Plaintiff with the Honor Committee members within the one-day window—or at any point. Thus, Plaintiff was stripped of his right to challenge the members of the committee under the SOM rules.

### *Honor Committee Continues to Delay Producing Materials*

94.     The Yale Honor Committee rules state that a student has the right "to examine any and all written materials being provided to the committee as soon as possible so that the student may have ample opportunity to question or refute them."

95.     Plaintiff's Honor Committee hearing was initially scheduled for October 4, 2024. On September 9, 2024, Plaintiff informed Dean Tsung that he was going to be out of the country on October 4, 2024. The Honor Committee hearing was therefore rescheduled for November 8, 2024.

96.     The investigation against Plaintiff had gone on since at least June 12, 2024. Plaintiff was formally charged via the September 8, 2024 letter referenced above.

97.     However, it was not until October 14, 2024, that Plaintiff finally received sixteen (16) documents that the Honor Committee expected to use as evidence against him in the upcoming hearing.

98.     This extreme delay in providing Plaintiff with these materials was in violation of the procedural rules. The Honor Committee's delay prevented Plaintiff from having a fair and reasonable opportunity to defend himself at the hearing, in violation of the Yale School of Management policies.

### *Honor Committee Stealthily Introduces a New, Unrelated Charge*

99.     At the time it produced the materials to Plaintiff, the Honor Committee stealthily introduced a new charge against Plaintiff without the required notice and due process under Yale's

policies. In the September 8, 2024, charge notice letter, the Honor Committee had charged that Plaintiff "improperly utilized AI on the final exam in the course [MGT423E Sourcing and Managing Funds]."

100.    However, in the materials the Honor Committee produced on October 14, 2024, the Honor Committee stealthily introduced a new allegation regarding an additional exam in an unrelated course. Specifically, the sixteen documents that the Honor Committee produced included an additional final exam that was not the subject of the officially noticed charge: a final exam in Plaintiff's Investor course (MGT412E), which was a different class, taken one semester earlier with a different professor.

101.    The Honor Committee failed to provide Plaintiff with *any* due process required under the Yale policies regarding the Investor course before that allegation was stealthily introduced in the October 14, 2024, materials. In violation of the Yale policies, the Honor Committee never notified Plaintiff that he was being charged with AI use on the Investor final exam. Rather, Plaintiff was only charged that he "improperly utilized AI on the final exam in the course [of Sourcing and Managing Funds (MGT423E)."

### *Honor Committee Intentionally Withholds Exculpatory Materials*

102.    To make matters worse, the Honor Committee failed to produce exculpatory materials to Plaintiff.

103.    According to the Honor Committee, the results of the GPTZero scan performed on Plaintiff's final exams "flagged" six (6) questions total between the two final exams that they scanned as potentially being written by AI. One of those six reports was never produced to Plaintiff.

104.    Since the Committee refused to produce that sixth GPTZero scan, Plaintiff ran that question through GPTZero himself, and received a result showing that GPTZero calculated a 96% probability that the sixth question was written by a human. Naturally, the Honor Committee withheld the results of the scan on the sixth question because those results were favorable to Plaintiff.

105.    Before the Honor Committee hearing, Plaintiff made another request to Honor Committee Chairman Choi in writing for any evidence in the investigative file that he had not received. Choi responded: "Not that I am aware of. Those particular passages jumped out to human readers as likely to be AI-generated, which is why the AI detectors were run on them". Chairman Choi claimed that he was not aware of any GPTZero scans there were not produced to Plaintiff—despite the fact that only five of six reports regarding the "flagged" questions had been produced to Plaintiff. And tellingly, the omitted report was favorable to Plaintiff.

### *The Honor Committee Conducts its Hearing*

106.    On November 8, 2024, between approximately 12:30pm and 1:45pm, the Honor Committee heard Plaintiff's matter. During the hearing, Plaintiff provided the Committee with evidence showing that the GPTZero program the Committee had used to analyze his final exams is not reliable. For example, Plaintiff submitted his correspondence with Scott Aaronson, a prominent Computer Science professor at the University of Texas and one of the authors of OpenAI's original AI detection tool, who confirmed that tools like GPTZero are not reliable. To further illustrate the unreliability of AI detection tools, Plaintiff also submitted AI detection test results from GPTZero of written scholarly works of prominent members of the Yale community, including Dean Charles Kerwin, former President Peter Salovey, and members of the Honor

Committee. Those scans indicated that there was a "100% probability" that selections from these works—some published over 30 years ago—were written by AI, a palpably false result.

107.    The Honor Committee's response to this evidence was silence. The Committee members did not ask a single question regarding the reliability of AI detection tools that they were using against Plaintiff in that proceeding.

108.    In the face of the Committee's silence, Plaintiff asserted his innocence to charges of AI use. As he had done before the hearing, Plaintiff again offered to produce copies of any files related to any of his Yale assignments. Chairman Choi then asked Plaintiff for the underlying "Microsoft Word" files used to produce the PDF files for the two final exams (Sourcing and Managing Funds and Investor) that formed the basis for the allegations against Plaintiff. Plaintiff explained that he did not use Microsoft Word for the two final exams but instead used a different word processing program, Apple Pages. Plaintiff offered to provide copies of the Apple Pages files that were used to produce the submitted PDFs. The hearing then concluded.

