### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOHN DOE,**<br><br>                              *Plaintiff,*<br><br>v.<br><br>**YALE UNIVERSITY, YALE UNIVERSITY BOARD OF TRUSTEES, WENDY TSUNG in her individual and official capacity, K. GEERT ROUWENHORST in his individual and official capacity, JACOB THOMAS in his individual and official capacity, SHERILYN SCULLY in her individual and official capacity, JAMES CHOI in his individual and official capacity, and ANJANI JAIN in his individual and official capacity,**<br><br>                              *Defendants.* | **Civil Action No. 3:25-cv-00159** |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

Christine D. Brown, Esq.
Stuart Bernstein, Esq.
Andrew T. Miltenberg, Esq.
(pro hac vice forthcoming)
Kimberly S. Courtney, Esq.
(pro hac vice forthcoming)

363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
cbrown@nmllplaw.com
sbernstein@nmllplaw.com
amiltenberg@nmllplaw.com
kcourtney@nmllplaw.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

ARGUMENT .......................................................................................................... 10

I.     Temporary Restraining Order and Preliminary Injunction Standard ................................ 10

II.    Plaintiff Will Likely Suffer Irreparable Injury in the Absence Of An Injunction. ........... 13

III.   Plaintiff Is Likely To Succeed On The Merits Of His Claims .......................................... 17

    A.    Plaintiff Is Likely To Succeed On The Merits Of His Claim For Breach Of Contract. 17

        1.   Defendants Are Bound By Their Own Policies and Procedures ............................... 18

        2.   Plaintiff And Defendants Have Enforceable Contract, And Plaintiff Is Likely To
            Succeed On Merits Of Breach Of Contract Claim. ..................................................... 20

    B.    Plaintiff Is Likely To Succeed On His Claim For Breach Of The Implied Covenant Of
        Good Faith And Fair Dealing. ........................................................................................... 24

        1.   Yale is Bound By Its Own Policies and Procedures ................................................. 24

        2.   Plaintiff And Defendants Have An Enforceable Contract, With A Covenant Of Good
            Faith And Fair Dealing, And Plaintiff Is Likely To Succeed On Merits Of This
            Claim. ............................................................................................................................. 24

    C.    Plaintiff Is Likely To Succeed On The Merits Of His Title VI Claim For
        Discrimination Based On National Origin. ....................................................................... 25

        1.   Defendants Must Comply With Title VI of the Civil Rights Act ............................. 25

        2.   Plaintiff Is Likely To Succeed On The Merits Of His Title VI Claim For
            Discrimination Based On National Origin. ................................................................. 26

    D.    Plaintiff Is Likely To Succeed On His Title VI Claim For Retaliation Based On His
        Complaint Of Discrimination Based On National Origin. ............................................... 27

    E.    Plaintiff Is Likely To Succeed On His Claim For Intentional Infliction of Emotional
        Distress. ........................................................................................................................... 29

    F.    Plaintiff Is Likely To Succeed On His Claim For Negligent Infliction of Emotional
        Distress. ........................................................................................................................... 31

        1.   Defendants Owe Plaintiff A Duty .............................................................................. 31

        2.   Defendants Breach A Duty Owed To Plaintiff. ......................................................... 32

        3.   The Harm to Plaintiff Due to the SOM Administration's Breach of Duty Was
            Foreseeable, And Caused Plaintiff's Emotional Distress. ........................................ 32

IV.   The Balance Of Hardships Tips Decidedly In Plaintiff's Favor ....................................... 33

V.    The Requested Injunction Is In The Public's Interest. ...................................................... 34

CONCLUSION ........................................................................................................ 35

i

## TABLE OF AUTHORITIES

Cases

*Abdul Wali v. Coughlin,*
  754 F.2d 1015 (2d Cir. 1985)..................................................................................... 17

*Asa v. Pictometry Int'l Corp.,*
  757 F. Supp. 2d 238 (W.D.N.Y. 2010) .................................................................. 11

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
  784 F. 3d 887 (2d Cir. 2015)..................................................................................... 11

*Carrol v. Allstate Ins. Co.,*
  262 Conn. 433, 815 A.2d 119 (2003) ...................................................................... 29

*Coleman v. Newburgh Enlarged City School Dist.,*
  319 F. Supp. 2d 446 (S.D.N.Y. 2004)..................................................................... 16

Connecticut Ins. Guaranty Assn. v. Fontaine,
  278 Conn. 779, 900 A.2d 18 (2006) ....................................................................... 18

*Demoulas v. Quinnipiac Univ.,*
  No. CV155006283S, 2015 WL 1427951 (Conn. Super. Ct. Mar. 5, 2015)...................... 17, 18

*Doe v. Brown Univ.,*
  210 F. Supp. 3d 310 (D.R.I. 2016).......................................................................... 12

*Doe v. Middlebury College,*
  No. 1:15-cv-192-jgm, 2015 WL 5488109 (D.Vt. Sep. 16, 2015).................................... passim

*Doe v. Pennsylvania State Univ.,*
  276 F. Supp. 3d 300 (M.D. Pa. 2017)..................................................................... 12

*Doe v. Rensselaer Polytechnic Inst.,*
  No. 1:20-CV-1185, 2020 WL 5775193 (N.D.N.Y. Sept. 28, 2020)...................... 10

*Doe v. Rensselaer Polytechnic Inst.,*
  No. 18-CV-1374 (FJS)(CFH), 2019 WL 181280 (N.D.N.Y. Jan. 11, 2019) .......... 13

*Doe v. Siena College,*
  No. 1:22-CV-1115 (BKS/TWD), 2023 WL 197461 (N.D.N.Y. Jan. 17, 2023)...................... 12

*Doe v. Texas Christian Univ.,*
  601 F. Supp. 3d 78 (N.D. Tex. 2022) ..................................................................... 12

*Doe v. Univ. of Notre Dame, supra,*
  2017 WL 1836939 ................................................................... 15, 16, 34, 35

*Doe v. University of Cincinnati,*
  223 F. Supp.3d 704 (S.D. Ohio 2016) ................................................................. 12

*Doe v. University of Connecticut,*
  No. 3:20CV92 (MPS), 2020 WL 406356 (D. Conn. Jan. 23, 2020) ..................... 11, 15, 34, 35

*Eng v. Smith,*
  849 F.2d 80 (2d Cir. 1988)....................................................................................... 17

*Floyd v. City of New York,*
  959 F. Supp. 2d 668 (S.D.N.Y. 2013)..................................................................... 34

*Frankovich v. Burton,*
  185 Conn. 14, 440 A.2d 254 (1981) ........................................................................ 31

*General Mills, Inc. v. Chobani, LLC,*
  158 F. Supp. 3d 106 (N.D.N.Y. 2016).................................................................... 11

*King v. DePauw Univ.,*
  No. 2:14-cv-70, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014).................................... 12, 16, 34

*LaForest v. Former Clean Air Holding Co.*,
   376 F.3d 48 (2d Cir. 2004)................................................................................ 13
*LaRouche v. Kezer*,
   20 F. 3d 68 (2d Cir. 1994)................................................................................ 11
*Little v. Yale Univ.*,
   92 Conn. App. 232, 884 A.2d 427 (2005) ....................................................... 29
*Maczaczyj v. State of N.Y.*,
   956 F. Supp. 403 (W.D. N.Y. 1997)................................................................ 16
*Montinieri v. Southern New England Telephone Co.*,
   175 Conn. 337 (1978) ..................................................................................... 32
*Morrissey v. Yale Univ.*,
   268 Conn. 426, 844 A.2d 853 (2004) .............................................................. 29
*Nokes v. Miami Univ.*,
   No. 17-CV-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017)....................... 12
O'Bryan v. O'Bryan,
   67 Conn. App. 51, 787 A.2d 15 (2001), *aff'd*, 262 Conn. 355, 813 A.2d 1001 (2003) ........... 18
*Okafor v. Yale Univ.*,
   No. CV980410320, 2004 WL 1615941 (Conn. Super. Ct. June 25, 2004) ............. 17
*Perodeau v. Hartford*,
   259 Conn. 729 (2002) ..................................................................................... 32
*Phillip v. Nat'l Collegiate Athletic Ass'n*,
   960 F. Supp. 552 (D. Conn. 1997)................................................................... 16
Ramirez v. Health Net of the Northeast, Inc.,
   285 Conn. 1, 938 A.2d 576 (2008) .................................................................. 18
*Reuters Ltd v. United Press International, Inc.*,
   903 F.2d 904 (2d Cir. 1990)............................................................................ 11
*Ritter v. Oklahoma*,
   No. 16-CIV-0438-HE, 2016 WL 2659620 (W.D.Okla. May 6, 2016)............... 12, 35
*Shore v. Stonington*,
   187 Conn. 147, 444 A.2d 1379 (1982) ............................................................ 31
*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................ 11
*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*,
   339 F.3d 101 (2d Cir. 2003)............................................................................ 13
*Zides v. Quinnipiac Univ.*,
   No. CV020470131S, 2006 WL 463182 (Conn. Super. Ct. Feb. 7, 2006) .............. 31

**Statutes**
42 U.S.C. § 2000d.............................................................................................. 25, 27

## PRELIMINARY STATEMENT

Plaintiff John Doe[1] ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, hereby moves, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order ("TRO") and preliminary injunction. Defendants in this action are Yale University ("Yale"), Yale University Board of Trustees (the "Board" or "Board of Trustees"), K. Geert Rouwenhorst ("Professor Rouwenhorst"), in his individual and official capacity, Jacob Thomas ("Professor Thomas"), in his individual and official capacity, Sherilyn Scully ("Dean Scully"), in her individual and official capacity, James Choi ("Chairman Choi"), in his individual and official capacity, and Anjani Jain ("Dean Jain"), in his individual and official capacity. The Defendants in this action are referred to collectively herein as "Defendants" or "SOM Administration".

