## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN DOE,
     Plaintiff,

v.

YALE UNIVERSITY, YALE UNIVERSITY
BOARD OF TRUSTEES, WENDY TSUNG,
K. GEERT ROUWENHORST, JACOB
THOMAS, SHERILYN SCULLY, JAMES
CHOI, AND ANJANI JAIN,
     Defendants.

CASE NO. 3:25-cv-00159-SFR

MARCH 12, 2025

## OBJECTION TO PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants object to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF 16 ("Motion")). The Court should deny Plaintiff's Motion.

## I.  PRELIMINARY STATEMENT

Plaintiff's final examination in Sourcing and Managing Funds was flagged by a Teaching Assistant because it was among the highest scoring and seemed unusually long and detailed given the short time permitted for completing the exam. Plaintiff's exam responses were similar to responses generated by artificial intelligence ("AI"). This was potentially problematic because students were prohibited from using AI during the exam. Plaintiff was not forthcoming in Yale's review of the situation and, in November 2024, he was suspended until this Summer and received an "F" in the course.

For several reasons, the Motion should be denied. First, the relief sought is impossible because Plaintiff delayed filing his Motion for more than three months after the discipline. Classes for the term are almost over, ending on May 3, 2025, and Commencement takes place on May 19,

2025. Second, Plaintiff's decision to delay establishes there is no irreparable harm. Regardless, Plaintiff has not come close to satisfying the extraordinary standards for a TRO or preliminary injunction. Courts in this District and Circuit have held, repeatedly, that there is no irreparable harm when students are suspended or even expelled. That is more apparent here, where Plaintiff is an experienced professional enrolled in a part-time program, not an undergraduate student awaiting graduation to embark on his career. Third, the Plaintiff cannot show likelihood of success on the merits. The examination at issue contains wording similar to an answer generated by AI. At the time, Plaintiff was not forthcoming with Yale during its inquiry about that final examination. He ignored several requests by Yale for information relevant to his case and was properly suspended as a result.[1]

## II.      THE CORRECT FACTUAL BACKGROUND

### A.      The EMBA Program

The Yale School of Management's (the "SOM") Masters in Business Administration for Executives ("EMBA") Program (the "Program") is rigorous and for accomplished professionals. (**Exhibit A** ("Dean Tsung Aff.") ¶ 2.) The average student in the Program has sixteen years of work experience and is thirty-nine years old. (**Exhibit B**.) Students work full-time and attend class every other weekend. (Tsung. Aff. ¶ 4.) The Program is not akin to undergraduate studies where an interruption could require explanation by a student. Approximately one third of Program students were born outside of the United States and English is often not their first language. (Tsung. Aff. ¶ 3.)

Students in the Program are required to take a number of specific courses, including

---

[1] In addition, neither the equities nor the public interest support Plaintiff because, among other reasons, Plaintiff was indisputably not forthcoming and was thus properly disciplined for that, Plaintiff used AI, and Plaintiff delayed filing his Motion. All of those things render the relief Plaintiff seeks inequitable and against the public interest.

numerous required courses in their second year.  (Tsung. Aff. ¶ 5; **Exhibit C** ("Bulletin") at 35–36.)  Core course classes generally meet six times over the course of approximately twelve weeks (every other weekend).  (Tsung. Aff. ¶ 4.)  Courses are offered in the Program once a year.  (Tsung. Aff. ¶ 5.)  If a student misses a course, there is no opportunity to take it again in the Program until the following year.  (Tsung. Aff. ¶ 5.)  Students in the Program complete courses in the Program and not in the SOM's regular MBA program.  (Tsung. Aff. ¶ 6.)  Although the courses taught in the Program are also taught in the regular MBA program, the regular MBA program does not offer all or most EMBA courses in a particular term.  (Tsung. Aff. ¶ 6.)  It is therefore often not possible to make up Program courses by taking regular MBA program courses.  (Tsung. Aff. ¶ 6.)

Class attendance is an essential component of the EMBA program.  (Tsung. Aff. ¶ 7.) Missing a class can negatively impact a student's grade.  (Tsung. Aff. ¶ 7; Bulletin at 38.)  Missing several classes can result in a failing grade.  (Tsung. Aff. ¶ 7; Bulletin at 38.)  Students are generally expected to attend class in person, but students in good standing can attend a limited number of classes remotely.  (Tsung. Aff. ¶ 7 (discussing Extended Classroom Policy).)  Students who attend remotely must do so live. They cannot fulfill attendance requirements by watching recordings. (Tsung. Aff. ¶ 7.)  Although most classes are recorded, some are not.  (Tsung. Aff. ¶ 7; Bulletin at 42.)  Regardless, watching recordings is not a substitute for class attendance and participation, which are fundamental to the Program and often important aspects of students' grades.  (Tsung. Aff. ¶ 7; ECF 24-4.)  Students are only allowed to watch recordings in very limited situations, such as when they are excused from class due to serious illness.  (Tsung. Aff. ¶ 7.)

A core component of the Program is the Learning Team Model.  (Tsung. Aff. ¶ 8.)  Students are assigned to Learning Teams and are expected to work through Program requirements with their team.  (Tsung. Aff. ¶ 7; ECF 2-1 at ¶ 8.)  For these and other reasons, it is not possible to add a

student to courses when they are already well underway. (Tsung. Aff. ¶¶ 8, 9, 31, 32.) Doing so would fundamentally alter the nature of the Program. (Tsung. Aff. ¶¶ 8, 9, 31, 32.)

The SOM requires academic honesty. (**Exhibit D** ("Chair Choi Aff.") ¶ 2; Bulletin at 66.) Students who do not cooperate with the SOM's Honor Committee face serious consequences. (Rouwenhorst Aff. ¶ 2; Choi Aff. ¶ 3; Bulletin at 66.) At the Program's orientation, SOM described to Plaintiff a case where a student was expelled for not being forthcoming with the Honor Committee. (**Exhibit E** ("Professor Rouwenhorst Aff.") ¶ 2 (discussing Orientation Lesson Plan).)

### B. Plaintiff

Plaintiff is an experienced professional who operates his own companies. (*E.g.*, **Exhibit F**.) He speaks fluent English. (*E.g.*, **Exhibit G** (Plaintiff giving a TEDx Talk).) Plaintiff describes himself as an entrepreneur and investor who founded "a technology driven real estate and hospitality company." (Exhibit F.) Plaintiff also founded a different real estate company and seemingly has several other real estate ventures. (*See* **Exhibit H**.) Plaintiff has been a Member of Entrepreneurs' Organization for the past four years. (Exhibit F.) According to Plaintiff, members "must be the owner, founder, or majority stakeholder of a business earning a minimum of [$1,000,000] in revenue during the most recent fiscal year." (Exhibit F.) One or more of Plaintiff's companies has thus purportedly earned $1,000,000 in revenue for the last four years. In other words, Plaintiff is a far cry from an undergraduate student who might have to explain a gap in education history. Plaintiff already holds several degrees and has an established career.

### C. Plaintiff's Enrollment In The Program And Concerns About AI

Plaintiff enrolled in the Program in 2023. In Spring 2024, he enrolled in a required course, Sourcing and Managing Funds. The course included a take-home final examination that had to be completed in four hours and required students to acknowledge:

**You are *not* allowed to browse online resources or use AI tools (like ChatGPT) for formulating answers. In addition, you are *not* allowed to communicate with anyone or ask for help from others during the exam**.

(**Exhibit I** (all emphasis in original).)

On June 10, 2024, a Teaching Assistant grading the exam emailed the course professors:

I wanted to briefly flag [Plaintiff]'s exam, which was one of the highest scoring. The responses were so detailed that I questioned how it could have been completed in four hours. It clocked in at 30 pages whereas almost all others were under 20. I suppose it's possible, but I wanted to run it by both of you to get a second opinion – its length stood out relative to the others.

(**Exhibit J**.) The course Professors, including Professor K. Geert Rouwenhorst, then conducted a preliminary assessment to determine if there was potential misconduct. (Rouwenhorst Aff. ¶ 5.)

Like the TA, Professor Rouwenhorst was suspicious of Plaintiff's exam, especially when compared to the other students in the class—all of whom are high-achieving professionals and a number of whom do not speak English as their first language. (Rouwenhorst Aff. ¶ 3.) Plaintiff's responses were lengthier and contained "near perfect punctuation and grammar and elaborate formatting" despite the four-hour time limit. (**Exhibit K**.) Professor Rouwenhorst also found it suspicious that Plaintiff "performed relatively poorly on question 5, where AI tools were the least helpful." (Exhibit K.) Professor Rouwenhorst determined that at least one of Plaintiff's answers "showed substantial overlap with answers to simple prompts on ChatGPT." (Ex. K.) For example:

*Plaintiff's Answer*: "By increasing the dividend, [the company] signals to investors that it is confident in its financial health and future cash flows."

*Chat GPT's Answer*: "By increasing dividends, the company signals to investors and the market that it has strong financial health and confidence in its future cash flows."

(*Compare* **Exhibit L**, *with* **Exhibit M**; *see also* Choi Aff. ¶ 15.) There were numerous other suspicious similarities between ChatGPT answers and what Plaintiff wrote. (*See* Choi Aff. ¶ 15 and *compare, e.g.*, Exhibit L (using "Attracting and retaining investors" as a bullet point), *with,*

*e.g.*, Exhibit M (using "Attracting and retaining investors" as a bullet point).)

Professor Rouwenhorst also ran portions of three suspicious essay responses through ChatGPTZero. (Exhibit K.) ChatGPTZero is "a tool to highlight the possible use of AI in writing text." (**Exhibit N**.) Professor Rouwenhorst's use of ChatGPTZero did not violate any Yale policy. The policy from Yale's Poorvu Center that Plaintiff cites did not prohibit Professor Rouwenhorst from using ChatGPTZero. The policy, which is attached as **Exhibit O**, notes reliability concerns with AI detection tools to explain why Yale chose not to enable an AI detection feature in its Canvas platform. The policy does not prohibit SOM professors from using ChatGPTZero. (Exhibit O.) ChatGPTZero determined all three samples from Plaintiff's exam had a **100% probability of being AI-generated**.[2] (Exhibit N.)

Professor Rouwenhorst referred the matter to the SOM Honor Committee. (Exhibit K.) Professor Rouwenhorst's decision had nothing to do with Plaintiff's ethnicity or background. Many students in the Program are from outside the U.S. (Tsung Aff. ¶ 3.) Professor Rouwenhorst was born in the Netherlands. (*Id.* ¶ 3.)

