# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE,<br>            Plaintiff, | : | CASE NO. 3:25-cv-00159-SFR |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, YALE UNIVERSITY<br>BOARD OF TRUSTEES, WENDY TSUNG,<br>K. GEERT ROUWENHORST, JACOB<br>THOMAS, SHERILYN SCULLY, JAMES<br>CHOI, AND ANJANI JAIN,<br>            Defendants. | :<br>:<br>:<br>:<br>:<br>: | <br><br><br><br>MARCH 12, 2025 |

## AFFIDAVIT OF CHAIR JAMES CHOI

I, James Choi, being duly sworn, depose and say:

1. I am over the age of twenty-one and believe in and understand the obligations of an oath. I have served on the School of Management's Honor Committee ("Honor Committee" or "Committee") for ten years and am currently the Chair of the Honor Committee. I am also a Professor of Finance in the School of Management. My duties include involvement in Honor Committee proceedings, teaching, and research.

### Background On The Honor Committee

2. The Honor Code provides that "[h]onesty is fundamental to the profession and practice of management" and "is therefore the bedrock premise of management education at Yale." It is therefore a non-negotiable expectation that students who are involved in Honor Committee matters will be forthcoming in their dealings with the Committee.

3. The Honor Committee views not being forthcoming extremely seriously and severely punishes students who engage in such conduct.

4. Students are advised of the importance of being forthcoming with the Honor Committee the moment they arrive on campus.

5. Student use of AI is a major concern for the Honor Committee. The Honor Committee takes allegations of improper AI use seriously. There is no Yale policy against using AI detection tools to investigate potential AI use. The Committee collects electronic files from students because those files often contain hidden data that is relevant to determining whether the student used AI. For example, documents may show the total amount of time that was spent editing them, or even a time-stamped history of edits. The Honor Committee expects students to comply with requests for documents as part of its expectations

138938191.1

regarding being forthcoming. Failing to do so is viewed as an extraordinary violation of the Honor Code. I am not aware of any student other than Plaintiff having ever ignored or failed to comply with requests for documents.

6. As the Procedures of the Honor Committee ("Procedures") note, the Honor Committee process outlined in the Yale School of Management Bulletin provides an overview of the procedures the Honor Committee has customarily employed. The Procedures are intended to give members of the community a general road map to the process. They are not intended to be binding. To the contrary, the Procedures provided that "deviations may be taken by the [C]hair when appropriate to a given case" and that the steps identified "are customary."

**My Investigation Into Plaintiff's Honor Committee Case**

7. I am familiar with Plaintiff's Honor Committee case. I was Chair during the case. Plaintiff's case involved the possible use of AI in violation of examination rules.

8. In accordance with the Honor Committee's customary process, the first step in Plaintiff's case was to collect relevant materials and then determine whether the matter would be referred to the Honor Committee for a meeting to discuss the matter.

9. I determined that the original electronic version of the document that Plaintiff converted to a PDF and submitted as his final examination for his Sourcing and Managing Funds class was a critical piece of evidence. I expected that the document would have data relevant to determining whether Plaintiff used AI, such as an edit history. I therefore requested that Dean Wendy Tsung ask Plaintiff for the document. Dean Tsung repeatedly asked Plaintiff to provide the document. Plaintiff did not respond.

10. I therefore contacted Plaintiff directly to ask him for the document. I first did so on August 10, 2024, via email. I asked Plaintiff to provide the document by August 12, 2024. Plaintiff did not respond, and I therefore emailed him again on August 12, 2024. Plaintiff responded on August 16, 2024, and I replied that same day.

11. I reminded Plaintiff in several of my emails about the Honor Committee's expectation that he be forthcoming and how severely the Committee treated students who are not forthcoming. My intent in making such statements was to communicate to Plaintiff the potential consequences of his failing to comply with the request for the electronic file. I did not then, nor ever, intend or attempt to coerce Plaintiff to confess. Full copies of my relevant emails communicating to Plaintiff the potential consequences of failing to comply with the request for the electronic file are attached as **Exhibit 1**.

12. I determined that it was prudent to look at coursework Plaintiff had submitted in other courses to see if a fact pattern could be established that strengthened or weakened the likelihood that Plaintiff used AI on his Sourcing and Managing Funds examination. I therefore asked the School of Management's Chief Information Officer, Kenneth Wieler, to review the final examination Plaintiff submitted for his Investor course. Mr. Wieler identified suspicious content in that examination and ran and sent me two ChatGPTZero reports that indicated a 95% probability that each of two portions of the examination were

2

written by AI.

