UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------- x
THIERRY RIGNOL,                                                   :
                                                                 :
                                    Plaintiff,                    :
                                                                 :
            v.                                                    :        25-CV-159 (SFR)
                                                                 :
YALE UNIVERSITY, YALE UNIVERSITY BOARD :
OF TRUSTEES, WENDY TSUNG, K. GEERT          :
ROUWENHORST, JACOB THOMAS, SHERILYN :
SCULLY, JAMES CHOI, and ANJANI JAIN,                :
                                                                 :
                                    Defendants.                  :
----------------------------------------------------------------- x

**MEMORANDUM & ORDER**

Plaintiff Thierry Rignol is an entrepreneur and investor who enrolled as a part-time

graduate student at the Yale School of Management ("SOM") in 2023 as a member of the

class of 2025. After a teaching assistant flagged one of his exams in the spring of 2024, SOM

administrators conducted an investigation to determine whether Rignol violated examination

rules by using generative artificial intelligence ("AI"). In the course of its investigation,

SOM determined that Rignol was not forthcoming during the investigation and did use AI;

SOM penalized Rignol by issuing him an F in the course and suspending him from classes

for one year.

Rignol subsequently sought a preliminary injunction that would reinstate him as a

student in good standing at SOM such that he could graduate with his classmates in the class

of 2025 this spring. Because I conclude that Rignol has failed to make the threshold showing

of irreparable harm, I deny Rignol's motion for a preliminary injunction.

I.    **BACKGROUND**

A.    **Factual Background**

1.    **Rignol Enrolls at SOM**

Thierry Rignol is an entrepreneur and investor. Defs.' Ex. F at 1, ECF No. 43-1. In his LinkedIn profile, which Defendants attach to their memorandum, Rignol describes himself as the founder of a "technology driven real estate and hospitality company" headquartered in Mexico and operating throughout the Americas. Defs.' Ex. F at 1, 4. Rignol's profile says his firm had 28 full-time workers as of the end of 2020. In addition to managing his own firm, Rignol serves as a director on the boards of several private enterprises. *Id.* at 4. Rignol is a French national authorized to live and work in the United States on an investor visa. Compl. ¶¶ 15, 72, ECF No. 1.

Rignol enrolled in SOM's MBA for Executives program in July 2023. Compl. ¶ 31. The MBA for Executives ("EMBA") program is oriented towards professionals who have advanced significantly in their careers. Defs.' Ex. A ¶ 2, ECF No. 41-2 ("Tsung Aff."). EMBA students continue to work full-time while attending classes every other weekend. Tsung Aff. ¶ 4. The EMBA curriculum requires regular in-person attendance, together with significant collaboration with colleagues on a student's Learning Team. Tsung Aff. ¶¶ 7-9.

In the spring of 2024, Rignol enrolled in Sourcing and Managing Funds, a core curriculum class taught by Professors Rouwenhorst and Thomas. Defs.' Ex. E ¶ 3, ECF No. 41-6 ("Rouwenhorst Decl."). The final exam for the course instructed students that "You are *not* allowed to browse online resources or use AI tools (like ChatGPT) for formulating answers." Defs.' Ex. I at 2, ECF No. 41-10 (emphasis in original). Students were allowed to

complete the exam under self-timed conditions at any time during the two-week exam period in May 2024. *Id.*

Rignol's exam was flagged by a teaching assistant on June 10, 2024. Defs.' Ex. J, ECF No. 41-11. The teaching assistant noted that Rignol's exam, "one of the highest scoring," had "clocked in at 30 pages whereas almost all others were under 20." While conceding it was theoretically possible to produce such an exam under timed conditions, the teaching assistant said that Rignol's exam "length stood out relative to the others." Defs.' Ex. J. Rouwenhorst investigated further and shared his initial findings with Wendy Tsung, an SOM administrator responsible for overseeing the EMBA program. Defs.' Ex. K, ECF No. 41-12. In his email to Tsung on June 11, 2024, Rouwenhorst said he had "serious concerns about violation of the exam rules, such as improper use of AI." He noted that certain "answers to essay type questions on the exam score high on the likelihood of being AI generated using ChatGPTzero as a detection tool" and "[a]t least one answer shows substantial overlap with answers to simple prompts on ChatGPT." *Id.* Rouwenhorst asked that Tsung "refer this to the Honor Committee for further investigation." *Id.*

### 2.    SOM's Honor Code and Honor Committee

SOM's Honor Code requires that students adhere to the "highest standards of academic integrity." Defs.' Ex. C at 7, ECF No. 41-4 ("Bulletin").[1] The Honor Committee is a group of students and faculty convened to investigate "instances of academic infractions." *Id.* at 8. By custom, an Honor Committee investigation begins when a member of the SOM

---

[1] I cite throughout to the pagination set by ECF rather than any internal numbering appearing on the parties' exhibits or memoranda.

community refers a matter to the Committee chair. *Id.* at 9. The Committee chair conducts an

initial review to determine if the offense "would be of sufficient seriousness to warrant the

attention of the committee." If the chair determines the conduct is sufficiently serious, they

must notify the student and advise the student of how the Honor Committee will conduct its

investigation. *Id.* at 9, 10. The Bulletin requires the following be communicated to the

student:

> [T]he student will be directed to review the Committee Policies and Procedures
> to apprise the student of the rights: (a) to appear before the committee, (b) to be
> accompanied by any member of the university community to act as the student's
> adviser,[2] (c) to examine any and all written materials being provided to the
> committee as soon as possible, and ordinarily at least forty-eight hours in
> advance of the meeting, so that the student may have ample opportunity to
> question or refute them.

