### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THIERRY RIGNOL, | : | CASE NO. 3:25-cv-00159-SFR |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, YALE UNIVERSITY | : | |
| BOARD OF TRUSTEES, WENDY TSUNG, | : | |
| K. GEERT ROUWENHORST, JACOB | : | |
| THOMAS, SHERILYN SCULLY, JAMES | : | |
| CHOI, AND ANJANI JAIN, | : | |
| Defendants. | : | MAY 15, 2025 |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 12, Defendants respectfully submit this Memorandum of Law in Support of their Motion to Dismiss. The Court should grant Defendants' Motion and dismiss all of Plaintiff's claims with prejudice.

### I.        PRELIMINARY STATEMENT

As this Court noted during the argument on Plaintiff's Motion for a Preliminary Injunction, Plaintiff's primary claim, for breach of contract, is subject to the extremely high standard in *Gupta v. New Britain General Hospital*, 239 Conn. 574, 687 A.2d 111 (1996). Plaintiff must prove that the University's actions were arbitrary or that it breached a specific contractual promise. *Id.* Plaintiff can do neither. The University's decisions were fully rational. It followed the provisions in the alleged contract, the School of Management's Bulletin. And even if there were alleged deviations, the Bulletin expressly provided for that.

Plaintiff's other claims also fail. Plaintiff has not pleaded any facts supporting plausible claims of national origin discrimination or retaliation under Title VI. Nor has he come close to

pleading facts meeting the extraordinarily high standard for intentional infliction of emotional distress.  Plaintiff's negligent infliction of emotional distress claim is precluded by *Gupta*.  And his claims fail for other reasons, as described below.

The Court should dismiss all of Plaintiff's claims with prejudice.

## II.    THE ALLEGED WELL-PLEADED FACTS

Plaintiff states that he is an accomplished professional who has been educated in the United States since at least high school and obtained dual degrees from Rice University before his admission to Yale's Executive Master of Business Administration Program ("EMBA" or the "Program") in September 2023.  (ECF 79 ("Cmplt.") ¶¶ 28–31, 51.)

In June 2024, two of Plaintiff's professors suspected that Plaintiff cheated on his final examination in their class by using artificial intelligence ("AI").  (*E.g.*, Cmplt. ¶ 50.)  Plaintiff admits that the professors' suspicions were based on multiple indications, including "substantial overlap" between "[a]t least one" of Plaintiff's answers and "answers to [similar] simple prompts on ChatGPT"; the "near perfect punctuation and grammar and elaborate formatting" in Plaintiff's exam, despite a four-hour limit; Plaintiff's "relatively poor[]" performance "on [a] question[] where AI tools were the least helpful"; and the finding of the AI detection software, ChatGPTZero, that there was a high likelihood that Plaintiff used AI.  (Cmplt. ¶ 50.)  Plaintiff thus admits that there was ample basis for the professors' suspicions that he cheated.  Plaintiff admits that he was unaware of these suspicions until later.  (Cmplt. ¶¶ 48, 64.)

The professors referred the matter to the Honor Committee (*E.g.*, Cmplt. ¶ 49.), which "considers instances of academic infractions and other serious violations" of policy.  (**Exhibit A** ("Bulletin") at 67.[1])  The Committee "collect[s] facts pertaining to such infractions and violations,

---

[1] The Court may consider the Bulletin because it is integral to and incorporated in Plaintiff's Complaint, including because Plaintiff extensively cites the Bulletin (*e.g.*, Cmplt. ¶¶ 33–47) and because the Bulletin is the basis for

mak[es] judgments about them, and determin[es] punishment where appropriate." (Bulletin at 67; *see also* Bulletin at 67 ("The [C]ommittee will collect the facts relevant to each complaint under consideration and make judgments on whether an infraction or violation has been committed and on its seriousness to the community. Based on these judgments, the [C]ommittee will choose a punishment that it deems appropriate to the offense.") The Honor Committee "consists of four faculty members (one of whom shall be designated [C]hair), six [School of Management] students . . . , and the [D]ean of [S]tudents (who [] act[s] as secretary to the [C]ommittee and shall be nonvoting." (Bulletin at 67; *see also* Cmplt. ¶ 40.)

Notably, the Bulletin provides that "the [] steps" for a typical Honor Committee process "*are customary*" and that "*deviations may be taken* by the [C]hair when appropriate." (Bulletin at 67 (emphasis added).) The process generally begins with the Chair "request[ing] a written statement [from the student] and copies of any other relevant materials pertinent to the complaint." (Bulletin at 68.) "Based on th[o]se materials, the [C]hair [typically] will decide whether the offense, if the charge is true, would be of sufficient seriousness to warrant the attention of the [C]ommittee." (Bulletin at 68.) If the Chair "deem[s] [the complaint] sufficiently serious, the [C]hair or the [C]hair's designee [typically] inform[s] the student[.]" (Bulletin at 68.) The student is also generally advised "to review the Committee Policies and Procedures" to apprise them of their rights, which ordinarily include the opportunity "to examine any and all written materials being provided to the [C]ommittee as soon as possible, and ordinarily at least forty-eight hours in

---

Plaintiff's breach of contract claim. *E.g.*, *Gabriel v. Albany Coll. of Pharmacy & Health Scis. - Vermont Campus*, No. 2:12-CV-14, 2012 WL 4718678, at *7 n.5 (D. Vt. Oct. 3, 2012) (Honor Code integral to Amended Complaint by disciplined student because Honor Code's "terms form[ed] the basis of [plaintiff's] breach of contract claim"). The Court can also consider many of the documents Defendants submitted in their Opposition to Plaintiff's Motion for a Preliminary Injunction (ECF 41) because those documents are integral to Plaintiff's claims and/or the Court can take judicial notice of them, etc. For example, Plaintiff's final exam, the evidence against Plaintiff, etc. are integral to Plaintiff's claims that he did not cheat, etc. The video of Plaintiff speaking perfect English is the subject of judicial notice and relevant to Plaintiff's claims that the University should have dismissed its belief that he cheated as the result of a language barrier.

advance of the meeting" the student has with the Committee.  (Bulletin at 68.)  While members of the Committee are generally "invited to excuse themselves from the case if there is a conflict of interest," there is no requirement that they do so.  (Bulletin at 69.)  A student is typically given the opportunity to "object" to the inclusion of a Committee member on the basis that the member "is prejudiced."  (Bulletin at 70.)  If the student objects, the Chair ordinarily decides "whether the member should be recused" and the student can usually appeal a "decision of the [C]hair not to recuse the challenged member" "to the cognizant academic dean," whose decision is final.  (Bulletin at 70.)  There is thus no obligation to recuse Committee members—the Bulletin gives the University discretion to decide whether recusal is appropriate.  The Committee then generally meets with the student to discuss the case.  (Bulletin at 68.)  The Committee decides the case and may impose certain explicit sanctions, including "[s]uspension of one or more terms [and] [a] mandatory F in [the] course" or "other sanctions of intermediate severity."  (Bulletin at 68–69.)

A student may ordinarily appeal an adverse decision to the Faculty Review Board.  (Bulletin at 70.)  "The cognizant academic dean will [generally] offer any student against whom an infraction or violation is found the opportunity to meet with the cognizant academic dean . . . to raise any objections to the proceedings on the grounds of procedural irregularity or prejudice.  (Bulletin at 70.)  "If objection is raised, the [] dean will investigate the objection and may remand the matter to the [C]ommittee to correct [any] procedural irregularity . . . ."  (Bulletin at 70.)

In this case, Plaintiff admits that he was repeatedly informed of the allegations against him prior to the Chair referring the matter to the Honor Committee.  Plaintiff alleges that his professors "informed [him] that his final exam paper was 'flagged' for possible use of Artificial Intelligence ('AI') technology in completing [his] exam," which "[i]f true . . . would be a violation of the rules of the exam, and the Yale Honor Code."  (Cmplt. ¶ 65; *see also, e.g.*, Cmplt. ¶ 64.)  Plaintiff also

admits that he discussed the allegations against him with Dean Sherilyn Scully and Dean Wendy Tsung on July 24, 2024.  (Cmplt. ¶¶ 70, 71, 78.)

The Chair of the Honor Committee, Professor James Choi, attempted to obtain the file Plaintiff used to create his final exam, which could have shed light on whether Plaintiff used AI tools.  (*E.g.*, Cmplt. ¶ 108; **Exhibit B**.[2])  On August 10, 2024, for example, Professor Choi emailed Plaintiff:  "Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced [the] PDF file you submitted for the exam.  I am now asking you directly." (Exhibit B; *see also, e.g.*, Cmplt. ¶ 80 (invoking and selectively quoting that email).)  And on August 16, 2024, Professor Choi email Plaintiff stating:  "I am asking you to send us the Word file from which the PDF was produced."  (Exhibit B; *see also, e.g.*, Cmplt. ¶ 83 (invoking and selectively quoting that email).)