109.    About 15 minutes later, at approximately 2:02pm, Plaintiff received a voicemail message from Dean Tsung asking him to return her call. Plaintiff returned her call at approximately 2:21pm. During the call, Dean Tsung formally asked Plaintiff to send the Honor Committee the Apple Pages files discussed in the meeting. Plaintiff informed Dean Tsung that he had left campus and would go back to his laptop and send the requested files. Plaintiff was upset about the hearing, and asked Dean Tsung if he could be excused from an upcoming 2:30pm class. Dean Tsung stated that was fine.

110.    Plaintiff acted quickly and sent the requested files to Dean Tsung within 40 minutes, by approximately 3:03pm. Plaintiff then left campus for the rest of the day, and missed the 2:30pm class as he had discussed with Dean Tsung.

111.    Despite knowing that Plaintiff was no longer on campus, Dean Tsung called Plaintiff again at approximately 3:32pm. Plaintiff was not available to answer the call.

112.    At approximately 4:02pm Dean Tsung texted Plaintiff asking him to come back to campus at 5:30pm that day. About an hour later, at approximately 5:07pm, Plaintiff responded to Dean Tsung's text message stating "I am unfortunately not able to meet at 5:30pm today. Please let me know what day and times next week you'd like me to make myself available."

113.    At approximately 5:19pm, Dean Tsung called Plaintiff and informed him that he needed to return to the Honor Committee to meet with them at 5:30pm (within about ten minutes), as well as bring his personal laptop with him to show the Committee. Plaintiff responded to Dean Tsung that he was not on campus, not available in ten minutes to be on campus, and that he could make himself available at any other time in the coming week provided he is given reasonable advance notice. Dean Tsung told Plaintiff that if he did not make himself available *immediately*, the hearing would be postponed and the matter would take longer to resolve. Plaintiff re-iterated that he was ready, willing, and able to meet anytime in the next week, provided he is given reasonable notice.

### ***Honor Committee Finds Plaintiff Liable of a Different, Uncharged Offense***

114.    At approximately 8:28pm, on November 8, 2024, the same day as the hearing, Plaintiff received a letter from Chairman Choi informing him that Plaintiff that the Committee had found him liable for "not being forthcoming," stating: "The committee determined that you have not been forthcoming to the Honor Committee."

115.    Before this point, Plaintiff had never received *any* notice from Yale that he was being charged with "not being forthcoming," nor was he afforded *any* of the due process protections afforded under the Yale policies with respect to the charge of "not being forthcoming."

As a result, the Committee never afforded Plaintiff the opportunity to defend himself against the charge of "not being forthcoming."

116.    Notably, the Honor Committee's decision did not include a conclusion or decision regarding the actual charges with which Plaintiff was charged: "improperly utilize[ing] AI on the final exam" in the Sourcing and Managing Funds.

117.    In sum, the decision of the Honor Committee—that Plaintiff was liable for "not being forthcoming"—was pronounced without any notice of such charge, without any opportunity for Plaintiff to defend such charge, without providing Plaintiff with any materials regarding such charge, and without a hearing as to that charge. Thus, the Honor Committee's decision was outside the scope of Plaintiff's disciplinary proceedings and in violation of Yale's Policies and Procedures.

118.    For the charge of "not being forthcoming," the Honor Committee imposed a penalty a one-year suspension from the EMBA program. No grade penalty was assessed.

119.    On November 14, 2024, Plaintiff received correspondence from Dean Tsung reaffirming, "There is no grade penalty outcome from the Honor Committee decision."

120.    Plaintiff was given only five business days to appeal the severity of the findings of the Honor Committee to the Faculty Review Board. The FRB consisted of three (3) senior faculty members, Prof. Rouwenhorst, Prof. Thomas, and Dean Jain. Although Dean Jain told Plaintiff that Professors Rouwenhorst and Thomas would likely recuse themselves, and that the other two FRB members would then be Professors Finger and Pinker, upon information and belief, this did not occur.

### *Yale's Rule Violations Continue with Plaintiff's First Appeal*

121.    According to the Yale SOM Bulletin, "[an] accused student can appeal the *severity* of the penalty, but not the *findings*, from the full committee to the Faculty Review

Board".[29] The Faculty Review Board  determines the "appropriateness of the punishment assessed" by the Honor Committee, and assumes "the correctness of the committee's finding of a violation".[30] Therefore, the [Faculty Review Board] cannot change the Honor Committee's finding of "not being forthcoming", but may only review the severity of the penalty of a one-year suspension.

122.    On November 15, 2024, Plaintiff appealed the severity of the findings of the Honor Committee to the Faculty Review Board ("FRB"). Because the FRB can only review the severity of the one-year suspension penalty, Plaintiff's appeal was limited in scope to that issue. Thus, in the face of the limited scope of appeal, Plaintiff raised three arguments contesting the severity of the one-year suspension: (1) the penalty was excessive since Plaintiff was never charged with "not being forthcoming"; (2) such a determination is not a basis for punishment on its own without a finding of a violation of the Honor Code, and (3) the punishment of a one-year suspension was unprecedented and excessive.