This motion for a TRO and preliminary injunction seeks to enjoin Defendants from enforcing the disciplinary decision and penalties against Plaintiff, including the one-year suspension from Yale's Executive Master of Business Administration program ("EMBA") in the Yale School of Management ("SOM" or "Yale SOM"), the grade of "F" on his transcript, the disciplinary notation on his academic transcript, and the disciplinary notation on his academic record, and to immediately restore Plaintiff's access to all courses and academic resources available to all other students in the EMBA program, and upon successful completion of his degree requirements, to timely confer Plaintiff's degree.

This is a case in which the SOM Administration violated their own due process rules and wrongfully suspended an innocent student. As a result of Defendants' unlawful conduct, the student's education, reputation, and career have been thrown into disarray. This TRO seeks to

---

[1] Plaintiff previously filed a motion to proceed pseudonymously with this Court.

restore the status quo to before Defendants wrongfully suspended the student and minimize the harm while this case proceeds to trial.

The SOM Administration failed to follow their own policies and procedures in disciplining Plaintiff John Doe. Yale's Honor Code and its procedures function as a binding contract between the school and its students, ensuring fair process and due notice before imposing sanctions. Yet, Plaintiff was suspended for one year for "not being forthcoming" without ever receiving notice of such a charge, without an opportunity to defend against it, and without any evidentiary basis presented to support it.

Here, the SOM Administration's procedural failures are extensive and egregious, making it highly probable that Plaintiff will succeed on his breach of contract claim. Furthermore, the arbitrary nature of Defendants' actions and omissions, including shifting charges without due process, withholding evidence, and applying inconsistent penalties, supports claims for breach of the covenant of good faith and fair dealing. Given the clear contractual violations and the weight of legal precedent, Plaintiff has established a strong likelihood of success on the merits. Without injunctive relief in this case, the Plaintiff will suffer permanent and irreparable harms, which no financial compensation that can undo, including to Plaintiff's reputation, EMBA degree, future education, and career opportunities, which will cause him severe emotional distress. The court's intervention is the only way to prevent irreparable harm.

## STATEMENT OF FACTS

The factual background supporting Plaintiff's claims in the instant action are set forth in Plaintiff's Complaint, previously filed in this Court, and incorporated herein by reference. (*See* Complaint ("Compl.")). Additional facts in support of this Motion are set forth in the Declaration of John Doe, and Exhibit A, filed herewith. (*See* Declaration of John Doe ("Doe Decl.")). For the Court's convenience, a summary of the relevant facts follows.

Graduating from the Yale School of Management is an extraordinary honor that requires dedication and self-sacrifice. (Compl. ¶1, 13, n.3; Doe Decl. ¶3). In exchange for completing a rigorous courseload over two years, students receive a degree that brings life-changing opportunities. (*Id*.). To protect the integrity of the degree, the Yale SOM and all students promise to follow a set of rules regarding academic conduct and discipline. (Compl. ¶3, 17, 33-47, n.2; Doe Decl. ¶4). All students must follow the rules in order to graduate. (Compl. ¶33-35; Doe Decl. ¶4). And likewise, the SOM Administration must themselves follow the rules before a student can be removed from the program and deprived of a degree. (*Id*.). The rules enforce fairness, protect students, and ensure that no student is deprived of a degree wrongfully. (*Id*.).

This case arises out of the acts and omissions of Defendants, and their employees and/or agents, against Plaintiff, as an SOM EMBA student, resulting in erroneous findings of a violation of the Yale Honor Code[2] ("Honor Code"), a one-year suspension from the EMBA program, and a grade of "F" in a course. (*See* Compl.). Defendants' Honor Committee conducted a disciplinary process that was neither thorough nor impartial, and deprived Plaintiff of his fundamental rights to a fair proceeding, proper notice of the charges and evidence against him (including the exclusion of exculpatory evidence), and the opportunity to present his case to impartial hearing and appeal panels. (*See*, e.g., Compl. ¶4, 99, 101, 115, 127, 160, 185).

Defendants' procedural rules[3] expressly require: (1) that when a suspected violation is reported, the student must be notified of the specific charge; (2) that the Honor Committee must conduct an investigation into the alleged violation; (3) that the student has the right to review all written evidence presented to the committee; (4) that the student must be given an opportunity to

---

[2] Yale School of Management Honor Code, 2024-25, https://bulletin.yale.edu/bulletins/som/rights-and-responsibilities-students (last visited January 1, 2025).
[3] Yale School of Management Bulletin, 2023-2024, https://bulletin.yale.edu/sites/default/files/school-of-management-2023-2024.pdf (last visited February 16, 2025).

present a defense at a hearing; and (5) that disciplinary sanctions must align with the findings of fact from the hearing. (Compl. ¶33-47). In Plaintiff's case, the SOM Administration violated each of these rules: exculpatory evidence was withheld from Plaintiff, no notice was given for the charge of "not being forthcoming," no hearing was held on that charge, and no evidence supporting the charge was ever presented to Plaintiff. (Compl. ¶8-9, 94-105).

Plaintiff was originally charged with "improperly utilizing AI on the final exam in the course," (Compl. ¶8; Doe Decl. ¶23), and during the investigation of that charge, he was wrongfully pressured to falsely confess to cheating on his final exam by Dean Sherilyn Scully, and Chair Choi. (Compl. ¶5, 68-87, 97, 100, n.27; Doe Decl. ¶20). Defendant Dean Sherilyn Scully was the Dean of Students of the Yale School of Management during time periods relevant to this action and was a member of the Honor Committee investigatory team relevant to this action. (Compl. ¶21). Defendant Chair James Choi is a Professor of Finance in the Yale School of Management and the Chair of the Honor Committee investigatory team relevant to this action. (Compl. ¶22).

Plaintiff was not given the documents that constituted evidence against him on this *original* charge until after the original hearing date, and has never received all of those documents.[4] (Doe Decl. ¶21; Compl. ¶5, 68-87, 97, 100, n.27). Defendants also failed to produce exculpatory materials, as required under the rules. (*Id*.). Defendants used AI detection tools that they knew were not reliable —and that Yale's own policy forbid using—against Plaintiff. (Compl. ¶6, 50, 54-63).

Defendants violated their own Policies and Procedures by failing to excuse members of the Honor Committee and FRB who had conflicts of interest in Plaintiff's disciplinary matter. (Compl.

---

[4] A hearing on this *original* charge of "improperly utilizing AI on the final exam in the course" was originally set for October 4, 2024, and then rescheduled for November 8, 2024. (Compl. ¶95).

¶41). Defendants violated Plaintiff's right under the Procedures to have an opportunity to present a challenge to members of the Honor Committee, which right was stripped from him because the notice that he received did not contain the names of the members of the committee, and thus he was unable to file that challenge within the one (1) day deadline outlined in the Procedures. *Id*.

Contrary to the rules, on the day of Plaintiff's hearing on that *original* charge, the Honor Committee demanded that Plaintiff return for a second hearing that same day, without reasonable notice, and when Plaintiff was not on campus or available. (Doe Decl. ¶22; Compl. ¶7, 109, 113). Rather than schedule a date and time, and provide Plaintiff with notice of that second hearing, as required under the rules, the Committee held the meeting anyway, without providing Plaintiff with an opportunity to attend, and made a decision against him at that meeting. (Doe Decl. ¶23; Compl. ¶114-120).

On the basis of the SOM Administration's erroneous, biased decision, they first issued Plaintiff a finding of responsibility for this new charge of "not being forthcoming", which was never charged upon him at all, and he received no notice therefore. (Doe Decl. ¶23; Compl. ¶8, 80, 114-120). Plaintiff was suspended for one year, and the Honor Committee made no finding as to the *original* charge of "improperly utilized Artificial Intelligence on the final exam in the course". (Doe Decl. ¶23; Compl. ¶2, 8, 12, 73). At no point prior to this finding was Plaintiff informed that "not being forthcoming" was a charge under consideration, nor was he given proper notice, an opportunity to review evidence, or a chance to defend against it. (*Id*.). The SOM Administration did not follow the required procedural rules in bringing this new charge of "not being forthcoming", because he was not given fair notice or opportunity to defend the new charge against him. (Compl. ¶7-8, 42, 99-101; Doe Decl. ¶23).