### D.    The Honor Committee's Preliminary Investigation

The Honor Committee's process generally begins with the Chair of the Honor Committee "request[ing] a written statement and copies of any other relevant materials pertinent to the complaint." (Bulletin at 67.) "Based on the[] materials [collected], the [C]hair [] then [normally] decide[s] whether the offense, if the charge is true, would be of sufficient seriousness to warrant the attention of the committee." (Bulletin at 67.) If so, the Chair refers the matter to the Committee, generally informs the student, and the matter usually proceeds to a meeting. (Bulletin at 67.) However, the Chair may deviate from these customary procedures. (Bulletin at 66

---

[2] Plaintiff assails the accuracy of ChatGPTZero but, as explained below, one of Plaintiff's sources recently told the *Yale Daily News* that AI detection tools are highly accurate.

("[D]eviations may be taken by the [C]hair when appropriate to a given case . . . .").)

Professors and administrators repeatedly informed Plaintiff that they were investigating his possible use of AI. On June 17, 2024, Professor Rouwenhorst emailed Plaintiff: "During grading of the final exams, your exam paper was flagged for possible use of AI which, if true, would be a violation of the rules of the exam. We referred the matter to the SOM Honor Committee for further investigation." (**Exhibit O**.) On June 20, 2024, Dean Wendy Tsung emailed Plaintiff reiterating that his examination was "flagged for possible Honor Code violations" and that his grade "will remain incomplete." (Exhibit O.) Plaintiff was well aware of the allegations against him.

Dean Tsung and Dean Sherilyn Scully then met with Plaintiff on July 24, 2024. (*E.g.,* Tsung Aff. ¶ 11.) Deans Tsung and Scully did not attempt to coerce a confession from Plaintiff. (Tsung Aff. ¶ 12.) They instead wanted to ensure that Plaintiff was fully informed of the serious nature of the allegations and possible ramifications. (Tsung Aff. ¶ 12.) Plaintiff denied using AI.

Deans Tsung and Scully and Chair of the Honor Committee, James Choi, attempted to obtain from Plaintiff the key document at issue: the original, electronic version of the document Plaintiff had used to create his Sourcing and Managing Funds final examination (the "Electronic File").[3] The Electronic File was highly relevant to the decision Chair Choi had to make regarding whether to refer the case to the full Honor Committee. (Choi Aff. ¶ 9.) Plaintiff did not submit the Electronic File despite repeated requests that he do so. (*E.g.*, Choi Aff. ¶ 15.)

On July 30, 2024, Dean Tsung emailed Plaintiff to ask him for the Electronic File. (**Exhibit P**.) Plaintiff did not respond. On August 7, 2024, Dean Tsung emailed Plaintiff to again asked for the Electronic File. (Exhibit P.) Plaintiff once again did not respond.

On August 10, 2024, Chair Choi emailed Plaintiff to request the Electronic File:

---

[3] Plaintiff submitted a PDF document when he submitted his final. The Honor Committee sought to obtain the original or "Word" version that Plaintiff used to create the PDF to assess the metadata in the document.

Dear [Plaintiff]:

I am writing to you in my capacity as the [C]hair of the SOM Honor Committee. I have received a complaint that you violated the Honor Code while taking the Sourcing and Managing Funds final exam.

Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced that PDF file you submitted for the exam. I am now asking you directly.

I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale.

Please send us the file by Monday, August 12 at 5:00 P.M. EDT.

Sincerely yours,
James Choi

(**Exhibit Q**.) Plaintiff did not provide the Electronic File by the August 12 deadline.

On August 12, 2024, Chair Choi again emailed Plaintiff: "I have not received the Word file from you. Should I note that you are refusing to share this file with the Honor Committee?" (Exhibit Q.) Four days later, on August 16, Plaintiff responded, but did not provide the Electronic File. (Exhibit Q.) Instead, Plaintiff implied Chair Choi did not need the Electronic File because Chair Choi "had already received a copy of the submitted exam." (Exhibit Q.) Plaintiff also claimed to be confused, asserting that Deans Tsung and Scully had told him "that this matter ha[d] not been formally referred to the Honor Committee."[4] (Exhibit Q.) Chair Choi responded:

The first step in the process is for the [C]hair of the Honor Committee to make a determination of whether the case will proceed to the Honor Committee. This can involve some gathering of evidence. That is where we are right now.

I have the PDF file that you submitted. I am asking you to send us the Word file from which the PDF was produced. You seem to be weighing whether you will cooperate or not. It's your choice, but if history is a guide, failure to cooperate would be viewed by the Honor Committee as an extraordinary violation of the Honor Code.

---

[4] Plaintiff also claimed that he did not know what policy he had allegedly violated despite the fact that he had been repeatedly told that the investigation concerned violating the examination rules by using AI. (*E,g.*, Exhibit O.)

(Exhibit Q)  Chair Choi was not trying to coerce a false confession from Plaintiff.  (Choi Aff. ¶ 11.)  In Chair Choi's ten years on the Honor Committee, no student had ever ignored requests for documents about a case.  (Choi Aff. ¶¶ 1, 5.)  Chair Choi wanted to ensure that Plaintiff was aware that the Honor Committee would take seriously Plaintiff's decision not to provide the documents it had requested.  (Choi Aff. ¶ 11.)  Plaintiff still did not provide the Electronic File.

Chair Choi deemed it appropriate to review Plaintiff's coursework in other classes to determine if Plaintiff was using AI more broadly.  (Choi Aff. ¶ 12.)  The Bulletin authorized Chair Choi to collect "any . . . relevant materials."  (Bulletin at 68.)  Plaintiff's other coursework was relevant to the question of whether Plaintiff used AI because the coursework could show a pattern of using AI.  In fact, ChatGPTZero recommends that educators "[s]ee if there is a history of AI-generated text in the student's work" by "looking for a long-term pattern of AI use . . . to determine whether the student was using AI."  (Exhibit N.)  Chair Choi was not merely relying on AI detection tools and was instead doing exactly what those tools recommend.

On August 16, 2024, Chair Choi notified Plaintiff that he was looking into Plaintiff's other coursework and provided him an opportunity to revise his statement denying using AI:

> I have expanded my investigation into your case into deliverables you submitted for other courses.  I have identified at least one additional Microsoft Word file that I will be requesting from you.
>
> If you would like to revise your statement to Deans Scully and Tsung about your Sourcing and Managing Funds final exam, you still have an opportunity to do so.  The Honor Committee has historically been lenient with respect to revisions students make to their stories prior to their appearance before the Committee.

(**Exhibit R**.)  Chair Choi was not trying to "coerce" a confession from Plaintiff.  Instead, Chair Choi was ensuring fairness by explaining that the Honor Committee permits revisions to statements and may show leniency when students are forthcoming.  (Choi Aff. ¶ 11.)

On August 19, 2024, Chair Choi emailed Plaintiff to request the original version of Plaintiff's final examination for his Investor course and to again remind Plaintiff of the repeated requests for the Electronic File from his Sourcing and Managing Funds final examination:

> On behalf of the Honor Committee, I am requesting that you send me the Microsoft Word file that was used to produce the PDF you submitted for the Investor final exam. This is in addition to my previous request that you send me the Word file used to produce the PDF you submitted for the Sourcing and Managing Funds final exam.

(**Exhibit S**.) Plaintiff still did not provide the Electronic File despite this sixth request or reminder that he do so and he did not provide the original version of the document he used to create his final examination submission for his Investor course. (*E.g.*, Choi Aff. ¶ 15.)

Chair Choi investigated whether Plaintiff used AI on his Investor final. The Investor final prohibited the use of AI. (**Exhibit T** ("You should not use ChatGPT or similar software.").)

First, Chair Choi had SOM's CIO, Kenneth Wieler, analyze Plaintiff's Investor final. (Choi Aff. ¶ 12.) Mr. Wieler ran ChatGPTZero analyses for two responses. (Choi Aff. ¶ 12.) ChatGPTZero assessed a 95% chance that each of those responses were created by AI. (**Exhibit U**.) Neither Mr. Wieler nor Chair Choi ran any additional scans. (Choi Aff. ¶ 18.)

Second, Chair Choi entered one of the prompts on the Investor examination into ChatGPT. (**Exhibit V**.) ChatGPT produced a response that was suspiciously similar to Plaintiff's response. (*See* Choi Aff. ¶ 15 (detailing similarities between Investor response and ChatGPT response).[5]

### E.    Scheduling The Honor Committee Meeting

Chair Choi decided to refer the matter to the Honor Committee. (Choi Aff. ¶ 15.)

On September 8, 2024, Dean Tsung emailed Plaintiff to notify him that Chair Choi had

---

[5] For example, Plaintiff's response included the phrase investors "may choose to act as if markets are efficient for several reasons" while ChatGPT's response included the phrase investors "may still choose to 'act as if' they are efficient for several reasons." (*Compare* Exhibit T, *with* Exhibit U.)

"referred the inquiry to the full Honor Committee for review." (**Exhibit W**.) Dean Tsung reiterated that the specific "allegation [was that he] improperly utilized AI." (Exhibit W.) Dean Tsung also referred Plaintiff to the Bulletin and informed Plaintiff, among other things, (1) that the Honor Committee meeting was tentatively scheduled for Friday, October 4, 2024, (2) that he could "request a recusal of any member of the [Honor] Committee," (3) that he could access a list of Honor Committee members by clicking on a link in her email (and that the list of members would be updated soon), and (4) that he would receive "[a]ny written materials the Honor[] Committee [would] review . . . in advance of the" meeting. (Exhibit W.)

Plaintiff responded to Dean Tsung's email on September 9, 2024, <u>copying his attorneys</u>. (Exhibit W.) He did not raise any concerns about accessing the Bulletin or the list of Honor Committee members. (Exhibit W.) The sole issue he raised was about his availability:   He asked to move the meeting to November—a month later. (Exhibit W.)

Dean Tsung replied to Plaintiff on September 12, 2024, informing him that she had rescheduled the Honor Committee meeting to November 8, 2024. (Exhibit W.)

On October 14, 2024, the Honor Committee sent Plaintiff all the documents it had on the case, including all of the ChatGPTZero and ChatGPT responses that had been collected. (**Exhibit X**; Choi Aff. ¶ 18.) It did not withhold any documents. (Choi Aff. ¶ 18.) The documents provided to Plaintiff included the documents related to both the Sourcing and Managing Funds final examination and the Investor final examination. (Choi Aff. ¶ 18.) The Honor Committee provided Plaintiff with the documents twenty-five (25) days before the meeting even though the Bulletin only required it to send the documents "at least forty-eight hours in advance." (Bulletin at 68.)