13. On August 16, 2024, I informed Plaintiff via email that I had expanded my investigation into other coursework he had submitted and that I would be requesting at least one additional document from him.

14. On August 19, 2024, I asked Plaintiff to provide the document he used to create his Investor final examination PDF and again reminded Plaintiff to provide the document he used to create his Sourcing and Managing Funds final examination. Plaintiff did not provide either document. Plaintiff's refusal to provide the documents was unprecedented. In my ten years on the Honor Committee, no other student has ever ignored requests for documents.

### The Honor Committee Proceedings Before The Meeting

15. I decided to refer Plaintiff's case to the Honor Committee. The allegation was that Plaintiff violated the exam rules by using AI. My decision was based in significant part on Plaintiff's failure to provide the documents I had requested. My decision was also based on the nature of the allegations and the evidence against Plaintiff. If true, the allegation that Plaintiff used AI in an exam where it was prohibited would be more than sufficiently serious to warrant the attention of the Honor Committee. I felt Plaintiff may have used AI because, among other things, there were many similarities between what Plaintiff wrote in his exam questions and the response ChatGPT produced when prompted with that question. Examples of such similarities include, but are not limited to:

> *Plaintiff's SMF Exam*: "By increasing the dividend, TPR signals to investors that it is confident in its financial health and future cash flows. This confidence can help reassure investors that the company can handle the financial burden of the acquisition while continuing to reward shareholders."

> *ChatGPT*: "By increasing dividends, the company signals to investors and the market that it has strong financial health and confidence in its future cash flows. This can help to build investor confidence in the takeover process."

> *Plaintiff's SMF Exam:* "Attracting and retaining investors : A higher dividend yield can make TPR's stock more attractive to income-focused investors, which can help support the stock price during the period of uncertainty and transition associated with the acquisition."

> *ChatGPT:* "Attracting and Retaining Investors... A higher dividend can make the company's stock more attractive to dividend-focused investors, ensuring continued or increased investment during the potentially volatile period of a takeover."

> *Plaintiff's SMF Exam*: "The dividend increase is a commitment to delivering value to shareholders directly, serving as a tangible benefit that shareholders receive immediately, and potentially offsetting any concerns or uncertainties they might

3

have about the acquisition."

*ChatGPT*: "It shows a commitment to returning value to shareholders, indicating that the company is confident in managing the financial impact of the takeover."

*Plaintiff's SMF Exam*: "Announcing a dividend increase can help mitigate these concerns by providing a positive news story alongside the acquisition."

*ChatGPT*: "An increase in dividends can help mitigate this effect by providing immediate tangible returns to shareholders."

*Plaintiff's Investor Exam*:

> The beta ($\beta$) of a portfolio measures the sensitivity of the portfolio's excess returns (over the risk-free rate) to the excess returns of the market index. Beta is a proxy for risk because it's a measure of how much the portfolio's returns move in relation to the market's returns. Beta measures the tendency of the portfolio's returns to respond to swings in the market.
>
> If $\beta = 1$, then the portfolio's excess returns are expected to move in line with the market's excess returns. If the market goes up (or down) by 1%, the portfolio is also expected to go up (or down) by approximately 1%.
> If $\beta > 1$, the portfolio is considered to be more volatile than the market. It means that the portfolio's excess returns are expected to move more than the market's excess returns. If the market goes up (or down) by 1%, the portfolio is expected to go up (or down) by more than 1%.
> If $\beta < 1$, the portfolio is considered to be less volatile than the market. It means that the portfolio's excess returns are expected to move less than the market's excess returns. If the market goes up (or down) by 1%, the portfolio is expected to go up (or down) by less than 1%.

*ChatGPT*:

> The beta of a portfolio measures its sensitivity to overall market movements. It indicates how much the portfolio's returns are expected to change in response to a change in the market's returns. Specifically:
>
> • Beta = 1: The portfolio is expected to move in line with the market. If the market goes up by 1%, the portfolio is expected to increase by 1% as well, and vice versa.
> • Beta > 1: The portfolio is more volatile than the market. A beta of 1.5, for example, means the portfolio is expected to increase by 1.5% when the market rises by 1%, but also decrease by 1.5% if the market falls by 1%.
> • Beta < 1: The portfolio is less volatile than the market. A beta of 0.5 means that if the market rises by 1%, the portfolio is expected to rise by only 0.5%, and if the market falls by 1%, the portfolio is expected to decrease by 0.5%.