*Id.* at 9. The Honor Committee will notify the student of the membership of the Committee

so that the student may request recusals of members the student believes to be "prejudiced"

against them. *Id.* at 11. The chair may accept or refuse a student's request to recuse a

Committee member. If a request to recuse is rejected, the following procedure must be

followed:

> A decision of the chair not to recuse the challenged member will be
> communicated to the student, who may within one day after receiving the notice
> appeal the decision to the cognizant academic dean of the relevant academic
> program. The cognizant academic dean's decision to deny or grant the appeal
> of a conflict of interest will be final.

*Id.*

---

[2] The Bulletin notes that the student adviser is "not an advocate, but rather a source of support"
who "may help the student in preparing for the meeting with the Honor Committee and may
accompany the student to the meeting." *Id.* at 10.

The Honor Committee is "empowered to take the following actions and may impose other sanctions of intermediate severity: exoneration, warning (verbal or written), probation, mandatory F in course (for academic infractions), suspension of one or more terms + mandatory F in course, expulsion." *Id.* at 9-10.

A student dissatisfied with Honor Committee proceedings has two options for administrative review within SOM. First, a student may meet with the dean responsible for overseeing their academic program to lodge complaints regarding "procedural irregularity or prejudice." The dean must then "investigate the objection and may remand the matter to the committee to correct the procedural irregularity or to re-deliberate after disqualifying the member or members found to be prejudiced." *Id.* A student also has the option to appeal the severity of penalty to the Faculty Review Board. *Id.* The Review Board is comprised of the academic dean overseeing the relevant academic program and two faculty members who did not participate in Honor Committee proceedings. *Id.* The Review Board will "judge the appropriateness of the punishment assessed by the committee, assuming the correctness of the committee's finding of a violation." *Id.* "The appeal of the full committee decision to the Faculty Review Board can result in a sanction more severe than the one originally imposed." *Id.*

### 3.    Rignol's Appearance Before the Honor Committee

Professor Choi was chair of the Honor Committee in the summer and fall of 2024. Defs.' Ex. D ¶¶ 1, 7, ECF No. 41-5 ("Choi Aff."). After Tsung shared Rouwenhorst's email describing Rignol's potential academic misconduct with him, Choi undertook an initial investigation to decide whether Rignol's conduct was sufficiently serious to merit referral to the full Honor Committee. *Id.* ¶ 8. As part of that initial review, Choi sought to examine the

native file of the document Rignol used to turn in the PDF containing his exam answers. *Id.* ¶ 9.

SOM administrators Tsung (Assistant Dean of the EMBA program) and Sherilyn Scully (SOM Dean of Students) met with Rignol on July 24, 2024, to discuss the investigation into Rignol's use of AI. Defs.' Ex. Y, ECF No. 41-26. Rignol says that Tsung and Scully used the meeting to pressure him to confess to using AI. Rignol Decl. ¶ 20, Feb. 25, 2025, ECF No. 17. Rignol asserts that the SOM administrators threatened that, if he did not confess to misconduct, the Honor Committee would impose a harsher disciplinary sanction, which could lead to his expulsion from SOM and cancelation of his student visa. Defs.' Ex. Y; Compl. ¶ 72.[3] Tsung denies that she and Scully attempted to coerce Rignol— rather, she says that they used the meeting to review "the Honor Committee's policy of leniency when students accept responsibility for actions" and preview the "immigration consequences associated with any discipline imposed by the Committee because we wanted to ensure that [Rignol] was fully informed." Tsung Aff. ¶ 12.

Tsung wrote to Rignol on July 30, 2024, noting that Choi was "requesting that you submit to us the word version of your submission version of the Sourcing and Managing Funds exam." Defs.' Ex. P, ECF No. 41-17. Rignol did not respond. *See id.* Tsung reiterated the same request to Rignol on August 7, 2024. *Id.* Rignol again failed to respond. *Id.*

On August 10, 2024, Choi wrote to Rignol directly. He said:

I have received a complaint that you violated the Honor Code while taking the Sourcing and Managing Funds final exam. Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced that PDF file you submitted for the exam. I am now asking you directly. I remind you that

---

[3] The Complaint notes that Rignol has an investor visa, not a student visa. Compl. ¶ 72.

when a student has been found by the Honor Committee to have lied or not been
forthcoming with the Committee, the most common punishment is permanent
expulsion from Yale.

Choi Aff. ¶ 10. Rignol again failed to reply. *Id.* On August 12, 2024, Choi wrote to Rignol

again. *Id.*; *see also* Defs.' Ex. Q at 2, ECF No. 41-18. Rignol's first response to Choi came

four days later on Friday, August 16, 2024. Defs.' Ex. Q at 2. Rignol said:

> I'm confused. Until now, Wendy and Dean Scully have told me that this matter
> has not been formally referred to the Honor Committee. Further, I was told that
> you had already received a copy of the submitted exam. I am of course happy
> to comply with the SOM policies at all times.

*Id.* Choi responded:

> The first step in the process is for the chair of the Honor Committee to make a
> determination of whether the case will proceed to the Honor Committee. This
> can involve some gathering of evidence. That is where we are right now. I have
> the PDF file that you submitted. I am asking you to send us the Word file from
> which the PDF was produced. You seem to be weighing whether you will
> cooperate or not. It's your choice, but if history is a guide, failure to cooperate
> would be viewed by the Honor Committee as an extraordinary violation of the
> Honor Code.