Professor Choi repeatedly put Plaintiff on notice in those emails that Plaintiff's refusal to produce the requested document would likely be viewed by the Honor Committee as demonstrating a lack of candor and would likely lead to severe sanctions.  For example, Professor Choi wrote:

> Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced [the] PDF file you submitted for the exam.  I am now asking you directly.
>
> *I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale.*

(Exhibit B (August 10, 2024 Email) (emphasis added).)

---

[2] Plaintiff makes it appear as though Professor Choi did not request documents from Plaintiff until Plaintiff's meeting with the Committee on November 8, 2024.  (*See* Cmplt. ¶ 108.)  Plaintiff does that by selectively quoting emails he exchanged with Professor Choi in August 2024.  The entire emails are integral to Plaintiff's claims and incorporated into Plaintiff's Complaint in light of Plaintiff's reliance on portions of what Professor Choi wrote.  (*E.g.*, Cmplt. ¶¶ 79–86.)  Plaintiff cannot selectively quote Professor Choi out of context to support his claims while precluding review of the full emails.  Indeed, as discussed below, Professor Choi's emails are integral to the decision that Plaintiff was not forthcoming and are thus integral to Plaintiff's challenge to that decision.  (*See, e.g.*, *infra*.)

> I am asking you to send us the Word file from which the PDF was produced. You seem to be weighing whether you will cooperate or not. It's your choice, but if history is a guide, *failure to cooperate would be viewed by the Honor committee as an extraordinary violation of the Honor Code.*

(Exhibit B (August 16, 2024 Email) (emphasis added).)

Plaintiff admits he did not produce the file until after his meeting with the Committee on November 8, 2024, approximately three months after Professor Choi's emails. (Cmplt. ¶ 108.)

Professor Choi "'expanded [his] investigation into [Plaintiff's] case to deliverables [Plaintiff] submitted for other courses.'" (Cmplt. ¶ 84.) The Bulletin allowed this because it authorized Professor Choi to collect "any [] relevant materials pertinent to the complaint." (Bulletin at 68.) Plaintiff's submissions in other courses were relevant because, among other reasons, they might have shown a pattern of AI use. Professor Choi asked Plaintiff to submit the file he had used to create an exam submission in another course. (Cmplt. ¶ 108.)

On September 8, 2024, the Honor Committee provided Plaintiff with an "official notification letter" specifying that he was accused of "'improperly utilize[ing] AI on the final exam in [his] course.'" (Cmplt. ¶ 88.) Plaintiff admits that that letter also notified him of his rights by, for example, referring him to "'[a] list of the student Honor Committee members and faculty members,'" which Dean Tsung noted would "'be updated very soon once the new [C]ommittee members have been selected.'" (Cmplt. ¶ 88; *see also* **Exhibit C**.[3]) The Committee provided Plaintiff with a link and told him to check it when it was updated for recusals. Regardless, Plaintiff did in fact seek the recusal of all of the Honor Committee members. (**Exhibit D**.[4])

---

[3] Dean Tsung's email is integral to and incorporated in Plaintiff's Complaint in light of the claims Plaintiff makes based on that email and the fact that he selectively quotes from it. (*See, e.g.*, Cmplt. ¶¶ 88, 90, 93.) The email shows that Plaintiff was directed to review the Bulletin to ensure that he was apprised of his rights. (*See* Exhibit C; *see also* Memorandum And Order on Plaintiff's Motion for a TRO/PI (ECF 89) at 8 (noting as much).)

[4] Plaintiff's emails seeking recusals are integral to Plaintiff's claims in light of Plaintiff's assertion that he "was stripped of his right to challenge the members of the [C]ommittee." (Cmplt. ¶ 93.) It is incredulous for Plaintiff to allege he was unable to challenge Committee members when he did exactly that.

On October 14, 2024, the Honor Committee produced documents related to the case to Plaintiff.  (Cmplt. ¶ 97.)  Plaintiff admits that occurred well before his meeting with the Committee, which had previously been rescheduled for November 8, 2024.  (Cmplt. ¶ 95.)

Plaintiff claims that the documents produced to him were incomplete because supposedly there were six ChatGPTZero scans but only five scans were produced.  (Cmplt. ¶ 103.)  Even so, the supposed sixth scan had no impact on Plaintiff because he "ran [the question at issue] through [Chat]GPTZero himself" and received the scan result he was purportedly missing.  (Cmplt. ¶ 104.)

Plaintiff met with the Honor Committee on November 8, 2024.  (Cmplt. ¶ 104.)  He was well aware of the allegations against him and that one issue before the Committee was whether he had been forthcoming.  (*E.g.*, Cmplt. ¶¶ 65, 88; Exhibit B (August 16, 2024 email stating: "[F]ailure to cooperate would be viewed by the Honor committee as an extraordinary violation of the Honor Code.").)  Plaintiff defended himself, including by assailing the reliability of AI detection tools.  (*E.g.*, Cmplt. ¶ 106, ¶ 108 ("Plaintiff asserted his innocence to charges of AI use.").)  Professor Choi again "asked Plaintiff for the underlying 'Microsoft Word' files used to produce the PDF files."  (Cmplt. ¶ 108.)  Plaintiff disclosed "that he did not use Microsoft Word" to create his exam submission and had "instead used a different word processing program, Apple Pages."  (Cmplt. ¶ 108.)  The meeting ended and Plaintiff finally submitted "the requested files" thereafter.  (Cmplt. ¶ 110.)  Thus, despite repeated requests for the "file that produced [the] PDF file [Plaintiff] submitted for [his] exam" dating back to at least August, Plaintiff did not produce that file until after his meeting on November 8, 2024.  (*E.g.*, Cmplt. ¶ 110; Exhibit B.)

The Honor Committee asked that Plaintiff return with his personal laptop to meet with the Committee.  (Cmplt. ¶ 113.)  Nothing prohibited the Honor Committee from asking Plaintiff to return (Bulletin), and the Committee's decision to do so was well-founded:  Plaintiff admits he

disclosed significant information (the Pages documents) to the Committee after the meeting ended and the Committee wanted to examine Plaintiff's laptop. (Cmplt. ¶¶ 110, 113.) Plaintiff claimed he was unable to return to meet with the Committee. (Cmplt. ¶ 113.)

The Committee concluded that Plaintiff had not been forthcoming and suspended him for one year. (Cmplt. ¶¶ 114, 118.) Plaintiff had been on notice that his candor was at issue. (*E.g.*, Exhibit B.) There was more than ample basis for the Committee's decision: The Committee repeatedly asked Plaintiff to provide the "file that produced [the] PDF file [Plaintiff] submitted for [his] exam," Professor Choi warned Plaintiff that the failure to do so "would be viewed by the Honor committee as an extraordinary violation of the Honor Code," but Plaintiff chose not to provide the files until after his meeting. (*E.g.*, Exhibit B; Cmplt. ¶ 110.)

On November 14, 2024, Dean Tsung emailed Plaintiff: "'There is no grade penalty *outcome* from the Honor Committee decision.'" (Cmplt. ¶ 119 (emphasis added).) Plaintiff assumed his grade would not be affected, but that is not what Dean Tsung wrote. She wrote that there was no "outcome" (*i.e.*, decision) regarding a grade penalty.

Plaintiff appealed the Honor Committee's decision. (Cmplt. ¶ 122.) Plaintiff argued, among other things, that "a determination [that a student has not been forthcoming] is not a basis for punishment on its own without a finding of a violation of the Honor Code" (*i.e.*, that the Honor Committee could not conclude he was not forthcoming without concluding he cheated). (*E.g.*, Cmplt. ¶¶ 122, 123.) The Faculty Review Board denied Plaintiff's appeal but remanded the case to the Honor Committee for it to "'continue deliberating'" on the allegation that Plaintiff cheated (*i.e.*, violated the rules of the exam).[5] (*E.g.*, Cmplt. ¶¶ 124, 125.)

---

[5] In actuality, Dean Anjani Jain, not the Faculty Review Board, remanded the matter. The Court can consider this fact because it is established by two letters from Dean Jain that are integral to Plaintiff's claims of procedural error and which Plaintiff selectively quotes from. (*E.g.*, Cmplt. ¶¶ 124–26, 138.) (*See* **Exhibit E**.)

The Honor Committee concluded that Plaintiff had cheated by violating the exam rules. (Cmplt. ¶ 122.) Ample evidence supported that conclusion. The ChatGPTZero scans showing a high likelihood Plaintiff generated answers using AI were only one piece of evidence. Furthermore, Plaintiff's professors found "substantial overlap" between "a[t] least one [of Plaintiff's] answer[s]" and "answers to simple prompts on ChatGPT;" Plaintiff's exam was suspiciously lengthy and contained "near perfect punctuation and grammar and elaborate formatting" that caused the professors to "question[]" "whether" it was possible to complete the exam without improper assistance in the four-hour time limit; and Plaintiff "performed relatively poorly" on a question "where AI tools were the least helpful." (Cmplt. ¶ 50.)