123.    Plaintiff noted in his appeal that—before his case—no student had ever been found liable for the charge of "not being forthcoming" on its own. Rather, "not being forthcoming" was always applied as an aggravating factor to an underlying Honor Code violation. Plaintiff also noted that, in his case, the Committee imposed an elevated penalty for "not being forthcoming" (a one-year suspension) beyond what had been historically been imposed when "not being forthcoming" was used as an aggravating factor (a one-week suspension). Finally, Plaintiff noted that the Honor Committee's handling of his matter incentivizes students to falsely confess to the Committee's

---

[29] Yale, School of Management Bulletin, 2024-25, https://bulletin.yale.edu/bulletins/som/rights-and-responsibilities-students.
[30] *Id*.

charges in order to receive a lesser penalty. Plaintiff requested that the one-year suspension be revised to either exoneration or a warning.

124.    On November 19, 2024, Plaintiff received a letter from Dean Jain informing him that the FRB denied his appeal and that the one-year suspension from Yale's EMBA program remained in effect.

125.    Shockingly, Dean Jain's November 19 letter also stated that Dean Jain was requesting that Chairman Choi and the Honor Committee "continue deliberating"—this time on yet another *new*, broader and uncharged allegation: "violation of the examination rules".

126.    In addition, contrary to Dean Tsung's November 14, 2024 confirmation that "[t]here is no grade penalty outcome from the Honor Committee decision," Dean Jain also stated: "In the meantime, I am asking Rouwenhorst to withhold your grade in the course."

127.    To recap, the Honor Committee had charged Plaintiff with "improperly utiliz[ing] AI on the final exam" in the Sourcing and Managing Funds course. Without complying with the notice and due process requirements of the Yale Policies and Procedures, the Honor Committee stealthily alleged that Plaintiff also used AI on the final exam in another, unrelated course (Investor). The Honor Committee did not find Plaintiff liable for either the charged offense (improper AI use on the Sourcing and Managing Funds exam) or the uncharged allegation (improper AI use on the Investor final exam). Instead, the Honor Committee found Plaintiff liable for a new, uncharged offense ("not being forthcoming") for which Plaintiff was afforded no advance notice or other due process required under the Yale policies. Then, when Plaintiff appealed the severity of the penalty for the uncharged offense of "not being forthcoming," the Faculty Review Board directed the Honor Committee to consider a *new* uncharged allegation ("violation of exam rules").

128.    Per the Yale SOM Policies and Procedures, the only issue before the FRB on appeal was the severity of the penalty imposed against plaintiff on the charge of "not being forthcoming." Thus, Dean Jain's directive to consider a new charge ("violation of exam rules") was a violation of Yale's Policies and Procedures.

### *Honor Committee Meets Again Without Notice or Opportunity for Plaintiff to Attend*

129.    Following Dean Jain's directive, the Honor Committee met a second time on November 21, 2024. This time, the Committee met in secret, without notice to Plaintiff, or providing Plaintiff with the opportunity to attend, in violation of Yale policy.

### *Honor Committee Imposes "Additional Decisions" in Violation of the Yale Policies*

130.    Then, on November 21, 2024, Plaintiff received a "decision letter" with "additional decisions" from the Honor Committee.

131.    The November 21 decision letter states: "The committee determined that you *violated the rules of the Sourcing and Managing Funds final exam*." (emphasis added). The committee exonerated you on the charge of violating the rules of the Investor final exam." Despite claiming to have made a finding that Plaintiff "violated the rules" on his Sourcing and Managing Funds final exam, there was no finding by the Committee that Plaintiff improperly used AI on the Sourcing and Managing Funds final exam, which was the only allegation for which Plaintiff was charged in accordance with the Yale policies. Without such a finding, it was not possible for the Committee to find that Plaintiff "violated" the rules of that course.

132.    The Committee's November 21 decision letter informed Plaintiff for the first time that he had been "charged" with an additional offense ("violating the rules of the Investor final exam"). Plaintiff was never afforded notice that he was being charged with that the offense of "violating the rules of the Investor final exam", in clear violation of Yale's Policies and Procedures.

133. Additionally, the Honor Committee announced to Plaintiff that it would impose a penalty of "F" in the Sourcing and Managing Funds course—contrary to Dean Tsung's November 14, 2024, confirmation that "[t]here is no grade penalty outcome from the Honor Committee decision."

134. Then, Plaintiff received a letter dated November 22, 2024, from Dean Tsung stating that his one-year suspension from Yale's EMBA program began on November 20, that he would receive an Incomplete grade in his MGT 699E Colloquium, and that his MGT 423E Sourcing and Managing Funds course grade would "require remediation." Plaintiff was informed that he was not eligible to return to the EMBA program until after July 2025. He was also informed that he must notify his learning teams regarding his suspension, causing harm to his relationships with students and instructors, his reputation, and his career.

135. Yale's November 22 letter also informed Plaintiff that he is barred from participating in any Yale SOM or Yale University sponsored events, whether on or off-campus, including, but not limited to, conferences, alumni, career, or recruiting events. Plaintiff was barred from campus, any Yale facilities, his email account, and all Yale systems. The letter also informed Plaintiff that his suspension will be noted on his transcript while he is on suspension, which will be removed when he returns, if he affirmatively makes such a request.

***Plaintiff's Second Appeal***

136. On December 2, 2024, Plaintiff submitted a second appeal to the FRB regarding the Honor Committee's new penalty, a "F" in his Sourcing and Managing Funds course. Under the Yale policies, the scope of Plaintiff's second appeal was limited to the severity of the "F" grade that he received.