Defendants continued to violate the rules during the appellate process. (Doe Decl. ¶24; Compl. ¶4, 9, 120- 138). During Plaintiff's appeal, in violation of the rules, his case was unilaterally sent back to the Honor Committee to "continue deliberating" on a new *third* charge of "violation of the examination rules". (Doe Decl. ¶24; Compl. ¶9, 125, 137). Plaintiff was not afforded notice or opportunity to participate, or any required procedure with respect to this *third* charge. (Doe Decl. ¶24; Compl. ¶129-135).

The Honor Committee then issued a penalty of an "F" in the course on this *third* charge of "violation of the examination rules". (Doe Decl. ¶25; Compl. ¶130-135). The Honor Committee made this determination without providing Plaintiff with any basis for its decision, with no analysis of the facts and rules that supported such determination, and with still no conclusions made on the *original* charge that he "improperly utilized Artificial Intelligence on the final exam". (*Id.*).

Another example of the SOM Administration's wrongful acts against Plaintiff and failure to follow proper procedures is a recent email that the SOM Honor Committee sent out to all SOM students, including those in Plaintiff's EMBA program. (Doe Decl. ¶26). On February 19, 2025, the SOM Honor Committee sent out a summary of its actions in the academic year. (*Id.*). Number 2 in that email states, "A student used AI on a final exam in violation of exam rules and was not forthcoming with the Honor Committee. Penalty: F in the course and a 1-year suspension." (*Id.*). This appears to refer to the disciplinary determination against Plaintiff, based on the reference to not being "forthcoming", and includes the *false statements* that Plaintiff was found responsible for using "AI on a final exam", which was not a finding or determination in his matter. Although it does not directly identify Plaintiff, if a student or instructor were to know about his disciplinary matter, they would be wrongfully informed by the SOM Honor Committee of an incorrect violation against him, for which he was not found responsible, further harming his reputation. (*Id.*).

The SOM Administration's procedural failures constitute a clear breach of contract, depriving Plaintiff of the due process to which he is entitled and causing irreparable harm to his education, career, and reputation. (Compl. ¶139-187). Defendants' acts and omissions also constitute discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, retaliation for complaint of discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, intentional infliction of emotional distress, and negligent infliction of emotional distress. (Compl. ¶188-227).

As a result of Defendants' conduct, Plaintiff currently cannot continue his education in the Yale SOM EMBA program. (Doe Decl. ¶8; Compl. ¶13). Plaintiff's reputation has been wrongfully harmed and his relationship permanently altered for the worse, with his Yale SOM peers, his instructors, and professors. (Doe Decl. ¶5, 7, 8, 12, 15, 18; Compl. ¶13, 134, 216). Plaintiff's reputation is very important to him, and he has built strong personal and professional relationships with his classmates, instructors and professors. (Doe Decl. ¶5). If injunctive relief is not granted, it will be extremely harmful to Plaintiff's academic, professional, and personal reputation, and will harm his potential future academic endeavors, his future career, and his emotional well-being. (Doe Decl. ¶7; Compl. ¶13, 134, 216, 219).

Not only would Plaintiff's reputation be harmed, but the value of his degree would be destroyed if this case were litigated without injunctive relief. (Doe Decl. ¶12). The true benefit of Yale is not just the coursework—it's the reputation and network, which Yale administrators regularly repeat. (*Id*.). At Yale and in the professional world beyond, trust and reputation are everything. (*Id*.). If Plaintiff's classmates and professors believe — even mistakenly — that he was suspended for cheating, he will be permanently isolated from professional opportunities, and his network, which should be a lifelong asset, will instead become a liability. (*Id*.).

If injunctive relief is not granted in this case, Plaintiff will no longer be able to graduate from his EMBA program with his classmates (Doe Decl. ¶8). Plaintiff will also be unable to finish in the top of his class as was his trajectory. (Doe Decl. ¶6; Compl. ¶31). Delaying his graduation will remove his ability to proudly earn this once-in-a-lifetime distinction. (*Id*.) No amount of money can remedy that loss. (*Id*.) At Yale SOM, grades are curved, and High Honors (HH) are awarded to only the top 10% of students in each class, with Honors given to the next 25%. Valedictorian status is determined by the number of HH grades earned during the first-year core curriculum, meaning it's already been determined who that student should be. (Doe Decl. ¶8). Right now, Plaintiff is ranked #1 in his class based on this system. (*Id*.; *See* Exhibit A to Doe Decl. (Plaintiff's transcript). This isn't an honor that Plaintiff can reclaim later. (*Id*.) Valedictorian is awarded once. (*Id*.) It's tied to the graduating class of 2025. (*Id*.) If Plaintiff is forced to delay his graduation date, that distinction is gone forever. (*Id*.) Without an injunction, Plaintiff will lose the chance to achieve something that only one student per year can earn—although he personally performed at the highest level in the EMBA program—just because he was wrongfully removed from the program by the SOM Administration. No amount of money can remedy that loss. (*Id*.)

Plaintiff intends to pursue further graduate education, which he made the SOM Administration aware of during his admission interview, and disciplinary hearing. (Doe Decl. ¶11). During the pendency of this litigation, even though the discipline against Plaintiff is wrongful, he will be unable to seek further academic degrees with a disciplinary record. (*Id*.). In addition, just having a gap year on his transcript and resume is unexplainable and would likely cause him to be rejected from any academic program. (*Id*.). Plaintiff would have to explain why he took 3 years to complete a 2 year degree, which could disqualify him from high-level positions, corporate boards, and policy fellowships—opportunities that rely on integrity and trust. (*Id*.).

If the disciplinary penalties endure during the course of this litigation, Plaintiff may face immigration consequences. (Doe Decl. ¶13). Plaintiff is not a U.S. citizen, does not have a green card, and is in the USA on an investor visa. (*Id*.). During the course of the disciplinary investigation, the SOM Administration weaponized his immigration status against him in an attempt to coerce him to falsely admit to cheating on his exam. (*Id*.). If this suspension remains on his record during the course of this litigation, he may be required to disclose it on visa or permanent residency applications, jeopardizing his long-term ability to stay in the U.S. (*Id*.). With immigration policies constantly shifting, Plaintiff has no way of knowing how this wrongful suspension might affect his future status. (*Id*.). An immigration officer may ask why it took 3 years to complete a 2 year degree. (*Id*.). Plaintiff would have to explain that he was wrongfully accused, wrongfully found responsible, wrongfully issued disciplinary penalties, sued the SOM Administration, won in court, and then the charges and penalties were dropped thereafter. (*Id*.). The suspension alone could be grounds for any immigration officer -- who has full and absolute discretion on approval and rejection of visas -- to deny Plaintiff's visa, and in turn force him to leave the U.S. after spending 15+ years living, working, and building a future here. (*Id*.).

Without injunctive relief, Plaintiff will be severely emotionally harmed by the SOM Administration's unfair and unreasonable process, and the unjust results. (Doe Decl. ¶7, 9, 16; Compl. ¶13, 14, 211-227). The harm to Plaintiff's academic, professional, and personal reputation, as well as the harm to his potential future academic endeavors, and his future career, will cause additional harm to Plaintiff's emotional well-being. (Doe Decl. ¶7; Compl. ¶13, 30, 134, 135). Plaintiff will also be further severely emotionally harmed by the SOM Administration's unfair and unreasonable process, and the unjust results, if injunctive relief is not granted. (Doe Decl. ¶9). Plaintiff would also have to return to the EMBA program with the next class in constant fear that

he will be wrongfully accused again of cheating, which causes him further extreme emotional distress. (Doe Decl. ¶16).

If the Court were to issue an injunction on or before March 7, 2025, Plaintiff will have only missed four elective classes. Doe Decl. ¶17). Plaintiff would like to either 1) make up those exact courses; 2) take four new electives to meet his credit requirements; or 3) complete the required courses after graduation (as Yale has allowed for other students). (*Id.*).

If injunctive relief is not granted, these harms will be permanent and inescapable for Plaintiff. (Doe Decl. ¶15). Plaintiff would have to return to the EMBA program with the next graduating class, and participate in the program in constant fear that he would be wrongfully accused of cheating again. (Doe Decl. ¶16). There is no financial compensation that can undo the damage to Plaintiff's reputation, career, and future opportunities. (*Id.*). The court's intervention is the only way to prevent irreparable harm. (*Id.*).