On November 3, 2024, Plaintiff requested the Honor Committee recuse Dean Scully. (**Exhibit Y**.) Plaintiff "felt that she view[ed] [him] as an outsider due to [his] nationality." (Exhibit

Y.) The request was untimely. The Bulletin required recusal requests be submitted "[w]ithin one day after receiving" the notification regarding Committee members. (Bulletin at 70.) Even though the request was untimely, and baseless, the Honor Committee recused Dean Scully. (Choi Aff. ¶ 19.) On November 4, 2024, four (4) days before the meeting, Plaintiff sought to recuse all of the student members of the Honor Committee who did not take the same courses he had taken.[6] (Exhibit Y.) The Honor Committee refused. (Choi Aff. ¶ 19.) And, on November 5, 2024, three (3) days before the meeting, Plaintiff requested recusal of any member of the Honor Committee involved in the preliminary investigation and "any member of the Honor Committee who ha[d] already been exposed to evidence regarding this matter. . . ." (Exhibit Y.) Every member of the Honor Committee had seen the evidence because the meeting was only three (3) days away, so Plaintiff was requesting that everyone recuse themselves. (Choi Aff. ¶ 19.) The Committee obviously did not agree to recuse the entire Honor Committee. (Choi Aff. ¶ 19.)

It was apparent Plaintiff was trying to delay the meeting even further. (Choi Aff. ¶ 19.)

Nevertheless, the Honor Committee went above and beyond to ensure fairness. On November 5, Chair Choi sent Plaintiff another email reiterating:

> The membership of the Honor Committee is available to you at https://som.yale.edu/myportal/academics/academic-requirements/yale-som-honor-code.

> You may request that a member be recused if you believe that member would be prejudiced in your case. I will make a judgment as to whether such a request will be granted.

(**Exhibit Z**.)

### F.    The Honor Committee Meeting

The meeting finally occurred on November 8, 2024, in-person in New Haven. The Plaintiff

---

[6] Plaintiff asserts that Deans Tsung and Scully had represented that the Committee's student members would have taken Sourcing and Managing Funds. Deans Tsung and Scully did not make that representation. (Tsung Aff. ¶ 11.)

did not inform the Honor Committee about any limitations on his availability for that day.  The Honor Committee questioned Plaintiff about using AI.  (Choi Aff. ¶ 21.)  Plaintiff denied doing so.  (Choi Aff. ¶ 21.)  The Honor Committee also questioned Plaintiff about his refusal to produce the Electronic File and the document he used to create his Investor final examination.  (Choi Aff. ¶ 22.)  Plaintiff told the Honor Committee that he did not produce the Electronic File or other document because he could not produce a Microsoft Word file, since he used Apple software—specifically, a program call Pages—to create the document.  (Choi Aff. ¶ 22.)  This was the first time Plaintiff disclosed using Pages.  (Choi Aff. ¶ 22.)  He should have made that disclosure the first time he was requested to produce the "Word" document. The Honor Committee found Plaintiff was not acting credibly or forthcoming.  (Choi Aff. ¶ 22.)  Plaintiff knew expulsion was a likely outcome for not being forthcoming. (Choi Aff. ¶ 23.)

As his defense, Plaintiff assailed AI detection tools as unreliable.  (Choi Aff. ¶ 21.)  For the first time, Plaintiff submitted documents about AI to the Honor Committee even though Chair Choi had told Plaintiff he had to submit any documents he wanted to use at least twenty-four hours before the meeting.  (Choi Aff. ¶ 21.)  Chair Choi permitted the documents.  (Choi Aff. ¶ 21.)  As an example, Plaintiff alleges that he "submitted his correspondence with Scott Aaronson, a prominent Computer Science professor at the University of Texas and on the authors of OpenAI's original AI detection tool." (Cmplt. ¶ 106.)  Plaintiff alleges in his Complaint that Mr. Aaronson's correspondence "confirmed that tools like ChatGPTZero are not reliable." (Cmplt. ¶ 106.)  The *Yale Daily News*, however, quotes Mr. Aaronson as explaining that ChatGPTZero can "detect the probability of AI use 'in the high 90s.'" (**Exhibit AA** (quoting Mr. Aaronson).)  Regardless, the Committee did not consider the ChatGPTZero printouts in its deliberations.  (Choi Aff. ¶ 32.)

Plaintiff left the meeting and the Honor Committee began deliberating.  (Choi Aff. ¶ 24.)

Plaintiff then emailed the Honor Committee the documents it had been requesting for months, including the Electronic File. (Choi Aff. ¶ 24.)

Because Plaintiff had just disclosed that he used Pages to create the Electronic File and the other document, Chair Choi researched Pages and learned that an editing history of Pages is preserved on the hard drive of the computer that produced the document. (Choi Aff. ¶ 25.) That history is not in emailed versions of the document. (Choi Aff. ¶ 25.) Chair Choi determined that Plaintiff's laptop might contain information relevant to Plaintiff's use of AI.[7] (Choi Aff. ¶ 25.)

Knowing that Plaintiff was nearby, Dean Tsung contacted Plaintiff and asked him to return with his laptop. (Tsung Aff. ¶ 14.) Plaintiff claimed he was unavailable, but he subsequently admitted to Dean Tsung that he could have returned but didn't because he was afraid the Honor Committee would seize his laptop. (Tsung Aff. ¶¶ 14, 15.)

The Honor Committee viewed Plaintiff's refusal to return as yet another delay tactic. (Choi Aff. ¶ 26.) It concluded that Plaintiff had engaged in a pattern of obstructionist behavior, including seeking baseless recusals on the eve of the meeting. (Choi Aff. ¶ 27.) It was not willing to delay the process further. (Choi Aff. ¶ 27.) The Committee concluded that Plaintiff had not been forthcoming. (Choi Aff. ¶ 28.) No other student had ever ignored requests for documents. (Choi Aff. ¶ 14.) The Committee suspended Plaintiff for one year. (Choi Aff. ¶ 28.)

Chair Choi notified Plaintiff of the Honor Committee's decision the same day (November 8, 2024). (**Exhibit BB**) Plaintiff was reminded of the appeal process. (Exhibit BB.)

Thus, Plaintiff was aware on November 8, 2024, that he had been suspended. (Exhibit BB.) By then, Plaintiff had been represented by counsel for at least two months. (Exhibit W.)

---

[7] All of this could have been done months earlier had Plaintiff cooperated. Defendants are seeking Plaintiff's electronic devices, including his laptop. (*See* ECF 25.) Plaintiff is resisting Defendants' request. (*E.g.*, ECF 25.) His opposition is further proof of his failure to be forthcoming and that he may be hiding additional evidence of misconduct.

**G.    Plaintiff Appeals**

On November 14, 2024, Plaintiff emailed Dean Tsung to inquire about an appeal he planned to file and his Sourcing and Managing Funds grade. (**Exhibit CC**.) Dean Tsung replied:

> I don't know when the faculty will be meeting this week but like I said, they do plan to meet and your grade should be updated next week.
>
> Your appeal to the Faculty Review Board is for the severity of the one year suspension penalty and not the findings of the Honor Committee decision. There is no grade penalty *outcome* from the Honor Committee decision.

(Exhibit CC (emphasis added).) As the plain language of Dean Tsung's email establishes, Dean Tsung told Plaintiff there had been no "outcome" concerning a grade penalty, but not that he would not face any grade penalty. (Exhibit CC; *see also* Exhibit C (noting faculty would be meeting).)

On November 15, 2024, Plaintiff appealed his suspension. (**Exhibit DD**.) Pursuant to the Bulletin, his appeal was limited to challenging the severity of his punishment, and not the Honor Committee's findings. (Exhibit DD.) Plaintiff argued his one-year suspension was unprecedented and his punishment constituted error because the Honor Committee had found him responsible for not being forthcoming without finding him responsible for cheating. (Exhibit DD.)

The Faculty Review Board ("FRB") met and denied Plaintiff's appeal on November 19, 2024.[8] (**Exhibit EE**.) Dean Jain immediately informed Plaintiff of the decision and that his suspension would be effective the next day. (Exhibit EE.) Dean Jain also wrote:

> I am asking [Chair] Choi and the Honor Committee to continue deliberating the complaint of violation of the examination rules in the course MGT 423E: *Sourcing and Managing Funds* to determine whether you violated SOM's Honor Code. In the meantime, I am asking Professor Rouwenhorst to withhold your grade in the course. You will be informed of both outcomes by Dean [] Tsung when they are determined.

(Exhibit EE.) Dean Jain, but not the FRB, directed the Honor Committee to continue deliberation.

---

[8] Professor Rouwenhorst and the other Sourcing and Managing Funds professor, Professor Jacob Thomas, recused themselves from the FRB. (Rouwenhorst Aff. ¶ 7.)

The Bulletin gave Dean Jain that authority.  (Bulletin at 70.)

The Honor Committee reconvened to continue deliberating whether Plaintiff used AI. (Choi Aff. ¶ 31.)  It concluded that he had, determining that Plaintiff should receive an "F" in Sourcing and Managing Funds, and notified Plaintiff of its decision the same day, November 21, 2024.  (Choi Aff. ¶ 31.)  The Honor Committee also considered whether Plaintiff used AI on the Investor final examination but concluded that it had insufficient evidence to hold Plaintiff responsible for using AI on that examination.[9]  (Choi Aff. ¶ 35.)  The Committee gave no weight to the ChatGPTZero scans in its deliberations and instead relied on other evidence—including the similarities between Plaintiff's response and ChatGPT's response.[10]  (Choi Aff. ¶ 32.)

Plaintiff appealed the imposition of the "F" to the FRB on December 2, 2024.  (**Exhibit FF.**)  He challenged the severity of his penalty and asserted that the FRB "exceeded the scope of its authority" by having the Honor Committee continue its deliberation.  (Exhibit FF.)  On December 11, 2024, the FRB denied Plaintiff's appeal of his "F."  (**Exhibit GG.**)  Dean Jain notified Plaintiff of the FRB's decision that same day.  (Exhibit GG.)  Dean Jain also addressed Plaintiff's claim that the FRB had acted improperly:

> My letter of November 19, 2024 made it clear that it was my decision as the cognizant dean, and not the FRB's, to ask the Honor Committee to continue deliberating the original complaint of violation of exam rules, a complaint on which the Honor Committee did not reach a decision in its first hearing.  This directive to the Honor Committee is fully within my authority and responsibility as the cognizant dean.  Moreover, this directive did not issue a new charge to the Honor Committee.  The only charge the Honor Committee considered in its continued

---

[9] Plaintiff complains that he was confused about what exactly he was charged with because it wasn't clear to him that the Honor Committee was examining his conduct on the Investor final examination.  The Defendants dispute Plaintiff's argument, but the Court need not consider that argument because the Honor Committee did not make a finding about the Investor examination.