4

138938191.1

*Plaintiff's Investor exam*:

> Alpha (α) measures the performance of a portfolio relative to a benchmark index, adjusting for the risk taken (as measured by β). α represents the excess return of the portfolio above the return predicted by the CAPM given its β. Essentially, α is the portfolio's return beyond what would be expected based on its level of systematic risk.
>
> Positive Alpha indicates that the portfolio has outperformed its benchmark after adjusting for risk, suggesting that the portfolio manager has added value through their selection of investments.
> Negative Alpha indicates that the portfolio has underperformed its benchmark after adjusting for risk, which could be due to poor investment choices, timing, or simply the costs associated with managing the portfolio. Zero Alpha: Implies that the portfolio has earned a return exactly as expected for its level of risk. There's no excess return, but also no underperformance relative to the benchmark. Holding the market would yield an alpha equal to zero.

*ChatGPT*:

> Alpha is a measure of a portfolio's performance relative to a benchmark index, considering the risk (beta) of the portfolio. It represents the excess return of an investment relative to the return of a benchmark index, given the investment's risk level. Essentially, alpha indicates how well a portfolio has performed in comparison to what would have been expected based on its beta.
>
> Expectations for Alpha:
> • Positive Alpha: This implies that the portfolio has outperformed the benchmark index given its level of risk. This suggests superior management or selection of investments.
> • Zero Alpha: Indicates that the portfolio has performed exactly in line with the benchmark, given its level of risk. This suggests that the portfolio's performance can be fully explained by the market movements and the portfolio's beta.
> • Negative Alpha: Implies that the portfolio has underperformed the benchmark index given its level of risk. This suggests that either the investments selected or the portfolio management has not effectively added value.

16. There is no "charge" for not being forthcoming to the Honor Committee. Rather, all students are informed that they are expected to be forthcoming and I repeatedly reminded Plaintiff of that fact. As students are told and as I reminded Plaintiff, if a student is not forthcoming in his interactions with the Honor Committee, the Honor Committee imposes discipline based on that conclusion.

5

138938191.1

17. I asked Dean Tsung to notify Plaintiff of my decision to refer his case to the Honor Committee, and she did so via email on September 8, 2024. That email included links to the Honor Code, including the Procedures, as well as the list of Honor Committee members and notice that Plaintiff could request the recusal of any Committee member. The email also noted that we set the date for Plaintiff's Honor Committee meeting as October 4, 2024. We subsequently moved the meeting to November 8, 2024, at Plaintiff's request, and we informed Plaintiff on September 12, 2024, that we had moved the meeting to that date, nearly two months in advance.

18. We sent the documents we had compiled for Plaintiff's case to Plaintiff on October 14, 2024, approximately twenty-five days before the meeting and well before the "at least forty-eight hours in advance" minimum timeframe described in the Procedures. Our production included five ChatGPTZero scans—three scans related to the Sourcing and Managing Funds examination from Professor Geert Rouwenhorst and two scans related to the Investor examination from Mr. Wieler. Those were all the scans that the Honor Committee had. There are no additional ChatGPTZero scans I am aware of, and I did not withhold any such scans. Plaintiff's claim that there is a sixth scan is inaccurate.

19. Plaintiff attempted to baselessly delay his Honor Committee meeting. Among other things, on November 3, 2024, five days before the meeting, Plaintiff sought to recuse Dean Sherilyn Scully. I granted Plaintiff's request as a courtesy even though I believed the request was baseless. On November 4, 2024, four days before the meeting, Plaintiff sought to recuse all of the student members of the Honor Committee who had not taken the same courses that he had taken, who had not done all the Sourcing and Managing Funds homework and had the same two professors as himself, and who had not taken the same exam and were given the same prompt he was given. There was no basis for that request, and granting it would have made it impossible to achieve quorum for the Committee. Student members of the Honor Committee regularly sit on cases involving courses they have not taken. As another example, on November 5, 2024, three days before the meeting, Plaintiff asked to recuse every member of the Honor Committee who had seen any evidence. All the members of the Honor Committee had seen evidence because the meeting was only three days away. Plaintiff was thus asking for everyone to be recused. He also asked at this time that any member of the Honor Committee who participated in the investigation of his case be recused, which would imply recusing me, the Chair. The Procedures of the Honor Committee that delineate its customary process explicitly require that the Chair investigate all cases prior to a hearing and then participate in the hearing. I considered these requests even though they were untimely, but denied them because they were baseless.