*Id.* Later that same day, Choi wrote to Rignol to inform Rignol that he had expanded his

investigation to consider "deliverables you submitted for other courses." Defs.' Ex. R, ECF

No. 41-19. On August 19, 2024, Choi requested that Rignol send to him "the Microsoft Word

file that was used to produce the PDF you submitted for the Investor final exam." Defs.' Ex.

S, ECF No. 41-20. Choi noted that this was "in addition to my previous request that you send

me the Word file used to produce the PDF you submitted for the Sourcing and Managing Funds

final exam." *Id.* Rignol never responded to either request for documents. Choi Aff. ¶ 14. Choi

says that Rignol was the first student to decline to produce documents in his ten years serving

on the Honor Committee. *Id.*

After this initial investigation, Choi referred Rignol to the full Honor Committee. *Id.* ¶ 15. Choi relied in part on the many similarities between Rignol's answers to exam questions and those produced when Choi submitted exam questions to ChatGPT. *Id.* Choi felt that Rignol's refusal to provide requested documents provided further grounds to suspect Rignol cheated on the exams. *Id.*

Tsung wrote to Rignol on September 8, 2024, notifying him that Choi had referred an inquiry to the full Honor Committee. Defs.' Ex. W at 2-3, ECF No. 41-24. Tsung noted that the Committee would investigate whether Rignol "improperly utilized AI on the final exam in the course." *Id.* at 3. Tsung told Rignol that he was required to attend a meeting with the Honor Committee, directed Rignol to consult the Bulletin for a description of how the Committee would conduct its activities, and shared a link for where Rignol could find a directory of Committee members should he decide to seek recusals. *Id.* (Tsung noted that the list of Committee members would be updated soon with some new members). *Id.* Tsung wrote that the meeting was tentatively scheduled to take place on October 4, 2024. *Id.*

Rignol responded on September 9, 2024. *Id.* at 2. Rignol asked if the meeting could be rescheduled to November, noting he would be out of the country on October 4 for his wedding. *Id.* Rignol copied his attorneys in this email communication. *Id.* Tsung responded on September 12, 2024, confirming that the Committee would meet on November 8, 2024. Defs.' Ex. X at 3, ECF No. 41-25. Tsung wrote to Rignol on October 14, 2024, to share the evidence that the Committee planned to review in advance of its meeting on November 8. She noted these "materials contain a memo authored by Professor Rouwenhorst referring the case as well as the supporting documentation he provided and email exchanges with the committee chair." *Id.* at 2. Tsung asked that, if Rignol sought to provide a written response,

that he share it with her by October 30 so that she could distribute it to the entire Committee. *Id.*

Rignol sought recusals beginning on November 3, 2024. In a message copying one of his attorneys, he requested that Scully—the former dean of students and an *ex officio* member of the Committee—be recused from participation. Defs.' Ex. Y. Choi granted this request. Choi Aff. ¶ 19. Rignol responded on November 4, 2024, asserting that Scully and Tsung had previously represented to him that the Committee would include seven students who had taken the same Sourcing and Managing Funds exam as Rignol. Defs.' Ex. Z, ECF No. 41-27. Choi responded, noting that Tsung and Scully disputed Rignol's recollection of their meeting, and reiterating that the Committee would follow the procedures described in the Bulletin. Choi informed Rignol that the only proper grounds for seeking recusal was if a Committee member "would be prejudiced in your case." *Id.* On November 5, after Rignol asked to recuse every member of the Committee who had reviewed evidence in his case or had participated in the initial review of evidence, Choi declined, saying he felt the recusal requests were "baseless." Given the evidence had been shared with Committee members in advance of the hearing that was occurring in three days, Rignol's requests would have required recusing the entire Committee and its chair. Choi Aff. ¶ 19.

The Honor Committee met to consider Rignol's conduct on November 8, 2024. *Id.* ¶ 20. Notwithstanding Tsung's instruction that Rignol submit any written materials by October 30, Defs.' Ex. X, on the day of his hearing Rignol sought and was granted leave from Choi to present written documents describing the unreliability of ChatGPTzero and other AI detection tools. Choi Aff. ¶ 21. At the hearing, Rignol continued to deny that he had used AI on his exam. *Id.* Rignol told Committee members that he had ignored Choi's emails

requesting Microsoft Word copies of his exams because he had written the exam in Apple Pages, not Word. *Id.* ¶ 22.[4] Rignol says that he left the meeting in a state of considerable distress. Compl. ¶ 109. Following the meeting, Tsung contacted Rignol to ask that he send the Pages document that he said at the hearing he used to produce the PDF. Tsung Aff. ¶ 14. Rignol produced this document while the Committee was still meeting. *Id.* Rignol also requested to be excused from attending class that afternoon. Compl. ¶ 109.