The Honor Committee gave Plaintiff an "F" in the course. (Cmplt. ¶ 133.) The Bulletin expressly provided for the imposition of an "F" and a one-year suspension. (Bulletin at 69 (permitting, *inter alia*, a "[s]uspension of one or more terms + mandatory F in course").)

Plaintiff appealed the imposition of the "F." (Cmplt. ¶ 137.) The Faculty Review Board denied Plaintiff's appeal. (Cmplt. ¶ 138.)

Plaintiff then filed this action. Plaintiff asserts claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) national origin discrimination under Title VI, (4) retaliation under Title VI, (5) intentional infliction of emotional distress ("IIED"), and (6) negligent infliction of emotional distress ("NIED"). (Cmplt.) Plaintiff also seeks a declaratory judgment, the specifics of which are discussed below. (Cmplt.)

## III.    LEGAL STANDARD AND RELEVANT LAW

"Any claim that fails 'to state a claim upon which relief can be granted' will be dismissed." *Raymond v. Manchester Police Dep't*, No. 3:24-CV-1098 (VAB), 2024 WL 5010489, at *2 (D. Conn. Dec. 6, 2024) (quoting Fed. R. Civ. P. 12(b)(6)) (granting motion to dismiss).

"In reviewing a complaint under Rule 12(b)(6), a court applies a 'plausibility standard' guided by '[t]wo working principles.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "First, '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted)). "Second, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Raymond*, 2024 WL 5010489, at *2 (quoting *Iqbal*, 556 U.S. at 679). "Thus, the complaint must contain 'factual amplification . . . to render a claim plausible.'" *Id.* (quoting *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009).

"Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review 'to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference.'" *Raymond*, 2024 WL 5010489, at *2 (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). "A court may also consider 'matters of which judicial notice may be taken' and 'documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in

bringing suit.' *Id.* (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993);

*Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005)).

## IV.    ARGUMENT

### A.  Plaintiff's Breach Of Contract Claim Fails

"The elements of a breach of contract claim are the formation of an agreement,

performance by one party, breach of the agreement by the other party, and damages." *Bradley v.*

*Yovino*, 218 Conn. App. 1, 23, 291 A.3d 133, 149 (2023) (quotation marks omitted).

The claim for breach of contract is Plaintiff's main claim.  Plaintiff made that clear at oral

argument for his motion for preliminary injunction.  The Court correctly observed that in order to

succeed on that claim, Plaintiff must establish that Defendants acted "arbitrarily, capriciously[,] or

in bad faith" or that they "fail[ed] to fulfill [a] specific contractual promise distinct from any overall

obligation to offer a reasonable program" in order to succeed on his State claims.  (ECF 82

(referencing *Gupta*, 239 Conn. at 574) at 15:13–22, 26:7–9 ("I have to find that it was arbitrary

and capricious and supported by essentially no rational basis.").)  Indeed, this academic dishonesty

case fundamentally revolves around a university's conclusion that a student cheated and was not

forthcoming in its efforts to address misconduct.  This case thus implicates the core principles of

non-interference that underlie *Gupta* and its progeny, including the judicial policy of giving

academic institutions wide leeway to address academic matters by not second-guessing their

decisions except under extremely narrow circumstances.  *See, e.g., Doe v. Wesleyan Univ.*, No.

3:19-CV-01519 (JBA), 2022 WL 2656787 at *6 (D. Conn. July 8, 2022) ("Connecticut courts seek

to "limit judicial intrusion into educational decision making" by requiring student plaintiffs to

establish "nonperformance of a special promise . . . .") (quoting *Bass v. Miss Porter's Sch.*, 738 F.

Supp. 2d 307, 230 (D. Conn. 2010)); *Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL

11

1614230, at *1 (D. Conn. Mar. 31, 2020) ("[T]here are certain *narrow* circumstances in which a student may bring a breach-of-contract claim against a university." (emphasis added) (citing *Gupta*, 239 Conn. at 592)); *see also, e.g.*, *Lotto v. Hamden Bd. of Educ.*, No. CV-05-4010436, 2006 WL 618361, at *4 (Conn. Super. Ct. Feb. 21, 2006) (granting motion to strike claim challenging expulsion for possession of alcohol). "In addition, strict compliance [with purported procedural and contractual provisions] on the part of the institution is not necessary; instead, its obligation is one requiring substantial compliance," and "a technical breach of the terms of a contract is excused." *Wesleyan*, 2022 WL 2656787 at *6.

"A 'specific contractual promise' must be narrow enough that a factfinder could determine whether it has been violated." *Madej*, 2020 WL 1614230, at *10. "Not all of a College's statements constitute a 'specific contractual promise.'" *Id.* An alleged promise to a student that she would receive "many credits" for her prior studies is *not* a specific contractual promise. *Faigel v. Fairfield University*, 75 Conn. App. 37, 41, 815 A.2d 140, 143 (2003); *see also, e.g.*, *Bass ex rel. Bass*, 738 F. Supp. 2d at 325 (concluding that the "implied promise Plaintiff alleges Porter's to have made is '*too imprecise* to qualify for consideration as a "specific contractual promise."'" (emphasis added) (quoting *Faigel*, 75 Conn. App. at 43)); *Hope Acad. v. Friel*, No. CV030081183S, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004) ("To qualify as a 'specific contractual promise,' the promise or promises relied on must be precise and grounded on specific contractual terms or provisions." (citing *Faigel*, 75 Conn. App. at 42)). Thus, in *McNeil v. Yale University*, , the Court granted a motion to dismiss a breach of contract claim, holding that "general language" in "Yale's Equal Opportunity Statement, Undergraduate Regulations, and Sexual Misconduct Policies cannot result in specific contractual promises" because construing general statements as sufficient to state a claim under *Gupta* "would involve the judiciary in the

awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached.'" 436 F. Supp. 3d 489, 531 (D. Conn. 2020) (quotation marks omitted), *aff'd in part, vacated in part sub nom. on other grounds in McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639-CV, 2021 WL 5286647 (2d Cir. Nov. 15, 2021).

Federal law, including Supreme Court precedent, likewise instructs that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999); *Charest v. President & Fellows of Harvard Coll.*, No. CV 13-11556-DPW, 2016 WL 614368, at *17 (D. Mass. Feb. 16, 2016) ("'[C]ourts are chary about interfering with academic decisions made by private colleges and universities.'" (alteration omitted) (quoting *Schaer v. Brandeis Univ.*, 432 Mass. 474, 482, 735 N.E.2d 373, 381 (2000)). "[A] student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by [a] Court." *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016).

### 1. Plaintiff's Claim Fails Because The Bulletin Allows For Deviations

Plaintiff cannot establish a breach because the Bulletin provides that the "steps" for the Honor Committee Process outlined in the Bulletin "are customary" and that "deviations may be taken by the [C]hair when appropriate to a given case."[6] (Bulletin at 67.) There can be no breach—much less a breach of a specific provision, as *Gupta* requires—when the purported contract says that the University can deviate from the process summarized in the purported contract and that that

---

[6] This Court recently noted as much. (ECF 82 30:6–11 ("This is a contract claim and I have the contract in front of me and the contract says that deviations can be taken by the Chair where appropriate in the given case and the following steps are customary."); *see also, e.g.*, ECF 82 34:5–21.)

process is merely customary. *See Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 190 (D. Conn. 2021) (granting motion to dismiss breach-of-contract claim seeking tuition reimbursement due to transition to remote learning due to COVID-19 pandemic because "decision to suspend in-person education in light of the COVID-19 pandemic represent[ed] an exercise of authority expressly reserved to the University, and the exercise of that authority cannot constitute a breach" and provision regarding refunds "expressly commit[ted] the decision of whether to issue a refund to the University's discretion"); *Gabriel v. Albany Coll. of Pharmacy & Health Scis. - Vermont Campus*, No. 2:12-CV-14, 2012 WL 4718678, at *7 (D. Vt. Oct. 3, 2012) (dismissing breach of contract claim related to discipline because of, among other flaws, "'[d]eviation' provision" in Honor Code); *Moffett v. Kimberly-Clark Corp.*, No. 3:97CV1390(WWE), 1998 WL 698760 (D. Conn. Aug. 6, 1998) (dismissing claim based on Handbook's "permissive phrases" because those phrases "demonstrate that such a determination is left to the defendant's discretion" and plaintiff's breach claims therefore failed).