137.    As grounds for Plaintiff's second appeal, he argued that the Faculty Review Board violated its own rules by directing the Honor Committee to "continue deliberating" and issue findings regarding a charge that was not the subject of the appeal, rather than judging the "appropriateness of the punishment assessed by the committee," as the FRB is required to do. Thus, Plaintiff argued that the FRB exceeded the scope of its authority in violation of SOM policy, and, as such, the penalty imposed upon him must be overturned.

138.    On December 11, 2024, Plaintiff received a denial of his appeal of the second Honor Committee decision in a letter from Dean Jain, stating only that "after careful consideration" the FRB decided to "deny the appeal". Plaintiff's grade of "F" in his Sourcing and Managing Funds course would remain in effect. As a result of this wrongful result, Plaintiff will no longer be at the top of his class, an honor which he had rightfully earned.

## COUNT I

### Breach of Contract
**(Against All Defendants)**

139.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

140.    By the act of matriculation, together with the payment of the required tuition fees, a contract between the student and the university is created containing two implied conditions: (1) that no student shall be arbitrarily expelled therefrom; and (2) that the student will submit himself (sic) to reasonable rules and regulations for the breach of which, in a proper case, he (she) may be expelled, and that he (she) will not be guilty of such misconduct as will be subversive of the discipline of the university. 15 Am. Jur. 2d, Colleges and Universities, Sec. 30, p. 294; *Okafor v. Yale Univ.,* No. CV980410320, 2004 WL 1615941, at *5 (Conn. Super. Ct. June 25, 2004).

141.    Plaintiff applied to, enrolled in, and paid the associated fees and expenses for the EMBA program at Yale. Plaintiff did so in reliance upon the understanding, and with the reasonable expectation, that Yale would implement, enforce, and uphold the provisions and policies set forth in its official publications, including the Honor Code and other Policies and Procedures.

142.    Through the documents that Defendants publish and provide to students, including Yale's Honor Code, Honor Committee Procedures, and other Policies and Procedures, Defendants made express and/or implied contractual commitments to its students, including Plaintiff, regarding the Honor Code violation, investigation, hearing, and appeal processes and procedures, among other applicable matters.

143.    An express contract, or, alternatively, a contract implied in law, or in fact, was formed between Plaintiff and Defendants.

144.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff during the Honor Code violation proceedings and process, including, but not limited to the following.

145.    Defendants had an obligation to uphold the terms of the Honor Code and other Policies and Procedures, including instilling trust in Plaintiff that he would be treated with honesty, integrity, and fairness in the course of the disciplinary investigation and proceedings against him.

146.    Defendants knew that Plaintiff was a foreign student, who is not a native English speaker or writer, and should have considered that fact when determining whether to bring a charge against him, and how to investigate such charge. Instead, Defendants violated their own Policies and Procedures by treating Plaintiff unfairly, and discriminating against him because he is a non-native English speaker and writer.

147.    Defendants violated their own Policies and Procedures by failing to excuse members of the Honor Committee and FRB who had conflicts of interest in Plaintiff's disciplinary matter.

148.    Defendants violated Plaintiff's right under the Procedures to have an opportunity to present a challenge to members of the Honor Committee, which right was stripped from him because the notice that he received did not contain the names of the members of the committee, and thus he was unable to file that challenge within the one (1) day deadline outlined in the Procedures.

149.    Defendants violated their own guidelines by singling out Plaintiff's final exam paper in his Sourcing and Managing Funds course, with no reasonable evidence to support an inference that Plaintiff cheated on that exam paper using AI to complete it. Upon information and belief, Plaintiff was the only student singled out for his final exam paper to be scanned by the GPTZero AI detection program.

150.    Defendants knew, or had reason to know, at the time that the GPTZero program was used to scan Plaintiff's final exam paper, that such program and technology generally is not reliable, and is especially biased against non-native English speakers and writers such as Plaintiff.

151.    Plaintiff requested the materials that were sent to the Honor Committee and its investigators on numerous occasions, and only received some of those documents after the date of the initial hearing date, which was rescheduled. The investigation began in early June of 2024, and Plaintiff did not receive any documents at all until October 14, 2024. This extreme delay prejudiced Plaintiff's ability to research, prepare and defend the false allegation against him.

152.    To date, Plaintiff has still not received one of the reports from the GPTZero scans of his exams. Defendants withheld exculpatory materials from Plaintiff, who never received those materials to date, including the GPTZero scan results of the sixth question on his final exam.

153.    Defendants, including, but not limited to, Dean Tsung, Dean Scully, and Honor Code Committee Chairman James Choi, engaged in extensive and multiple efforts to coerce Plaintiff into making a false confession of cheating on his final exam paper, including threatening that he would be deported from the United States, and threatening to expand the investigation to all of his assignments and exams in his other courses.

154.    Defendants accused Plaintiff of not following SOM Policies during the Honor Code violation investigation, but refused to inform Plaintiff what policy he had violated, or how he violated that policy.

155.    During the Honor Code Committee hearing, the members of the Committee refused to consider materials that Plaintiff presented to them that were exculpatory, including information regarding the lack of reliability of AI detection programs like GPTZero.

156.    On the day of Plaintiff's Honor Code Committee hearing, he was asked to provide the Pages versions of two final exam papers, which he provided to Defendants. On the same day, without any notice, he was demanded to return to campus immediately for another meeting with the Committee and produce his personal laptop computer. Plaintiff had already left campus for the day and requested to have the meeting the following week, with reasonable notice. Instead, the Committee proceeded to issue a finding that Plaintiff had not been "forthcoming," failed to make a determination as to the original Honor Code allegation, and nevertheless issued Plaintiff a one-year suspension from the Yale EMBA program.