## **ARGUMENT**

### I.    **Temporary Restraining Order and Preliminary Injunction Standard.**

Plaintiff's motion for a temporary restraining order and preliminary injunction[5] should be granted because, as will be discussed herein, Plaintiff satisfies all relevant elements for obtaining a temporary restraining order and preliminary injunction: (1) Plaintiff can demonstrate a likelihood of irreparable injury; (2) there is either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in Plaintiff's favor; (3) the balance of hardships tips in Plaintiff's favor regardless of the likelihood of success; and (4) the "public interest would not be disserved" by granting the injunction. *Benihana, Inc. v. Benihana of*

---

[5] Plaintiff requests that bond for this temporary restraining order be waived. *See Doe v. Rensselaer Polytechnic Inst.,* No. 1:20-CV-1185, 2020 WL 5775193, at *2 (N.D.N.Y. Sept. 28, 2020) ("No giving of security shall be required. Although Rule 65(c) 'seems to require the posting of a bond for all TROs, a number of cases have held that the court's discretion to set the amount of the bond includes the discretion to waive the bond entirely.'").

*Tokyo, LLC*, 784 F. 3d 887, 895 (2d Cir. 2015); *see also Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *General Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 114-115 (N.D.N.Y. 2016).

A preliminary injunction, while considered an extraordinary remedy, should be issued when necessary to preserve the status quo pending the final outcome of a case. *Reuters Ltd v. United Press International, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990). "[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.,* the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010). The "'[s]tatus quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F. 3d 68, 74 (2d Cir. 1994) (quoting Black's Law Dictionary). The temporary restraining order and preliminary injunction that Plaintiff seeks here merely *preserves* the status quo of the last peaceable, uncontested status between the parties, i.e.— John Doe's status as an active student enrolled in Yale's EMBA program, who was on track to be first in his class.

A number of federal district courts within the Second Circuit have granted injunctive relief of the type sought here, where a TRO and injunction is requested to prohibit a school from enforcing a disciplinary decision against a student, while litigation on the matter is pending. *See Doe v. University of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *1 (D. Conn. Jan. 23, 2020) (following Second Circuit precedent, court granted student's preliminary injunction enjoining defendants from enforcing suspension pending outcome of litigation); *Doe v. Middlebury College,* No. 1:15-cv-192-jgm, 2015 WL 5488109, 2015 U.S. Dist. LEXIS 124540

(D.Vt. Sep. 16, 2015) (following Second Circuit precedent, court enjoined school from expelling the student pending outcome of plaintiff's contract claims).

Similarly, a number of federal courts in other jurisdictions have granted such relief while a legal challenge to a disciplinary decision and penalty is pending in court, *see*:

- *Doe v. Siena College,* No. 1:22-CV-1115 (BKS/TWD), 2023 WL 197461, at *1 (N.D.N.Y. Jan. 17, 2023) (court granted student preliminary injunction enjoining and restraining college from enforcing suspension and placing it on transcript, and directing college to timely confer student's degree).

- *Nokes v. Miami Univ.*, No. 17-CV-482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017) (court granted preliminary injunction prohibiting public university from suspending student with due process allegations against student conduct proceeding);

- *Doe v. Pennsylvania State Univ.*, 276 F. Supp. 3d 300, 302 (M.D. Pa. 2017) (preliminary injunction granted to student alleging due process violations in adjudicating student conduct matter);

- *Doe v. University of Cincinnati,* 223 F. Supp.3d 704 (S.D. Ohio 2016) (preliminary injunction granted regarding student suspension after allegations of due process violations in student conduct matter);

- *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 313 (D.R.I. 2016) (court determined that school breached contract with student in conduct of disciplinary proceeding, school ordered to vacate decision and expunge student record, after having previously issued a preliminary injunction in the case);

- *Ritter v. Oklahoma*, No. 16-CIV-0438-HE, 2016 WL 2659620, 2016 U.S. Dist. LEXIS 60193 (W.D.Okla. May 6, 2016) (preliminary injunction granted, staying enforcement of discipline against student, and permitting plaintiff to complete all remaining graduation requirements;

- *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) (court found student accused of sexual misconduct had demonstrated likelihood of success on breach of contract claims against school, prohibited school from enforcing a suspension, and ordered student be permitted to enroll in and attend school without restriction);

- *Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78 (N.D. Tex. 2022) (court granted plaintiff's preliminary injunction, enjoining defendant from enforcing plaintiff's suspension).

## II.     Plaintiff Will Likely Suffer Irreparable Injury in the Absence Of An Injunction.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Doe v. Rensselaer Polytechnic Inst.*, No. 18-CV-1374 (FJS)(CFH), 2019 WL 181280, at *2 (N.D.N.Y. Jan. 11, 2019). To make a showing of irreparable harm, the moving party must establish that he is subject to an imminent harm that cannot be adequately remedied by money damages alone. *See LaForest v. Former Clean Air Holding Co*., 376 F.3d 48, 56 (2d Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd*., 339 F.3d 101, 113-114 (2d Cir. 2003).

Plaintiff clearly presents at least four separate grounds that support a determination that he would suffer irreparable harm if his disciplinary decision and sanctions were enforced prior to a decision being made on the merits of this case. First, the wrongful disciplinary decision and penalties against Plaintiff that are the subject of this court action are harmful to Plaintiff's reputation. The decision and sanctions against Plaintiff negatively impact his academic life, professional life, personal life, career, and earning potential. Without injunctive relief, the harm to Plaintiff's reputation would continue during the course of this litigation, and cause him further, irreparable damages.

Second, if injunctive relief is not granted, Plaintiff will no longer be able to graduate from his EMBA program with his classmates, nor will he finish in the top of his class as was his trajectory. Delaying Plaintiff's graduation will remove his ability to proudly earn this once-in-a-lifetime distinction of graduating first in his class, which cannot be remedied. Plaintiff would also be unable to explain this gap year in between completion of his EMBA degree, which would make it difficult or impossible for him to transfer to another program. It would also be difficult for him to find another program of the level of prestige as the Yale EMBA. Third, if Plaintiff is not allowed

13

to return immediately to his EMBA program and graduate with his class, and to have his disciplinary record immediately lifted, he would likely be unable to transfer to another similar program, even if he were to find one of the same level, because he would be required to disclose his wrongful disciplinary record and penalties in any application to another program. Plaintiff may also have to disclose this disciplinary record on other types of applications, such as professional licenses, during the time period of this litigation. Therefore, if Plaintiff is unable to return immediately to his EMBA program and graduate with his class, as well as have his disciplinary record immediately lifted, he will suffer irreparable harm.

Fourth, if the disciplinary penalties endure during the course of this litigation, Plaintiff may face immigration consequences. Plaintiff is not a U.S. citizen, does not have a green card, and is in the USA on an investor visa. If this suspension remains on his record during the course of this litigation, he may be required to disclose it on visa or permanent residency applications, jeopardizing his long-term ability to stay in the U.S. With immigration policies constantly shifting, Plaintiff has no way of knowing how this wrongful suspension might affect his future status. An immigration officer may ask why it took 3 years to complete a 2 year degree. Plaintiff would have to explain that he was wrongfully accused, wrongfully found responsible, wrongfully issued disciplinary penalties, sued the SOM Administration, won in court, and then the charges and penalties were dropped thereafter. The suspension alone could be grounds for any immigration officer -- who has full and absolute discretion on approval and rejection of visas -- to deny Plaintiff's visa, and in turn force him to leave the U.S. after spending 15+ years living, working, and building a future here.

Finally, Plaintiff will endure irreparable extreme emotional harm if the injunctive relief requested is not granted. This action is of a highly sensitive and personal nature. The public

14

embarrassment and humiliation the Plaintiff continues to endure as a result of the false allegations and sanctions against him are severe. Plaintiff has worked extremely hard to make it to the top of his EMBA class, and has cultivated important relationships with his peers, professors and instructors. If he is not able to graduate with his cohorts, and claim the top honors in his class, he will suffer irreparable emotional harm. Plaintiff has also been severely emotionally harmed by Defendants' unfair and unreasonable disciplinary process, and the unjust results that he faces. If injunctive relief is not granted, the extreme emotional harm of Defendants' wrongful actions will endure during the course of this litigation, which cannot be remedied. Thus, injunctive relief is proper in this case.

In addition, the above irreparable harms cannot be compensated with monetary damages. Federal district courts within the Second Circuit agree that money damages cannot make a plaintiff whole for such losses. In *Doe v. Middlebury College,* the District of Vermont enjoined a school from expelling a student plaintiff pending the outcome of the plaintiff's contract claims. *Doe v. Middlebury College*, *supra,* 2015 WL 5488109 at \*3.[6]  That court stated, "While Plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate for . . . the delay in the completion of his degree, or the opportunity to begin his career in July . . . with this particular employment. Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap." *Id.*[7] In

---

[6] Similarly, the District of Connecticut in *Doe v. Univ. Connecticut*, enjoined the university from enforcing a student's suspension pending the outcome of the litigation, and acknowledged that monetary damages were insufficient to make the plaintiff whole, stating: "For a college student poised to graduate in a few months, it is highly likely that a . . . suspension and a sanction for sexual assault would indeed 'forever change[]' the trajectory of his education and career. . . . [H]e would need to explain a gap on his résumé in future applications to schools or jobs. He would also need to explain the . . . notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects." *Doe v. Univ. Conn.*, *supra*, No. 20-CV-00092, ECF No. 18, at \*4.