[10] The Honor Committee had ample evidence that Plaintiff used AI without the scans.  The Committee had ChatGPT's response to one of the questions on the Sourcing and Managing Funds examination.  (Exhibit M.)  ChatGPT's response was different from the ChatGPTZero scan—the scan provided the probability that the submission was generated by AI while ChatGPT's response was actual text that the Honor Committee compared to what Plaintiff wrote.  (*E.g.*, Exhibit M.)  Chat GPT's response was similar to Plaintiff's response in a number of ways.  (*E.g.*, Choi. Aff. ¶ 15.)

deliberation, and issued a ruling on, was the original charge of violating the exam rules in MGT 423E.

(Exhibit GG.)

On December 12, 2024, Dean Tsung sent Plaintiff a letter discussing the terms of his discipline. (**Exhibit HH**.) She explained that he would have to remediate Sourcing and Management Funds and that another course Plaintiff was in the midst of, Colloquium, would remain incomplete and had to be addressed upon Plaintiff's return from suspension. (Exhibit HH.) She explained that <u>Plaintiff is eligible to return to the Program after the Program's Residency Week in July 2025.</u>[11] (Exhibit HH.)  Dean Tsung also noted that <u>Plaintiff needs to take ten (10) more classes to graduate,</u> not including his required remediation. (Exhibit HH.)  Finally, Dean Tsung noted that Plaintiff has an outstanding overdue fee balance that, pursuant to Yale policies, must be paid before Plaintiff can return. (Exhibit HH.)  Plaintiff's fee balance is approximately $32,000. (Tsung Aff. ¶ 38.)

### H.    The Current Status

In order to graduate, <u>Plaintiff must complete ten courses</u> and remediate Sourcing and Managing Funds, which generally requires retaking the entire course. (Tsung Aff. ¶ 17.) Plaintiff has not started seven of the ten courses he needs to graduate. Further, he was withdrawn from two of the three courses he started and he needs to restart those two courses from the beginning. (Tsung Aff. ¶ 17.)  It would be impossible for Plaintiff to fulfill these requirements and graduate in his original class year. (*E.g.*, Tsung Aff. ¶ 28; *see also infra.*)  <u>Classes end May 3, 2025</u>, and <u>Commencement is May 19, 2025</u>. (Tsung Aff. ¶ 18.)

<u>Eight of the ten outstanding courses are required courses</u> that Plaintiff must complete to

---

[11] Plaintiff has raised the requirement that students must generally complete the Program in twenty-two months. (*See* ECF 24.)  As Dean Tsung's letter makes clear, the Program is not enforcing that policy against Plaintiff and he is "eligible to return to the [P]rogram" in July 2025 and complete his degree. (Exhibit HH; Tsung Aff. ¶ 37.)

graduate.[12]  (Tsung Aff. ¶¶ 22, 25, 27, 28, 29; Bulletin at 35–36.)  <u>Of those eight courses, only two</u> <u>are being offered from start to finish between now and graduation</u> in either the Program or the regular MBA program.  (Tsung Aff. ¶¶ 23, 26, 29.)  Three of the remaining six required courses are underway in the Program right now, but Plaintiff will have missed most of them by late March 2025, and that still leaves <u>three required courses that have concluded for the year and are not being</u> <u>offered in either the Program or the regular MBA program at all this term</u>.  (Tsung Aff. ¶ 24; **Exhibit HH**.)  <u>There are no summer classes</u> in either the Program or the regular MBA program. (Tsung Aff. ¶¶ 5, 6.)  The earliest Plaintiff could potentially take those three courses is next fall, after he is reinstated.  (Tsung Aff. ¶ 23.)  Plaintiff cannot graduate by watching videos of those courses or the ongoing courses he has largely missed because, as Plaintiff concedes, class participation, group work, etc. are fundamental components of the Program.  (Tsung Aff. ¶¶ 7, 8, 31; *see* ECF 24-4[13].)  Nor is it reasonable to impose an undue burden on the SOM by requiring it to reassign professors to work with Plaintiff on coursework he has missed.  (Tsung Aff. ¶ 31.)

It is also impossible for Plaintiff to complete Colloquium this year.  (Tsung Aff. ¶ 27.) Colloquium classes are not recorded and Plaintiff cannot watch recordings to catch up.  (Tsung Aff. ¶ 27.)  Nor can Plaintiff remediate Sourcing and Managing Funds this year.  (Tsung Aff. ¶ 30.)  It is impossible for Plaintiff to meet the requirements of the Program and graduate this year,

---

[12] In his Supplemental Declaration (ECF 24 at ¶ 5), Plaintiff asserts there are no required classes in the second year of the Program and that he therefore does not need to take any particular courses to graduate.  Dean Tsung's Affidavit and the Bulletin establish otherwise.  A list of classes that students "must" take to graduate begins on page 35 of the Bulletin.  (Bulletin at 35.)  Page 36 of the Bulletin lists a number of "year-two courses" all students must take to graduate and that students in the Asset Management Track (including Plaintiff) must take to graduate.  (Bulletin at 36.)  The courses listed include courses Plaintiff admits he missed (ECF 24 at ¶ 8) and the Class Schedule (Exhibit 2 to Dean Tsung's Affidavit) shows that Plaintiff missed several additional required classes, as Dean Tsung explains.

[13] The syllabi attached to Plaintiff's Supplemental Declaration establish that class participation is essential.  *See* ECF 24-4 at 6–7 (Leading Small and Medium Enterprises:  Grade is 30% class attendance); 20 (Competitive Strategy: Grade is 25% class preparation and participation and 25% exercises in pairs); 32 (ESG Investing:  Grade is 25% class attendance and participation); 54 (Legal Context of Management:  Grade is 40% final group presentation).

and Plaintiff should not be allowed to graduate without completing core Program components. This is especially true when the reason Plaintiff has not done so is Plaintiff's own misconduct.

## III.    THE EXTRAORDINARY STANDARD AT ISSUE

"A preliminary injunction is an <u>extraordinary equitable remedy</u> that is <u>never awarded as of right</u>."[14] *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (emphasis added) (quotation marks omitted).  Put differently, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quotation marks omitted).

The Supreme Court recently reaffirmed "that a plaintiff seeking a preliminary injunction must make a clear showing that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Starbucks Corp.* 602 U.S. at 346 (*quoting Winter v. Nat'l Res. Defense Council, Inc.* 555 U.S. 7, 20 (2008)).

"The question is not whether the plaintiff has suffered irreparable harm, but whether [he] will be irreparably harmed *in the absence of an injunction*.  In other words, the injunction must prevent or remedy the harm." *Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07CV1562(ERK)(RML), 2008 WL 207843, at *6 (E.D.N.Y. Jan. 24, 2008), *aff'd and remanded sub nom. Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885 (2d Cir. 2008)

"Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A.*

---

[14] "The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *New York v. Trump*, No. 25-CV-01144 (JAV), 2025 WL 455406, at *2 (S.D.N.Y. Feb. 11, 2025).

*v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (noting that significant delay may be grounds to deny injunction). Thus, a delay in filing suit or seeking a preliminary injunction "may, standing alone, preclude the granting of injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (alteration and internal quotation marks omitted); *see also, e.g., Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 35 (2d Cir. 1991) (delay belies irreparable harm); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief . . . .").

In *Montague*, 2017 WL 4942772, at *4, the Court explained:

> [Plaintiff's] assertion that he will suffer irreparable harm is weakened by his delay in filing the within motion. If [plaintiff] believed he was facing irreparable harm from his expulsion, he should have filed the within motion earlier. Instead, [plaintiff] waited over four months since the initial filing of his suit to file the within motion. [Plaintiff's] own delay suggests that he was not facing irreparable harm that required immediate action to remedy an imminent and non-speculative harm, but a harm that could be remedied upon a final adjudication of the merits.

*Id.* (footnotes omitted).

"[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11 CIV. 325 RJH, 2011 WL 1419612, at *7 (S.D.N.Y. Apr. 11, 2011) (collecting cases denying injunctions where delay was twelve weeks). The Second Circuit has "found delays of as little as ten weeks sufficient to defeat [any] presumption of irreparable harm that is essential to the issuance of a preliminary injunction." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005).

In *Knoch v. Univ. of Pittsburgh*, No. 2:16-CV-00970-CRE, 2016 WL 4570755, at *1 (W.D. Pa. Aug. 31, 2016), a student who was suspended due to a domestic incident filed a motion for a preliminary injunction seeking reinstatement. The Court denied it, noting in part:

> Plaintiff filed his Motion for Preliminary Injunction on July 11, 2016, thirteen days after he filed his complaint and two months after Provost Beeson accepted the

[University Review Board]'s recommendation [on] May 12, 2016 and the adjudication process ended. Plaintiff provides no excuse for failing to file his motion for preliminary injunction until <u>two months</u> after he was put on final notice of his suspension, and approximately <u>a month and a half before the commencement of the Fall 2016 semester</u>. While his delay is not determinative, as Plaintiff has failed to otherwise show irreparable harm, his delay in seeking preliminary injunctive relief tends to negate the immediacy of his alleged irreparable harm.

*Id.* at \*9 (emphasis added).

And in *Anyadike v. Vernon Coll.*, No. 7:15-CV-00157-O, 2016 WL 107901, at \*1 (N.D. Tex. Jan. 11, 2016), a student dismissed from a nursing program sought a preliminary injunction seeking reinstatement to his program. The Court denied the motion, explaining in relevant part:

[Plaintiff's] several-month delay in filing until weeks before he would have otherwise graduated from the LVN Program not only limits the Court's ability to analyze Plaintiff's claims, it militates against a finding of irreparable harm.

*Id.* at \*10 (quoting the Court's Prior Order).