## The Honor Committee Meeting

20. Plaintiff's Honor Committee meeting was held on November 8, 2024.

21. Plaintiff denied using AI. At the meeting, he asked to submit a large number of printed documents assailing the reliability of AI detection tools. I allowed Plaintiff to submit those documents even though his request to do so was untimely. I had previously told him that he must submit any documents at least twenty-four hours in advance of the hearing to give

6

Committee members adequate time to review the materials.

22. The Honor Committee asked Plaintiff about his decision not to produce the electronic files it had requested. Plaintiff stated that he did not produce the documents because he could not produce a Microsoft Word file, since he used Apple software—specifically, a program called Pages—to create the documents. The Honor Committee found that explanation incredible.

23. During his appearance before the Honor Committee, Plaintiff made reference to the fact that expulsion is the expected punishment for not being forthcoming to the Honor Committee, showing that he was fully aware of the precedent for not being forthcoming.

24. Plaintiff left the meeting, and the Honor Committee began deliberating. The Honor Committee was stunned by Plaintiff's disruptive action of ignoring the request to submit any documents he wished us to consider at least twenty-four hours before the meeting, his prior failure to produce the electronic files requested, and his incredible explanation for why he had not done so. It concluded that Plaintiff's actions were unprecedented.

25. The Honor Committee also discussed whether Plaintiff used AI. The Honor Committee determined that it would like to examine the original electronic Pages files that contained the two exam submissions. Plaintiff emailed us the files. In the course of familiarizing myself with Pages, I discovered that Pages preserves a time-stamped history of edits for any document it produces. However, this edit history only exists on the hard drive of the computer that produced the document, and not on any emailed version of the file. Therefore, examining the files on Plaintiff's laptop would allow us to determine whether the exam texts were written in a manner consistent with human editing or with copy and pasting from AI.

26. I decided to ask Plaintiff to return to the Committee with his laptop. Plaintiff had attended the meeting in person and had left the meeting approximately 90 minutes before I decided to ask him to return, so the Committee knew that Plaintiff was nearby. Dean Tsung called and texted Plaintiff to ask him to return, but Plaintiff said he was unavailable. I called Plaintiff's mobile phone multiple times to ask Plaintiff to return, but Plaintiff did not answer his phone. The Committee concluded that Plaintiff's refusal to return was another delay tactic.

27. The Honor Committee also concluded that Plaintiff had engaged in a pattern of obstructionist behavior, including seeking baseless recusals on the eve of the hearing. The Committee was not willing to delay the process further to wait for Plaintiff's laptop.

28. The Honor Committee concluded that Plaintiff had not been forthcoming. The Committee's conclusion was based largely on Plaintiff's unprecedented refusal to produce the documents it had requested—a decision that, as noted above, the Committee concluded had no justification—and his refusal to return to the Committee. The Committee decided that a one-year suspension was warranted.

29. The Honor Committee did not determine at that time whether Plaintiff had used AI. It felt that Plaintiff's decision to not be forthcoming had become the primary issue.

7

### The Continued Deliberations

30. On or around November 15, 2024, Dean Anjani Jain asked the Honor Committee to continue its deliberations regarding whether Plaintiff used AI.

31. The Honor Committee met on November 21, 2024, and continued its deliberations. It concluded that Plaintiff used AI, thereby violating the rules of the Sourcing and Managing Funds examination, and determined that Plaintiff should receive an "F" in the course.

32. The Honor Committee did not rely on AI detection tools, including the ChatGPTZero scans, to reach its decision. The Honor Committee decided to give no weight to the scans and the scans therefore played no role in the Committee's deliberations.

33. The Honor Committee did, however, rely on Plaintiff's decision to not be forthcoming in reaching its decision that Plaintiff had used AI. The Honor Committee felt that Plaintiff's refusal to provide the documents could only be explained by Plaintiff attempting to hide misconduct in light of the fact that the only alternate explanation Plaintiff had offered (regarding his use of Pages instead of Microsoft Word) was incredible.

34. The Honor Committee also relied on strong similarities between Plaintiff's response and the ChatGPT response to one of the Sourcing and Managing Funds exam questions, which the Committee found evidenced the fact that Plaintiff used AI on the examination.

35. The Honor Committee did not conclude that Plaintiff used AI on his Investor examination. The Honor Committee strongly suspected that Plaintiff had improperly used AI on that examination as well, but it could not rule out the possibility that the responses at issue were found via permissible Internet searches instead of impermissible AI generation.