After Rignol left the hearing, the Honor Committee began deliberating. Choi says that he and other Honor Committee members found Rignol's responses to their questions at the hearing "incredible." Choi Aff. ¶ 22. In particular, Choi says: "The Honor Committee was stunned by [Rignol's] disruptive action of ignoring the request to submit any documents he wished us to consider at least twenty-four hours before the meeting, his prior failure to produce the electronic files requested, and his incredible explanation for why he had not done so. It concluded that [Rignol's] actions were unprecedented." *Id.* ¶ 24. As the Committee deliberated, Choi reviewed the Pages file that Rignol had shared and researched whether the file contained its editing history. *Id.* ¶ 25. Choi determined that Pages does not transmit the editing history of a file when the file is shared via email, but that the editing history would be available on the hard drive of the computer used to write the exam. *Id.* In light of this, approximately 90 minutes after Rignol had left the hearing, Tsung called Rignol to ask that he return with his laptop. *Id.* ¶ 26. Rignol responded that he was unavailable to

---

[4] Pages is a word processing program that allows users to sync documents across their Apple devices. *Intro to Pages for iCloud*, Pages User Guide for iCloud, https://support.apple.com/guide/pages-icloud/intro-to-pages-for-icloud-gile83665246/icloud (last visited May 4, 2025).

return to campus for a meeting, but suggested he could be available the following week. *Id.* ¶ 26; Compl. ¶¶ 111-13. Choi then called Rignol multiple times to ask him to return but Rignol did not answer his phone. Choi Aff. ¶ 26. Choi said that the Committee "concluded that [Rignol's] refusal to return was another delay tactic." *Id.*

The Honor Committee decided not to wait to conduct a second meeting with Rignol. It concluded that Rignol had not been forthcoming with the Committee. Choi Aff. ¶ 28. The decision was "based largely on [Rignol's] unprecedented refusal to produce the documents it had requested—a decision that . . . the Committee concluded had no justification—and his refusal to return to the Committee." *Id.* It did not reach the issue of whether Rignol had indeed used AI on his Sourcing and Managing Funds exam because it determined that Rignol's "decision to not be forthcoming had become the primary issue." *Id.* ¶ 29. The Honor Committee wrote to Rignol later that evening to notify him that it had determined he had not been forthcoming and that the penalty for this finding would be a one-year suspension from SOM. Defs.' Ex. BB, ECF No. 41-29.

On November 14, 2024, Rignol wrote to Tsung asking when his grade in Sourcing and Managing Funds would be released. Defs.' Ex. CC at 4, ECF No. 41-30. Tsung responded:

> I don't know when the faculty will be meeting this week but like I said, they do plan to meet and your grade should be updated next week. Your appeal to the Faculty Review Board is for the severity of the one year suspension penalty and not the findings of the Honor Committee decision. There is no grade penalty outcome from the Honor Committee decision.

*Id.* at 4.

### 4. Proceedings Before the Faculty Review Board

On November 15, 2024, Rignol appealed the one-year suspension imposed by the Honor Committee to Deputy Dean Anjani Jain and the Faculty Review Board. *See* Defs.' Ex. DD, ECF No. 41-31. Rignol asserted that he had been forthcoming. *Id.* at 5. In addition, relying in part on an email from Tsung where she disclosed that there had been only one other student penalized in the past three years for not being forthcoming, and this penalty was in connection with a determination that the student had falsified attendance records, Rignol asserted that his discipline was the first instance where the Honor Committee had issued a standalone penalty for not being forthcoming without addressing the merits of the underlying charge. *Id.* Rignol asserted that "not being forthcoming" has "always been an enhancement factor in sentencing, not a basis for the punishment in and of itself." *Id.* at 4. He maintained that the penalty in the case "incentivizes students to falsely confess in order to receive a reduced penalty." *Id.* at 5.

Deputy Dean Jain wrote to Rignol on November 19, 2024, to inform Rignol that the Faculty Review Board had denied Rignol's appeal. Defs.' Ex. EE, ECF No. 41-32. Jain also communicated the following:

> Separate from the FRB decision, I wish to let you know that I am asking Professor James Choi and the Honor Committee to continue deliberating the complaint of violation of the examination rules in the course MGT 423E: *Sourcing and Managing Funds* to determine whether you violated SOM's Honor Code.

*Id.*

Pursuant to Jain's direction, the Honor Committee met again on November 21, 2024. Choi Aff. ¶ 31. Rignol was not invited to appear again before the Honor Committee. *See* Rignol Decl. ¶ 24, Feb. 25, 2025. In this second meeting, the Honor Committee determined that Rignol

had violated examination rules by using AI. Choi Aff. ¶ 31. Choi says the Honor Committee relied on Rignol's decision not to be forthcoming in reaching its decision that he used AI. In particular, "[t]he Honor Committee felt that [Rignol's] refusal to provide the documents could only be explained by [Rignol] attempting to hide misconduct in light of the fact that the only alternative explanation [Rignol] had offered (regarding his use of Pages instead of Microsoft Word) was incredible." *Id.* ¶ 33. In addition, in concluding that Rignol used AI, the Honor Committee relied on the "strong similarities between [Rignol]'s response and the ChatGPT response to one of the Sourcing and Managing Funds exam questions." *Id.* ¶ 34. Choi says that the Honor Committee did not rely on the ChatGPTZero scans produced by Rouwenhorst. *Id.* ¶ 32. The Honor Committee reached this decision only with regard to Rignol's exam in Sourcing and Managing Funds. Although Choi and Committee members suspected Rignol may also have used AI in completing his exam in the Investor course, "it could not rule out the possibility that the responses at issue were found via permissible Internet searches instead of impermissible AI generation." *Id.* ¶ 35. The Honor Committee determined that an appropriate penalty would be a mandatory "F" grade in Sourcing and Managing Funds. *Id.* ¶ 31.