### 2. Plaintiff's Claim Is Largely Based On Generic, Inactionable Language

Generalized, aspirational language cannot support claims—claims must instead be based on specific language. *E.g.*, *McNeil*, 436 F. Supp. 3d at 531 (holding that language was too generalized); *Gupta*, 239 Conn. at 593. Plaintiff largely bases his claim on generic statements that cannot support a claim. For example, Plaintiff alleges that the University breached a purported contract by allegedly not "treat[ing] [him] with honesty, integrity, and fairness in the course of the disciplinary investigation and proceedings against him." (Cmplt. ¶ 145; *see also* Cmplt. ¶ 144; Cmplt. ¶ 146 (alleging that Defendants "treat[ed] Plaintiff unfairly").) Plaintiff cannot base a claim on an assertion that the University did not treat him fairly because any such alleged promise is insufficiently specific and "would 'involve the judiciary in the awkward tasks of defining what

constitutes" fairness in contravention of *Gupta*'s prohibition on Court second-guessing decisions by educational institutions. *McNeil*, 436 F. Supp. 3d at 531 (quoting *Gupta*, 239 Conn. at 591). Plaintiff must base his claims on *specific* promises.

### 3. Plaintiff's Allegedly Specific Claims Fail

Plaintiff's purported specific claims of breach fail for various reasons. Many of the claimed violations are not, in fact, violations. Other claims are belied by Plaintiff's own allegations. Many claimed breaches are also trivial and/or not connected to cognizable damages, and should be excused. *E.g.*, *Wesleyan*, 2022 WL 2656787 at *6.

- *The Alleged Failure To Consider Plaintiff's Foreign And Non-Native English Speaker Status* (Cmplt. ¶ 146): The Bulletin does not say that the University must consider a student's national origin or language skills when deciding whether to ignore suspicions or evidence of academic misconduct. Plaintiff seeks to improperly add language that does not exist. *O'Connor v. City of Waterbury*, 286 Conn. 732, 746, 945 A.2d 936, 948 (2008) ("noting that Courts are "prohibited from implying the existence of a term that is not expressly written in the agreement, because that would require [Courts] to rewrite the agreement for the parties"). It certainly was not arbitrary to decide that suspicions of AI use could not be dismissed as the result of a language issue when Plaintiff's own allegations establish that Plaintiff is a highly accomplished professional educated in the United States and judicially noticeable documents establish that Plaintiff speaks perfect English.

- *The Alleged Failure To Excuse Members Of The Honor Committee Who Purportedly Had Conflicts Of Interest* (Cmplt. ¶ 147): The Bulletin provides that Committee Members have discretion to decide whether to recuse themselves and that the University has discretion to recuse members as it sees fit. (Bulletin at 69, 70.) The Bulletin does not mandate recusal in any particular circumstance. Plaintiff does not identify any member of the Honor Committee who allegedly improperly failed to recuse themselves, and does not allege any actual bias.[7] This is, moreover, the exact type of trivial claim that cannot stand. *E.g.*, *Wesleyan*, 2022 WL 2656787 at *6 (technical breaches excused). It is beyond speculative to suggest that a recusal would have made any difference. *E.g.*, *Bradley*, 218 Conn. App. at 23 (damages are element of claim).

---

[7] Plaintiff alleges "upon information and belief" that Professors Rouwenhorst and Thomas did not recuse themselves from the Faculty Review Board, but that is different from the Honor Committee. (Cmplt. ¶ 120.) Plaintiff's "upon information and belief" allegation is not well pleaded and is inaccurate. *See, e.g.*, *Whiteside v. Hover-Davis, Inc.*, No. 19-CV-6026 CJS, 2020 WL 979785, at *4 (W.D.N.Y. Feb. 28, 2020), *aff'd*, 995 F.3d 315 (2d Cir. 2021) ("A plaintiff cannot avoid the necessity of pleading a plausible claim supported by factual allegations merely by asserting statements "upon information and belief" without explaining the basis for the belief.").

- *The Alleged Failure For Plaintiff To Have An Opportunity To Seek Recusals* (Cmplt. ¶ 148): As just noted, this is a claim that cannot stand because the University substantially complied with its policy even if Plaintiff did not have an opportunity to seek recusals. Plaintiff cannot tie this claim to any cognizable damages, particularly because he does not identify a member of the Honor Committee who should have been recused. Regardless, Plaintiff exercised his ability to recuse members of the Honor Committee. (Exhibit D.)

- *The Alleged "Singling" Out Of Plaintiff's Examination Without Any Purported "Reasonable Evidence"* (Cmplt. ¶ 149): Nothing prohibits the University from "singling out" an exam that it suspects may reflect cheating. To the contrary, that is precisely what the University is supposed to do. (*E.g.*, Bulletin at 67 (suspected case of cheating should be reported).) Plaintiff's assertion that the University had "no reasonable evidence to support an inference that Plaintiff cheated" is belied by Plaintiff's own allegations, including his allegation quoting the evidence his professors found. (Cmplt. ¶ 50.)

- *The Use Of ChatGPTZero* (Cmplt. ¶ 150): The Bulletin does not prohibit the use of AI detection tools. The bulletin expressly allows for inquiry to identify "[s]uspected" or "probable" violations and for the "collect[ion] [of relevant] facts." (Bulletin at 67, 68.) Plaintiff's arguments about the reliability of ChatGPTZero do not change that.

- *The Timeliness Of The Production Of Materials* (Cmplt. ¶ 151): Plaintiff admits that he received the documents for his case on October 14, 2024 and that his hearing did not occur until November 8, 2024. (Cmplt. ¶ 97; Cmplt. ¶ 95.) That far exceeds the "forty-eight hours in advance of the meeting" provision in the Bulletin. (Bulletin at 68.)

- *The Purported Withholding Of A Document* (Cmplt. ¶ 152): Plaintiff's conclusory claim that he did not receive a purported ChatGPTZero scan that the Honor Committee had is belied by his own well-pleaded allegation that the Honor Committee produced everything it was aware of. (Cmplt. ¶ 105.) Regardless, Plaintiff admits that he "ran [the purportedly missing] GPTZero [scan] himself." (Cmplt. ¶ 104.) Plaintiff thus admits he had the evidence he claimed he was missing and either did or could have presented it to the Honor Committee. The alleged failure to produce the scan is therefore, at best for Plaintiff, a trivial violation to which no damages are attached and which cannot support a claim.

- *The Alleged Coercion/Expansion Of The Investigation* (Cmplt. ¶ 153): Plaintiff's claims of alleged "coercion" are based on his allegations about Dean Scully purportedly raising the prospect of immigration implications. (Cmplt. ¶ 153.) The Bulletin does not prohibit the University from discussing potential implications of disciplinary proceedings with students. This is simply not a breach of any alleged contract. That is particularly true when Plaintiff's sensational characterizations of this purported comment, which are not facts, are stripped away, as they must be. There was similarly nothing wrong with purportedly "expand[ing] the investigation"—the Bulletin provides that the Committee will "collect the facts relevant," and evidence of cheating in other classes was relevant to the question of whether Plaintiff cheated as it would establish a pattern of cheating. (Buletin at 67.)

- *The Alleged Failure To Inform Plaintiff Of What Policy He Violated* (Cmplt. ¶ 154): Plaintiff's assertion that the University "refused to inform Plaintiff what policy he had

violated[] or how he violated that policy" is belied by Plaintiff's own allegations, including his allegation that his professors "informed [him] that his final exam paper was 'flagged' for possible use of Artificial Intelligence ('AI') technology in completing the exam," which "[i]f true . . . would be a violation of the rules of the exam, and the Yale Honor Code." (Cmplt. ¶ 65.)  Plaintiff also admits that "[i]n [a] September 8, 2024, charge notice letter, the Honor Committee [] charged that Plaintiff 'improperly utilized AI on the final exam[.]'" (Cmplt. ¶ 99; *see also, e.g.*, Cmplt. ¶¶ 70, 71.)

- *The Alleged Refusal To Consider The Alleged Unreliability Of GPTZero* (Cmplt. ¶ 155): There is no provision in the Bulletin stating that the Honor Committee cannot consider certain evidence, never mind a provision stating that it cannot consider AI detection tools. To the contrary, the Committee is entitled to "collect the facts." (Bulletin at 67.)  Plaintiff's challenge to the ChatGPTZero scans is not only not a violation of any purported contract, it is an improper attempt to have this Court do what *Gupta* prohibits:  Reweigh evidence and sit as a super appellate body over the Honor Committee instead of deferring to it.

- *The Committee's Not Being Forthcoming Finding* (Cmplt. ¶ 156):  The Bulletin allows the Committee to "collect the facts relevant to each complaint . . . and make judgments on whether an infraction or violation has been committed and on its seriousness." (Bulletin at 67.)  Whether Complainant was forthcoming with the Committee was an issue relevant to this case.  Complainant admits he was repeatedly given notice of this issue long before the hearing. (Cmplt. ¶¶ 80, 83.)  The Committee was no more prohibited from considering whether Plaintiff was forthcoming than this Court is precluded from considering whether an attorney appearing before it has violated their duty of candor to this Court.[8]

- *The Decision To Remand The Case* (Cmplt. ¶ 157):  The Bulletin provides that a student may "raise any objections to the proceedings on the grounds of procedural irregularity or prejudice" and that, "[i]f objection is raised, the cognizant academic dean will investigate the objection and may remand the matter to the [C]ommittee to correct the procedural irregularity." (Bulletin 70.)  Plaintiff admits he raised a procedural challenge to the Committee's decision. (Cmplt. ¶ 122 ("Plaintiff [argued] . . . [that] a determination [on not being forthcoming] is not a basis for punishment [on its own without finding of a violation of the Honor Code[.]").)  The University was therefore well within its rights to remand the matter to the Committee for further adjudication.  Plaintiff cannot have it both ways.