157.    Plaintiff then appealed the Honor Code Committee's decision, and rather than reviewing the appropriateness of the punishment assessed by the Committee, as is required, the Faculty Review Board instead denied Plaintiff's appeal and remanded the matter back to the Committee to adjudicate the original allegation that Plaintiff used AI to complete his final exam paper. This action was outside the scope of the FRB authority.

158.    Despite the fact that the Honor Code Committee made no finding to penalize Plaintiff's grade in his Sourcing and Managing Funds course, and the fact that Dean Tsung confirmed in writing that he would not receive a grade penalty for that course, he nevertheless received a grade of F in that course, with no explanation from Defendants.

159.    The Honor Committee Procedures clearly stated that Plaintiff is entitled to be informed of the charges against him at the beginning of any investigation, that he is entitled to review the evidence against him, and that he is entitled to attend hearings. However, Defendants violated their Policies and Procedures by failing to inform Plaintiff of the new charge against him of failure to cooperate, and provide him with a fair and reasonable opportunity to review the evidence, attend the hearing, and present exculpatory evidence.

160.    The Honor Committee went outside its authority by considering the charge "not being forthcoming" without being referred such charge by a Yale SOM student, staff, or faculty member to the chair of the Committee. The Honor Committee created that charge on its own, without any due process or transparency.

161.    The Honor Committee violated its Policies and Procedures by issuing Plaintiff penalties that were excessive compared to penalties given to other students, lacking the consistency in its decisions that is stressed in those Policies and Procedures. The Defendants and FRB ignored

the precedent of prior disciplinary penalties and issued Plaintiff penalties that were not fair, reasonable, or proportional to the charge against him.

162.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

163.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

164.    Plaintiff and Defendants have an implied contract, which is subject to an implied covenant of good faith and fair dealing, through Defendants' application of, and reliance upon, Yale's Policies and Procedures, including the Honor Code and Procedures applicable thereto, as justification for Plaintiff's issuance of a grade of "F" and a one-year suspension. *Demoulas v. Quinnipiac Univ.*, No. CV155006283S, 2015 WL 1427951, at *4 (Conn. Super. Ct. Mar. 5, 2015)("This court concludes a trier of fact could find that there was an implied contract between the plaintiff and [university] and that the Student Handbook and the Student Code of Conduct were a part of that contract.").

165.    "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." (Internal quotation marks omitted.) *O'Bryan v. O'Bryan,* 67 Conn.App. 51, 57, 787 A.2d 15 (2001), aff'd, 262 Conn. 355, 813 A.2d 1001 (2003). Moreover, if the language in a contract is ambiguous or the intent is not clear, courts construe the ambiguity against the drafter. *Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 13–14, 938 A.2d 576 (2008). See also, *Connecticut Ins. Guaranty Assn. v. Fontaine,* 278 Conn. 779, 784–89, 900 A.2d 18 (2006). The party who actually does the writing of an instrument

36

will presumably be guided by his own interests and goals in the transaction. *Demoulas v. Quinnipiac Univ.,* No. CV155006283S, 2015 WL 1427951, at *5 (Conn. Super. Ct. Mar. 5, 2015).

166.    Plaintiff applied to, enrolled in, and paid the associated fees and expenses for the EMBA program at Yale, in reliance upon the understanding, and with the reasonable expectation, that Yale would implement, enforce, and uphold the provisions and Policies set forth in its official publications, including the Honor Code and other Policies and Procedures.

167.    Through the documents that Defendants publish and provide to students, including Yale's Honor Code, Honor Committee Procedures, and other Policies and Procedures, Defendants made implied contractual commitments to its students, including Plaintiff, regarding the Honor Code violation, investigation, hearing, and appeal processes and procedures, among other applicable matters.

168.    A contract implied in law, or in fact, was formed between Plaintiff and Defendants.

169.    Based on the aforementioned facts and circumstances, Defendants breached implied agreement(s) with Plaintiff during the Honor Code violation proceedings and process, including, but not limited to the following.

170.    Through their implied contract with Plaintiff in its Policies and Procedures, Defendants implicitly guaranteed that any Honor Code investigation, hearing, and appeals, would be conducted with honesty, fairness, and in according with Yale's own Policies and Procedures. Instead, Defendants acted in bad faith and without basic fairness towards Plaintiff.

171.    Defendants knew that Plaintiff was a foreign student, who is not a native English speaker or writer, and should have considered that fact when determining whether to bring a charge against him, and how to investigate such charge. Instead, Defendants violated their own Policies

and Procedures by treating Plaintiff unfairly, and discriminating against him because he is a non-native English speaker and writer.

172.    Defendants violated their own Policies and Procedures by failing to excuse members of the Honor Committee and FRB who had conflicts of interest in Plaintiff's disciplinary matter.

173.    Defendants violated Plaintiff's right under the Procedures to have an opportunity to present a challenge to members of the Honor Committee, which right was stripped from him because the notice that he received did not contain the names of the members of the committee, and thus he was unable to file that challenge within the one (1) day deadline outlined in the Procedures.