[7] The court in *Doe v. Univ. of Notre Dame*, in the Northern District of Indiana, similarly granted injunctive relief to a student facing university discipline and recognized that monetary damages were insufficient to compensate the plaintiff, stating: "Even if [plaintiff] prevails in this case and the disciplinary dismissal is set aside by the final relief

the case at bar, as in the *Middlebury College* case, a delay in the issuance of Plaintiff's degree will cause a gap year in the completion of his degree, which will cause irreparable harm that cannot be compensated monetarily.

Other District Courts in the Second Circuit have made similar determinations regarding the irreparable harm of a disciplinary decision enforcement upon a student while the case is litigated. *See Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (granting preliminary injunction where, "if the motion is denied, [plaintiff]'s education will be interrupted and delayed, perhaps for years"); *Coleman v. Newburgh Enlarged City School Dist.*, 319 F. Supp. 2d 446, 453 (S.D.N.Y. 2004) (if suspension of student were to continue during litigation, including the preclusion from extracurricular activities, student would be caused "imminent and irreparable harm by jeopardizing (a) the quantity and quality of the Plaintiff's education, (b) the Plaintiff's chance to graduate from high school, (c) the Plaintiff's chance for a college scholarship, and (d) the Plaintiff's opportunity to attend college"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D. N.Y. 1997) ( irreparable harm existed where student would not be able to participate in master's program, which would likely affect ability to engage in future employment and would have an unquantifiable effect on his mental health).

For the foregoing reasons, the Plaintiff will face the above irreparable harms, that cannot be remedied with monetary damages, if injunctive relief is not granted in this action.

---

awarded, in order to earn his degree [plaintiff] would still be required to. . . retake the two courses necessary for his degree. . . . I am persuaded that this gap constitutes irreparable harm to [plaintiff's] reputation and resumé for purposes of career prospects and possible further academic advancement. The questions the gap raises, and the explanation it requires, are potentially damaging to [plaintiff] in a manner not compensable by money damages and not repaired by permanent injunctive relief that might be granted after a decision on the merits in [plaintiff's] favor." *Doe v. Univ. of Notre Dame*, *supra*, 2017 WL 1836939, at *12. *See also*, *King v. DePauw University*, *supra*, 2:14-cv-70 (S.D. Ind. Aug. 22, 2014) (court found that monetary damages would not remedy gap year for student suing university over wrongful suspension).

**III.    Plaintiff Is Likely To Succeed On The Merits Of His Claims.**

Plaintiff is likely to succeed on the merits of the claims stated in his Complaint, and thus satisfies the second prong of the requirements for a preliminary injunction. There are, *at a minimum*, sufficiently serious questions going to the merits of his claims to make them fair ground for litigation, and the balance of the relative hardship tips in his favor. A movant seeking to show a likelihood of success on the merits "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

    **A.    Plaintiff Is Likely To Succeed On The Merits Of His Claim For Breach Of Contract.**

Plaintiff's claim for breach of contract is likely to succeed in this action. Plaintiff is a paying, matriculated student in the Yale SOM EMBA program, which creates a contract between Plaintiff and Defendants. *See* 15 Am. Jur. 2d, Colleges and Universities, Sec. 30, p. 294; *Okafor v. Yale Univ.,* No. CV980410320, 2004 WL 1615941, at *5 (Conn. Super. Ct. June 25, 2004); *Demoulas v. Quinnipiac Univ.*, No. CV155006283S, 2015 WL 1427951, at *4 (Conn. Super. Ct. Mar. 5, 2015) (a trier of fact could find implied contract between plaintiff and [university], and that Student Handbook and Code of Conduct were a part of that contract). Implied in the agreement between the parties is that Plaintiff will submit himself to the SOM Administration's reasonable rules and regulations, that the SOM Administration will fairly and reasonably apply their own procedures and afford due process to the Plaintiff during the course of a disciplinary investigation and proceedings, and that the SOM Administration shall not arbitrarily issue disciplinary sanctions against Plaintiff suspending him from the EMBA program. *Id.* at *5.

"Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." (Internal quotation marks

17

omitted.) *O'Bryan v. O'Bryan,* 67 Conn. App. 51, 57, 787 A.2d 15 (2001), *aff'd*, 262 Conn. 355, 813 A.2d 1001 (2003). Moreover, if the language in a contract is ambiguous or the intent is not clear, courts construe the ambiguity against the drafter. *Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 13–14, 938 A.2d 576 (2008). *See also*, *Connecticut Ins. Guaranty Assn. v. Fontaine,* 278 Conn. 779, 784–89, 900 A.2d 18 (2006). The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. *Demoulas v. Quinnipiac Univ.,* No. CV155006283S, 2015 WL 1427951, at *5 (Conn. Super. Ct. Mar. 5, 2015).

### 1.   Defendants Are Bound By Their Own Policies and Procedures

The Yale School of Management 2024-25 Bulletin contains the Rights and Responsibilities of students, the Yale SOM Honor Code, and the Procedures of the Honor Committee.[8] These Policies and Procedures were in effect during the 2024-2025 academic year, and at the time of the alleged incidents at issue in this matter. The Honor Code stresses to "students, faculty, and staff" that honesty is "fundamental to the profession and practice of management", that honesty is the "bedrock premise" of education at Yale, and that "honesty and integrity build the trust essential to a free and lively exchange of ideas".[9] The Honor Code applies to students, faculty, and staff.[10] The Honor Code grants authority over alleged code violations, such as those at issue here, to the Honor Committee.[11]

The Honor Code stresses valuing "inclusivity" and celebrates "diverse backgrounds" as a "hallmark" of SOM community members.[12] Yale's SOM presents itself as a "center of integrity

---

[8]  Yale School of Management Bulletin, 2023-2024, https://bulletin.yale.edu/sites/default/files/school-of-management-2023-2024.pdf (last visited February 13, 2025).
[9] *Id*, Guiding Principles.
[10] *Id*.
[11] *Id*.
[12] *Id*., Community Standards.

and fair dealing"[13] and highlights  that "All forms of discrimination fall outside the bounds of expected behavior" of its students, faculty and staff.[14] The Procedures of the Honor Committee state that it is responsible for collecting facts pertaining to alleged violations of the code, making judgments about those facts, and making determinations as to appropriate punishment.[15]

The Honor Committee consists of members who are appointed by the Deputy Dean for Academic Programs, including four (4) faculty members, six (6) SOM students, and the Dean of Students (who is non-voting and acts as the secretary), and for cases involving students in the M.B.A. for Executives program, the assistant dean for the M.B.A. for Executives program.[16] At the beginning of the investigation, the chair of the Honor Committee is required to ask any members to "excuse themselves" if there is a conflict of interest. The Procedures also require the chair to inform the student under investigation of the names of the members of the committee who will consider the student's disciplinary matter. After such notice, the student only has one (1) day to object to any members of the committee and ask for their recusal.[17]

A disciplinary investigation typically begins through notice to the chair of the Honor Committee by a faculty, student or staff member of a probable code violation.[18] The reporting party signs a written statement and produces any relevant materials to the chair.[19] The chair then decides whether the allegations and facts are sufficient to submit to the full Honor Committee.[20] For disciplinary matters that are referred by the chair to the full Honor Committee, the student who is the subject of the complaint must be informed of the charges against him or her, as well as the

---

[13] *Id.*
[14] *Id.*
[15] *Id.*, Procedures of the Honor Committee - Composition and Charge; Process.
[16] *Id.*
[17] *Id.*, Procedures of the Honor Committee - Review (1).
[18] *Id.*, Procedures of the Honor Committee - Process (1-2).
[19] *Id.*
[20] *Id.*, Procedures of the Honor Committee - Process (1-2).

student's right to attend the hearing, to be accompanied by an adviser, and to examine "any and all written materials being provided to the committee as soon as possible" so that the student has "ample opportunity to question or refute them".[21]

The Honor Committee has the limited authority to issue penalties for a finding of violation of the code, including an exoneration, warning, probation, a mandatory F in the course, suspension from one or more terms plus a mandatory F in the course, or expulsion from Yale SOM (or other sanctions of intermediate severity).[22] Any disciplinary penalty given by the Honor Committee to a student remains in that student's file at Yale SOM and with the Honor Committee. Suspension for a full semester or longer will appear on the student's transcript.[23]

The Honor Committee is required to seek consistency in its decisions, and study and publish the outcomes of proceedings in prior years.[24] The findings of the Honor Committee may not be appealed within Yale, but a student may appeal the severity of the penalty within five (5) business days of the decision to the Faculty Review Board ("FRB"), which consists of the cognizant Academic Dean, and two faculty members who were not part of the full committee.[25]

### 2. Plaintiff And Defendants Have Enforceable Contract, And Plaintiff Is Likely To Succeed On Merits Of Breach Of Contract Claim.