The showing a plaintiff must make is heightened when the plaintiff seeks a mandatory, as opposed to prohibitory, injunction. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Status quo" is defined as "[t]he situation that currently exists." *Union Cosm. Castle, Inc. v. Amorepacific Cosms. USA, Inc.*, 454 F. Supp. 2d 62, 68 (E.D.N.Y. 2006) (quotation marks omitted) (holding that seeking "reinstatement of business relations" constituted a request for a mandatory injunction). "A mandatory preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). In other words, it is not sufficient for a plaintiff seeking a mandatory injunction to establish, for example, merely a likelihood of success on the merits—he "must meet the more rigorous standard of demonstrating a 'clear' or 'substantial'

likelihood of success on the merits." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008).

A request for reinstatement to an educational institution is a request for a mandatory injunction, particularly when the status quo is that the student has been suspended for months before seeking an injunction. *Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020), one of the cases Plaintiff principally relies on, held that the plaintiff in that case sought a mandatory injunction because he had been suspended from his university before he filed suit and was requesting to reenroll and therefore sought "to alter the status quo." And in *Montague v. Yale Univ.*, No. 3:16-CV-00885(AVC), 2017 WL 4942772, at *3 n.10 (D. Conn. Mar. 8, 2017), the Court held that a student was "moving for a mandatory injunction because he [was] requesting the [C]ourt to order Yale to reinstate him, which is an affirmative act as [the student] ha[d] already been expelled and removed from Yale's campus."[15]

"[T]he denial of a preliminary injunction [is reviewed] for abuse of discretion." *Doniger*, 527 F.3d at 47.

## IV.    ARGUMENT

Plaintiff has not come close to making the extraordinary showing required of him.

---

[15] *See also, e.g, Barsoumian v. Williams*, 29 F. Supp. 3d 303, 319 (W.D.N.Y. 2014) (plaintiff surgical resident's motion for preliminary injunction seeking "reinstatement as an active surgical resident for the purpose of continued training during the pendency of this action" sought mandatory relief); *Holmes v. Poskanzer*, No. 1:06-cv-00977, at 5 (N.D.N.Y. Jan. 3, 2007) ("because Plaintiffs seek an injunction that would command SUNY-New Paltz to reinstate them and alter the status quo, they are moving for a mandatory injunction, and must meet a higher showing for the issuance of an injunction in this matter"); *Cartagena v. Crew*, No. CV–96–3399, 1996 WL 524394, at *5 (E.D.N.Y. Sept. 5, 1996) (reinstatement of suspended school board members would constitute mandatory relief); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1261 (10th Cir. Colo. 2005) (observing that mandatory injunctions do not always alter status quo, and holding that plaintiff-professor's motion for preliminary injunction seeking reinstatement, "[w]hile merely seeking restoration of the status quo," nonetheless would require an affirmative act and therefore requested mandatory relief); *Preston v. Bd. of Trs. of Chi. State Univ.*, 120 F. Supp. 3d 801, 804-05 (N.D. Ill. 2015) (reinstatement of expelled university student would constitute mandatory relief).   Some Courts have held that seeking reinstatement is prohibitory rather than mandatory, but those cases are distinguishable.   In *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, *2 n.7 (D. Vt. Sept. 16, 2015), for example, the "Court [did] not view the injunction as altering the status quo where Plaintiff sought a preliminary injunction seeking to prevent interruption in his pursuit of a degree two days after the denial of his final administrative appeal" and because the student was listed as an "active" student and billed for the upcoming semester *after* he filed suit. *Id.* at *1 (suit filed August 28, 2015), *2 n.7 (listed as an active student as of September 11, 2015).

**A.    Plaintiff Seeks A Mandatory Injunction And Must Meet The Higher Standard**

Plaintiff seeks a mandatory injunction.  Plaintiff seeks, among other things, the exact relief—reinstatement—that the plaintiffs sought in *Doe v. UConn* and *Montague* where Judges of this Court held that the injunctions sought were mandatory.[16]  *Doe*, 2020 WL 406356, at *2; *Montague*, 2017 WL 4942772, at *3 n.10.  The status quo for months has been that Plaintiff is suspended.  Plaintiff seeks a mandate undoing his suspension, requiring a path permitting him to graduate immediately and changing his "F" grade in a class that is required for him to graduate, which was an "Incomplete" for months before the "F" was imposed.  This is far different from cases where Courts have found the relief to be prohibitory.  In *Doe v. Middlebury*, 2015 WL 5488109, *2 n.7 (D. Vt. Sept. 16, 2015), for example, the injunction was prohibitory because the student filed the motion "two days after the denial of his final administrative appeal" when his college still considered him an "active" student.  Those are not the facts here.

Regardless, Plaintiff has not come close to satisfying any standard for an injunction.

**B.    The Court Should Deny Plaintiff's Motion Because Of Plaintiff's Delay**

Plaintiff failed to seek a preliminary injunction for more than three months after his suspension and shortly before the end of classes.

Plaintiff was suspended on November 8, 2024.  (Exhibit BB.)  By that date, he had been represented by his counsel for at least two months.  (Exhibit W (copying counsel on a September 9, 2024, email).  Plaintiff's appeal of his suspension was denied on November 19, 2024, and he was notified of that fact that same day.  (Exhibit EE.)  Plaintiff should have filed his Motion within hours of either his suspension or the denial of his appeal.  *E.g.*, *Doe v. Middlebury*, 2015 WL

---

[16] The fact that Plaintiff has drafted his requested relief as asking the Court to prohibit Yale from doing certain things is not dispositive.  *See Montague*, 2017 WL 4942772, at *3 n.10 (what the plaintiff is seeking is what matters, not how he "label[s]" his request).  Indeed, Yale already did the things, like suspending Plaintiff, Plaintiff seeks to prevent.

5488109, *1 (filing for injunction two days after appeal denied); *Doe v. Univ. of Conn.*, 2020 WL 406356, at *1, *2 (filing for injunction five days after sanction finalized). Plaintiff's "F" was imposed on November 21, 2024, and his appeal regarding that was denied on December 11, 2024. (Exhibit FF; Exhibit GG.) But Plaintiff waited until February 25, 2025, to file his Motion. (ECF 16.) That was about <u>3 months and 17 days</u> (109 days) after Plaintiff was suspended, <u>3 months and 6 days</u> (98 days) after Plaintiff's appeal of his suspension was denied, <u>3 months and 4 days</u> (96 days) after he received his "F", and <u>2 months and 14 days</u> (76 days) after that appeal was denied.

All of those dates are over the two-month time period in which Courts will "typically decline to grant preliminary injunctions" because of delay. *Life Techs. Corp.*, 2011 WL 1419612, at *7. They are longer than the two-month delay found too long in *Knoch*, 2016 WL 4570755, at *1. All of the dates other than the denial of Plaintiff's appeal related to his "F", which could have been added to a Motion previously filed (*see* ECF 23 & 24), are over the three-month time period that courts have repeatedly held to be too long. *Life Techs. Corp.*, 2011 WL 1419612, at *7 (collecting cases). Plaintiff delayed filing his Motion for more than three months despite knowing that he was missing classes and that Commencement was rapidly approaching. (*E.g.*, Tsung Aff. ¶ 18.) *See Anyadike*, 2016 WL 107901, at *1 (noting that the plaintiff's decision to wait until weeks before graduation to file undermined his claim and the relief that could be afforded). If the harm that Plaintiff claims was truly irreparable or anywhere near as serious as he claims, Plaintiff would not have waited so long to file the Motion. Plaintiff has been well aware of his rights. He had legal counsel for at least two months before he was even suspended.[17] (Exhibit W.)

---

[17] At the Preliminary Status Conference with the Court, Plaintiff's counsel suggested the delay in filing was due to counsel's illness. Plaintiff has four attorneys, including Attorney Christine D. Brown. (*See* Cmplt. at 49.) His attorneys have represented him since at least September 2024. (Exhibit W.) Regardless, any excuse for the delay does not change the fact that the relief Plaintiff seeks is impossible because of the delay. *See infra.*

The extraordinary remedy of a preliminary injunction is not warranted for plaintiffs who do not work expediently to protect their rights. The Court should deny Plaintiff's Motion.

### C.    The Court Should Deny Plaintiff's Motion Because He Seeks The Impossible

When deciding a motion for a preliminary injunction, the question is "not whether the plaintiff has suffered irreparable harm, but whether [he] will be irreparably harmed *in the absence of an injunction.*" *Nat'l Elevator*, 2008 WL 207843, at *6. Plaintiff cannot satisfy that standard because it is now impossible for him to graduate with his class. As described above, <u>Plaintiff cannot meet the academic requirements of the Program before Commencement this year</u>. (Tsung Aff. ¶ 17.) Classes end May 2, 2025, and Commencement is May 19, 2025. (Tsung Aff. ¶ 18.) If the Court were to grant Plaintiff's Motion on the day proposed for oral argument (April 7, 2025 (ECF 32)), that leaves approximately <u>twenty-six</u> (26) days for Plaintiff to complete nine courses start to finish, complete a tenth course (that is incomplete), and remediate Sourcing and Managing Funds. That is impossible. A number of required courses will not be offered until next year.[18] (Tsung Aff. ¶¶ 23, 26.) As the syllabi that Plaintiff has submitted establish, it is impossible for Plaintiff to pass several classes even if he could somehow manage to do more than six months of work in 26 days because class grades are based in significant part on participation or group work that Plaintiff cannot complete simply by watching videos and submitting work. (See ECF 24-4.) For example, 50% of the grade in the Competitive Strategy course that Plaintiff missed entirely is based on preparation and participation (25%) and exercises completed with another student (25%). (ECF 24-4 at 20.) Plaintiff cannot participate or complete exercises in a class that ended months ago. And Plaintiff's request to catch up on work independently over the summer seeks a fundamental alteration of the Program. The Program is not based on independent study. Learning

---

[18] Plaintiff admits that not all of the courses at issue are offered even in the regular MBA program. (ECF 24 ¶ 14.)

Teams, class participation, etc. are essential to meeting the Program requirements.  (*E.g.*, Tsung Aff. ¶¶ 7, 8.)  This further establishes why Plaintiff's delay in filing his Motion is unreasonable.  It also establishes that what Plaintiff is asking for is not feasible.  The Court should therefore deny Plaintiff's Motion on this basis as well.

### D.    Plaintiff Cannot Establish Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999) (internal quotation marks omitted).  "Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* at 234 (internal quotation marks omitted).  "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Id.* (quotation marks omitted).  In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Id.*  A plaintiff must establish irreparable harm for every action he asks the defendant to take. *Mostaghim v. Fashion Inst. of Tech.*, No. 01 CIV. 8090 (HB), 2001 WL 1537545, at *1 (S.D.N.Y. Dec. 3, 2001).