36. The Honor Committee's actions and decisions had nothing to do with Plaintiff's ethnicity, national origin, or English language skills. I was born in South Korea and English is not the language I learned first. Based on my interactions with Plaintiff, he speaks and writes fluent English. During his appearance before the Honor Committee, he stated that most people would find it hard to believe that English is not his first language.

37. The punishments the Honor Committee imposed on Plaintiff were amply supported by, and proportional to, Plaintiff's misconduct. If anything, the punishment was light. For example, Plaintiff and his classmates were made aware at their orientation of a student who was expelled for not being forthcoming to the Honor Committee.

Dated at New Haven, Connecticut this 10th day of March, 2025.

_____
James Choi

State of Connecticut        )
                            ) ss. New Haven
County of New Haven         )

8

138938191.1

Subscribed and sworn to before me this ⎯⎯ th day of March, 2025

_Deborah S. Lettiero_
Notary Public/Commissioner of the Superior Court

STATE OF CONNECTICUT, s.s.

County of New Haven

Subscribed and sworn (or affirmed) before me this

⎯⎯ day of March , 20 25

by _Deborah S. Lettiero_

DEBORAH S. LETTIERO, Notary Public
My Commission Expires January 31, 2029

9

# Exhibit 1

 Gmail                                                                              James Choi <jjchoi@gmail.com>

___

**SMF exam**

___

**James Choi** <james.choi@yale.edu>                                            Fri, Aug 16, 2024 at 8:05 AM
To: "Doe  John " <John Doe @yale.edu>
Cc: "Tsung, Wendy" <wendy.tsung@yale.edu>, "Scully, Sherilyn" <sherilyn.scully@yale.edu>

The first step in the process is for the chair of the Honor Committee to make a determination of whether the case will proceed to the Honor Committee. This can involve some gathering of evidence. That is where we are right now.

I have the PDF file that you submitted. I am asking you to send us the Word file from which the PDF was produced. You seem to be weighing whether you will cooperate or not. It's your choice, but if history is a guide, failure to cooperate would be viewed by the Honor Committee as an extraordinary violation of the Honor Code.

If you don't check your Yale email outside of class weekends, please send me your personal email address.

> On Fri, Aug 16, 2024 at 6:41 AM Doe  John <John Doe @yale.edu> wrote:
> Professor Choi,
>
> I'm confused. Until now, Wendy and Dean Scully have told me that this matter has not been formally referred to the Honor Committee. Further, I was told that you had already received a copy of the submitted exam.
>
> I am of course happy to comply with the SOM policies at all times. If you believe I have not followed any policy, can you please let me know which one so I can respond appropriately ?
>
> The EMBA program meets every other weekend in New Haven. If you need to reach me outside of school days, please write to my personal email address. For any urgent concern, please call me on my cellphone directly.
>
> I am always happy to cooperate with your process as appropriate.
>
> Kind regards,
>
> John
>
> --
> John       Doe
> Cell:                    | Linkedin | Twitter | Facebook
>
> ___
>
> **From:** James Choi <jjchoi@gmail.com>
> **Sent:** Monday, August 12, 2024 4:31 PM
> **To:** Doe , John <John Doe @yale.edu>
> **Cc:** Tsung, Wendy <wendy.tsung@yale.edu>; Scully, Sherilyn <sherilyn.scully@yale.edu>
> **Subject:** Re: SMF exam
>
> Dear John ,
>
> I have not received the Word file from you. Should I note that you are refusing to share this file with the Honor Committee?
>
> Sincerely yours,
> James Choi
>
> On Sat, Aug 10, 2024 at 4:09 PM James Choi <james.choi@yale.edu> wrote:

Dear ,

I am writing to you in my capacity as the chair of the SOM Honor Committee. I have received a complaint that you violated the Honor Code while taking the Sourcing and Managing Funds final exam.

Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced that PDF file you submitted for the exam. I am now asking you directly.

I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale.

Please send us the file by Monday, August 12 at 5:00 P.M. EDT.

Sincerely yours,
James Choi

--

James J. Choi
Yale School of Management
https://faculty.som.yale.edu/jameschoi/

--
James J. Choi
Yale School of Management
https://faculty.som.yale.edu/jameschoi/

--
James J. Choi
Yale School of Management
https://faculty.som.yale.edu/jameschoi/