Rignol appealed this penalty to the Faculty Review Board on December 2, 2024. Defs.' Ex. CC, ECF No. 41-30. In his appeal, he challenged the ability of the Faculty Review Board to remand his case to the Honor Committee to reach a decision on whether he violated exam rules. *Id.* at 5. Jain responded on behalf of the Faculty Review Board on December 11, 2024. Defs.' Ex. GG, ECF No. 41-34. Jain informed Rignol that his appeal was denied and addressed Rignol's contention that the Faculty Review Board exceeded its authority in the way it handled his first appeal. *Id.* Jain noted:

Your appeal statement included the claim that the FRB "exceeded the scope of its authority" by directing the Honor Committee to continue deliberating and "issue findings regarding a *new charge*" (emphasis added). I wish to point out that this claim is entirely erroneous. My letter of November 19, 2024 made it clear that it was my decision as the cognizant dean, and not the FRB's, to ask the Honor Committee to continue deliberating the original complaint of violation of exam rules, a complaint on which the Honor Committee did not reach a decision in its first hearing. This directive to the Honor Committee is fully within my authority and responsibility as the cognizant dean. Moreover, this directive did not issue a new charge to the Honor Committee. The only charge the Honor Committee considered in its continued deliberation, and issued a ruling on, was the original charge of violating the exam rules in MGT 423E.

*Id.*

Tsung wrote to Rignol on December 12, 2024, to inform him of the terms of his suspension. Defs.' Ex. HH, ECF No. 41-35. Tsung's letter notes that Rignol's suspension began on November 20, 2024. *Id.* The letter told Rignol that he is "eligible to return to the program post July 2025 Residency, at a time the academic calendar will allow you to start the balance of your courses" and his "return date will be determined once the class schedule for the academic year is set." *Id.* Tsung informed Rignol that his "suspension will be noted on your transcript while you are on leave and will be removed at your request when you return." *Id.* In closing, Tsung reminded Rignol of the courses he would need to complete in order to meet the requirements for graduation. *See id.*

At the time of his suspension in November 2024, Rignol had started but not completed two courses. These courses ended on January 10, 2025. Rignol was withdrawn from two other courses that started after his suspension began. These courses ended on February 8, 2025. Three out of four of these classes are required for Rignol's graduation. None of the four classes will be offered again until November 2025. Tsung Aff. ¶¶ 20-23 & Ex. 3.

14

**B.      Procedural History**

Rignol filed a Complaint and Motion to Proceed Under Pseudonym on February 3,

2025. ECF Nos. 1, 2. The Complaint raises claims for breach of contract, breach of the

implied covenant of good faith and fair dealing, national origin discrimination in violation of

Title VI, retaliation in violation of Title VI, intentional infliction of emotional distress, and

negligent infliction of emotional distress. *See generally* Compl. The Complaint seeks, *inter*

*alia*, money damages and a declaratory judgment declaring that the "sanction of a grade of

'F' and suspension for one year should be reversed" and Plaintiff is to be "immediately

reinstated as a student in good standing and be permitted to begin classes immediately upon

commencement of the next semester." Compl., Prayer for Relief ¶ vii.

On February 25, 2025, after four additional courses in Rignol's EMBA program were

already underway,[5] Tsung Aff. ¶ 24, Rignol applied for a temporary restraining order and

preliminary injunction seeking an order: "(i) prohibiting Defendants from suspending

Plaintiff and marking his transcript and academic record with any suspension; (ii) prohibiting

Defendants from issuing Plaintiff a grade of F and marking his transcript and academic

record with such grade; (iii) requiring Defendants to provide/restore Plaintiff's access to all

courses and academic activities for his EMBA program, for which Plaintiff has already paid,

registered, and is underway; (iv) requiring Defendants to allow Plaintiff to choose how he

would like to complete his degree requirements, including the options to 1) make up the

---

[5] None of these four courses will be offered again in the EMBA program until spring 2026. Tsung
Aff. ¶ 26. A fifth required class, the Colloquium, appears to run through the entire year. *Id.* ¶ 27
& Ex. 3.

exact courses; 2) take four new electives to meet his credit requirements; or 3) complete the required courses after graduation (as Yale has allowed for other students); and (v) directing Defendants, upon Plaintiff's successful completion of the relevant requirements, to timely confer Plaintiff's degree, pending the resolution of this litigation." Pl.'s Mot. for TRO & Prelim. Inj., ECF No. 16 ("Pl.'s Mot."); *see also* Mem. of Law in Supp. of Pl.'s Mot. for TRO & Prelim. Inj., ECF No. 18 (Pl.'s Mem.).

I convened a status conference on February 27, 2025, and thereafter set a briefing and argument schedule in accordance with dates proposed by the parties. ECF No. 23.[6] Defendants filed a response to Rignol's motion for a preliminary injunction on March 12, 2025. Obj. to Pl. Mot. for TRO & Prelim. Inj., ECF No. 41 ("Defs.' Mem."). Rignol replied in support of a preliminary injunction on March 24, 2025. Reply Mem. in Supp. of Pl.'s Mot. for TRO & Prelim. Inj., ECF No. 59 ("Reply"). On March 31, 2025, I issued a written decision denying Rignol's motion to proceed under pseudonym and required him to refile the complaint under his own name. ECF No. 60.