- *The Alleged Promise That Plaintiff Would Not Receive A Grade Penalty* (Cmplt. ¶ 158): The Bulletin expressly states that one allowable punishment is a "[s]uspension of one or more terms [and] a mandatory F in [the] course." (Bulletin at 69.)  It was not a breach of any alleged contract for the University to suspend Plaintiff and give him an "F."  A purported statement from Dean Tsung cannot change the alleged contract.  Regardless,

---

[8] Plaintiff also seems to claim that he was asked to provide documents, to return to campus, to produce his laptop, and that the Committee did not initially make a finding regarding his use of AI.  None of these alleged acts violate the Bulletin.  The Committee was entitled to collect evidence and make judgments, for example. (Bulletin at 67.)  The Bulletin does not say that the Committee cannot find that a student was not forthcoming without finding that he cheated.  Regardless, that issue was addressed when Plaintiff raised it.

Plaintiff admits that Dean Tsung told him there was "no grade penalty *outcome* from the Honor Committee decision," not that there would be no grade penalty. (Cmplt. ¶ 119.)

- *The Alleged Failure To Inform Plaintiff Of A Supposed "New Charge"* (Cmplt. ¶ 159): Plaintiff's conclusory allegation that the University introduced a "new charge" is belied by Plaintiff's own allegations. Plaintiff admits he was charged with "violation of the rules of the exam." (*E.g.*, Cmplt. ¶ 65.) He claims the "new charge" was "violation of exam rules." (Cmplt. ¶ 128.) The charges are the same.

- *The Allegation That The Committee Could Not Consider Whether Plaintiff Was Forthcoming* (Cmplt. ¶ 160): As previously discussed, the Committee had the authority to consider whether Plaintiff was forthcoming because that was a relevant issue (and one that Plaintiff was repeatedly notified would be an issue). (*See supra*.)

- *The Allegation That The Penalties Were Excessive* (Cmplt. ¶ 161): The Bulletin reserves the question of what penalty to impose to the University. (Bulletin at 67 (allowing Committee to "make judgments") and 70 (allowing for appeal of penalty Committee imposes and decision on that appeal, which is final).) Regardless, any request for this Court to second-guess the penalty imposed is improper under *Gupta*.

All of Plaintiff's claims of breach are baseless and should be dismissed. The University complied, or at absolute minimum substantially complied, with its process. Plaintiff is grasping at straws to invent gripes with the process. But Plaintiff's gripes have no basis in the Bulletin and are refuted by it. Even if that was not the case, Plaintiff's claims are not connected to damages.

### 4. Plaintiff's Claim Fails Against The Individual Defendants

Even if Plaintiff had stated a proper breach-of-contract claim against the University, which he has not, the Court should still dismiss Plaintiff's breach of contract claim against the Individual Defendants. Plaintiff cannot state a breach-of-contract claim against any non-Yale Defendant because any purported contract was only between Plaintiff and Yale—not between him and individual Yale employees. *E.g.*, *Gabriel*, 2012 WL 4718678, at *7 (dismissing claims against individual defendants in student discipline case because plaintiff could not "show that the Honor Code was a contract between himself and the individual . . . [d]efendants" and collecting university cases holding the same thing).

18

### B. Plaintiff's Implied Covenant Claim Fails

"To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract *must have been taken in bad faith.*" *Landry v. Spitz*, 102 Conn. App. 34, 42, 925 A.2d 334, 342 (2007) (alteration omitted).

"Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.*

"[B]ecause the covenant of good faith and fair dealing only requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *O & G Indus., Inc. v. Am. Home Assurance Co.*, 204 Conn. App. 614, 632, 254 A.3d 955, 967 (2021) (alterations and quotation marks omitted).

#### 1. Plaintiff's Claims Do Not Implicate Contractual Rights

Plaintiff's implied covenant claim fails because the grievances he asserts do not implicate his alleged contractual rights. As previously discussed, Plaintiff received anything he was allegedly entitled to receive under any alleged contract. Plaintiff's grievances are not based on the Bulletin, are often refuted by the Bulletin, and/or are inconsequential.

#### 2. Plaintiff Does Not Adequately Allege Bad Faith

Plaintiff does not allege fraud or a design to mislead or deceive. That is particularly true when Plaintiff's conclusory characterizations of what happened are stripped away and only well-

pleaded facts are left. As discussed above and in more detail below, Plaintiff is inventing purported errors and adding sensational characterizations to what happened. That is not sufficient.

### C. Plaintiff's Title VI Discrimination Claim Fails

"In order to establish a claim [under Title VI], [a plaintiff] must show that a defendant discriminated against him on the basis of [national origin], (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for the defendant's actions." *Gabriel*, 2012 WL 4718678 at *5. Thus, an "Amended Complaint must allow the Court to reasonably infer that [the plaintiff] was treated differently from others due to unlawful and intentional discrimination." *Id.* "[T]hat inference *must be supported by allegations of specific facts* indicating a deprivation of rights" (*i.e.*, intentional discrimination). *Id.* (emphasis added). "[I]n assessing the plausibility of [the plaintiff's] claims, the Court . . . *may consider whether more likely or alternate explanations for the alleged conduct exist*." *Id.* (emphasis added). "Title VI claims are subject to the burden-shifting framework" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Joy v. Crime Victims Treatment Ctr.*, No. 23-CV-11177 (MMG), 2025 WL 326521, at *6 (S.D.N.Y. Jan. 29, 2025) (internal quotation marks omitted).

In *Gabriel*, 2012 WL 4718678, the Court dismissed a Title VI discrimination claim filed by a student disciplined by his college.[9] The plaintiff claimed he was discriminated against because he was Egyptian-American and alleged as evidence of national origin discrimination that other students who cheated were not punished but he was and that his professor initially refused to offer him a makeup date when his exam conflicted with his citizenship ceremony, among other allegations. *Id.* at *2, *5. The Court found those allegations insufficient. The Court noted that "an obvious alternate explanation for the . . . [d]efendants' alleged conduct is that [the plaintiff]

---

[9] The plaintiff filed a claim under Title VII, but the Court construed it as a claim under Title VI. *Id.* at *5.

made significant use of un-cited materials in violation of the college's Honor Code." *Id.* at *6.

The Court also explained that the plaintiff failed to allege specific facts supporting discrimination:

> There is little in the Amended Complaint, beyond [plaintiff's] repeated references to his Egyptian heritage and his choice of religion, to suggest intentional discrimination. While direct evidence of discrimination is not required, a pleading must nonetheless allege "circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf,* 35 F.3d at 713. Beyond [plaintiff's] repeated assertions that he was the victim of discrimination, the pleadings in this case give no support for such an inference.
>
> What little circumstantial evidence [plaintiff] submits is insufficient to set forth a plausible discrimination claim. Denial of a bathroom break during an exam may have been harsh, but it did not constitute actionable discrimination, and provides scant support for a broader claim. *See, e.g., Hamilton v. City College of City Univ. of New York,* 173 F.Supp.2d 181, 185 (S.D.N.Y.2001) (denial of calculator during exam was insufficient to support claim that professor had violated plaintiff's Constitutional rights). Similarly, reluctance to re-schedule an exam, followed by the professor's agreement to assign a new date, does not create an inference of intentional discrimination. Finally, punishment for alleged plagiarism when lesser violators escaped sanction does not, without additional supporting facts, suggest discriminatory intent.
>
> In sum, the Amended Complaint and its many exhibits do not support a plausible claim that [plaintiff] was mistreated because of either his national origin or his religion. The ACPHS Defendants' motion to dismiss [plaintiff's] discrimination claim is therefore GRANTED.

*Id.* at *6; *see also id.* at *9 (dismissing discrimination claim against other defendants because claims of discrimination against those defendants were "entirely conclusory").

Plaintiff's claim fails for the same reasons articulated in *Gabriel*, 2012 WL 4718678.