174.    Defendants violated their own guidelines by singling out Plaintiff's final exam paper in his Sourcing and Managing Funds course, with no reasonable evidence to support an inference that Plaintiff cheated on that exam paper using AI to complete it. Upon information and belief, Plaintiff was the only student singled out for his final exam paper to be scanned by the GPTZero AI detection program.

175.    Defendants knew, or had reason to know, at the time that the GPTZero program was used to scan Plaintiff's final exam paper, that such program and technology generally is not reliable, and is especially biased against non-native English speakers and writers such as Plaintiff.

176.    Plaintiff requested the materials that were sent to the Honor Committee and its investigators on numerous occasions, and only received some of those documents after the date of the initial hearing date, which was rescheduled. The investigation began in early June of 2024, and Plaintiff did not receive any documents at all until October 14, 2024. This extreme delay prejudiced Plaintiff's ability to research, prepare and defend the false allegation against him.

177.    Defendants withheld exculpatory materials from Plaintiff, who never received those materials to date, including the GPTZero scan results of the sixth question on his final exam.

178.    Defendants, including, but not limited to, Dean Tsung, Dean Scully, and Honor Code Committee Chair James Choi, engaged in extensive and multiple efforts to coerce Plaintiff into making a false confession of cheating on his final exam paper, including threatening that he would be deported from the United States, and threatening to expand the investigation to all of his assignments and exams in his other courses.

179.    Defendants accused Plaintiff of not following SOM Policies during the Honor Code violation investigation, but refused to inform Plaintiff what policy he had violated, or how he violated that policy.

180.    During the Honor Code Committee hearing, the members of the Committee refused to consider materials that Plaintiff presented to them that were exculpatory, including information regarding the lack of reliability of AI detection programs like GPTZero.

181.    On the day of Plaintiff's Honor Code Committee hearing, he was asked to provide the Pages versions of two final exam papers, which he provided to Defendants. On the same day, without any notice, he was demanded to return to campus immediately for another meeting with the Committee and produce his personal laptop computer. Plaintiff had already left campus for the day and requested to have the meeting the following week, with reasonable notice. Instead, the Committee proceeded to issue a finding that Plaintiff had not been "forthcoming", failed to make a determination as to the original Honor Code allegation, and nevertheless issued Plaintiff a one-year suspension from the Yale EMBA program.

182.    Plaintiff then appealed the Honor Code Committee's decision, and rather than reviewing the appropriateness of the punishment assessed by the Committee, as is required, the

Faculty Review Board instead denied Plaintiff's appeal and remanded the matter back to the Committee to adjudicate the original allegation that Plaintiff used AI to complete his final exam paper. This action was outside the scope of the FRB authority.

183.    Despite the fact that the Honor Code Committee made no finding to penalize Plaintiff's grade in his Sourcing and Managing Funds course, and the fact that Dean Tsung confirmed in writing that he would not receive a grade penalty for that course, he nevertheless received a grade of F in that course, with no explanation from Defendants.

184.    The Honor Committee Procedures clearly stated that Plaintiff is entitled to be informed of the charges against him at the beginning of any investigation, that he is entitled to review the evidence against him, and that he is entitled to attend hearings. However, Defendants violated their Policies and Procedures by failing to inform Plaintiff of the new charge against him of failure to cooperate, and provide him with a fair and reasonable opportunity to review the evidence, attend the hearing, and present exculpatory evidence.

185.    The Honor Committee went outside its authority by considering the charge of failure to cooperate without being referred such charge by a Yale SOM student, staff, or faculty member to the chair of the Committee. The Honor Committee created that charge on its own, without any due process or transparency.

186.    The Honor Committee violated its Policies and Procedures by issuing Plaintiff penalties that were excessive compared to penalties given to other students, lacking the consistency in its decisions that is stressed in those Policies and Procedures. The Defendants and FRB ignored the precedent of prior disciplinary penalties and issued Plaintiff penalties that were not fair, reasonable, or proportional to the charge against him.

187.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT III

### Title VI of the Civil Rights Act of 1964
**42 U.S.C. § 2000d et seq.**
**Discrimination based on national origin**
**(Against All Defendants)**

188.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

189.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*. ("Title VI"), prohibits discrimination on the basis of national origin in programs and activities receiving federal financial assistance.

190.    Title VI states: "No person in the United States shall, on the ground of race, color or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

191.    Defendants receive federal funding[31] and thus must comply with Title VI.

192.    Plaintiff was discriminated against by Defendants, including his Yale EMBA Professors Geert Rouwenhorst and Professor Jake Thomas, the members of the Honor Code investigation team, the members of the Honor Code Committee, and the members of the FRB, based on his national origin, and non-native English speaker/writer status.

---

[31] *See*, Yale, Federal Opportunities and Funded Database, https://your.yale.edu/research-support/office-sponsored-projects/funding/federal-opportunities-and-funded-database; Yale, Financial Aid, Loans for Graduate and Professional Students, https://finaid.yale.edu/graduate-aid/loans; Yale, School of Management, Federal Loans, https://som.yale.edu/programs/mba/affording-your-mba/student-loans-101/federal-loans.

193.    Plaintiff was wrongfully singled out, based solely on his national origin, and not based on any reasonable evidence that Plaintiff had cheated on his Sourcing and Managing Funds final exam paper, in violation of Defendants' Policies and Procedures.