An express contract, or, alternatively, a contract implied in law, or in fact, was formed between Plaintiff and Defendants. Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff during the Honor Code violation proceedings and process, including, but not limited to the following. Defendants had an obligation to uphold the terms of the Honor Code and other Policies and Procedures, including

---

[21] *Id*., Procedures of the Honor Committee - Process (2).
[22] *Id*.
[23] *Id*., Procedures of the Honor Committee - Process (5).
[24] *Id*.
[25] *Id*., Procedures of the Honor Committee - Process (4).

instilling trust in Plaintiff that he would be treated with honesty, integrity, and fairness in the course of the disciplinary investigation and proceedings against him.

The SOM Administration knew that Plaintiff was a foreign student, who is not a native English speaker or writer, and should have considered that fact when determining whether to bring a charge against him, and how to investigate such charge. Instead, the SOM Administration violated their own Policies and Procedures by treating Plaintiff unfairly, and discriminating against him because he is a non-native English speaker and writer.

Defendants violated their own Policies and Procedures by failing to excuse members of the Honor Committee and FRB who had conflicts of interest in Plaintiff's disciplinary matter. Defendants violated Plaintiff's right under the Procedures to have an opportunity to present a challenge to members of the Honor Committee, which right was stripped from him because the notice that he received did not contain the names of the members of the committee, and thus he was unable to file that challenge within the one (1) day deadline outlined in the Procedures.

Defendants violated their own guidelines by singling out Plaintiff's final exam paper in his Sourcing and Managing Funds course, with no reasonable evidence to support an inference that Plaintiff cheated on that exam paper using AI to complete it. Upon information and belief, Plaintiff was the only student singled out for his final exam paper to be scanned by the GPTZero AI detection program. Defendants knew, or had reason to know, at the time that the GPTZero program was used to scan Plaintiff's final exam paper, that such program and technology generally is not reliable, and is especially biased against non-native English speakers and writers such as Plaintiff.

Plaintiff requested the materials that were sent to the Honor Committee and its investigators on numerous occasions, and only received some of those documents after the date of the initial hearing date, which was rescheduled. The investigation began in early June of 2024, and Plaintiff

did not receive any documents at all until October 14, 2024. This extreme delay prejudiced Plaintiff's ability to research, prepare and defend the false allegation against him. To date, Plaintiff has still not received one of the reports from the GPTZero scans of his exams. Defendants withheld exculpatory materials from Plaintiff, who never received those materials to date, including the GPTZero scan results of the sixth question on his final exam.

The SOM Administration, including, but not limited to, Dean Tsung, Dean Scully, and Honor Code Committee Chairman James Choi, engaged in extensive and multiple efforts to coerce Plaintiff into making a false confession of cheating on his final exam paper, including threatening that he would be deported from the United States, and threatening to expand the investigation to all of his assignments and exams in his other courses. The SOM Administration accused Plaintiff of not following SOM policies during the Honor Code violation investigation, but refused to inform Plaintiff what policy he had violated, or how he violated that policy. During the Honor Code Committee hearing, the members of the Committee refused to consider materials that Plaintiff presented to them that were exculpatory, including information regarding the lack of reliability of AI detection programs like GPTZero.

On the day of Plaintiff's Honor Code Committee hearing, he was asked to provide the Pages versions of two final exam papers, which he provided to Defendants. On the same day, without any notice, he was demanded to return to campus immediately for another meeting with the Committee and produce his personal laptop computer. Plaintiff had already left campus for the day and requested to have the meeting the following week, with reasonable notice. Instead, the Committee proceeded to issue a finding that Plaintiff had not been "forthcoming," failed to make a determination as to the original Honor Code allegation, and nevertheless issued Plaintiff a one-year suspension from the Yale EMBA program.

Plaintiff then appealed the Honor Code Committee's decision, and rather than reviewing the appropriateness of the punishment assessed by the Committee, as is required, the Faculty Review Board instead denied Plaintiff's appeal and remanded the matter back to the Committee to adjudicate the original allegation that Plaintiff used AI to complete his final exam paper. This action was outside the scope of the FRB authority.

Despite the fact that the Honor Code Committee made no finding to penalize Plaintiff's grade in his Sourcing and Managing Funds course, and the fact that Dean Tsung confirmed in writing that he would not receive a grade penalty for that course, he nevertheless received a grade of F in that course, with no explanation from Defendants.

The Honor Committee Procedures clearly stated that Plaintiff is entitled to be informed of the charges against him at the beginning of any investigation, that he is entitled to review the evidence against him, and that he is entitled to attend hearings. However, Defendants violated their Policies and Procedures by failing to inform Plaintiff of the new charge against him of failure to cooperate, and provide him with a fair and reasonable opportunity to review the evidence, attend the hearing, and present exculpatory evidence.

The Honor Committee went outside its authority by considering the charge of "not being forthcoming" without being referred such charge by a Yale SOM student, staff, or faculty member. The Honor Committee created that charge on its own, without any due process or transparency.

The Honor Committee violated its Policies and Procedures by issuing Plaintiff penalties that were excessive compared to penalties given to other students, lacking the consistency in its decisions that is stressed in those Policies and Procedures. The Defendants and FRB ignored the precedent of prior disciplinary penalties and issued Plaintiff penalties that were not fair, reasonable, or proportional to the charge against him.

As a result of the foregoing, Plaintiff is likely to succeed on the merits of his breach of contract claim against Defendants in this action.

**B.    Plaintiff Is Likely To Succeed On His Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

**1.    Yale is Bound By Its Own Policies and Procedures**

The contractual relationship between the Plaintiff and Defendants outlined above has implicit in it a covenant of good faith and fair dealing. Defendants are bound by this covenant in the course of their application of, and reliance upon, Yale's Policies and Procedures, including the Honor Code and Procedures applicable thereto, and their issuance of disciplinary sanctions against Plaintiff of a grade of "F" and a one-year suspension.

**2.    Plaintiff And Defendants Have An Enforceable Contract, With A Covenant Of Good Faith And Fair Dealing, And Plaintiff Is Likely To Succeed On Merits Of This Claim.**

Plaintiff applied to, enrolled in, and paid the associated fees and expenses for the EMBA program at Yale, in reliance upon the understanding, and with the reasonable expectation, that Yale would implement, enforce, and uphold the provisions and Policies set forth in its official publications, including the Honor Code and other Policies and Procedures. Through the documents that Defendants publish and provide to students, including Yale's Honor Code, Honor Committee Procedures, and other Policies and Procedures, the SOM Administration made contractual commitments to its students, including Plaintiff, regarding the Honor Code violation, investigation, hearing, and appeal processes and procedures, among other applicable matters.

Through their implied contract with Plaintiff in its Policies and Procedures, the Defendants implicitly guaranteed that any Honor Code investigation, hearing, and appeals, would be conducted with honesty, fairness, and in accordance with their own Policies and Procedures. Instead, as discussed more fully above, the SOM Administration acted in bad faith and without basic fairness towards Plaintiff, in violation of Plaintiff's due process rights and their own policies

24

and procedures. The SOM Administration violated their own Policies and Procedures through multiple acts and omissions. The SOM Administration used AI detection software against its own policies, singled out Plaintiff who is a non-native English speaker and writer, withheld documents including exculpatory materials, coerced Plaintiff to falsely confess to an Honor Code violation using threats and intimidation, failed to inform Plaintiff of a policy they accused him of violating, refused to consider exculpatory materials in his disciplinary proceeding, changed the alleged charge against him without notice or due process, engaged in an improper appeal proceeding and determination, went outside their authority, and issued Plaintiff wrongful and unreasonable severe disciplinary sanctions, among other adverse acts and omissions in violation of the covenant of good faith and fair dealing.

Based on the aforementioned facts and circumstances, the SOM Administration breached an implied covenant of good faith and fair dealing in its implied and express contractual agreements with Plaintiff, and Plaintiff is likely to succeed on the merits of that cause of action in this case.

### C. Plaintiff Is Likely To Succeed On The Merits Of His Title VI Claim For Discrimination Based On National Origin.

#### 1. Defendants Must Comply With Title VI of the Civil Rights Act

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI"), prohibits discrimination on the basis of national origin in programs and activities receiving federal financial assistance. Title VI states: "No person in the United States shall, on the ground of race, color or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

According to Defendants' website, containing its public "Federal Opportunities and Funded Database", Defendants receive federal funding.[26] Defendants also receive federal financial aid loans for Yale students.[27] Therefore, Defendants receive federal funding and must comply with Title VI.

### 2.    Plaintiff Is Likely To Succeed On The Merits Of His Title VI Claim For Discrimination Based On National Origin.