In *Phillips v. Marsh*, 687 F.2d 620, 621 (2d Cir. 1982), a cadet in her final semester at West Point was expelled for obtaining too many demerits, the last of which related to a drunk driving accident.  She sought and obtained a preliminary injunction ordering, among other things, her reinstatement and graduation.  *Id.* at 621–22.  On appeal, the Second Circuit reversed:

> We can conceive of no irreparable harm that would accrue to her in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages.

*Id.* at 622.[19]

---

[19] In dicta, the Second Circuit considered that the interruption of the plaintiff's academic work "may well have been" irreparable, but that issue was not before the Court because plaintiff had completed her coursework following her

"Numerous courts in this Circuit have [accordingly] concluded that a dismissed student will not suffer irreparable harm in the absence of reinstatement." *Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *6 (D. Conn. Mar. 31, 2020) (collecting cases). In *Madej*, former Chief Judge Hall held that a student who had been dismissed (withdrawn) from Yale had "not shown that he [would] be irreparably harmed absent reinstatement at Yale this semester" noting that his ability to obtain his degree was at most delayed by two semesters." *Id.* at *7. The Court rejected the plaintiff's arguments that purported reputational harm or immigration consequences (the student had been attending Yale on an F1 visa) were sufficient. *Id.*

In *Stockstill v. Quinnipiac Univ.*, No. 3:10-CV-265 (VLB), 2010 WL 2011152, at *5 (D. Conn. May 19, 2010), the Court denied a preliminary injunction seeking admission:

> The Court is unpersuaded by the Plaintiff's claims of irreparable injury. The Plaintiff's contention that missing classes for one semester will impede his future educational and career opportunities is purely speculative, as he has presented no evidence to support this contention. *See Ben–Yonatan v. Concordia College Corp.,* 863 F.Supp. 983, 986 (D.Minn.1994) (rejecting student's claim that her suspension from college would cause irreparable injury because she may never be admitted to medical school due to the resulting break in her academic record as "purely speculative").

In *Caiola v. Saddlemire*, No. 3:12-CV-00624 VLB, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013), the Court concluded that a student expelled "on the verge of graduation" could not show irreparable harm even though he had been accepted into graduate school:

> While an expulsion is a severe penalty, particularly since [plaintiff] was on the verge of graduation and had been admitted into a masters in education program, he is not entitled to the relief sought because he has failed to establish irreparable harm. In order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries. [Plaintiff] argues that the stigma of his expulsion will interfere with his academic and teaching career. Such interference is speculative. While he states that he was admitted into a masters program contingent on his graduation from UConn, he has

---

reinstatement. *Id.* Regardless, as discussed below, many Courts have since recognized that the interruption of an educational program does not constitute irreparably injury. *See infra.*

failed to offer any evidence that his expulsion did in fact or even was likely to result in a rescission of his admission.

In *Montague*, 2017 WL 4942772, at *4, the Court concluded that:

the harms [plaintiff] alleges [including a "delay in completing his education, not graduating with his contemporaries, and the possibility of decreased employment opportunities"] are quantifiable and can be adequately remedied by money damages. If [plaintiff] prevails on the merits of his underlying claims and he is reinstated to Yale, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation. *See Pierre v. University of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("Moreover, courts have also held that a suspension is not irreparable."); *Howe v. Pennsylvania State University—Harrisburg*, No. 1:16-0102, slip op. at 6 (M.D. Pa. Feb. 2, 2016) ("[T]he court finds that even if the plaintiff would experience a delay as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted."). If [plaintiff] is in fact reinstated, he could potentially recover monetary damages for the wrongfully imposed "suspension" time period.

In *Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 WL 6222918, *6, *7 (S.D.N.Y. Nov. 21, 2019), the Court denied a preliminary injunction to a suspended student:

[T]he Court concludes on the record before it that the harm that Plaintiff will suffer from suspension for a single semester at beginning of his senior year is not irreparable. As the Second Circuit has held, the harms a plaintiff might suffer from a delay in graduation are quantifiable and can be adequately remedied by money damages, should the plaintiff prevail on the merits of his case. *See Phillips v. Marsh*, 687 F.2d 620 (2d Cir. 1982) (West Point cadet failed to show irreparable harm as required to obtain a preliminary injunction requiring the United States Military Academy at West Point to graduate and commission her, because any damages which would accrue to her from deferring her career as a military officer would be compensable by money damages). . . .

If Plaintiff is denied injunctive relief at this early stage in the proceedings, the primary, serious, and non-speculative harm he will suffer is the delay of a single semester in his education and graduation. Such a delay, under the circumstances presented in this case, does not constitute harm that would not be compensable by money damages. Because Plaintiff has not demonstrated that he would be irreparably harmed absent the issuance of a preliminary injunction, his application must be denied.

And in *Mostaghim v. Fashion Inst. of Tech.*, No. 01 CIV. 8090 (HB), 2001 WL 1537545, at *2 (S.D.N.Y. Dec. 3, 2001), the Court denied a preliminary injunction where

FIT ha[d] only temporarily suspended [plaintiff]. That punishment, essentially a brief delay of graduation, does not constitute an irreparable harm. *See Phillips v. Marsh,* 687 F .2d 620 (2d Cir.1982) (Court declined to order West Point to reinstate a cadet so that she might graduate because if the cadet ultimately prevailed she could then be reinstated and a delay in graduation does not constitute irreparable harm). At the hearing, I indicated that [plaintiff] would not necessarily suffer irreparable harm if he were suspended for a longer period or expelled from FIT, since the irreparable harm would flow from the permanent deprivation of his degree, which is not the inevitable consequence in this case of either suspension or expulsion.

In addition to these cases, there are many similar cases from other Circuits.[20]

Plaintiff cites a few cases from this District or Circuit and several cases from elsewhere.

(*See* ECF 18 at 11–12, 16.) Those decisions are in the small minority and are also distinguishable.

---

[20] *Salau v. Denton,* 139 F. Supp. 3d 989 (W.D. Mo. 2015); Knoch, 2016 WL 4570755, at *27-28 (plaintiff's speculative contention that he would be unable to enter the workforce due to his suspension did not constitute irreparable harm, and any interruption of his education and delay in entering the workforce could be adequately compensated by monetary damages); *Pham v. Univ. of La. at Monroe,* No. 3:16-cv-00467, at 17 (W.D. La. July 13, 2016) (plaintiff's expulsion did not amount to irreparable harm because university had already expelled plaintiff by the time he brought suit and "[t]herefore, there is no threat of irreparable injury or reason to preserve the status quo because the status quo is not what is desired"); *Howe v. Pa. State Univ. Harrisburg,* No. 1:16-0102, 2016 WL 393717, at *6 (M.D. Pa. Feb. 2, 2016) ("even if the plaintiff would experience a delay [in his education] as a result of his suspension, this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted"); *Doe v. Ohio State Univ.,* 136 F. Supp. 3d 854, 870-71 (S.D. Ohio 2016) ("humiliation, extreme anxiety, mental distress and damage to his reputation" produced by the investigative and disciplinary process associated with a complaint against the plaintiff or sexual harassment was not sufficient to establish irreparable harm, nor was the fact that the proceedings may become memorialized in documents that could be publicly available); *Preston,* 120 F. Supp. 3d at 805-06 ("a student's ambitions in a particular future employment path" do not warrant the entry of a mandatory interlocutory injunction); *B.P.C. v. Temple Univ.,* No. 5:13-cv-07595, at 8-9 (E.D. Pa. Aug. 27, 2014) (plaintiff failed to establish irreparable harm because he did not put forth evidence showing that he was "potentially barred" from employment, but merely impaired from obtaining employment; and plaintiff's loss of education can be remedied since reinstatement is a possible remedy if he prevails at trial); *LaFreniere v. Regents of the Univ. of Cal.,* No. C 04-05308, 2006 WL 1867706, at *4 (N.D. Cal. July 6, 2006) (plaintiff's unsupported claim that he will suffer "irreparable psychological injury" if injunction is denied held insufficient to establish irreparable harm); *Marsh v. Del. State Univ.,* No. Civ.A. 05–00087, 2006 WL 141680, at *6 (D. Del. Jan. 19, 2006) (delay in education does not constitute irreparable harm where university has policy that would permit plaintiff to reapply three years following expulsion); *Baer v. Nat'l Bd. of Medical Examiners,* 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (in the context of a medical student's ADA claim, "[the plaintiff's] inability to continue as a medical student without interruption at Drexel, while [un]desirable, is not a harm that is irreparable to [plaintiff's] potential medical career"); *Ben-Yonatan v. Concordia Coll. Corp.,* 863 F. Supp. 983, 986 (D. Minn. 1994) (plaintiff's argument that she may never be admitted to medical school because of her one year break in her academic record is purely speculative and not sufficient to show the irreparable harm necessary to justify injunctive relief); *Sohmer v. Kinnard,* 535 F. Supp. 50, 52 (D. Md. 1982) ("a mere delay in plaintiff's entry into the profession does not constitute irreparable harm"); *Law v. William Marsh Rice Univ.,* 123 S.W.3d 786, 794-95 (Tex. App. Houston 14th Dist. 2003) ("[The plaintiff] will not be able to return to Rice for two semesters and, therefore, will not have the opportunity to pursue any job with his degree qualifications for at least a year. . . . Such harm, however, can be compensated by monetary damages"); *Boehm v. Univ. of Pa. Sch. of Veterinary Med.,* 392 Pa. Super. 502, 524 (Pa. Super. Ct. 1990) (trial court abused discretion by issuing a preliminary injunction because suspended students could be compensated by monetary damages).

For example, *Doe v. Middlebury*, 2015 WL 5488109, at *3 explained:

> This case presents a unique situation where Plaintiff was exonerated of the charge of sexual assault by one U.S. institution following an investigation and hearing, allowed to continue his studies the next term, and subsequently determined by his college following a second investigation of the same allegation to have committed sexual assault, after which he was expelled.

Those facts are nothing like the facts here.