Defendants filed a motion to compel on March 3, 2025, which sought production of Rignol's laptop and other electronic records; Defendants asserted these records were relevant

---

[6] Rignol's motion is captioned as an *ex parte* emergency request for TRO and preliminary injunction, even though it was filed on the public docket after attorneys for Defendants had appeared. Pl.'s Mot. At the status conference on February 27, I told the parties that I was not inclined to grant a motion for TRO based solely on Rignol's brief and affidavit, particularly as I could not determine from Rignol's filings whether it was feasible for Rignol to complete all required courses before graduation. Accordingly, Rignol filed a supplemental declaration addressing his assertion that he could timely complete graduation requirements, Rignol Supp. Decl., Feb. 28, 2025, ECF No. 24, and the parties set an expedited briefing schedule so that I could hear from both sides on Rignol's entitlement to equitable relief. As the standard for a TRO is identical to that for a preliminary injunction, *Kreger v. McCance*, 537 F. Supp. 3d 234, 239 (D. Conn. 2021), my opinion addressing Rignol's entitlement to a preliminary injunction also resolves whether he is entitled to a TRO.

to their anticipated argument that the equities did not favor Rignol because he had in fact cheated on his exam. ECF No. 25. Rignol filed a response on March 12, 2025. ECF No. 45. After hearing argument, the Court[7] granted in part the motion to compel on March 19, 2025, and required compliance with the order by March 28, 2025. ECF No. 54. I permitted both parties to file any supplemental evidence relating to the preliminary injunction motion by April 9, 2025. ECF No. 71. On April 9, 2025, Defendants filed two supplemental exhibits they assert demonstrate Rignol's violation of examination rules. ECF Nos. 80, 81.

The parties twice confirmed that they did not request an evidentiary hearing concerning the preliminary injunction. On March 7, 2025, the parties submitted a joint notice of their availability for oral argument that stipulated they did not seek an evidentiary hearing. ECF No. 32. The parties reiterated that position in response to my questions at a pre-hearing status conference on April 3, 2025. ECF No. 61. After setting oral argument for April 7, 2025, I postponed argument at the request of the parties so they could explore settlement. ECF Nos. 67, 78.[8] The parties did not settle, so I heard oral argument on April 11, 2025. ECF No. 83.[9]

---

[7] The Honorable Thomas Farrish, United States Magistrate Judge, decided the motion to compel on an expedited basis. *See* ECF No. 26, Order of Referral. I thank Judge Farrish for his prompt decision.

[8] Settlement talks were convened by the Honorable Robert Spector, United States Magistrate Judge. I offer my thanks to Judge Spector for his efforts to mediate this dispute, as well as to the parties for attempting in good faith to resolve their differences. As I noted at oral argument, the decision to explore settlement has no bearing on how I decide the matter before me, nor do I know what positions the parties may have taken during confidential settlement talks.

[9] At oral argument, Rignol's counsel clarified that his request for a preliminary injunction was limited to his contractual claims. Tr. 15:5-7, ECF No. 82.

## II.    <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Hanson Tr. PLC v. SCM*

*Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the

most drastic tools in the arsenal of judicial remedies"). To obtain a preliminary injunction, a

movant must make a clear showing that (1) he is likely to succeed on the merits,[10] (2) he is

likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the

equities tips in his favor, and (4) an injunction is in the public interest. *Starbucks Corp. v.*

*McKinney*, 602 U.S. 339, 346 (2024) (citing *Winter*, 555 U.S. at 20, 22).[11]

---

[10] In the Second Circuit, a party who seeks to alter the status quo *ante*—that is, the status that existed before the dispute between the parties arose—must demonstrate "a clear or substantial likelihood of success on the merits." *N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37-38 (2d Cir. 2018) (citing *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). The parties disagree about whether an injunction here would alter the status quo *ante*. *See* Pl.'s Mem. 11; Defs.' Mem. 21. As I conclude for the reasons set forth *infra* that Rignol has not carried his burden with respect to the irreparable harm requirement, I do not consider the merits of Rignol's claims and so do not decide whether an injunction here would be mandatory or prohibitory.

[11] The parties cite the four-factor test for preliminary injunctions set forth in *McKinney* and *Winter*. In *McKinney*, the Supreme Court stated that "absent a clear command from Congress, courts must adhere to the traditional four-factor test" in deciding whether to grant a preliminary injunction. *McKinney*, 602 U.S. at 346. Following *McKinney*, the Second Circuit restated its prior holdings that "[a] party seeking a preliminary injunction must demonstrate (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (internal quotations omitted). The Second Circuit had previously held that *Winter*'s four-factor test did not displace the Circuit's own customary (and slightly more flexible) formulation of the preliminary injunction standard. *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010). Under either standard, Rignol fails to carry his burden with respect to the first factor: irreparable harm.

III.   **DISCUSSION**

A.     **Irreparable Harm**

The irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations and internal quotation marks omitted). A movant is entitled to a preliminary injunction only if they make a clear showing that they "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* at 118 (citations and internal quotation marks omitted). "A plaintiff must connect future harm to the absence of an injunction (i.e., show that he or she will be irreparably harmed if the Court does not grant the requested preliminary injunction)." *Doe v. Quinnipiac Univ.*, No. 3:17-cv-364 (JBA), 2017 WL 1206002, at *5 (D. Conn. Mar. 31, 2017).

Rignol says that missing graduation and delaying his studies will lead him to forego the one-time opportunity to be recognized as class marshal, an honor afforded to the EMBA student with the highest grades in the first year core curriculum. Pl.'s Mem. 17; Rignol Decl. ¶ 8, Feb. 25, 2025. He further asserts that the suspension will cause continuing harm for the rest of his career because he will forever be forced to explain why it took him three years instead of two to complete his EMBA. *Id.* Rignol also fears that the disclosure of SOM's disciplinary proceedings will damage his standing in the eyes of potential investors and among his peers at SOM. *Id.* at 17-18. Additionally, Rignol submits that he will be prevented from pursuing any postgraduate studies at another institution for the duration of this litigation because no university will accept him based on his current academic record at SOM. *Id.* at

17-18. Finally, Rignol says that the suspension could imperil his ability to remain in the United States on an investor visa. *Id.* at 18.