### 1. Plaintiff's Claim Is Conclusory

Plaintiff claims that Defendants violated Title VI by allegedly "sing[ling] out" his examination for scrutiny and then suspending him and giving him an "F." (Cmplt. ¶¶ 193–95.) Those claims are conclusory. As was the case in *Gabriel*, 2012 WL 4718678, at *6, they are not supported by well-pleaded facts. Indeed, Plaintiff effectively concedes that various Defendants may not have even known of his alleged national origin, alleging only that "Defendants had

knowledge, *or reason to know*." (Cmplt. ¶ 196 (emphasis added).) Plaintiff admits that the Honor

Committee included at least eleven (11) people, but does not plead *facts* showing those individuals

(never mind all or even a majority of them) knew (or even had "reason to know") of his alleged

national origin.[10] (Cmplt. ¶ 40; *see also generally* Cmplt.; Bulletin 67) Plaintiff cannot prove that

alleged national origin discrimination "was a substantial or motivating factor for the defendant's

actions" when he does not even allege all or even most of them knew his national origin.

Regardless, the only alleged "facts" that relate to Plaintiff's national origin in any way

concern individuals other than the individuals who purportedly flagged Plaintiff's exam and who

imposed his discipline. Plaintiff alleges that Dean Sherilyn Scully referenced possible deportation

in a meeting he had with her, (Cmplt. ¶ 72[11]), but Plaintiff's Amended Complaint establishes that

Dean Scully played no role in the initial decision to review Plaintiff's exam (because that decision

was made by the course professors) and that Dean Scully played no role in the Honor Committee's

decision. (*E.g.*, Cmplt. ¶ 48 (alleging that professors 'singled out" Plaintiff's exam), ¶ 67 n.27

(**Exhibit F**) (citing to an article from July 2024 establishing that Dean Scully was retiring); Cmplt.

(making no reference to Dean Scully having a role in Honor Committee deliberations).)

More importantly, there are simply no specific allegations supporting national origin

discrimination. The sole allegation against Dean Scully is plainly not sufficient. There were more

allegations of discrimination in *Gabriel*, 2012 WL 4718678, including an allegation that the

plaintiff's professor refused to reschedule his examination when it conflicted with his citizenship

ceremony, yet the Court still found those allegations insufficient. Plaintiff has not come close to

alleging sufficient facts to state a claim for discrimination under Title VI.

---

[10] The allegations related to Dean Tsung, who was not a voting member of the Committee and acted as the Secretary for purposes of Plaintiff's case, are discussed below. (*See* Cmplt. ¶ 40; Bulletin 67.)
[11] Plaintiff's assertion that "Dean Scully attempted to use the fear of deportation to convince Plaintiff to change his story and confess" is certainly not a well-pleaded fact. That is Plaintiff's characterization.

### 2. There Is An Obvious Alternate Explanation

Plaintiff's failure to allege actual *facts* supporting national origin discrimination is particularly glaring in light of the fact that there is an obvious alternate explanation for the actions Plaintiff challenges: The professors scrutinized Plaintiff's examination because it was suspicious and the Honor Committee imposed discipline because it found that Plaintiff cheated and was not forthcoming. That is the same situation the Court found supported dismissal in *Gabriel*, 2012 WL 4718678, at *6 (obvious alternate explanation was that plaintiff cheated/university concluded he cheated). The notion that Defendants took the actions they did because they suspected and then concluded that Plaintiff engaged in misconduct is far "more likely" than the notion that Defendants all decided to intentionally discriminate against Plaintiff because he is from France.

### 3. Plaintiff Cannot Establish A Pretext

As noted above, Title VI claims are subject to the well-known *McDonnell-Douglas* burden-shifting framework, which requires Plaintiff to prove that the non-discriminatory reasons for Defendants' actions are pretextual. *Joy*, 2025 WL 326521, at *6. Plaintiff cannot do that. As just discussed, he alleges no *facts* supporting national origin discrimination. It simply is not believable that the decisions of two professors and ten faculty members and students on the Honor Committee were based on anti-French animus, rather than academic dishonesty.

### 4. The Claims Against The Individual Defendants Should Be Dismissed

Assuming without conceding that the Amended Complaint states a Title VI discrimination claim against the University, which it does not, the Court should still dismiss the Title VI discrimination claim against the Individual Defendants. Plaintiff has alleged no *specific* facts of intentional national origin discrimination against any Individual Defendant.

### D.  Plaintiff's Title VI Retaliation Claim Fails

To establish a Title VI retaliation claim, a plaintiff "must allege that []he engaged in protected activity, the [defendant] knew about h[is] protected activity, []he suffered an adverse action, and there was a causal connection between the protected activity and the adverse action. *Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209, 214–15 (2d Cir. 2024) (internal quotation marks omitted).  Plaintiff's retaliation claim is also subject to *McDonnell-Douglas*.  *Joy*, 2025 WL 326521, at *6 (noting as much and discussing burden-shifting framework).

### 1. Plaintiff Does Not Properly Allege Protected Activity

Plaintiff's only allegations regarding purported activity are conclusory.  Plaintiff alleges that "he complained during the Honor Code investigation and proceedings that he was being discriminated against based on his national origin, and non-native English speaker/writer status." (Cmplt. ¶ 204; *see also* Cmplt. ¶ 205 ("Plaintiff complained to Defendants that he was wrongfully singled out, based solely on his national origin, and not based on any reasonable evidence that he had cheated . . . .").)  Plaintiff does not allege what, specifically, he said, when he said it, nor to whom he said it, etc.  Plaintiff's allegation is therefore missing alleged *facts* necessary to establish that his retaliation claim is plausible.  If, for example, Plaintiff did not complain to the entire Honor Committee, it is not plausible that the entire Honor Committee was aware of Plaintiff's complaint or that the Committee's decision was causally connected to Plaintiff's alleged complaint. Plaintiff's allegations that he engaged in protected activity are not well-pleaded.  *See, e.g.*, *Denmark v. Elmore Cnty. Sheriff Dep't*, No. 2:20-CV-100-RAH-SMD, 2020 WL 5650411, at *2 (M.D. Ala. Aug. 5, 2020), *report and recommendation adopted*, No. 2:20-CV-100-RAH, 2020 WL 5648320 (M.D. Ala. Sept. 22, 2020) (explaining that allegations were not well-pleaded because "[w]ell-pleaded facts are the basic five W's: who, what, where, when, why; and how.").

Indeed, Plaintiff's own, more specific allegations undermine his conclusory allegation that he engaged in protected activity. Plaintiff includes a more specific allegation regarding his purported "complaint" in his retaliation claim. He alleges that he "complained that Defendants selected him, and only him, excluding the other students in the class, for a scan of his final exam paper using an AI detector called GPTZero, which is well known by Defendants and others to be unreliable, is not accepted practice at Yale, and is not meant to be used to adjudicate whether a student had cheated using AI to create a final paper." (Cmplt. ¶ 207.) That is not protected activity. It is not a complaint about alleged intentional national origin discrimination. It is a complaint about AI detection tools or, at best for Plaintiff, possibly a complaint that the University should have checked all other student work for AI use. But that allegation, which is Plaintiff's most specific allegation about his purported "complaint," is not activity protected under Title VI.

*2. Plaintiff Does Not Adequately Allege Knowledge Of Any Protected Activity*

Plaintiff not only fails to allege that the purported decisionmakers were aware of his alleged protected activity, he affirmatively alleges that several purported decisionmakers could not have been aware of his alleged protected activity and suggests other decisionmakers were not aware.

The first act that Plaintiff appears to claim was retaliatory was the decision by his professors to scrutinize his exam. (Cmplt. ¶ 204 & ¶ 207.) But Plaintiff's allegations establish that act could not have been retaliatory because it predated any "complaint" by Plaintiff. In fact, Plaintiff admits he was "unaware at the time" that "his exam paper . . . was [allegedly] singled out by his professors" and only learned that later on, after his professors had referred the matter and Dean Tsung contacted him about it. (Cmplt. ¶¶ 48, 64, 65.) Plaintiff's retaliation claim related to the professors' purported actions therefore fails as a matter of law.