194.    Defendants selected him, and only him, excluding the other students in the class, for a scan of his final exam paper using an AI detector called GPTZero, which is well known by Defendants and others to be unreliable, is not an accepted practice at Yale, and is not meant to be used to adjudicate whether a student had cheated using AI to create a final paper.

195.    Plaintiff was wrongfully issued a one-year suspension, and received an "F" in his Sourcing and Managing Funds course, as a result of said discrimination.

196.    Defendants had knowledge, or reason to know, of Plaintiff's foreign origin, and non-native English speaker/writer status, prior to singling him out for the Honor Code investigation, and were made aware of that fact again during the course of the investigation.

197.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV

### Title VI of the Civil Rights Act of 1964
**42 U.S.C. § 2000d, *et seq*.**
**Retaliation for complaint of discrimination based on national origin**
**(Against All Defendants)**

198.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

199.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*., prohibits retaliation for complaints of discrimination based on national origin in programs and activities receiving federal financial assistance.

200.     Defendants receive federal funding,[32] and thus must comply with Title VI.

201.     Department of Education regulation 34 C.F.R. Part 100 provides: (e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act *or this part,* or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part. 34 C.F.R. § 100.7(e)(second emphasis added).

202.     Recipients of federal funds are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by the statutes that OCR enforces.

203.     Retaliatory acts against any individual who exercises his or her rights under Title VI are considered to be discrimination and are unlawful.

204.     Plaintiff was retaliated against by Defendants, including his Yale EMBA Professors Geert Rouwenhorst and Professor Jake Thomas, the members of the Honor Code investigation team, and the members of the Honor Code Committee, because he complained during the Honor Code investigation and proceedings that he was being discriminated against based on his national origin, and non-native English speaker/writer status.

205.     Plaintiff complained to Defendants that he was wrongfully singled out, based solely on his national origin, and not based on any reasonable evidence that Plaintiff had cheated on his Sourcing and Managing Funds final exam paper.

---

[32] *See*, Yale, Federal Opportunities and Funded Database, https://your.yale.edu/research-support/office-sponsored-projects/funding/federal-opportunities-and-funded-database; Yale, Financial Aid, Loans for Graduate and Professional Students, https://finaid.yale.edu/graduate-aid/loans; Yale, School of Management, Federal Loans, https://som.yale.edu/programs/mba/affording-your-mba/student-loans-101/federal-loans.

206.    Defendants had knowledge, or reason to know, of Plaintiff's foreign origin, and non-native English speaker/writer status, prior to singling him out for the Honor Code investigation, and were made aware of that fact again during the course of the investigation.

207.    Plaintiff complained that Defendants selected him, and only him, excluding the other students in the class, for a scan of his final exam paper using an AI detector called GPTZero, which is well known by Defendants and others to be unreliable, is not an accepted practice at Yale, and is not meant to be used to adjudicate whether a student had cheated using AI to create a final paper.

208.    Plaintiff was coerced by Defendants to wrongfully confess to violating the Honor Code, using the threat of revocation of his visa, the threat of deportation, the threat that he would receive a harsher penalty if he didn't confess.

209.    Plaintiff appealed the decision issued by the Honor Code Committee, who wrongfully issued him a one-year suspension, as a result of said discrimination, and then received a harsher penalty after appealing, which process and penalty did not conform to the Defendants' Policies and Procedures.

210.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

<u>**COUNT V**</u>

<u>**Intentional Infliction of Emotional Distress**</u>
**(Against All Defendants)**

211.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

212.    A claim for intentional infliction of emotional distress by a student against a university may be maintained where the Plaintiff establishes four elements. 1) the actor intended

to inflict emotional distress or knew, or had reason to know, that it was a likely result of the actor's conduct; 2) the conduct was extreme and outrageous; 3) the actor's conduct caused Plaintiff's distress; and 4) Plaintiff suffered severe emotional distress. *Little v. Yale Univ.,* 92 Conn. App. 232, 239, 884 A.2d 427, 431 (2005).

213.    Generally, a defendant's actions may be found to be extreme and outrageous where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Morrissey v. Yale Univ.*, 268 Conn. 426, 428, 844 A.2d 853, 854 (2004), citing *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003).

214.    Based on the foregoing facts, the Defendants either intended to inflict emotional distress upon Plaintiff because he was the top student in his class, and/or because he was a foreign student. Alternatively, Defendants knew, or should have known, that putting Plaintiff through a disciplinary investigation and hearing, and finding him responsible for academic discipline, with the outcome of a grade of "F" and a one-year suspension from Yale's EBMA program, would be likely to cause Plaintiff emotional distress.

215.    Based on the foregoing facts, the conduct of the Defendants in relying upon the GPTZero program was extreme and outrageous. First, it was extreme and outrageous for Defendants to use that program in violation of Yale's own policy outlining the unreliability of such programs. Next, Defendants acted in an extreme and outrageous manner by using that unreliable program as evidence against Plaintiff and to issue Plaintiff academic discipline, contrary to the program's own recommendations. In addition, Defendants acted in an extreme and outrageous manner by failing to follow numerous procedural requirements for Plaintiff's disciplinary proceedings and appeals, including, among others, that Defendant was not provided all scans that

were performed of his final exams using the GPTZero program, and the RFB acted outside the scope of its authority in its two decisions.