In this action, Plaintiff alleges that he was discriminated against by the SOM Administration, based on his national origin and non-native English speaker/writer status, by Defendants, including his Yale EMBA Professors Geert Rouwenhorst and Professor Jake Thomas, the members of the Honor Code investigation team, the members of the Honor Code Committee, and the members of the FRB.

As discussed in the factual background more fully above, Plaintiff was wrongfully singled out, based solely on his national origin, and not based on any reasonable evidence that Plaintiff had cheated on his Sourcing and Managing Funds final exam paper, in violation of Defendants' Policies and Procedures. The SOM Administration selected him, and only him, excluding the other students in the class, for a scan of his final exam paper using an AI detector called GPTZero, which is well known by Defendants and others to be unreliable, is not an accepted practice at Yale, and is not meant to be used to adjudicate whether a student had cheated by using AI to create a final paper. Plaintiff was wrongfully issued a one-year suspension, and received an "F" in his Sourcing and Managing Funds course, as a result of said discrimination. The SOM Administration had knowledge, or reason to know, of Plaintiff's foreign origin, and non-native English speaker/writer

---

[26] *See*, Yale, Federal Opportunities and Funded Database, https://your.yale.edu/research-support/office-sponsored-projects/funding/federal-opportunities-and-funded-database.

[27] *See* Yale, Financial Aid, Loans for Graduate and Professional Students, https://finaid.yale.edu/graduate-aid/loans; Yale, School of Management, Federal Loans, https://som.yale.edu/programs/mba/affording-your-mba/student-loans-101/federal-loans.

status, prior to singling him out for the Honor Code investigation, and were made aware of that fact again during the course of the investigation.

As a result of the foregoing, Plaintiff is likely to succeed on the merits of his Title VI claim against Defendants.

### D.    Plaintiff Is Likely To Succeed On His Title VI Claim For Retaliation Based On His Complaint Of Discrimination Based On National Origin.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*., prohibits retaliation for complaints of discrimination based on national origin in programs and activities receiving federal financial assistance. Defendants receive federal funding,[28] and thus must comply with Title VI. Department of Education regulation 34 C.F.R. Part 100 provides: (e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act *or this part,* or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part. 34 C.F.R. § 100.7(e)(second emphasis added).

Recipients of federal funds are prohibited from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege secured by the statutes that OCR enforces. Retaliatory acts against any individual who exercises his or her rights under Title VI are considered to be discrimination and are unlawful.

Plaintiff was retaliated against by the SOM Administration, including his Yale EMBA Professors Geert Rouwenhorst and Jake Thomas, the members of the Honor Code investigation team, and the members of the Honor Code Committee, because he complained during the Honor

---

[28] *See*, Yale, Federal Opportunities and Funded Database, https://your.yale.edu/research-support/office-sponsored-projects/funding/federal-opportunities-and-funded-database; Yale, Financial Aid, Loans for Graduate and Professional Students, https://finaid.yale.edu/graduate-aid/loans; Yale, School of Management, Federal Loans, https://som.yale.edu/programs/mba/affording-your-mba/student-loans-101/federal-loans.

Code investigation and proceedings that he was being discriminated against based on his national origin, and non-native English speaker/writer status. Plaintiff complained to the SOM Administration that he was wrongfully singled out, based solely on his national origin, and not based on any reasonable evidence that Plaintiff had cheated on his Sourcing and Managing Funds final exam paper.

The SOM Administration had knowledge, or reason to know, of Plaintiff's foreign origin, and non-native English speaker/writer status, prior to singling him out for the Honor Code investigation, and were made aware of that fact again during the course of the investigation. Plaintiff complained that the SOM Administration selected him, and only him, excluding the other students in the class, for a scan of his final exam paper using an AI detector called GPTZero, which is well known by Defendants and others to be unreliable, is not an accepted practice at Yale, and is not meant to be used to adjudicate whether a student had cheated by using AI to create a final paper. Plaintiff was also threatened, intimidated, and coerced by the SOM Administration to wrongfully confess to violating the Honor Code, using the threat of revocation of his visa, the threat of deportation, and the threat that he would receive a harsher penalty if he didn't confess.

Plaintiff appealed the decision issued by the Honor Code Committee, who wrongfully issued him a one-year suspension, as a result of said discrimination, and then received a harsher penalty after appealing, which process and penalty did not conform to the Defendants' Policies and Procedures.

As a result of the foregoing, Plaintiff is likely to succeed on the merits of his Title VI claim for retaliation based on his complaint of discrimination based on his national origin and non-native English speaker and writer status.

**E.    Plaintiff Is Likely To Succeed On His Claim For Intentional Infliction of Emotional Distress.**

A claim for intentional infliction of emotional distress by a student against a university may be maintained where the Plaintiff establishes four elements. 1) the actor intended to inflict emotional distress or knew, or had reason to know, that it was a likely result of the actor's conduct; 2) the conduct was extreme and outrageous; 3) the actor's conduct caused Plaintiff's distress; and 4) Plaintiff suffered severe emotional distress. *Little v. Yale Univ.*, 92 Conn. App. 232, 239, 884 A.2d 427, 431 (2005). Generally, a defendant's actions may be found to be extreme and outrageous where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Morrissey v. Yale Univ.*, 268 Conn. 426, 428, 844 A.2d 853, 854 (2004), *citing Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003).

Based on the foregoing facts, the SOM Administration intended to inflict emotional distress upon Plaintiff because he was the top student in his class, and/or because he was a foreign student and non-native English speaker and writer, and/or because he complaint about being singled out due to such status. In addition, the SOM Administration knew, or should have known, that putting Plaintiff through a disciplinary investigation and hearing, without due process, and finding him wrongfully responsible for academic discipline, with the outcome of a grade of "F" and a one-year suspension from the Yale SOM EBMA program, would likely cause Plaintiff severe emotional distress.

Similarly, the conduct of the the SOM Administration in relying upon the GPTZero program was extreme and outrageous. First, it was extreme and outrageous for the SOM Administration to use that program in violation of their own policy outlining the unreliability of such programs. Next, the SOM Administration acted in an extreme and outrageous manner by

using that unreliable program as evidence against Plaintiff and to issue Plaintiff academic discipline, contrary to the SOM Administration's own recommendations. In addition, the SOM Administration acted in an extreme and outrageous manner by failing to follow numerous procedural requirements for Plaintiff's disciplinary proceedings and appeals, including, among others, that Plaintiff was not provided all scans that were performed of his final exams using the GPTZero program, and the FRB acted outside the scope of its authority in its two decisions.

Defendants' extreme and outrageous conduct in this case in failing to follow the SOM Administration's own Policies and Procedures has wrongfully caused Plaintiff severe emotional distress. Not only was the investigatory process extremely stressful, and interfered with Plaintiff's work and school performance, but the fact that he had to defend himself against false allegations of cheating, with no evidence against him to support such accusation, also caused Plaintiff distress. In addition, Plaintiff's reputation has been harmed with his fellow classmates, and his professors throughout the EMBA program. His grade of "F" for such a stellar student who was on track to be the top student in his class, is extremely hurtful and emotionally distressing for Plaintiff.

Defendants have also caused Plaintiff extreme emotional distress because Plaintiff is now forced to endure a one-year suspension, after having achieved so much in his EMBA program, with his classmates and professors by his side, yet another student will now take the top achieving spot in the class in his place. Not only will this cause a delay in him achieving his degree, but he will be forced to join another class, with students he does not know, and possibly different professors and instructors, which will be difficult for Plaintiff and will cause him further emotional distress. Plaintiff desires to complete his degree with his current class, and any outcome outside of that possibility is extremely distressing for Plaintiff.

After his one-year suspension, and upon return to his EMBA program with another class of cohorts, Plaintiff must also now complete his EMBA program in constant fear that he will be wrongfully accused of cheating, even though he continues to do nothing wrong, which causes him further extreme emotional distress.

As a result of the foregoing, Plaintiff has shown that the SOM Administration 1) intended to inflict emotional distress or knew, or had reason to know, that they were likely to cause Plaintiff emotional distress as a result of their acts and omissions; 2) that their acts and omissions were extreme and outrageous; 3) that their acts and omissions caused Plaintiff's distress; and 4) that Plaintiff suffered severe emotional distress.

Therefore, Plaintiff has shown a likelihood of success on the merits of his claim for intentional infliction of emotional distress.

**F.    Plaintiff Is Likely To Succeed On His Claim For Negligent Infliction of Emotional Distress.**

Plaintiff has also shown a likelihood of success on the merits of his claim for negligent infliction of emotional distress, as follows.