Plaintiff's other cases involve programs and situations that are not comparable to the EMBA Program and Plaintiff's situation. For example, *Doe v. UConn* involved a traditional undergraduate student seeking to complete his education to obtain a job and embark on his career. *Doe v. UConn*, 2020 WL 406356, at *2. *Doe v. Siena Coll.*, No. 1:22-CV-1115 (BKS/TWD), 2023 WL 197461 (N.D.N.Y. Jan. 17, 2023), involved an ROTC student who "identified a specific job"—a prestigious commission in the United States Army—that was "contingent upon his graduation" and established that he was "unlikely to be offered another similar position." *Id.* at *13. The Court thus distinguished the case from the "[m]any" cases holding that "the plaintiff had not made a showing of irreparable harm because any harm to employment or reputation stemming from a gap in studies was too 'speculative.'" *Doe v. Siena*, 2023 WL 197461, at *13.

Plaintiff is nothing like an undergraduate or even normal graduate student about to embark on their career. Plaintiff is an experienced and successful entrepreneur who runs his own companies and who represents on LinkedIn that his companies have revenues exceeding $1,000,000 annually. (Exhibit F.) Concerns about purported "gaps" in résumés that a small minority of Courts have found to be applicable to undergraduate or certain graduate students are not applicable to him. Plaintiff will have no gap in his résumé because he has been working throughout his tenure in the Program. (*E.g.*, Exhibit F.) Plaintiff identifies no job that he is certain to lose because of his suspension. He does not say that he plans to change jobs.

Plaintiff's claims are the classic assertions that Courts have held are not irreparable and are instead speculative. Plaintiff's claim that his suspension might one day have an impact on his immigration status unless the Court grants an injunction is beyond speculative. *Madej*, 2020 WL 1614230, at *7 (rejecting claim about immigration concerns). It is not clear when Plaintiff may need to apply for new status, or what that status would be. Plaintiff is in a part-time MBA program. It would not be unusual for him to take three years to finish it.

There is nothing close to irreparable harm here. The Court should deny Plaintiff's Motion.

### E.    Plaintiff Is Not Likely To Succeed On His Claims

Plaintiff cannot show that he is likely to succeed on his claims, never mind that he is clearly or substantially likely to do so. Plaintiff's claims are baseless.

*1.    Plaintiff Engaged In The Misconduct He Was Found Responsible For*

Plaintiff was not forthcoming with the Honor Committee and he cheated on the Sourcing and Managing Funds examination by using AI.

The Honor Committee sent Plaintiff email after email asking for the relevant Electronic File. (*E.g.*, Exhibit Q.) He should have responded promptly and candor required that he early on disclose using Pages instead of Word. He waited until after the Honor Committee meeting to provide the Electronic File, and made the absurd excuse that he could not produce a "Word" document because he used Pages. (Choi Aff. ¶ 22.) None of Plaintiff's conduct was forthcoming.

One of Plaintiff's examination answers included a sentence that was virtually identical to a ChatGPT prompt. (Exhibit L ("By increasing the dividend, [the company] signals to investors that it is confident in its financial health and future cash flows."); Exhibit M ("By increasing dividends, the company signals to investors and the market that it has strong financial health and confidence in its future cash flows.").)

Even if Plaintiff could prove breaches of process, which as discussed below he cannot, any such breaches were technical and harmless because Plaintiff cheated and was not forthcoming. He therefore has no damages. *See infra.*

### 2.    *Educational Deference Precludes Plaintiff's Claims*

Federal and state law require deference to the University's decisions and Plaintiff cannot overcome that deference.

The Supreme Court has explained that "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Thus, "'courts are chary about interfering with academic decisions made by private colleges and universities.'" *Charest v. President & Fellows of Harvard Coll.*, No. CV 13-11556-DPW, 2016 WL 614368, at *17 (D. Mass. Feb. 16, 2016) (alteration omitted) (quoting *Schaer v. Brandeis Univ.*, 432 Mass. 474, 482, 735 N.E.2d 373, 381 (2000)). "[A] student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court." *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016).

The Supreme Court of Connecticut has recognized a strong policy of "deference to academic decisionmaking." *E.g.*, *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 594, 687 A.2d 111, 120 (1996). As Judge Arterton explained in a cheating case:

> [I]n line with *Gupta*, Connecticut courts seek to "limit judicial intrusion into educational decision making" by requiring student plaintiffs to establish "nonperformance of a special promise, a promise outside the purview of normal educational expectations."

*Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787 at *6 (D. Conn. July 8, 2022) (quoting *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 230 (D. Conn. 2010)).

Thus, technical breaches of a contract are excused and a student may only pursue claims based on, *inter alia*, a breach of a "specific contractual promise" or where the school acted arbitrarily, meaning without "any discernable rational basis." *See, e.g.*, *Gupta*, 239 Conn. at 593, 595; *Doe v. Wesleyan*, 2022 WL 2656787, at *6.

The principles of educational deference apply regardless of the claims asserted. *See, e.g.*, *Davis*, 526 U.S. at 648 (annunciating policy of deference in Title IX case); *Mara v. MacNamara*, No. 3:14-CV-01095 RNC, 2015 WL 4392956, at *9 (D. Conn. July 15, 2015) (applying *Gupta* to negligence claim regarding discipline); *Scalzi v. Mead Sch. for Hum. Dev.*, No. XO5CV 950148213S, 1999 WL 391917, at *4 (Conn. Super. Ct. June 4, 1999) (any claim).

In *Stockstill*, 2010 WL 2011152, at *8, the Court held that the plaintiff was not likely to succeed on the merits of his claims and therefore denied his requested preliminary injunction after applying educational deference to the plaintiff's breach of contract claim and concluding that the university's actions were not "made arbitrarily, capriciously, or in bad faith."

And in *Doe v. Wesleyan*, 2022 WL 2656787, at *7, the Court granted summary judgment to the defendant university on the plaintiff's claims related to her discipline for cheating—including claims of procedural error—because plaintiff could not meet *Gupta*'s narrow exceptions.

Here, Plaintiff cannot satisfy the narrow exceptions to *Gupta* and its progeny. The University's actions in dealing with Plaintiff—who obstructed proceedings at every turn—were certainly not arbitrary and, as discussed below, Defendants did not breach any specific provision.

3. *Plaintiff Cannot Succeed on the Contract Claims*

Plaintiff cannot meet his high burden under *Gupta* because the Bulletin provides that the procedures are only "customary" and that "deviations may be taken by the [C]hair when appropriate." (Bulletin at 67.)  Even if Plaintiff could establish a violation of any Bulletin

provision, which he cannot, his claim still fails because the provisions are only customary.

Regardless, Plaintiff's claims of procedural error are baseless:

- The Professors' Preliminary Investigation:  The Bulletin provides that matters should be referred to the Honor Committee when there is a potential "probable violation."  (Bulletin at 68.)  The Professors' preliminary evaluation was appropriate to establish a "probable violation."  Nothing in the Bulletin prohibited the professors from evaluating Plaintiff's conduct and common sense supports what they did.  Plaintiff certainly cannot point to a specific provision precluding it.

- Use Of AI Detection Tools:  The SOM does not prohibit use of AI detection tools.  The policy Plaintiff points to explains why Yale has not enabled AI detection tools on its Canvas platform.  (Exhibit O.)  It simply does not prohibit the use of ChatGPTZero, etc.

- Alleged Pressure To Falsely Confess:  Plaintiff's claim is based on his mischaracterization of emails that apprised Plaintiff of the consequences of his actions and reminded him of the Honor Committee's policies.  (*E.g.*, Choi Aff. ¶ 11.)  Providing that information and making sure Plaintiff was aware of the consequences of his decisions, including potential immigration consequences, is not a breach of any policy.

- Notice Of Specific Charges:  Professor Rouwenhorst emailed Plaintiff to inform him that he was accused of violating the examination rules by using AI.  (Exhibit O.)  Professor Tsung told him the same thing.  (Exhibit O.)  Chair Choi told Plaintiff about the inquiry into the Investor examination. (Exhibit S.)  Plaintiff was well aware of the allegations.

- Notice Regarding "Not Being Forthcoming":  Plaintiff learned at orientation that not being forthcoming with the Honor Committee could lead to extremely serious penalties.  (Rouwenhorst Aff. ¶ 2.)  Chair Choi reminded Plaintiff of that fact on August 10, 2024, approximately three months before his meeting.  (Exhibit Q.)  Not being forthcoming is not a separate charge.  (Choi Aff. ¶ 16.)  It is a conclusion the Committee makes regarding a student's conduct in the process.  (Choi Aff. ¶ 16.)  Plaintiff was well aware of the fact that the Honor Committee was concerned that he was not being forthcoming.  (*E.g.*, (Choi Aff. ¶ 16; Exhibit Q.)

- Alleged Failure To Provide Documents:  Plaintiff received all the documents twenty-five (25) days before the Honor Committee meeting even though the Bulletin only required that he receive them two (2) days before the meeting. (Exhibit X; Choi Aff. ¶ 18; Bulletin at 68.)  Plaintiff's claim that the Committee withheld exculpatory documents is incorrect and based on the inaccurate contention that someone ran an additional ChatGPTZero scan.  (Choi Aff. ¶ 18.)

- Right To Seek Recusals:  Dean Tsung and Chair Choi repeatedly advised Plaintiff of his right to seek recusals in writing and Plaintiff exercised those rights.  (Exhibit W; Exhibit Y, Exhibit Z.)  Plaintiff's claim that he could not exercise this right because he was given a link to the Committee members instead of a list is absurd.  Plaintiff is an experienced professional in an Executive MBA program.  He knows how to use a link.

- <u>Plaintiff's Opportunity To Defend Himself</u>: Plaintiff has been represented by legal counsel since well before the Honor Committee meeting.  At the meeting, Plaintiff defended himself by attacking the credibility of AI detection tools.  (Choi Aff. ¶ 21.)  He defended his decision not to provide the documents the Committee requested by saying he used Apple Pages instead of Microsoft Word.  (Choi Aff. ¶ 22.)  Plaintiff's claim that the Committee failed to consider his evidence about AI detection tools is baseless—the Committee considered Plaintiff's argument but it did not matter because the Committee did not rely on the AI detection tools in reaching its conclusion.  (Choi Aff. ¶ 32.)

- <u>Asking Plaintiff To Return To The Meeting</u>:  Plaintiff cannot point to any provision that prohibited the Honor Committee from asking him to return.  There is no such provision.  Asking Plaintiff to return was rational because Plaintiff had just disclosed he had used Pages and the Committee learned his laptop would contain relevant information.  (Choi Aff. ¶ 25.)

- <u>Instructing The Committee To Continue Deliberations</u>:  The Bulletin expressly provides that Dean Jain could "remand the matter to the [C]ommittee to correct [the alleged] procedural irregularity."  (Bulletin at 70.)  Plaintiff had claimed it was error for the Committee to sanction him for not being forthcoming without deciding whether he cheated.