Defendants respond that a part-time master's student is unlikely to be irreparably harmed by interrupting his studies for one academic year. Defs.' Mem. 30. They note that Rignol has identified no specific academic program or concrete economic opportunity he will give up because of the one-year suspension from SOM. *Id.* And they suggest it is "beyond speculative" for Rignol to submit he will face immigration consequences because of the suspension. *Id.* at 31.

Rignol has not carried his burden of establishing that a break in studies until the start of the next academic year (in fall 2025) and continuing to have an F on his transcript will cause him irreparable harm. At the outset, I note that the Second Circuit has held that a delayed graduation alone does not constitute irreparable harm. *See Phillips v. Marsh*, 687 F.2d 620 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages . . . would surely be compensable by monetary damages."). And although courts sometimes find that a break in studies contributing to a delay in graduation constitutes irreparable harm, they have done so based on extenuating circumstances not present here.

For example, in *Doe v. Middlebury College*, the district court found that a one-year suspension constituted irreparable harm because it would result in the plaintiff losing a specific job he had been offered. No. 1:15-cv-192 (JGM), 2015 WL 5488109, at *3 (D. Vt. 2015). Similarly, in *Doe v. University of Connecticut*, the Court found that a two-year suspension would freeze the undergraduate plaintiff's career in its most nascent stage and, by leaving a prominent gap on his CV, require the plaintiff to explain that he was prohibited

from studying or working for an extended period because he had been found responsible for a sexual assault. No. 3:20-cv-92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020). The Court determined that such a suspension would "forever change the trajectory of [plaintiff's] education and career." *Id.* In contrast, courts have not found irreparable harm when a suspended student is unable to identify specific career prospects or educational plans that would be forfeited by serving a suspension. *See, e.g.*, *Madej v. Yale Univ.*, No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *7 (D. Conn. Mar. 31, 2020); *Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019); *Montague v. Yale Univ.*, No. 3:16-cv-885 (AVC), 2017 WL 4942772, at *3-4 (D. Conn. Mar. 8, 2017).

Rignol has not demonstrated that his career will be irreparably marked by continuing to serve the suspension. Rignol's attorneys describe him as "a successful businessman." Pl. Reply in Supp. Mot. to Proceed Under Pseudonym 10, ECF No. 31. Unlike the suspended undergraduate students in *Doe v. Middlebury* and *Doe v. UConn*, Rignol is vastly more established in his career and can continue working in his field of choice without interruption while suspended. *See* Reply 6 n.6 (describing Rignol as a "financially successful professional" and not refuting Defendants' contention that Rignol can continue to work throughout the pendency of this litigation). Indeed, Rignol failed to identify a single concrete opportunity that he would forfeit absent preliminary injunctive relief.

I am also not convinced that any gap in studies that Rignol chooses to disclose on his resume will cause irreparable harm. Continuing to serve the suspension does not prevent Rignol from listing merely his year of graduation rather than the number of years he took to earn a degree. And to the extent the suspension diminishes Rignol's earnings, those lost earnings can be quantified and remedied with money damages after a final determination of

the merits of the case. Furthermore, I reject Rignol's assertion that a preliminary injunction is necessary to prevent the damage to his professional reputation he says would occur if investors, business associates, or classmates realized that SOM determined he violated examination rules. A preliminary injunction is not an exoneration, and it would not remedy the fact that this lawsuit describing Rignol's disciplinary record is public record.[12]

Rignol's remaining arguments are unavailing. Rignol says his aspirations to pursue graduate studies at another institution will be frustrated during the pendency of this litigation because no institution will accept an applicant whose transcript discloses academic misconduct. Here again Rignol errs in assuming that if he were granted a preliminary injunction it necessarily follows that graduate schools would not learn of the disciplinary proceedings described in these public filings. Nor has Rignol articulated any concrete or immediate plan to pursue graduate studies. Thus, the harms to his aspirations of postgraduate studies are too speculative to entitle Rignol to a preliminary injunction. *See Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) ("Plaintiff's broad assertion that he will be harmed by having to explain his suspension to employers or graduate schools is too speculative to warrant injunctive relief, since he has identified no plans to attend any graduate school . . . ."). Similarly, while Rignol asserts that

---

[12] In his Complaint, Rignol seeks a declaratory judgment declaring, *inter alia*, that the "sanction of a grade of 'F' and suspension for one year should be reversed," his disciplinary record expunged, and any "record of the proceeding regarding the conduct of Plaintiff is to be permanently destroyed." Rignol's entitlement to a declaratory judgment will await a final adjudication in the case. Notably, Rignol's attorneys insisted repeatedly that whether Rignol violated examination rules by using AI is not relevant to the merits of his claims. *See, e.g.*, Reply 4-5 (asserting that "whether Plaintiff used AI is not relevant here"). Neither Rignol's Complaint nor his request for a preliminary injunction seek to prevent Defendants from convening the Honor Committee again to consider Rignol's conduct using the procedural protections to which he says he was entitled and denied.

the suspension will undermine valuable relationships he has cultivated with his classmates in the EMBA class of 2025 and cause him to forfeit the one-time honor of serving as class marshal at graduation, I find that those harms—which broadly assert that SOM has diminished the value of Rignol's degree—are compensable with money damages.[13] *Montague*, 2017 WL 4942772, at *3-4 (holding that not graduating with one's fellow classmates was a harm compensable with money damages); *see also Doe v. Vassar*, 2019 WL 6222918, at *6-7 (similar).