Plaintiff also claims he was retaliated against by "members of the Honor Code investigation team[] and the members of the Honor [] Committee." (Cmplt. ¶ 205.) There are no allegations that those individuals were aware of Plaintiff's purported complaint. Plaintiff's allegations seem to establish that all or most of the Honor Committee was *not* aware of Plaintiff's purported complaint because Plaintiff did not make his complaint to the entire Committee. Plaintiff details the events of the Honor Committee Hearing—the only time he could have made a complaint to the entire Honor Committee (or even a majority of it). (Cmplt. ¶¶ 106–08.) Plaintiff alleges, for example, that he told the Honor Committee AI detection tools were unreliable. (Cmplt. ¶ 107.) Plaintiff's discussion contains no allegation that he complained to the Honor Committee about purported national origin discrimination, however. (Cmplt. ¶¶ 106–08.) Plaintiff has not adequately alleged notice by the entirety or even majority of the Honor Committee, which is required to support his claim that the Honor Committee as a whole retaliated against him.[12]

### 3. Plaintiff Cannot Establish A Casual Connection, Never Mind Pretext

Plaintiff has not adequately alleged *facts* supporting a causal connection between his purported complaint and the claimed retaliation. In addition to the flaws already discussed, including the fact that Plaintiff has not adequately alleged that relevant decision makers were on notice of his alleged complaint, Plaintiff's claim also fails because there is once again an obvious alternate explanation. *See Gabriel*, 2012 WL 4718678, at *6. The University suspected Plaintiff

---

[12] The sole action that could theoretically constitute a complaint (and Defendants do not concede it does) is a November 3, 2024 email Plaintiff sent to Professor Choi and Dean Tsung on November 3, 2024 that is not referenced in the Amended Complaint but that Defendants filed with their Opposition to Plaintiff's Motion for a TRO/PI. (*See* ECF 41-26.) That email proves Defendants' points. Plaintiff did not purportedly complain until after his exam had been scrutinized and after the decision had been made to present the case to the full Honor Committee. Plaintiff made his purported complaint to Professor Choi and Dean Tsung, not the entire Honor Committee. There is no reason to believe anyone other than Professor Choi and Dean Tsung, never mind the entire Honor Committee, was aware of the purported complaint. Indeed, the Plaintiff sent the email to request the recusal of Dean Scully, who was recused.

cheated; determined he did, in fact, cheat; and found that he was not forthcoming.  Plaintiff's allegations are not sufficient to show a causal connection, never mind to establish pretext.

### 4. The Claims Against The Individual Defendants Should Be Dismissed

Assuming without conceding that Plaintiff has nevertheless stated a plausible retaliation claim, which he has not, he has not stated such a claim against the Individual Defendants. Professors Thomas and Rouwenhorst cannot have retaliated against Plaintiff because he did not lodge any complaint until after they referred the matter to the Honor Committee.  Plaintiff makes no well-pleaded allegations about any other Defendant.

### E.  Plaintiff's IIED Claim Fails

"To prevail on an intentional infliction of emotional distress claim [], [a plaintiff] must allege and prove that (1) the [defendant] intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct; (2) the [defendant's] conduct was extreme and outrageous; (3) the [defendant's] conduct was the cause of [the plaintiff's distress; and (4) the emotional distress [the plaintiff] sustained was severe." *Greenhouse v. Yale Univ.*, No. 3:05CV1429 (AHN), 2006 WL 473724, at *3 (D. Conn. Feb. 28, 2006); Cmplt. ¶ 212.

"Liability for intentional infliction of emotional distress requires conduct *exceeding all bounds usually tolerated by a decent society*, of a nature which *is especially calculated to cause and does cause mental distress of a very serious kind . . . .*"  *Muniz v. Kravis*, 59 Conn. App. 704, 708 (2000) (emphasis added).  "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, '*outrageous!*'"  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (emphasis added).  Even conduct that is insulting or taunting or results in hurt feelings is insufficient to support an IIED claim. *Greenhouse*, 2006 WL 473724, at *3 (citing *Appleton*, 254

27

Conn. at 211, where the Connecticut Supreme Court held that questioning a teacher's "vision and ability to read" in front of her co-worker, stating that Plaintiff "'had been acting differently'" and "should take a few days off from work" was insufficient to support an IIED claim). In light of the very high standard for IIED claims, "[t]he [C]ourt has an *important gatekeeper function*" to determine whether the high standards for IIED claims are met. *Id.* at *3 (emphasis added).

In *Greenhouse*, the Court dismissed an IIED claim alleging that an instructor told several male actors standing next to the plaintiff to simulate masturbation and then said: "That was great! Now this time do it again, only really come!," which *caused one of the male actors to simulate orgasm and led the plaintiff to flee "the stage as another male student attempted to physically restrain her*." *Id.* at *2 (emphasis added). The plaintiff purportedly complained about that incident and was allegedly placed "on warning" "as a preliminary step to dismissal" due in part to her complaint before subsequently being dismissed from her program of study. *Id.* at *2.

The Court concluded that even though the incident was "likely to be offensive to the average person," it could not support an IIED claim "when viewed in the context in which it occurred" because that context included an "acting exercise among [] drama students." *Id.* at *4.

### 1. Plaintiff Has Not Come Close To Pleading An IIED Claim

Plaintiff's allegations do not come close to satisfying the incredibly high standard for IIED. Plaintiff's allegations amount to nothing more than his disagreement with his disciplinary process and its outcome. They do not allege "outrageous" conduct or anything close to it. For example, Plaintiff principally asserts that it "was extreme and outrageous" for the University to allegedly "rely[] upon the GPTZero program" in assessing whether Plaintiff used AI. (Cmplt. ¶ 215.) There is absolutely nothing "outrageous" about a school using software designed to detect AI use to determine whether a student used AI. Plaintiff's claims about the reliability of the software do not

change that.  Plaintiff otherwise claims that it was "extreme and outrageous" for the University to allegedly "fail[] to follow numerous procedural requirements for Plaintiff's disciplinary proceedings."  (Cmplt. ¶ 215.)  As previously discussed, the University followed its process. Regardless, allegedly deviating from a disciplinary process is neither extreme nor outrageous. What Plaintiff alleges is not remotely comparable to, for example, an instructor allegedly telling male students to simulate masturbation and orgasm around a female student while a male student purportedly tries to physically prevent the female student from leaving—and that was still insufficient to state an IIED claim.  *See Greenhouse*, 2006 WL 473724, at *3.

### 2. Plaintiff Cannot Show The Required Intent Or Knowledge

As previously noted, Plaintiff must show that Defendants "intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct" in order to state an IIED claim.  *Id.*  Plaintiff cannot do that.  The idea that anyone would intend to inflict emotional distress or knew that it was likely to result from using AI detection software is ludicrous.  Using tools to detect AI is what schools are supposed to do when they suspect improper use of AI.  As discussed, Plaintiff's process claims are refuted by the Bulletin, but even if they weren't, it defies common sense to believe that anyone would intend to inflict emotional distress or know that it was likely by, for example, purportedly not giving Plaintiff the list of the members of the Honor Committee.  Plaintiff's IIED claim fails for this reason as well.

### 3. Plaintiff's Claim Is An Improper Attempt To Circumvent Gupta

Regardless, Plaintiff cannot maintain his IIED claim because it is an impermissible attempt to circumvent *Gupta* (and analogous federal law, including *Davis*) by having this Court second-guess the University's decisions.  Plaintiff literally asks this Court to say that the University's academic processes were "outrageous!"  That is a classic attempt to have this Court sit as a super-

appellate tribunal to review what the University did without satisfying *Gupta*'s narrow exceptions to the general prohibition on "judicial intrusion into educational decision making." *Brown Univ.*, 210 F. Supp. 3d at 331. Plaintiff's IIED claim should be denied for this additional reason even if he alleged "outrageous' conduct, which he does not.

### 4. The Claim Should Be Dismissed As To The Individual Defendants

As with Plaintiff's other claims, there are no allegations against the Individual Defendants that come close to stating a valid IIED claim. The Court should therefore dismiss this claim as to the Individual Defendants even if, despite the foregoing, it finds that a valid claim exists.

### F. Plaintiff's NIED Claim Fails

"To prevail on a claim for NIED under Connecticut law, 'the plaintiff is required to prove that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Henry v. Oluwole*, 108 F.4th 45, 61–62 (2d Cir. 2024) (quoting *Hall v. Bergman*, 296 Conn. 169, 182 n.8, 994 A.2d 666 (2010) (internal quotation marks omitted)).

Thus, the plaintiff must prove, among other things, "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Hamer v. Byrne*, 231 Conn. App. 53, 80 (2025) (quoting *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 446, 815 A.2d 119 (2003)).

In *Henry*, 108 F.4th at 61–62, the Second Circuit held that an NIED claim failed under Connecticut law "because the complaint alleges only intentional conduct," because the complaint did "not describe a negligent act by [the defendant] that would cause foreseeable distress," and because "the allegations underlying the NIED claim fail[ed] to establish causation." The Court

explained that the NIED claim was based on purportedly intentional conduct (sexual misconduct) and that there were "no remaining allegations that establish conduct by [the defendant] that caused [the plaintiff] emotional distress so severe as to cause bodily harm." *Id.* at 62.

Courts have held that NIED claims are subject to *Gupta*. In *Bass*, 738 F. Supp. 2d at 327, for example, the Court concluded that plaintiff's NIED claim failed because the defendant school's "determination to dismiss[p]laintiff d[id] not lack a 'discernable rational basis.'"

### 1. Plaintiff's NIED Claim Fails Under Gupta

Plaintiff's NIED claim is an improper attempt to evade *Gupta*. It fails because there were rational bases for the conduct Plaintiff challenges. It was rational, for example, to use AI detection tools to try to determine whether Plaintiff used AI. (*See* Cmplt. ¶ 225 (basing NIED claim in part on use of GPTZero scans).) Plaintiff cannot meet his high burden of establishing that there was no rational basis to investigate Plaintiff or find against him. To the contrary, Plaintiff acknowledges there was ample cause for investigation and discipline. (*E.g.*, Cmplt. ¶ 50.)

### 2. Plaintiff Relies On Intentional Misconduct

Plaintiff's claim also fails because he relies on purported intentional misconduct. Plaintiff alleges that Defendants' alleged actions were intentional. (*E.g.*, Cmplt. ¶¶ 192, 204.) Plaintiff then relies on those same alleged actions to support his NIED claim. (Cmplt. ¶ 225.) Plaintiff cannot do that. *See, e.g.*, *Henry*, 108 F.4th at 61–62.

### 3. Plaintiff Cannot Establish Foreseeability

Plaintiff cannot show that Defendants "should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Hamer*, 231 Conn. App. at 80. If he could, every student who faces discipline could assert an NIED claim and *Gupta* would be meaningless. Regardless and as

31

previously discussed, Plaintiff does not allege anything that should have made Defendants realize that what they were doing created an *unreasonable* risk of causing distress so serious that it might result in *illness or bodily harm*. Indeed, Plaintiff does not even allege he suffered such harm. Plaintiff's well-pleaded facts establish nothing more than his gripes with the process.

### *4. Plaintiff Cannot Establish Causation*

Plaintiff also fails to establish causation. Plaintiff cannot separate purported stress from the process itself from stress from the actions he challenges as wrongful. Even if he could, it defies logic to believe that stress so severe that it might result in illness or bodily injury was caused by GPTZero scans instead of other aspects of the process that Plaintiff does not challenge.

### *5. The Court Should Dismiss The Individual Defendants*

As with Plaintiff's other claims, there is nothing to state a claim for NIED against the Individual Defendants even if, despite the foregoing, the Court finds an NIED claim against Yale.

### **G. Plaintiff's Claims For Declaratory Relief Are Improper And Fail**

Plaintiff seeks

a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the sanction of a grade of "F" and suspension for one year should be reversed; (ii) Plaintiff is immediately reinstated as a student in good standing and permitted to begin classes immediately upon commencement of the next semester; (iii) Plaintiff's reputation is to be restored; (iv) Plaintiff's disciplinary record at Yale is to be expunged; (v) the record of Plaintiff's suspension and grade of "F" is to be removed from his academic record and education file at Yale; (vi) any record of the proceeding regarding the conduct of Plaintiff is to be permanently destroyed; and (vii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

(Cmplt Prayer for Relief.)

Plaintiff's request for declaratory relief fails for a number of reasons.

First, Plaintiff's request asks this Court to do precisely what state and federal law prohibits it from doing: second-guessing the University's decisions instead of deferring them and sitting as a super-appellate body. *E.g.*, *Davis*, 526 U.S. at 648; *Charest*, 2016 WL 614368, at *17; *Brown*

*Univ.*, 210 F. Supp. 3d at 331; *see also, e.g.*, *Gupta*, 239 Conn. at 687.  Plaintiff seeks, for example, to have this Court "reverse[]" his "F" grade.  That is improper under *Gupta*.  *See, e.g.*, *Wesleyan*, 2022 WL 2656787, at *7 ("Considering that this was a decision by a university to enter a specific grade for a student, an evaluation of whether it was appropriate is beyond the scope of *Gupta*'s exception. *See Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909 (Conn. Super. July 22, 2004) ("The court is not in a position to apply objective standards to analyze the allegations regarding ... whether a student was appropriately evaluated. . . .")).  Federal courts have "discretion to decline to hear a declaratory judgment action" "[e]ven if federal jurisdiction exists and the requirements for a declaratory judgment are met."  *Consol. Edison Co. of New York v. United States*, 30 F. Supp. 2d 385, 390 (S.D.N.Y. 1998); *see also, e.g.*, *Oxford Health Ins., Inc. v. Motherly Love Home Care Servs., Inc.*, 237 F. Supp. 3d 25, 35 (E.D.N.Y. 2017) ("The [Declaratory Judgment Act] confers *discretionary jurisdiction* upon federal courts rather than an absolute right upon the litigation invoking the remedy.").  The Court should decline to adjudicate Plaintiff's requested relief in light of the instructions from both the Supreme Court of the United States and the Connecticut Supreme Court requiring deference and noninterference with university decisions.

Second, "a plaintiff may not use the Declaratory Judgment Act to create legal rights that do not otherwise exist."  *HK Cap. LLC v. Fed. Deposit Ins. Corp.*, 734 F. Supp. 3d 288, 295 (S.D.N.Y. 2024) (internal quotation marks omitted).  That is exactly what Plaintiff seeks to do, however.  Plaintiff has no legal right to, for example, his "disciplinary record at Yale [being] expunged."  Plaintiff is asking the Court to not only ignore the University's policies, but to create different policies such as policies requiring expungement with no legal basis.

Third, Plaintiff's request for declaratory relief is largely moot.  *See, e.g.*, *Sudler v. City of New York*, 689 F.3d 159, 177–78 (2d Cir. 2012) (holding that claim for declaratory judgment

regarding prison credits that could affect length of sentence was moot where prisoners had been released from prison).  Plaintiff is on the verge of reinstatement.  His request, for example, that he be "immediately reinstated as a student in good standing and permitted to begin classes immediately upon commencement of the next semester" as well as his challenge to his soon-to-be-completed suspension will soon be moot, likely by the time the Court rules on this Motion.

Fourth, Plaintiff largely seeks relief that is impossible or otherwise unwarranted.  As this Court noted in its Memorandum and Order Denying Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiff's "lawsuit describing [his] disciplinary record is public record."  (ECF 89 at 22.)  This Court can therefore not "permanently destroy[]" "any record of the proceedings regarding the conduct of Plaintiff" as it cannot destroy public Court records.  Even if it could, there is absolutely no basis for the Court to do that and, given the public nature of Plaintiff's allegations, there is no basis to destroy any records about what happened.

The Court should dismiss Plaintiff's claim for declaratory relief.

## H.  The Court Should Dismiss "Yale University Board Of Trustees"

Finally, the Court should dismiss "Yale University Board Of Trustees" because it is not a legal entity.  Yale's legal name is Yale University.[13]  There is no entity called "Yale University Board Of Trustees."  Plaintiff has not made any substantive allegations against "Yale University Board Of Trustees" (*i.e.*, an allegation that "Yale University Board Of Trustees" acted improperly.[14]  (Cmplt.)  Plaintiff's claims are subject to dismissal for either of those reasons.  *E.g.*, *Byrd v. Rochester Hous. Auth.*, No. 6:17-CV-06248(MAT), 2018 WL 2739790, at *4 (W.D.N.Y.

---

[13] *See* Connecticut Secretary of State, Yale University, *available* here.  The Court can and should take judicial notice of that official government website for purposes of ascertaining Yale's legal name.  *E.g.*, *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (taking judicial notice of government website in motion to dismiss).

[14] The Complaint's sole allegation regarding "Yale University Board Of Trustees" is an allegation "[u]pon information and belief" that "Defendant Board of Trustees is the principal governing body of Yale University."  That is inaccurate. *See* the preceding footnote.  This Court need not and should not accept Plaintiff's inaccurate "upon information and belief" allegations in the face of the contrary definitive Secretary of State information.

June 7, 2018) ("Plaintiff also names 'All H.U.D. Housing Federal Government Contract Project Housing Low Income Citizens.'  This is not an actual entity, let alone one that is capable of being sued. . . .  Plaintiff, moreover, has included no allegations against this non-existent entity. Accordingly, it must be dismissed as a party."); *see also, e.g.*, *Gash v. Rosalind Franklin Univ.*, 691 F. Supp. 3d 858, 860 n.1 (N.D. Ill. 2023), *aff'd*, 117 F.4th 957 (7th Cir. 2024) (dismissing "the Board of Trustees" in lawsuit against university filed by Plaintiff's counsel's firm because the University "contend[ed] [it was] not a proper defendant" and the plaintiff "offer[ed] no response").

## V.    CONCLUSION

The Court should dismiss Plaintiff's claims with prejudice.

THE DEFENDANTS,
YALE UNIVERSITY, YALE
UNIVERSITY BOARD OF TRUSTEES,
WENDY TSUNG, K. GEERT
ROUWENHORST, JACOB
THOMAS, SHERILYN SCULLY,
JAMES CHOI, AND ANJANI JAIN

By: */s/ Brendan N. Gooley*
James M. Sconzo (ct04571)
Brendan N. Gooley (ct30584)
Amanda M. Brahm (ct30581)
CARLTON FIELDS, P.C.
One State Street, Suite 1800
Hartford, CT  06103-3102
Telephone:(860) 392-5000
Facsimile:  (860) 392-5058
E-mail:    jsconzo@carltonfields.com
bgooley@carltonfields.com
abrahm@carltonfields.com

Its Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that, on this 15th day of May, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Brendan N. Gooley*
Brendan N. Gooley