216.    Defendants' extreme and outrageous conduct in this case in failing to follow Yale's Policies and Procedures has wrongfully caused Plaintiff severe emotional distress. Not only was the investigatory process extremely stressful, and interfered with Plaintiff's work and school performance, but the fact that he had to defend himself against false allegations of cheating, with no evidence against him to support such accusation, also caused Plaintiff distress. In addition, Plaintiff's reputation has been harmed with his fellow classmates, and his professors throughout the EMBA program. His grade of "F" for such a stellar student who was on track to be the top student in his class, is extremely hurtful and emotionally distressing for Plaintiff.

217.    Defendants have also caused Plaintiff extreme emotional distress because Plaintiff is now forced to endure a one-year suspension, after having achieved so much in his EMBA program, with his classmates and professors by his side, yet another student will now take the top achieving spot in the class in his place. Not only will this cause a delay in him achieving his degree, but he will be forced to join another class, with students he does not know, and possibly different professors and instructors, which will be difficult for Plaintiff and will cause him further emotional distress. Plaintiff desires to complete his degree with his current class, and any outcome outside of that possibility is extremely distressing for Plaintiff.

218.    Plaintiff must also now complete his EMBA program in constant fear that he will be wrongfully accused of cheating, even though he continues to do nothing wrong, which causes him extreme emotional distress.

219.    Defendants' acts and omissions caused Plaintiff emotional anguish and distress, that was foreseeable, and severe enough that it might cause bodily harm or illness.

220.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI

### Negligent Infliction of Emotional Distress
### (Against All Defendants)

221.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

222.    Defendants have a duty to Plaintiff, as a matriculated student in the EMBA program, to uphold its Policies and Procedures, including the Honor Code and Procedures for disciplinary proceedings and appeals. *See Shore v. Stonington,* 187 Conn. 147, 151, 444 A.2d 1379 (1982)(negligence requires a duty to plaintiff); *Frankovich v. Burton,* 185 Conn. 14, 20, 440 A.2d 254 (1981); *Zides v. Quinnipiac Univ.*, No. CV020470131S, 2006 WL 463182, at *7 (Conn. Super. Ct. Feb. 7, 2006).

223.    The Supreme Court of Connecticut in *Montinieri v. Southern New England Telephone Co.,* 175 Conn. 337, 345 (1978) recognized that recovery for unintentionally caused emotional distress does not depend on proof of physical harm. To be liable, a defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress that could lead to illness. *Perodeau v. Hartford,* 259 Conn. 729, 751 (2002). Moreover, a party making an emotional distress claim must show that a *reasonable person* would have suffered emotional distress. *Id.,* at 755;see 3 F. Harper, F. James & O. Gray, Torts (2d Ed.1986) 18.4, p. 691 ("Generally defendant's standard of conduct is measured by the [emotional] reactions to be expected of normal persons").

224.    In this action, Defendants had a duty to Plaintiff to engage in a fair and reasonable review of his final exams, to not unjustifiably accuse him of cheating on his exam without a

reasonable basis therefore, and to follow Yale's Policies and Procedures. The use of the GPTZero program was not reasonable in light of the program's known unreliability, and Yale's own policy against using such programs.

225.    Defendants should have realized that making an accusation against Plaintiff with a high likelihood of falsity involved an unreasonable risk that Plaintiff may endure emotional distress. Defendants proceeded those GPTZero reports as their sole evidence against Plaintiff, yet found him responsible for an Honor Code violation. Plaintiff complied with everything that was asked of him, yet was found to have not been "forthcoming" and to have violated the Honor Code, despite no analysis or determination as to how or why that decision was made.

226.    Defendants acts and omissions caused Plaintiff emotional anguish and distress, that was foreseeable, and severe enough that it might cause bodily harm or illness.

227.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    on the first cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, damages to reputation, and loss of future career prospects;

(ii)    on the second cause of action for breach of an implied covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, damages to reputation, and loss of future career prospects;

(iii)    on the third cause of action for discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iv)    on the fourth cause of action for retaliation for Plaintiff's complaint of discrimination against Defendants based on his national origin, in violation of Title VI of the Civil Rights Act of 1964, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)    on the fifth cause of action for intentional infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vi)    on the sixth cause of action for negligent infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects; and

(vii)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the sanction of a grade of "F" and suspension for one year should be reversed; (ii) Plaintiff is immediately reinstated as a student in good standing and permitted to begin classes immediately upon commencement of the next semester; (iii) Plaintiff's reputation is to be restored; (iv) Plaintiff's disciplinary record at Yale is to be expunged; (v) the record of Plaintiff's suspension and grade of "F" is to be removed from his academic record and education file at Yale; (vi) any record of the proceeding regarding the conduct of Plaintiff is to be permanently destroyed; and (vii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: February 3, 2025                          Respectfully submitted,
New York, New York

**NESENOFF & MILTENBERG, LLP**

*/s/ Christine D. Brown*
**Christine D. Brown, Esq.**
**Andrew T. Miltenberg, Esq.**
**(*pro hac vice* admission pending)**
**Stuart Bernstein, Esq.**
**(*pro hac vice* admission pending)**
**Kimberly S. Courtney, Esq.**
**(*pro hac vice* admission pending)**
**363 Seventh Avenue, 5th Floor**
**New York, New York 10001**
**212-736-4500 (telephone)**
**cbrown@nmllplaw.com**

amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
kcourtney@nmllplaw.com

***Attorneys for Plaintiffs***