**1.    Defendants Owe Plaintiff A Duty**

Defendants have a duty to Plaintiff, as a matriculated student in the EMBA program, to uphold their Policies and Procedures, including the Honor Code and Procedures for disciplinary proceedings and appeals. *See Shore v. Stonington*, 187 Conn. 147, 151, 444 A.2d 1379 (1982) (negligence requires a duty to plaintiff); *Frankovich v. Burton*, 185 Conn. 14, 20, 440 A.2d 254 (1981); *Zides v. Quinnipiac Univ.*, No. CV020470131S, 2006 WL 463182, at *7 (Conn. Super. Ct. Feb. 7, 2006). This duty requires the SOM Administration to engage in a fair and reasonable review of Plaintiff's final exams, to not unjustifiably accuse him of cheating on his exam without a reasonable basis therefore, to provide him with due process, and to follow all of Defendants' Policies and Procedures.

31

### 2. Defendants Breach A Duty Owed To Plaintiff.

The Supreme Court of Connecticut, in *Montinieri v. Southern New England Telephone Co*., 175 Conn. 337, 345 (1978), recognized that recovery for unintentionally caused emotional distress does not depend on proof of physical harm. To be liable, a defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress that could lead to illness. *Perodeau v. Hartford*, 259 Conn. 729, 751 (2002). Moreover, a party making an emotional distress claim must show that a reasonable person would have suffered emotional distress. *Id*., at 755; see 3 F. Harper, F. James & O. Gray, Torts (2d Ed.1986) 18.4, p. 691 ("Generally defendant's standard of conduct is measured by the [emotional] reactions to be expected of normal persons").

Through Defendants' acts and omissions, as outlined in detail above, the SOM Administration breached their duty towards Plaintiff. Among other acts and omissions, the SOM Administration should have realized that making an accusation against Plaintiff with a high likelihood of falsity involved an unreasonable risk that Plaintiff may endure emotional distress. The SOM Administration used those GPTZero reports as evidence against Plaintiff, and found him responsible for an Honor Code violation. Plaintiff complied with everything that was asked of him, yet was found to have not been "forthcoming" and to have violated the Honor Code, despite no analysis or determination as to how or why that decision was made.

### 3. The Harm to Plaintiff Due to the SOM Administration's Breach of Duty Was Foreseeable, And Caused Plaintiff's Emotional Distress.

The acts and omissions of the SOM Administration caused Plaintiff severe emotional anguish and distress, that was foreseeable, and severe enough that it might cause bodily harm or illness. If the Motion for a TRO and Injunction is not granted, it will be extremely harmful to Plaintiff's academic, professional, and personal reputation, and will harm his potential future academic endeavors, his future career, and his emotional well-being. (Doe Decl. ¶7-8). If Plaintiff must endure the course of this litigation with his disciplinary decision and penalties in place, he

32

will be further severely emotionally harmed by the unfair and unreasonable process employed by the SOM Administration, and the unjust results that followed.

Without injunctive relief, Plaintiff will suffer enduring and significant impact to his future career, education, and potential earnings, as a result of the SOM Administration's wrongful conduct. (Doe Decl. ¶19). As a result of the foregoing, Plaintiff is likely to succeed on the merits of his claim for negligent infliction of emotional distress against the SOM Administration.

## IV.  The Balance Of Hardships Tips Decidedly In Plaintiff's Favor

Plaintiff satisfies the third prong for preliminary injunctive relief, which is that the balance of hardships on the parties of issuing an injunction tips decidedly in his favor. Courts within the Second Circuit have applied this balancing analysis in granting preliminary injunctive relief to plaintiff students. For example, in *Doe v. Middlebury*, the District of Vermont held:

> [I]t is unlikely Middlebury will suffer great damage or loss as a result of the issuance of a preliminary injunction preventing the expulsion of Plaintiff for the fall semester. Plaintiff was permitted to return to classes on the Middlebury campus . . . following the alleged assault, and remained a student during the investigation throughout the semester. . . .
>
> The Court is aware colleges have a difficult role in dealing with allegations of sexual misconduct. While Middlebury will suffer interference with its process and sanction if the Court grants the motion, if Middlebury prevails on the merits, it can refuse to award, or revoke, Plaintiff's diploma and maintain Plaintiff's disciplinary record in its files. The harm Middlebury will suffer if Plaintiff is allowed to remain a student for the fall semester is not as great as the harm Plaintiff will suffer if he is not permitted to return to campus but ultimately prevails in the case.
>
> *Doe v. Middlebury Coll.*, 2015 WL 5488109, *supra*, at *4.

The District of Connecticut recently reached the same conclusion, stating in *Doe v. University of Connecticut*:

> The balance of equities in this case favors a TRO. As discussed above, the Plaintiff faces a severe sanction and a cloud over his future, and the

> semester has already begun without him. If he is not permitted to enroll and attend classes while he litigates his claims against UCONN, *he will not graduate on time and will have a gap on his résumé and transcript to explain to any future schools or employers, even if he ultimately prevails in this case*. Money damages cannot compensate him for these harms, in part because they would be virtually impossible to determine. How does one know why one's job or school application is rejected?
>
> While UCONN certainly has an interest in designing and implementing its own disciplinary proceedings, the harm a TRO would inflict on UCONN is slight. It will suffer no harm if thePlaintiff enrolls and begins to take classes this Spring . . . .

*Doe v. University of Connecticut*, No. 3:20-cv-00092, ECF No. 18, at *11 (D. Conn. Jan. 23, 2020).[29]

The case at bar is similar to the *Middlebury College* and *University of Connecticut* cases above, in that it is unlikely that the SOM Administration will suffer great, or any, damage or loss as a result of the issuance of a preliminary injunction. However, as discussed herein in detail, the irreparable harm that Plaintiff will endure if the instant motion for an injunction is not granted is significant. Accordingly, the balance of the hardships tips decidedly in Plaintiff's favor, satisfying the third element for injunctive relief.

## V.    The Requested Injunction Is In The Public's Interest.

Finally, Plaintiff satisfies the fourth prong for a preliminary injunction, which is that the requested injunction is in the public interest. There is a strong public interest in avoiding violations of civil rights. *See Floyd v. City of New York*, 959 F. Supp. 2d 668, 673 (S.D.N.Y. 2013). Likewise,

---

[29] *See also, Doe v. Univ. of Notre Dame, supra*, 2017 WL 1836939, at *13 (To administer two exams to John Doe is a modest requirement, it presents no logistical burden to Notre Dame and is virtually costless to the institution. . . . On the other hand, if John prevails and the discipline is reversed, to deny the limited relief he seeks now would impose a significant extension of the hardship he suffers by a wrongful dismissal interrupting his senior year at the 11th hour."); *King v. DePauw Univ.*, *supra*, 2014 WL 4197507,*14 ("[T]he Court finds that if DePauw ultimately wins this suit, the harm it will have suffered by King's court-ordered return to campus this fall, while real, will not be as great as the harm King will have suffered if he is not permitted to return to campus but ultimately wins. A win by DePauw would vindicate its policies and its process in this case. King will still have been found responsible for sexual misconduct by DePauw, as his record will reflect, and he would have suffered significant consequences, although not the full extent of the consequences DePauw intended him to suffer. On the other hand, as discussed above, if the situation is reversed, in the absence of a preliminary injunction King will continue to suffer real, unavoidable consequences even if he wins this suit. Accordingly, the Court finds that the balance of equities is firmly in King's favor.").

"[t]he public has an interest in fundamentally fair and sound educational discipline that is not imposed arbitrarily or capriciously." *Doe v. Univ. of Notre Dame, supra*, 2017 WL 1836939, at *13. *See also Ritter v. State of Oklahoma, supra*, 2016 WL 2659620, at *3 ("[I]t is always in the public's interest that a student be treated fairly before being disciplined."). "While there is also a public interest in enforcement of university disciplinary policies, allowing the Plaintiff to enroll in school while the Court adjudicates his motion for a preliminary injunction does not unreasonably interfere with that interest." *Doe v. Univ. Conn.*, *supra*, No. 3:20-cv-00092, ECF No. 18, at *12. *See also Middlebury Coll.*, *supra*, 2015 WL 5488109, at *4.

Thus, the public interest weighs in favor of granting Plaintiff injunctive relief, satisfying the fourth and final element for such relief.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a temporary restraining order and preliminary injunction against the SOM Administration pending the adjudication of the merits of the Complaint.

Dated: February 21, 2025
      New York, New York

                              Respectfully submitted,

                              **NESENOFF & MILTENBERG, LLP**

                              ***<u>/s/ Christine D. Brown</u>***
                              **Christine D. Brown, Esq.**
                              Stuart Bernstein, Esq.
                              Andrew T. Miltenberg, Esq.
                              (*pro hac vice* admission forthcoming)
                              Kimberly S. Courtney, Esq.
                              (*pro hac vice* admission forthcoming)
                              363 Seventh Avenue, 5th Floor
                              New York, New York 10001
                              212-736-4500 (telephone)
                              cbrown@nmlllaw.com
                              sbernstein@nmlllaw.com

amiltenberg
@nmllplaw.com
kcourtney@nmllplaw.com
***Attorneys for Plaintiff***