- <u>Imposing A Suspension And An "F"</u>:  Plaintiff's claim that the Committee could not impose a suspension and an "F" is baseless because one of the enumerated penalties is: "Suspension of one or more terms + mandatory F in course."  (Bulletin at 69.)  The Bulletin also provides that the Committee can impose "other sanctions."  (Bulletin at 68.)  Plaintiff's claim that Dean Tsung told him he would not receive a grade penalty is belied by the plain language of Dean Tsung's email—Dean Tsung said no decision on a penalty had been made, not that there would be no penalty.  (Exhibit CC.)

- <u>Excessive Penalties</u>:  There is no specific provision that Plaintiff claims his penalties violated.  No student had ever refused to provide documents the Committee requested and Plaintiff's request for not producing the documents was incredible.  The Committee's decision that a suspension was warranted was amply supported, including by the precedent discussed with Plaintiff at his orientation in which a student was expelled.

The University engaged in a fair process.  Nothing Plaintiff complains of comes close to satisfying the high standard for being arbitrary, bad faith, or a breach of a *specific* provision.  *E.g.*, *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382, 388 (2004) (bad faith required for implied covenant claims).

### 4.    *Plaintiff Has No Viable Claim Under Title VI*

To prevail on a Title VI discrimination claim, a plaintiff must show, among other things, that he was intentionally discriminated against on the basis of his race or national origin and that

the discrimination was a substantial or motivating factor for the defendant's actions. *Joy v. Crime Victims Treatment Ctr.*, No. 23-CV-11177 (MMG), 2025 WL 326521, at *6 (S.D.N.Y. Jan. 29, 2025). To prevail on a Title VI retaliation claim, a plaintiff must plead, among other things, a causal connection between protected activity and the adverse action complained of. *Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209, 215 (2d Cir. 2024). Title VI claims are subject to the well-known *McDonnell Douglas* burden shifting framework. *Joy*, 2025 WL 326521, at *6.

At no point before this civil action did Plaintiff describe any particular fact supporting a claim of discrimination or retaliation. Plaintiff's Complaint does no better. The Title VI claim fails to allege any facts to support such a claim. The Title VI claims are built on mere speculation and conclusory assertions and will be subject to dismissal. (*See* Cmplt. ¶¶ 192–196, 204–209.)

But even if they survive dismissal, there's no way Plaintiff can prove likelihood of success on the merits. Assuming without conceding that Plaintiff could establish the other elements of his Title VI claims, Plaintiff cannot establish intentional discrimination on the basis of his race or national origin or a causal connection between any protected activity and his discipline. The evidence that Plaintiff cheated and was then not forthcoming about it is overwhelming. It included, for example, uncanny similarities between Plaintiff's Sourcing and Managing Funds exam response and ChatGPT's response to a similar question—including a sentence that was nearly identical. (*See, e.g.*, Choi Aff. ¶ 15; *compare* Exhibit L, *with* Exhibit M.) More importantly, there is no dispute that the SOM sent Plaintiff request after request for the Electronic File but that he failed to produce it. (*E.g.*, Exhibit Q.) The SOM took action based on rational, nondiscriminatory conclusions that Plaintiff cheated and was not forthcoming. (*E.g.*, Rouwenhorst Aff. ¶ 6; Choi Aff. ¶ 36; Tsung Aff. ¶ 16.) Plaintiff baselessly claims he was targeted and then disciplined because he is French. But this makes no sense because the examination answers were written in

thorough English, Plaintiff has lived and worked in the U.S. for years, and he speaks fluent English (Exhibit G). Moreover, one-third of Program students are foreign-born. (Tsung Aff. ¶ 3.) Plaintiff's examination stood out to a TA as suspicious for reasons that had nothing to do with Plaintiff's nationality. (Exhibit J.) The only evidence of potential protected activity that Plaintiff has presented is his email seeking Dean Scully's recusal, but the vast majority of the Committee was unaware of that email. (Exhibit Y.) Plaintiff has not even alleged sufficient facts to survive a Rule 12(b)(6) Motion. He cannot possibly overcome *McDonnell Douglas*.

5.     *The IIED And NIED Claims Will Fail*

"Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause and does cause mental distress of a very serious kind . . . ." *Muniz v. Kravis*, 59 Conn. App. 704, 708 (2000). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'outrageous!'" *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000).

In *Greenhouse v. Yale Univ.*, No. 3:05CV1429 (AHN), 2006 WL 473724, at *1 (D. Conn. Feb. 28, 2006), the Court dismissed an IIED claim alleging that an instructor told several male actors standing next to the plaintiff to simulate masturbation and then said: "That was great! Now this time do it again, only really come!," which caused one of the male actors to simulate orgasm.

Nothing that Plaintiff has alleged comes close to meeting the high standard for IIED.

To prevail on an NIED claim, a plaintiff must establish, *inter alia*, that it was foreseeable to the defendants that their actions might cause distress that was so foreseeable "that it might result in illness or bodily harm." *Morneau v. State*, 150 Conn. App. 237, 251, 90 A.3d 1003 (2014).

Plaintiff's NIED claim fails because nothing Plaintiff claims Defendants did comes close

to foreseeably creating a risk of harm so severe that it might result in illness or bodily harm. If it did, every student who faced discipline by his or her university would be entitled to sue. That, and this claim, is the exact thing that *Gupta* was intended to prevent.

### F.    The Equities Do Not Favor Plaintiff

Plaintiff cheated, obstructed the University's investigation into his cheating, and then delayed filing his Motion. The equities do not favor Plaintiff. They favor Defendants and the non-party students who will be harmed if the Court grants Plaintiff's request.

As Judge Hall explained in *Madej*, 2020 WL 1614230, at *19:

> Although the court acknowledges that Madej faces hardships as a result of his withdrawal, Yale's hardship is not insignificant. Yale has a legitimate interest in enforcing its clear policies, and an order requiring Yale to readmit Madej would diminish its ability to enforce those academic policies. Further, as discussed throughout this Ruling, Madej's hardships are diminished by the fact that he is eligible for reinstatement in the spring of 2021; any hardships he faces as a result of his withdrawal are temporary.

The hardship Yale would face from being required to reinstate Plaintiff goes far beyond the substantial interest in enforcing its academic policies. Plaintiff is asking the Court to force the SOM to fundamentally alter its Program. The requested relief will require the SOM to disregard course participation requirements, in-class learning, deadlines by which to complete courses, and to even change a grade. *See Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 409 (W.D.N.Y. 1997) (denying preliminary injunction requested by student where requested relief of attending program remotely "would be a substantial modification of the educational program"). The requested relief will impact other students who have been at SOM working diligently to lead the class as the Marshall at graduation. If the relief is granted, Plaintiff may unfairly bump another deserving student from Class Marshall. The requested relief will also unfairly impose on administrators, professors, TA's, and other students who will have to drop what they are doing, come up with a

plan that enables Plaintiff to complete ten classes in four weeks, and deal with the disruption of Plaintiff joining on-going classes that are nearing completion. Some courses Plaintiff must complete are not being offered until at least next Fall and others will be nearly over by early April. Plaintiff is asking the Court to order Yale to give him a degree based on a fundamentally altered academic program. *See Maczaczyj*, 956 F. Supp. at 409. There is no way Plaintiff can complete the ordinary course requirements before the next academic year. As the syllabi that Plaintiff has submitted establish, class participation, group projects, etc. that Plaintiff simply cannot fully make up are a key component of the Program and Plaintiff's outstanding classes. The Court should not require Yale to give Plaintiff a degree he did not properly earn.

Plaintiff's peers will be disadvantaged by their professors and TA's diverting time to Plaintiff instead of them. They will have to spend time incorporating Plaintiff into Learning Teams and group projects that have been underway for months. One member of the Class of 2025 who did not cheat and is currently slated to be Class Marshal/Valedictorian may have that honor stripped from them by a Court so that the honor can be awarded to Plaintiff despite his misconduct. Granting Plaintiff's Motion would be inequitable.

That is particularly true because Plaintiff is eligible for reinstatement in July. *Madej*, 2020 WL 1614230, at \*19 (ability to return soon weighed against plaintiff). He will be allowed to finish his classes by properly completing all course requirements. The equities do not favor Plaintiff.

### G.    The Public Interest Is In Denying Plaintiff's Motion

In *Harris as next friend of RNH v. Adams*, No. 24-CV-12437-PGL, 2024 WL 4843837, at \*24 (D. Mass. Nov. 20, 2024), a case involving a student who was disciplined for using AI, the Court held that the public interest supported the defendants because of educational deference principles. The Court explained that there "is a strong public interest in allowing school officials

to do their work undisturbed by unnecessary lawsuits." *Id.* And as Plaintiff's own cases recognize, the public has an interest "'in enforcement of university disciplinary policies.'" *Doe v. Siena Coll.*, 2023 WL 197461, at *21 (quoting *Doe v. Univ. of Conn.*, 2020 WL 406356, at *6). AI has become an endemic problem in education. (*See* Choi Aff. ¶ 5.) Schools are already struggling to address it. The public has a strong interest in not further degrading education by giving a free pass to students disciplined for refusing to cooperate with AI investigations.

Plaintiff's arguments about the public interest depend on his assertions that he did not cheat and was disciplined through an unfair process. Those assertions are baseless. Plaintiff can return to SOM in a few months, at a proper breaking point. The relief requested undermines the public interest by diverting educational resources from other students.

## V.     CONCLUSION

The Court should deny Plaintiff's Motion.

THE DEFENDANTS,
YALE UNIVERSITY, YALE
UNIVERSITY BOARD OF TRUSTEES,
WENDY TSUNG, K. GEERT
ROUWENHORST, JACOB
THOMAS, SHERILYN SCULLY,
JAMES CHOI, AND ANJANI JAIN

By: */s/ James M. Sconzo*
     James M. Sconzo (ct04571)
     Brendan N. Gooley (ct30584)
     Amanda M. Brahm (ct30581)
     CARLTON FIELDS, P.C.
     One State Street, Suite 1800
     Hartford, CT  06103-3102
     Telephone:(860) 392-5000
     Facsimile: (860) 392-5058
     E-mail:    jsconzo@carltonfields.com
               bgooley@carltonfields.com
               abrahm@carltonfields.com

     Its Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 12th day of March, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


*/s/ James M. Sconzo*
James M. Sconzo