Finally, Rignol asserts that, "with immigration policies constantly shifting," the investor visa that entitles him to live and work in the United States could be revoked if immigration officials learned that Rignol took three years to complete a two-year course of study because of a finding of academic misconduct. Pl.'s Mem. 13. I agree with Defendants that any immigration consequences of Rignol's suspension are too speculative to entitle him to a preliminary injunction. The lawsuit has publicly disclosed Rignol's disciplinary record. A preliminary injunction requiring Defendants to accommodate Rignol's graduation this spring would not exonerate Rignol nor prevent public disclosure of his discipline.

---

[13] At oral argument, Defendants further asserted that, should Rignol return to SOM following his suspension, he is eligible to compete with members of the class of 2026 for the honor of being class marshal. Tr. 60:11-14. This further supports my finding that forfeiting the honor of being class marshal at graduation in spring 2025 is not an irreparable harm. Moreover, Rignol's claim that he would be class marshal if I were to order Defendants to reinstate him and remove the F grade for the Sourcing and Managing Funds course is speculative. The class marshal honor is awarded based on grades received for certain first year classes, including Sourcing and Managing Funds. Tsung Aff. ¶ 35; Rignol Decl. ¶ 8, Feb. 25, 2025. I do not know what grade Rignol would receive in the course were his exam to be graded by his professors, and thus do not know whether Rignol would indeed be entitled to the class marshal honor should he otherwise manage to satisfy the requirements for graduation. *Id.*

I therefore conclude that Rignol has not met his burden of establishing he would be irreparably harmed absent a preliminary injunction.

**B.    Equities**

Since I have concluded that Rignol has failed to show irreparable harm, I need not consider the other requirements for issuing a preliminary injunction. *Inkel v. Connecticut*, No. 3:17-cv-1400 (MPS), 2019 WL 1230358, at *10 (D. Conn. Mar. 15, 2019) (stating that where "a plaintiff does not establish irreparable harm, the court need not address the other factors necessary for the issuance of injunctive relief") (internal quotation marks omitted). However, I observe that the balance of equities does not favor Rignol.

"Courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). I understand that Rignol has been under considerable stress since he was first accused of academic misconduct, and that he has much to lose from delaying graduation. And I acknowledge Rignol's apparent readiness to complete all the assignments he has missed in order to graduate with his peers this spring. Rignol Supp. Decl. ¶¶ 10-11, Feb. 28, 2025, ECF No. 24. But at the same time, an injunction requiring Defendants to permit Rignol to graduate this spring would require Defendants to "fundamentally alter the Program." Tsung Aff. ¶ 32.

The parties dispute whether granting an injunction would entail significant hardship to Defendants. Rignol maintains this is an insignificant burden. *See* Tr. 47:4-6 ("We're talking about watching some videos and maybe doing a couple of assignments to make up for some lectures that weren't recorded."). But I find Defendants' description of the manner in which the EMBA program would need to be modified, as well as the hardships faced by

24

administrators and instructors, far more persuasive than Rignol's assertion that he could substitute five months of missed graduate instruction for recorded class lectures and make-up essays. Tsung explains that "attendance, participation, and group work through Learning Teams and otherwise are core components of the Program" and "[c]lass participation and group work are commonly components of student grades." Tsung Aff. ¶ 31. Tsung observes that adding Rignol to classes underway or not even being offered would "dilute the rigor of the classes and require the diversion of substantial time and energy by professors and, with respect to ongoing classes, other students away from their current endeavors." *Id.* ¶ 32. I credit Defendants' assertion that an injunction would place an extraordinary burden on Rignol's professors and teaching assistants, who would be responsible for devoting a substantial amount of time to helping Rignol remediate coursework in classes he has missed.

These hardships were only exacerbated by Rignol's decision to wait until February 25, 2025—more than three months after his suspension began and more than two months after his final appeal to administrators was denied—to apply for injunctive relief. Rignol retained counsel as early as September 9, 2024, when he copied several attorneys, one of whom has noticed an appearance in this case, in an email to Tsung and Choi. Defs.' Ex. W at 2. Counsel explained at oral argument that the delay is attributable in part to several medical emergencies faced by members of Rignol's legal team. Tr. 81:5-11. But while I appreciate that no one can control such occurrences, I cannot ignore the fact that the difficulty of accommodating Rignol's request for an injunction is far higher now than it would have been had Rignol moved for an injunction in December 2024. Indeed, even had I issued an injunction the day that Rignol made his request (and without affording the parties the briefing and argument that they requested), the balance of equities would still have favored

Defendants. By February 25, 2025, Rignol had already missed four courses entirely (which ended in January and February 2025) and had missed sessions of five more courses underway. Tsung Aff. ¶¶ 20-26 & Ex. 3. Thus even on that earlier date, accommodating Rignol would have imposed a substantial hardship on Defendants.

I therefore conclude that the equities do not favor an injunction.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Rignol's application for a temporary restraining order and preliminary injunction, ECF No. 16, is DENIED.

The parties shall confer and submit a Rule 26(f) report describing case management deadlines for the remainder of this action on or before May 19, 2025.

**SO ORDERED.**

Bridgeport, Connecticut
May 5, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge