| | |
|---|---|
| **THIERRY RIGNOL,**<br><br>*Plaintiff,*<br><br>v.<br><br>**YALE UNIVERSITY, YALE UNIVERSITY BOARD OF TRUSTEES, WENDY TSUNG in her individual and official capacity, K. GEERT ROUWENHORST in his individual and official capacity, JACOB THOMAS in his individual and official capacity, SHERILYN SCULLY in her individual and official capacity, JAMES CHOI in his individual and official capacity, and ANJANI JAIN in his individual and official capacity,**<br><br>*Defendants.* | **Civil Action No. 3:25-CV-00159-SFR**<br><br>**SECOND AMENDED COMPLAINT AND <u>JURY DEMAND</u>** |

Plaintiff Thierry Rignol ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, and for his Complaint against Defendants Yale University ("Yale"), Yale University Board of Trustees (the "Board" or "Board of Trustees"), K. Geert Rouwenhorst ("Professor Rouwenhorst"), in his individual and official capacity, Jacob Thomas ("Professor Thomas"), in his individual and official capacity, Sherilyn Scully ("Dean Scully"), in her individual and official capacity, James Choi ("Chairman Choi"), in his individual and official capacity, and Anjani Jain ("Dean Jain"), in his individual and official capacity, alleges as follows:

<u>**THE NATURE OF THE ACTION**</u>

1. This action seeks redress for Yale School of Management's wrongful, discriminatory, and procedurally lawless suspension of Plaintiff Thierry Rignol—an outstanding Executive MBA student and French national—following a fundamentally flawed disciplinary process that violated Yale's own rules, federal law, and basic principles of fairness.

2. Plaintiff was a top student, on track to graduate first in his class, when Yale, without reasonable cause, targeted him for investigation. His final exam was the *only* one, out of over

seventy students, singled out for scrutiny using GPTZero—an unreliable AI detection tool that Yale itself had repudiated as inaccurate, biased, and unfit for academic discipline. GPTZero's known bias against non-native English speakers like Plaintiff amplified this injustice. Despite Yale's own published policy prohibiting reliance on AI detection tools, Defendants used these flawed reports as their primary evidence in his Honor Code proceedings.

3.     Yale's disciplinary process was a sham. The Honor Committee and its administrators repeatedly violated Yale's written policies and Plaintiff's contractual rights. They failed to provide timely or complete notice of charges, withheld critical evidence—including exculpatory materials—denied Plaintiff the ability to challenge biased Committee members, and introduced fabricated charges without notice or opportunity to respond. When Plaintiff maintained his innocence, Defendants escalated their misconduct: they threatened him with deportation, expanded the investigation beyond the original charge without authority, and manipulated the process to ensure an outcome that would justify punishing him.

4.     At no point did Yale make a finding that Plaintiff cheated. Instead, they invented a new charge—"not being forthcoming"—to impose a one-year suspension and later added a failing grade, in blatant violation of their own procedures. These actions destroyed Plaintiff's academic standing, damaged his reputation, derailed his professional prospects, and inflicted severe emotional harm.

5.     Plaintiff brings this action to rectify Yale's bad faith, discriminatory, and retaliatory conduct. He seeks declaratory and injunctive relief, compensatory and punitive damages, and such other relief as is necessary to undo the harm caused by Yale's abuse of its disciplinary process and betrayal of the trust placed in it by its students.

## THE PARTIES

6.      Plaintiff Thierry Rignol ("Plaintiff") is a natural person, a citizen of France, and a resident of Texas. During the events relevant to this action, Plaintiff was enrolled as a student in the Yale School of Management, Masters of Business Administration for Executives program.

7.      Defendant Yale University is a large, private, Ivy League, research university. Yale's EMBA program was ranked 16th in the country in 2024.[1] Yale is located in the city of New Haven, Connecticut.

8.      Upon information and belief, Defendant Board of Trustees is the principal governing body of Yale University. The Board selects Yale's President, who oversees the Board. Ten (10) of the Trustees on the Board are appointed as Successor Trustees, selected by the Board from Yale alumni who serve up to two (2) six (6) year terms. Six (6) of the Trustees are Alumni Fellows who are elected by Yale alumni and serve one six (6) year term. Connecticut's Governor and Lt. Governor serve as Ex Officio members of the Board. Defendant Board of Trustees oversees and approves Yale's Policies and Procedures, including, upon information and belief, the Yale School of Management Honor Code,[2] and the Policies and Procedures of Yale and the Honor Committee (collectively the "Policies" and/or "Procedures").[3]

9.      Defendant Dean Wendy Tsung is, upon information and belief, the Assistant Dean of Yale's EMBA Program, was on the Honor Committee's investigatory team relevant to this action, and is a resident of Connecticut.

---

[1] U.S. News and World Report, Best Graduate Schools, 2024, https://www.usnews.com/best-graduate-schools/top-business-schools/yale-university-01257/executive (last visited December 4, 2024).
[2] Yale School of Management Honor Code, *supra*.
[3] *Id.*, p. 66.

3

10. Defendant Professor Geert Rouwenhorst is, upon information and belief, the previous Chair of the Yale SOM Honor Committee, a Professor in the Yale EMBA program, and is a resident of Connecticut.

11. Defendant Professor Jake Thomas, is, upon information and belief, a Professor in the Yale EMBA program, is a member of the Faculty Review Board ("FRB") that hears appeals from the Honor Committee, and is a resident of Connecticut.

12. Defendant Dean Sherilyn Scully was, upon information and belief, the Dean of Students of the Yale School of Management during time periods relevant to this action, was a member of the Honor Committee investigatory team relevant to this action, and is, upon information and belief, a resident of Connecticut.

13. Defendant Chair James Choi, is, upon information and belief, a Professor of Finance in the Yale School of Management, the Chair of the Honor Committee investigatory team relevant to this action, and is, upon information and belief, a resident of Connecticut.

14. Defendant Dean Anjani Jain, is, upon information and belief, the Deputy Dean for Academic Programs at the Yale School of Management, oversees the FRB which handles appeals of student disciplinary matters from the Honor Committee, and is, upon information and belief, a resident of Connecticut. (Defendants referred to collectively herein as the "SOM Administration").

**JURISDICTION AND VENUE**

15. This Court has diversity, federal question, and supplemental jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) Plaintiff is a citizen of a foreign state, and Defendants are citizens of a US state, and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the federal law claim arises under the Constitution and Statues of the United States of America; and (iii) the state law claims are so closely related to

the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant Yale on the grounds that is conducting business within the State of Connecticut.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants' principal place of business is in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### *Plaintiff's Background*

18.     Plaintiff Thierry Rignol is a highly accomplished entrepreneur and investor, originally from France, with a record of academic excellence and professional success.

19.     Plaintiff earned a French Baccalauréat Diploma in science and mathematics from the Awty International School in Houston, Texas, graduating with the highest honors ("Mention Très Bien").

20.     He went on to receive dual degrees from Rice University in May 2012: a Bachelor of Science in Engineering (B.S.E.) in Biomedical Engineering and a Bachelor of Arts (B.A.) in Political Science.

21.     To further his career and professional development, Plaintiff applied to and was honored to be accepted into the Yale School of Management's prestigious Executive MBA (EMBA) program. His goal was to graduate in the Spring of 2025.

22.     Plaintiff began the EMBA program in July 2023. He quickly distinguished himself through his academic excellence, professionalism, and leadership. He built strong relationships

with his professors and classmates, excelled in his coursework, and was on track to graduate at the top of his class as Student Marshal/Valedictorian.

23.     Plaintiff invested substantially in his Yale education, paying approximately $208,500 in tuition for the EMBA program.

**Yale's Policies and Procedures**

24.     The Yale School of Management 2024–25 Bulletin contains the rights and responsibilities of students, the Yale SOM Honor Code, and the procedures of the Honor Committee.[4]

25.     These Policies and Procedures were in effect during the year 2024, and at the time of the alleged incidents in this complaint.

26.     The Honor Code stresses to "students, faculty, and staff" that honesty is "fundamental to the profession and practice of management," that honesty is the "bedrock premise" of education at Yale, and that "honesty and integrity build the trust essential to a free and lively exchange of ideas." The Honor Code applies to students, *and* faculty and staff of the SOM Administration.[5]

27.     The Honor Code grants authority over alleged code violations, such as those at issue here, to the Honor Committee.[6]

28.     The Honor Code states that it values "inclusivity" and celebrates "diverse backgrounds" as a "hallmark" of SOM community members. Yale's SOM presents itself as a "center of integrity and fair dealing."[7]

---

[4] See *Yale Sch. of Mgmt. Bull.* 66–72 (2024–2025), https://bulletin.yale.edu/sites/default/files/school-of-management-2024-2025.pdf (last visited June 16, 2025).
[5] *Id.* at 66.
[6] *Id.* at 68.
[7] *Id.* at 66–67.

29.     Yale's SOM stresses that "[a]ll forms of discrimination fall outside the bounds of expected behavior" of its students, faculty, and staff.[8]

30.     While investigating and considering disciplinary charges against a student, the Honor Committee is "responsible for collecting facts pertaining to [alleged violations], making judgments about them, and determining punishment where appropriate," while protecting the privacy of individuals involved and making judgments "as promptly as is consistent with the need to establish the facts of the case and to come to judgments based on these facts." *Id.* at 68–69.

31.     The Honor Committee consists of members appointed by the Deputy Dean for Academic Programs, including four faculty members, six SOM students, the Dean of Students (non-voting and acting as secretary), and in applicable cases, the assistant dean for the M.B.A. for Executives program. *Id.* at 68.

32.     At the beginning of the investigation, the chair of the Honor Committee is required to inform members of any conflicts of interest and request that members excuse themselves where appropriate. The chair must also inform the student of the names of committee members considering the matter, and the student has one business day to object and seek recusal of any member believed to be prejudiced. *Id.* at 70.

33.     A disciplinary investigation typically begins with notice to the chair by a faculty, student, or staff member of a probable violation. The reporting party must submit a signed statement and supporting materials. The chair determines if the matter merits submission to the full committee. *Id.* at 68.

34.     For cases referred to the full committee, the student must be informed of the charges, the right to attend the hearing, to be accompanied by an adviser, and to examine "any and

---

[8] *Id.* at 66.

all written materials being provided to the committee as soon as possible, and ordinarily at least forty-eight hours in advance of the meeting," to ensure the student has "ample opportunity to question or refute them."[9]

35.     The Honor Committee may issue penalties ranging from exoneration, warning, probation, mandatory failure in the course, suspension plus failure, to expulsion, or other appropriate sanctions.[10]

36.     Disciplinary penalties remain in the student's SOM file and, for suspensions of a semester or longer, appear on the transcript.[11]

37.     The Honor Committee *must* seek consistency in decisions.[12]

38.     Summaries of cases that came before the Honor Committee may be published, but only if they contain *anonymized* case summaries that *avoid revealing or encouraging speculation about identities*.[13]

39.     Findings of the Honor Committee may not be appealed, but a student may appeal the severity of the penalty to the Faculty Review Board within five business days.[14]

### *Plaintiff's Exam Paper Singled Out For Disciplinary Investigation*

40.     Although Plaintiff was unaware at the time, his final exam in Sourcing and Managing Funds (MGT423E) was unfairly singled out for additional scrutiny. His exam was the only one, out of more than seventy submitted by his classmates, that was flagged—subjecting him to differential and unjustified treatment without cause.

---

[9] *Id.* at 68–69.
[10] *Id.* at 69–70.
[11] *Id.* at 71.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 70.

41.     On June 11, 2024, Professor Rouwenhorst sent a letter to Dean Tsung, copying Professor Thomas, formally referring Plaintiff's final exam to the Honor Committee for further investigation. In that letter, he alleged "improper use of AI" based on reasoning and observations that, in fact, reflected Plaintiff's exceptional performance as the top student in his class and his distinctive writing style as a non-native English speaker.

42.     Professor Rouwenhorst further stated that "one of the [Teaching Assistants ('TA')] flagged an exam that appeared unusually long, elaborately formatted, and written with near perfect punctuation and grammar" (emphasis added). He continued:

> These are our observations:
>
> The exam was set for 4 hours, self-timed, Open book, but closed internet and no use of AI tools, honor code applies. (see attached exam and syllabus)
>
> *Some answers to essay type questions on the exam score high on the likelihood of being AI generated using ChatGPTzero as a detection tool* (see 3 attached examples; we did not do a full check and there are likely other examples).
>
> At least one answer shows substantial overlap with answers to simple prompts on ChatGPT (see attached word file example. We did not do a deep dive, and there may be other examples)
> The student performed relatively poorly on question 5, where AI tools were the least helpful.
>
> We questioned, but not investigated, whether the amount of time necessary to produce the exam answers by the student in terms of length, *near perfect punctuation and grammar and elaborate formatting*, would exceed the 4 hour limit set for the exam. (emphasis added).

43.     Plaintiff is a highly educated and accomplished professional who was on track to graduate at the top of his class in Yale's competitive EMBA program. It was entirely expected that his exam writing would be thorough, well-organized, and display near perfect punctuation and grammar—attributes consistent with his academic excellence.

44.     In addition, as a foreign student and non-native English speaker, it was natural that Plaintiff's writing style might stand out from that of his classmates. Given this, it would have been reasonable and expected for Professor Rouwenhorst—who knew of Plaintiff's background—to take this into account when reviewing Plaintiff's final exam.

45.     In violation of Yale's rules, Professor Rouwenhorst took it upon himself to conduct his own investigation of Plaintiff's exam before referring the matter to the Honor Committee.

46.     Professor Rouwenhorst's investigation relied on methods that violated Yale's own policies. Specifically, he used AI surveillance and detection technology, despite Yale's clear rejection of such tools as unreliable and inappropriate for academic integrity determinations.

47.     For context, Yale had previously used AI surveillance and detection software, specifically the program Turnitin, to check exams submitted through its internal Canvas system. However, Yale determined that such technology was unreliable and formally discontinued its use. As Yale explains on its website:

> "Controlling the use of AI writing through surveillance or detection technology is not feasible. Turnitin has acknowledged a reliability problem with its detection tool software and Yale has not enabled this feature in Canvas. We believe there are more fruitful ways to engage writing processes and expectations than to rely on predictions that will probably be outpaced by further AI development."[15]

48.     As Yale's own policy acknowledges, AI detection tools like GPTZero are unreliable. OpenAI—the company that created ChatGPT—released its own AI detection tool in January 2023 but *discontinued it just five months later* due to its *low accuracy*. Scott Aaronson, a leading computer science professor and one of the figures behind OpenAI's detection tool,

---

[15] Yale, *AI Guidance for Teachers*, Guidance for Teachers (2), https://poorvucenter.yale.edu/AIguidance (bold emphasis in original; italics emphasis added).

confirmed that tools like GPTZero, which was used against Plaintiff in this case, are similarly unreliable.

49.     Similarly, Edward Tian, the creator of GPTZero, has acknowledged that the program contains "implicit bias" that can result in false positives—wrongly identifying human writing as AI-generated.[16]

50.     A 2023 study published in the *International Journal for Educational Integrity* evaluated GPTZero alongside other AI detection tools and found that, when applied to human-written work, these tools produced inconsistent results, including false positives and uncertain classifications.[17]

51.     A study by five computer scientists at the University of Maryland concluded that, both theoretically and empirically, state-of-the-art AI detection tools cannot reliably identify AI-generated content in practical scenarios.[18]

52.     Even GPTZero's own website makes clear that the tool was not designed to provide definitive evidence of AI use in educational settings. Instead, it was intended only to "flag situations in which a conversation can be started" and to "drive further inquiry and spread awareness of the risks of using AI in written work."

The GPTZero creators explicitly caution:

**"These results should not be used to punish students."**[19]

---

[16] Tangermann, Victor, *Futurism*, There's a Problem With That App That Detects GPT-Written Text: It's Not Very Accurate. The media seized on a good story, but the numbers don't add up., January 9, 2023, https://futurism.com/gptzero-accuracy.

[17] Ahmed M. Elkhatat, Khaled Elsaid & Saeed Almeer, Evaluating the efficacy of AI content detection tools in differentiating between human and AI-generated text, International Journal for Educational Integrity, September 1, 2023, https://edintegrity.biomedcentral.com/articles/10.1007/s40979-023-00140-5.

[18] Vinu Sankar Sadasivan, Aounon Kumar, Sriram Balasubramanian, Wenxiao Wang, Soheil Feizi, Can AI-Generated Text be Reliably Detected?, March 17, 2023 (revised February 19, 2024), https://arxiv.org/abs/2303.11156.

[19] What are the limitations of the classifier?, *Id*.

53.     Remarkably, the disclaimers from GPTZero's own website—warning that its results should not be used to punish students—were plainly stated on the very reports that Professor Rouwenhorst prepared and submitted to the Honor Committee as evidence against Plaintiff.

54.     Moreover, AI surveillance and detection tools like GPTZero are known to unfairly target non-native English speakers and writers such as Plaintiff.

55.     As noted in a Stanford University article by experts in computer science, electrical engineering, and biomedical data science:

> "GPT detectors frequently misclassify non-native English writing as AI generated, raising concerns about fairness and robustness. Addressing the biases in these detectors is crucial to prevent the marginalization of non-native English speakers in evaluative and educational settings and to create a more equitable digital landscape." [20]

56.     In sum, despite the well-documented unreliability and bias of AI detection technology—and Yale's own policy prohibiting its use—Professor Rouwenhorst, acting unilaterally and contrary to the rules, generated GPTZero reports that served as the sole "evidence" against Plaintiff before the Honor Committee on the charge of using AI to cheat.

**Plaintiff Learns his Exam Was Flagged**

57.     Plaintiff first learned that his final exam had been flagged on June 12, 2024, when Dean Wendy Tsung, Assistant Dean of Yale's EMBA Program, notified him that he had received an "Incomplete" grade in his Sourcing and Managing Funds (MGT423E) course. When Plaintiff asked for more substantive information, none was provided.

58.     Frustrated by the lack of transparency, Plaintiff contacted Professors Geert Rouwenhorst and Jacob Thomas, the instructors for the course. For the first time, he was informed

---

[20] Weixin Liang, Mert Yuksekgonul, Yining Mao, Eric Wu, James Zou, *Patterns*, (Opinion) GPT detectors are biased against non-native English writers, https://www.sciencedirect.com/science/article/pii/S2666389923001307.

that his exam had been flagged for possible use of artificial intelligence (AI) technology—an alleged violation of the exam rules and the Yale Honor Code—and that the matter had been referred to the Honor Committee.

59.     Plaintiff repeatedly requested copies of the materials provided to the Honor Committee—at least three separate times—but received nothing. At the time of these requests, at least six documents had already been submitted to the Committee. [21]

60.     On July 19, 2024, Sherilyn Scully, Dean of Students at the time, [22] informed Plaintiff that it was up to the chair of the Honor Committee whether to refer the inquiry for formal investigation. Although the chair had decided to refer the matter to the full Committee, Plaintiff still had not been provided with any of the documents considered in that decision.

### *Dean Scully Pressures Plaintiff to Falsely Confess*

61.     The Yale School of Management Honor Code emphasizes that:

> "Honesty is fundamental to the profession and practice of management. It is therefore the bedrock premise of management education at Yale. To the community of students, faculty, and staff of the Yale School of Management, honesty and integrity build the trust essential to a free and lively exchange of ideas."[23]

62.     Yet in direct violation of these principles, members of the SOM Administration made threats to Plaintiff in an attempt to coerce a confession. They pressured Plaintiff to act dishonestly by promising leniency if he would falsely admit to misconduct.

---

[21] Upon information and belief, at the time of Plaintiff's requests, the following documents were available and withheld from Plaintiff: Complaint letter, SMF Final exam, ChatGPT prompt, GPTZero report #1, GPTZero report #2, GPTZero report #3.
[22] Dean Sherilyn Scully is no longer employed at Yale. *See* Yale School of Management, Headlines, Dean of Students Sherilyn Scully Departs After 17 Years ..., https://som.yale.edu/story/2024/dean-students-sherilyn-scully-departs-after-17-years-heart-som-community (last visited December 5, 2024).
[23] See *Yale Sch. of Mgmt. Bull.* 66 (2024–2025), https://bulletin.yale.edu/sites/default/files/school-of-management-2024-2025.pdf (last visited June 16, 2025)

63.     On July 24, 2024, Plaintiff met with Deans Tsung and Scully to discuss the Honor Code charge. During that meeting, Dean Scully made multiple efforts to pressure Plaintiff into a false confession. She first suggested that Plaintiff might have inadvertently violated the Honor Code by using Grammarly or a similar tool, explaining that Grammarly's AI components could alter text style and voice. Plaintiff responded that he was unfamiliar with Grammarly and had not used it on his exam. Dean Scully then asked whether Plaintiff had inadvertently discussed the exam with other students or TAs before, during, or after taking it, which Plaintiff denied. He further explained that he did not discuss any of the permitted resources with others. Dean Scully also questioned whether Plaintiff might have been confused about the exam's instructions regarding allowed resources or tools. Plaintiff made clear that the instructions on the exam cover page were clear and that he followed them strictly.

64.     Dean Scully escalated the pressure by invoking the fear of deportation. She suggested that Plaintiff's F1 visa could be revoked and that he could be deported as a result of the investigation. Plaintiff informed her that he was in the United States on an E2 investor visa, not a student F1 visa.

65.     Afterward, Plaintiff confirmed through his own research that Dean Scully's statements were incorrect. Suspension or expulsion does not result in revocation of student visas; students are able to transfer or re-enroll elsewhere without facing deportation.

66.     Dean Scully continued her efforts to secure a false confession. She told Plaintiff that, in her experience, students who confess tend to receive better outcomes, and warned that penalties would be harsher if the Honor Committee believed he was dishonest or attempting a cover-up. She suggested that a confession would make the Committee go easier on him and stressed that transparency was valued. Plaintiff, however, consistently affirmed that he had not

used AI on the exam, expressed confidence in his compliance with exam rules, and refused to admit to something he had not done. He left the meeting in shock.

67.     Later, Plaintiff spoke with another student who had undergone a similar investigation, reinforcing his belief that these types of "confession" meetings—targeting international students and exploiting the fear of deportation—are common practice at Yale.

### *Honor Committee Chair James Choi Pressures Plaintiff to Falsely Confess*

68.     The efforts to coerce a false confession continued with the Chair of the Honor Committee, James Choi ("Chairman Choi").

69.     On August 10, 2024, Chairman Choi sent Plaintiff an email stating:

> "I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale."

70.     On August 16, 2024, Plaintiff responded:

> "Until now, Wendy and Dean Scully have told me that this matter has not been formally referred to the Honor Committee. Further, I was told that you had already received a copy of the submitted exam. I am of course happy to comply with the SOM Policies at all times. If you believe I have not followed any policy, can you please let me know which one so I can respond appropriately? I am always happy to cooperate with your process as appropriate."

71.     Plaintiff never received a response from Chairman Choi identifying any policy he was alleged to have violated.

72.     That same morning, August 16, 2024, Chairman Choi escalated the pressure, warning:

> "Failure to cooperate would be viewed by the Honor Committee as an extraordinary violation of the Honor Code."

73.     Later that evening, Chairman Choi informed Plaintiff that "I have expanded my investigation into your case to deliverables you submitted for other courses." This improper

expansion of the investigation—undertaken in violation of the Honor Code's procedures—appeared to be retaliatory, aimed at pressuring Plaintiff for refusing to falsely confess to cheating.

74.    Chairman Choi continued pressuring Plaintiff to change his statement and falsely confess, writing:

> "If you would like to revise your statement to Deans Scully and Tsung about your Sourcing and Managing Funds final exam, you still have an opportunity to do so. The Honor Committee has historically been lenient with respect to revisions students make to their stories prior to their appearance before the Committee."

75.    Faced with mounting pressure from both Dean Scully and Chairman Choi, Plaintiff felt trapped between two unacceptable options: either "revise" his statement and falsely confess to misconduct he did not commit, hoping for leniency, or refuse to confess and risk expulsion.

76.    At this point, Plaintiff still had not been provided with any documentation about the charges against him. Instead, he faced the alarming prospect of defending himself against an investigation that now threatened to examine hundreds of assignments across all of his courses—conducted in violation of Honor Code rules.

### *The Honor Committee Formally Announces the Charge; Alleged AI use on Sourcing and Managing Funds Final Exam*

77.    On September 8, 2024, Plaintiff finally received the official notification letter from Dean Tsung. This letter stated that "the allegation is [Plaintiff] improperly utilized AI on the final exam in the course [Sourcing and Managing Funds (MGT423E)]".

### *Yale Deprives Plaintiff of the Right to Object to Committee Members*

78.    Under the Yale School of Management rules, the formal notification of a charge triggers procedural requirements that Yale must follow regarding the composition of the Honor Committee. Here, Yale violated those procedural requirements.

79.     First, under the Yale School of Management Policies and Procedures, Yale is required to notify an accused student of the composition of the Honor Committee: "the chair or chair's designee will notify the student of the membership of the [Honor] committee."[24] The SOM Administration failed to notify Plaintiff of the membership of the Honor Committee. Instead, Dean Tsung's letter stated that the members had not yet been chosen and would be "updated" soon, explaining: "A list of the student Honor Committee members and faculty members can be found here and will be updated very soon once the new committee members have been selected."

80.     At no point before the hearing did Yale ever notify Plaintiff of the members of the Honor Committee as required by Yale policy.

81.     Additionally, Yale deprived Plaintiff of his right to request recusal of Honor Committee members as required under the rules. The Yale SOM Administration's Policies and Procedures require that a student object to the composition of the Honor Committee within one day of receiving notice of the charge: "Within one day after receiving that notification, the student may object that a member is prejudiced by stating in writing the basis for this objection."[25]

82.     Here, Yale failed to provide Plaintiff with the names of the Honor Committee members within the one-day window—or at any point. As a result, Plaintiff was stripped of his right to challenge the composition of the Committee under SOM rules.

---

[24] Yale Sch. of Mgmt. Bull. 70 (2024–2025), https://bulletin.yale.edu/sites/default/files/school-of-management-2024-2025.pdf (last visited June 16, 2025).
[25] Yale Sch. of Mgmt. Bull. 70 (2024–2025), https://bulletin.yale.edu/sites/default/files/school-of-management-2024-2025.pdf (last visited June 16, 2025).

## *Honor Committee Continues to Delay Producing Materials*

83.     The Yale Honor Committee rules state that a student has the right "to examine any and all written materials being provided to the committee as soon as possible so that the student may have ample opportunity to question or refute them."[26]

84.     Plaintiff's Honor Committee hearing was initially scheduled for October 4, 2024. On September 9, 2024, Plaintiff informed Dean Tsung that he would be out of the country on that date. As a result, the Honor Committee rescheduled the hearing for November 8, 2024.

85.     The investigation against Plaintiff had been ongoing since at least June 12, 2024. Plaintiff was formally charged in the letter dated September 8, 2024.

86.     Despite this, Plaintiff did not receive the sixteen documents that the Honor Committee intended to use as evidence against him until October 14, 2024.

87.     This significant delay violated Yale's procedural rules. The Honor Committee's failure to provide timely access to these materials deprived Plaintiff of a fair and reasonable opportunity to defend himself at the hearing, in direct violation of Yale School of Management policies.

## *Honor Committee Stealthily Introduces a New, Unrelated Charge*

88.     At the time it produced materials to Plaintiff, the Honor Committee stealthily introduced a new charge against Plaintiff without providing the notice and due process required under Yale's policies. In the charge notice letter dated September 8, 2024, the Honor Committee charged Plaintiff with "improperly utiliz[ing] AI on the final exam in the course [MGT423E Sourcing and Managing Funds]."

---

[26] Id. at 68.

89.     However, in the materials produced on October 14, 2024, the Honor Committee introduced a new allegation regarding an exam in a different, unrelated course. Specifically, the sixteen documents provided included a final exam from Plaintiff's Investor course (MGT412E), a separate class taken in the prior semester with a different professor.

90.     The Honor Committee failed to provide Plaintiff with any of the due process required under Yale's policies before introducing this new allegation. The Honor Committee never notified Plaintiff that he was being charged with AI use on the Investor final exam. Rather, Plaintiff was charged only with "improperly utiliz[ing] AI on the final exam in the course [Sourcing and Managing Funds (MGT423E)]."

### *Honor Committee Intentionally Withholds Exculpatory Materials*

91.     To make matters worse, the Honor Committee failed to produce exculpatory materials to Plaintiff.

92.     According to the Honor Committee, the results of the GPTZero scans performed on Plaintiff's final exams "flagged" six questions between the two exams as potentially being written by AI. However, one of those six reports was never produced to Plaintiff.

93.     Since the Committee refused to provide that sixth GPTZero scan, Plaintiff ran that question through GPTZero himself. The result showed a 96% probability that the question had been written by a human. The Honor Committee withheld this report because its result was favorable to Plaintiff.

94.     Before the Honor Committee hearing, Plaintiff submitted another written request to Chairman Choi for any evidence in the investigative file that had not yet been provided. Chairman Choi responded: "Not that I am aware of. Those particular passages jumped out to human readers as likely to be AI-generated, which is why the AI detectors were run on them."

Choi claimed he was unaware of any GPTZero scans that had not been provided to Plaintiff, despite the fact that only five of the six reports regarding the "flagged" questions had been produced. The omitted report was favorable to Plaintiff.

95.     Defendants withheld over ninety (90) pages of written materials and evidence, including exculpatory evidence.

### *The Honor Committee Conducts its Hearing*

96.     On November 8, 2024, between approximately 12:30 p.m. and 1:45 p.m., the Honor Committee heard Plaintiff's matter. During the hearing, Plaintiff provided evidence demonstrating that GPTZero—the program the Committee used to analyze his exams—was unreliable. Plaintiff submitted his correspondence with Scott Aaronson, a computer science professor at the University of Texas and one of the authors of OpenAI's original AI detection tool, who confirmed that tools like GPTZero are not reliable. Plaintiff also submitted GPTZero test results on scholarly works by Yale community members, including Dean Charles Kerwin, former President Peter Salovey, and members of the Honor Committee. GPTZero's scans indicated there was a "100% probability" that selections from these works—some published over 30 years ago—were written by AI, a clearly false result.

97.     The Honor Committee's response was silence. The Committee members did not ask a single question regarding the reliability of the AI detection tools they were relying on in the proceeding.

98.     In the face of this silence, Plaintiff asserted his innocence. As he had done before the hearing, he offered to produce copies of any files related to his Yale assignments. Chairman Choi asked for the underlying Microsoft Word files used to produce the PDFs of Plaintiff's two

final exams. Plaintiff explained that he had not used Microsoft Word but Apple Pages and offered to provide the Apple Pages files. The hearing then concluded.

99.     About 15 minutes later, at approximately 2:02 p.m., Plaintiff received a voicemail from Dean Tsung asking him to return her call. Plaintiff called back at approximately 2:21 p.m. During the call, Dean Tsung formally requested the Apple Pages files discussed at the hearing. Plaintiff informed her he had left campus but would retrieve and send the files. Plaintiff, upset about the hearing, also asked to be excused from his upcoming 2:30 p.m. class, which Dean Tsung approved.

100.    Plaintiff acted promptly and sent the requested files to Dean Tsung within 40 minutes, by approximately 3:03 p.m. He then left campus for the rest of the day, as discussed.

101.    Despite knowing Plaintiff was no longer on campus, Dean Tsung called him again at approximately 3:32 p.m., but he was unavailable to answer.

102.    At approximately 4:02 p.m., Dean Tsung texted Plaintiff asking him to return to campus at 5:30 p.m. Plaintiff responded at 5:07 p.m., explaining: "I am unfortunately not able to meet at 5:30 p.m. today. Please let me know what day and times next week you'd like me to make myself available."

103.    At approximately 5:19 p.m., Dean Tsung called Plaintiff again, informing him he needed to return to the Honor Committee at 5:30 p.m. that day and bring his laptop. Plaintiff responded that he was not on campus, could not return on such short notice, but could make himself available at any other time in the coming week with reasonable notice. Dean Tsung stated that if he did not appear immediately, the hearing would be postponed and take longer to resolve. Plaintiff reiterated his willingness to meet at any time the following week with reasonable notice.

## *Honor Committee Finds Plaintiff Liable of a Different, Uncharged Offense*

104.     At approximately 8:28 p.m. on November 8, 2024, the same day as the hearing, Plaintiff received a letter from Chairman Choi informing him that the Committee had found him liable for "not being forthcoming," stating: "The committee determined that you have not been forthcoming to the Honor Committee."

105.     Before this point, Plaintiff had never received any notice from Yale that he was being charged with "not being forthcoming," nor was he afforded any of the due process protections required under Yale's policies for such a charge. As a result, Plaintiff was never given the opportunity to defend himself against that charge.

106.     Notably, the Honor Committee's decision did not include any conclusion or decision regarding the actual charges with which Plaintiff had been charged: "improperly utiliz[ing] AI on the final exam" in the Sourcing and Managing Funds course.

107.     In sum, the Honor Committee invented a charge against Plaintiff in order to find him responsible for something, anything, during the proceedings.

108.     The decision finding Plaintiff liable for "not being forthcoming" was made without notice of the charge, without an opportunity for Plaintiff to defend himself, without providing Plaintiff with any materials regarding the charge, and without a hearing on that charge. The Committee's actions were extreme, outrageous, outside the scope of Plaintiff's disciplinary proceedings, and in direct violation of Yale's policies and procedures.

109.     For the charge of "not being forthcoming," the Honor Committee imposed a one-year suspension from the EMBA program. No grade penalty was assessed.

110.     On November 14, 2024, Plaintiff received correspondence from Dean Tsung reaffirming: "There is no grade penalty outcome from the Honor Committee decision."

111.     Plaintiff was given only five business days to appeal the severity of the penalty to the Faculty Review Board. The FRB consisted of three senior faculty members: Professor Rouwenhorst, Professor Thomas, and Dean Jain. Although Dean Jain told Plaintiff that Professors Rouwenhorst and Thomas would likely recuse themselves and that the other two FRB members would be Professors Finger and Pinker, upon information and belief, this did not occur.

### *Yale's Rule Violations Continue with Plaintiff's First Appeal*

112.     According to the *Yale School of Management Bulletin*, "an accused student can appeal the severity of the penalty, but not the findings, from the full committee to the Faculty Review Board".[27] The Faculty Review Board determines the "appropriateness of the punishment assessed" by the Honor Committee and assumes "the correctness of the committee's finding of a violation".[28] Therefore, the Faculty Review Board could not change the Honor Committee's finding of "not being forthcoming," but *could only review the severity of the one-year suspension*.

113.     On November 15, 2024, Plaintiff appealed the severity of the one-year suspension to the Faculty Review Board (FRB). Because the FRB's authority was limited to reviewing the severity of the penalty, Plaintiff's appeal focused solely on that issue. Plaintiff raised three arguments: (1) the penalty was excessive because Plaintiff had never been charged with "not being forthcoming"; (2) "not being forthcoming" is not a basis for punishment on its own without a finding of a violation of the Honor Code; and (3) the punishment of a one-year suspension was unprecedented and excessive.

114.     Plaintiff noted that before his case, no student had ever been found liable solely for "not being forthcoming." Historically, that determination had only been used as an aggravating

---

[27] *Yale Sch. of Mgmt. Bull.* 70 (2024–2025), https://bulletin.yale.edu/sites/default/files/school-of-management-2024-2025.pdf (last visited June 16, 2025).
[28] *Id*.

factor in connection with an underlying Honor Code violation. Plaintiff further noted that the one-year suspension imposed in his case far exceeded prior penalties, where "not being forthcoming" had resulted in, at most, a one-week suspension. Plaintiff also explained that the Committee's handling of his case incentivized students to falsely confess in order to receive lesser penalties. Plaintiff requested that the one-year suspension be reduced to either exoneration or a warning.

115.    On November 19, 2024, Plaintiff received a letter from Dean Jain informing him that the FRB had denied his appeal and that the one-year suspension would remain in effect.

116.    Dean Jain's November 19 letter also stated that he was requesting that Chairman Choi and the Honor Committee "continue deliberating" on a new, broader, and uncharged allegation: "violation of the examination rules."

117.    This was despite Plaintiff's November 15th correspondence with Dean Jain reiterating the Policies that forbid this act. Plaintiff specifically stated:

> "Under the SOM policies, a student may "raise any objections to the proceedings on the grounds of procedural irregularity," after which the "cognizant academic dean will investigate the objection and may remand the matter to the committee to correct the procedural irregularity." To be clear, I am not saying that the Honor Committee's failure to issue a finding of guilt as to the charge of "improper AI use" constitutes a "procedural irregularity" within the SOM policy. I am not asking the cognizant academic dean to remand that matter to the Committee."

118.    Dean Jain responded to Plaintiff's email stating, "I understand what you are saying, and it is consistent with what I understood during our conversation."

119.    Dean Tsung also stated multiple times that Plaintiff's grade was not going to be impacted by the disciplinary proceedings or determinations. Specifically, when Dean Tsung met with Plaintiff over a zoom video call on November 11, 2024, she informed Plaintiff that the Honor Committee did not have enough evidence against him to find that he had improperly used AI on

his exam, and that Professors Rouwenhorst and Thomas would be meeting later that week to post his grade in the Sourcing and Managing Funds course. On November 14, 2024, Dean Tsung against stated in writing that "The faculty for SMF plans to meet this week so your grade should be updated sometime next week."

120.     In addition, contrary to Dean Tsung's November 14, 2024 confirmation that "[t]here is no grade penalty outcome from the Honor Committee decision," Dean Jain stated: "In the meantime, I am asking Rouwenhorst to withhold your grade in the course."

121.     To recap: The Honor Committee had charged Plaintiff with "improperly utiliz[ing] AI on the final exam" in Sourcing and Managing Funds. Without complying with notice and due process requirements, the Committee introduced an uncharged allegation of AI use on an unrelated exam (Investor). The Committee did not find Plaintiff liable for either the charged or uncharged AI use. Instead, it found him liable for the uncharged offense of "not being forthcoming," without providing notice or due process. When Plaintiff appealed the severity of that penalty, the FRB improperly directed the Committee to consider yet another new, uncharged allegation: "violation of exam rules."

122.     Under Yale SOM Policies and Procedures, the only issue properly before the FRB was the severity of the penalty imposed on the "not being forthcoming" charge. Dean Jain's directive to consider a new charge violated Yale's Policies and Procedures.

### *Honor Committee Meets Again Without Notice or Opportunity for Plaintiff to Attend*

123.     Following Dean Jain's directive, the Honor Committee met a second time on November 21, 2024. The Committee met in secret, without notice to Plaintiff or providing him the opportunity to attend, in violation of Yale policy.

*__Honor Committee Imposes "Additional Decisions" in Violation of the Yale Policies__*

124.    On November 21, 2024, Plaintiff received a "decision letter" with "additional decisions" from the Honor Committee.

125.    The November 21 decision letter stated: "The committee determined that you violated the rules of the Sourcing and Managing Funds final exam." The letter also stated: "The committee exonerated you on the charge of violating the rules of the Investor final exam." Despite claiming to have found that Plaintiff violated the rules of the Sourcing and Managing Funds final exam, the Committee made no finding that Plaintiff improperly used AI on that exam—the only allegation for which Plaintiff had been charged in accordance with Yale's policies. Without such a finding, the Committee had no basis to conclude that Plaintiff had violated the rules of that course.

126.    The November 21 decision letter also informed Plaintiff for the first time that he had been "charged" with an additional offense: "violating the rules of the Investor final exam." Plaintiff was never given notice that he was being charged with this offense, in clear violation of Yale's policies and procedures.

127.    On November 22nd, Plaintiff received an email from Dean Tsung stating that Plaintiff would now need to "remediate" his Sourcing and Managing Funds grade, a determination that was made before Plaintiff's deadline to appeal that grade had even passed (December 2nd).

128.    Additionally, the Honor Committee announced that it would impose a penalty of "F" in the Sourcing and Managing Funds course—contrary to Dean Tsung's November 14, 2024 confirmation that "[t]here is no grade penalty outcome from the Honor Committee decision."

129.    Plaintiff then received a letter dated November 22, 2024, from Dean Tsung stating that his one-year suspension from the EMBA program began on November 20, that he would

receive an Incomplete in MGT 699E Colloquium, and that his MGT 423E Sourcing and Managing Funds grade would "require remediation." Plaintiff was informed that he would not be eligible to return to the EMBA program until after July 2025. He was also instructed to notify his learning teams regarding his suspension, causing harm to his relationships with students, instructors, his reputation, and his career.

130.    Yale's November 22 letter also informed Plaintiff that he was barred from participating in any Yale SOM or Yale University sponsored events, whether on or off campus, including conferences, alumni, career, or recruiting events. This included the graduation of his SOM class, which now he couldn't even attend as a guest to support his fellow classmates. Plaintiff was barred from campus, any Yale facilities, his email account, and all Yale systems. The letter further informed Plaintiff that his suspension would be noted on his transcript during the suspension period, but that notation could be removed upon his return if he affirmatively requested it.

### *Plaintiff's Second Appeal*

131.    On December 2, 2024, the deadline for appealing his grade, Plaintiff submitted a second appeal to the Faculty Review Board regarding the Honor Committee's new penalty: an "F" in his Sourcing and Managing Funds course. Under Yale's policies, the scope of Plaintiff's second appeal was limited to the severity of the "F" grade he received.

132.    As grounds for his second appeal, Plaintiff argued that the Faculty Review Board violated its own rules by directing the Honor Committee to "continue deliberating" and issue findings regarding a charge that was not the subject of the appeal, rather than judging the "appropriateness of the punishment assessed by the committee," as the FRB was required to do.

Plaintiff argued that the FRB exceeded the scope of its authority in violation of SOM policy and, as such, the penalty imposed on him must be overturned.

133.     On December 11, 2024, Plaintiff received a denial of his second appeal in a letter from Dean Jain, stating only that "after careful consideration" the FRB had decided to "deny the appeal." Plaintiff's grade of "F" in his Sourcing and Managing Funds course remained in effect. As a result, Plaintiff will no longer graduate at the top of his class, an honor he had rightfully earned.

## COUNT I

### Breach of Contract
### (Against All Defendants)

134.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

135.     Plaintiff and Defendants entered into a binding contract through Plaintiff's enrollment in the Executive MBA Program and his payment of substantial tuition. This contract included, among others, Yale's Bulletin, Honor Code, and Honor Committee Procedures (collectively, "Policies"), which set forth specific rights and obligations concerning disciplinary procedures and fair treatment. See *Yale Sch. of Mgmt. Bull.* 66–72 (2024–2025).

136.     Connecticut law recognizes that this contract inherently includes two implied conditions: "(1) that no student may be arbitrarily expelled therefrom; and (2) that the student will submit himself or herself to reasonable rules and regulations for the breach of which, in a proper case, they may be expelled, and that they will not be guilty of such misconduct as will be subversive of the discipline of the university." 15 Am. Jur. 2d Colleges and Universities § 30, at 294; *Okafor v. Yale Univ.*, No. CV980410320, 2004 WL 1615941, at *5 (Conn. Super. Ct. June 25, 2004).

137.    The Policies constituted binding contractual promises to Plaintiff, requiring that Yale provide fair and impartial disciplinary proceedings, comply with procedural safeguards, and act in good faith. See also *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 593, 687 A.2d 111 (1996); *Craine v. Trinity Coll.*, 259 Conn. 625, 654–55, 791 A.2d 518 (2002); *Doe v. Yale Univ.*, 252 Conn. 641, 663, 748 A.2d 834 (2000); *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 658 (D. Conn. 2019).

138.    Plaintiff fully performed under the contract and satisfied all conditions precedent.

139.    The SOM Administration breached its contract by failing to provide Plaintiff with timely and complete disclosure of the evidence considered by the Honor Committee. The Bulletin required that Plaintiff be given access to "any and all written materials being provided to the committee as soon as possible, and ordinarily at least forty-eight hours in advance of the meeting." *Yale Sch. of Mgmt. Bull.* at 68–69. Plaintiff did not receive critical documents, including over 90 pages of exculpatory GPTZero reports and other materials, until after early discovery in this action, which prejudiced Plaintiff's ability to prepare a defense.

140.    The SOM Administration further breached its contract by allowing members of the Honor Committee with actual or apparent conflicts of interest to participate in Plaintiff's proceedings. The Policies require that "committee members will be invited to excuse themselves from the case if there is a conflict of interest," and that students be afforded a fair opportunity to object. *Id.* at 70. Plaintiff was denied this opportunity because the names of Committee members were not disclosed to him as required, and he was unable to make a timely objection.

141.    The SOM Administration breached its promise to base disciplinary decisions solely on the facts and evidence presented. The Policies mandate that the Committee "come to judgments

based on these facts." *Id.* at 69. Instead, the SOM Administration relied on speculation, unsupported accusations, and irrelevant material not part of the hearing record.

142.     The SOM Administration failed to protect the confidentiality of Plaintiff's proceedings, contrary to the Policies requiring that records be kept "in a confidential file" and that reports "shall not identify the students involved and so far as possible *avoid contextual information that would reveal or encourage speculation about the identity of individual students*." *Id.* at 71 (emphasis added).

143.     The SOM Administration failed to act with the consistency mandated by its Policies. The Bulletin requires that penalties be consistent with prior decisions. *Id.* Yale imposed excessive, arbitrary, and retaliatory penalties on Plaintiff that departed from established precedent for similar cases.

144.     The SOM Administration failed to act promptly as required. The Policies provide that the Honor Committee must act "as promptly as is consistent with the need to establish the facts of the case and to come to judgments based on these facts." *Id.* at 69. Plaintiff was subjected to unjustified delays that impaired his ability to defend himself.

145.     The SOM Administration unlawfully expanded the charges against Plaintiff without proper referral, fabricating a charge of "not being forthcoming" without notice, proper process, or adherence to its referral procedures. The Honor Committee overstepped its authority by initiating and adjudicating this charge without any complaint or referral from a faculty, staff, or student complainant.

146.     The SOM Administration coerced Plaintiff under threat of deportation and improper expansion of the investigation to compel a false confession, further breaching its contractual and ethical obligations.

147. The SOM Administration remanded Plaintiff's disciplinary matter for further deliberations on yet another, and vague, charge, in direct conflict with the Policies and Procedures.

148. The SOM Administration retaliated against Plaintiff for asserting his rights and pursuing an appeal, including imposing a grade penalty contrary to prior assurances and the outcome of the Committee's findings.

149. Because the SOM Administration's actions were disciplinary rather than academic in nature, strict compliance with the promised procedures was required, and judicial review is appropriate to ensure that Yale's decisions were not arbitrary, capricious, or made in bad faith. See *Gupta*, 239 Conn. at 593.

150. Yale's breaches caused Plaintiff substantial harm, including reputational damage, loss of educational and professional opportunities, emotional distress, and financial losses.

151. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing
**(Against All Defendants)**

152. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

153. The implied covenant of good faith and fair dealing protects Plaintiff's contractual rights and justified expectations. The covenant ensures that no party may "do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 598, 687 A.2d 111, 122 (1996); *Doe v. Yale Univ.*, 252 Conn. 641, 663, 748 A.2d 834 (2000).

154.     This duty applies not just to express terms but also to preventing abuse of discretion or procedural tools in a way that frustrates justified expectations. *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 658 (D. Conn. 2019); *Demoulas v. Quinnipiac Univ.*, No. CV155006283S, 2015 WL 1427951, at *4 (Conn. Super. Ct. Mar. 5, 2015).

155.     Plaintiff's rights were tied to Yale's Policies and Procedures—including procedural protections such as notice of charges, disclosure of evidence, an impartial committee, and fair hearing—which formed part of the contract. *Demoulas*, 2015 WL 1427951, at *4; *Yale Sch. of Mgmt. Bull.* 66–72 (2024–2025).

156.     Yale unilaterally authored its Policies and Procedures and imposed them on students. Therefore, any ambiguity regarding procedural discretion or proportionality of penalties must be construed against Yale as drafter. *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 13–14, 938 A.2d 576 (2008); *Demoulas*, 2015 WL 1427951, at *5.

157.     The SOM Administration acted in bad faith by failing to provide timely and complete evidence disclosure, as required by the Policies. The Bulletin promises students access to "any and all written materials being provided to the committee as soon as possible, and ordinarily at least forty-eight hours in advance of the meeting." *Yale Sch. of Mgmt. Bull.* at 68–69. Plaintiff was denied timely access to over 90 pages of critical documents necessary to defend himself, including exculpatory evidence.

158.     The SOM Administration acted in bad faith by allowing Committee members with actual or apparent conflicts of interest to participate, contrary to the requirement that members with conflicts "excuse themselves" and that students be afforded a fair opportunity to object. *Id.* at 70.

159.     The SOM Administration acted in bad faith by fabricating charges—such as "not being forthcoming"—without proper referral, depriving Plaintiff of notice and a fair opportunity to respond. The Honor Committee initiated and adjudicated charges that were not referred by any authorized party, in violation of Yale's own procedures.

160.     The SOM Administration misused their discretion by failing to base decisions solely on facts presented at the hearing. The Bulletin requires that judgments be "based on these facts." *Id.* at 69. Instead, decisions were based on speculation, unsupported accusations, and irrelevant material.

161.     The SOM Administration failed to protect the confidentiality of Plaintiff's proceedings as required. The Policies mandate that records be kept "in a confidential file" and reports anonymized to prevent speculation about student identities. *Id.* at 71.

162.     The SOM Administration imposed excessive, arbitrary, and inconsistent penalties, violating the Bulletin's promise of consistency and fairness in disciplinary outcomes. *Id.*

163.     The SOM Administration engaged in coercion and threats to force a false confession, including threatening deportation and improper expansion of the investigation. Such conduct reflects a dishonest purpose, not an honest mistake. *Landry v. Spitz*, 102 Conn. App. 34, 42, 925 A.2d 334 (2007); *Magnan v. Anaconda Indus.*, 193 Conn. 558, 566, 479 A.2d 781 (1984).

164.     The SOM Administration improperly retaliated against Plaintiff by imposing penalties inconsistent with prior assurances, including imposing a grade penalty after promising *multiple times in writing* that he would receive no grade sanction.

165.     Defendants delayed and withheld evidence, including more than ninety (90) pages of exculpatory GPTZero results and other materials that were in his investigation file, in direct violation of Yale's policies and procedures, and frustrating Plaintiff's ability to prepare his defense.

166.     The SOM Administration remanded Plaintiff's disciplinary matter for further deliberations on yet another, and vague, charge, in direct conflict with the Policies and Procedures.

167.     Defendants singled out Plaintiff for AI scanning without cause, knowing the unreliability of the tool, particularly as applied to non-native English speakers.

168.     The Faculty Review Board acted outside its authority by remanding the matter for adjudication of yet another *new*, and vague, charge of "violation of the exam rules", *rather than limiting its review to the appropriateness of the punishment*, as required.

169.     Not only did the Plaintiff not receive proper notice and opportunity to defend himself of this new charge, but it was so vague that it failed to reasonably inform Plaintiff of the nature of the new charge against him, violating his rights under Yale's policies and procedures.

170.     The SOM Administration's actions reflect an abuse of discretion, evasion of the spirit of the contract, and a deliberate frustration of Plaintiff's justified expectations under the contract.

171.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III

### Title VI of the Civil Rights Act of 1964
### 42 U.S.C. § 2000d et seq.
### Discrimination based on national origin
### (Against All Defendants)

172.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

173.     Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

174.     Yale University, including its School of Management ("SOM"), receives federal financial assistance and is subject to Title VI. See *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001).

175.     Plaintiff, a French national and non-native English speaker, alleges that Defendants discriminated against him on the basis of national origin through their selective enforcement of SOM's Honor Code and reliance on biased AI detection tools. Plaintiff was the only student among more than seventy (70) in his class whose exam was subjected to AI detection software scrutiny.

176.     The factors cited by the SOM Administration as an alleged basis for singling out Plaintiff's work—such as its "near perfect punctuation and grammar" and "elaborate formatting"—directly correlate with Plaintiff's non-native English background, as non-native speakers often exhibit formal, structured writing that differs from that of native speakers.

177.     The same Policies and Procedures that form part of Yale's contractual obligations also reflect Yale's stated commitment, under federal law and institutional policy, to protect students from discrimination based on national origin. Defendants' departure from these commitments further demonstrates the discriminatory animus underlying their actions.

178.     Yale's Honor Code emphasizes its commitment to inclusivity and prohibits discrimination of any kind: "All forms of discrimination fall outside the bounds of expected behavior." *Yale Sch. of Mgmt. Bull.* at 67.

179.     The Honor Code celebrates "diverse backgrounds and views" and characterizes inclusivity as a hallmark of the SOM community. *Id.*

180.     Yet Yale violated these principles when it applied its disciplinary processes and investigatory tools in a manner that disproportionately burdened Plaintiff on the basis of his national origin. See *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

181.     Defendants' reliance on GPTZero—despite their awareness of its known bias against non-native English writing, and despite Yale's policy disavowing the use of unreliable AI detection tools—demonstrates discriminatory intent or deliberate indifference. See *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011); *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

182.     Yale's own policies acknowledged that "controlling the use of AI writing through surveillance or detection technology is not feasible" and that AI detection tools are unreliable. Yet Defendants applied GPTZero solely to Plaintiff's exam, then imposed disproportionate penalties of both suspension and an "F" in violation of SOM's guidelines. *Yale Sch. of Mgmt. Bull.* at 69.

183.     Defendants were not merely negligent; they acted with deliberate indifference to the foreseeable discriminatory impact of their actions. Defendants knew or should have known that the procedural anomalies and the selective deployment of AI detection tools would place Plaintiff at a severe and disproportionate disadvantage because of his national origin.

184.     No other student of Plaintiff's class or cohort was subjected to similar scrutiny, sanctions, or use of GPTZero in comparable circumstances, further evidencing selective and discriminatory enforcement.

185.     Defendants' pattern of procedural irregularities, selective targeting, and reliance on flawed AI evidence—combined with coercive tactics that exploited Plaintiff's foreign status (including threats of deportation)—support an inference of intentional discrimination in violation

of Title VI. See *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

186.     Title VI requires a plaintiff to demonstrate that the defendants engaged in intentional discrimination on the basis of national origin. See *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Tolbert v. Queens Coll.*, 242 F.3d at 69.

187.     A plaintiff may establish intentional discrimination through direct evidence or through indirect evidence that gives rise to a plausible inference of discriminatory purpose. See *Doe v. Columbia Univ.*, 831 F.3d at 56; *Yusuf v. Vassar Coll.*, 35 F.3d at 715.

188.     Courts have held that intentional discrimination may be inferred from facts such as selective enforcement, procedural irregularities, disparate treatment, or departures from regular practices that disproportionately burden individuals based on protected characteristics. See *Vill. of Arlington Heights*, 429 U.S. at 266–68; *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (plurality).

189.     Moreover, a finding of intent may arise where a defendant acts with deliberate indifference to known or obvious risks that its conduct will result in unlawful discrimination. See *Papelino*, 633 F.3d at 89; *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir. 1999); *City of Yonkers*, 96 F.3d at 611.

190.     In this case, Defendants knew or were deliberately indifferent to the fact that the use of GPTZero and similar AI detection tools created a foreseeable and substantial risk of discrimination against non-native English speakers, such as Plaintiff. Yale's own policies expressly acknowledged that AI detection tools are unreliable and unsuitable for academic integrity determinations, particularly in light of their susceptibility to misidentify formal, structured writing—traits common to non-native English speakers—as AI-generated. The

Administration was aware of widespread academic literature, internal discussions, and public warnings regarding these tools' biases and inaccuracies. Nevertheless, Defendants selectively applied GPTZero only to Plaintiff's exam, out of more than seventy students, without providing any neutral justification or procedural safeguards to contest its use or reliability. Plaintiff was also notified that such GPTZero reports were being used as evidence against him in his Honor Code proceedings.

191.     Such selective enforcement and procedural deviations, in direct violation of Yale's own Policies and Procedures, caused Plaintiff to be subjected to unwarranted investigation, sanctions, and reputational harm, all of which were motivated in substantial part by Plaintiff's national origin.

192.     The totality of the circumstances—including the sequence of events, departures from standard practices, selective and biased investigatory tools, excessive penalties, and coercive threats tied to Plaintiff's national origin—permits the inference that Plaintiff was subjected to intentional discrimination in violation of Title VI. See *Vill. of Arlington Heights*, 429 U.S. at 266–68.

193.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV

### Title VI of the Civil Rights Act of 1964
**42 U.S.C. § 2000d, *et seq*.**
**Retaliation for complaint of discrimination based on national origin**
**(Against All Defendants)**

194.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

195.	Title VI prohibits retaliation by recipients of federal funds against any individual who complains of discrimination. See *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 176 (E.D.N.Y. 2008); 34 C.F.R. § 100.7(e).

196.	The anti-retaliation provisions of Title VI are interpreted consistently with Title IX and Title VII frameworks. See *Commodari v. Long Island Univ.*, 89 F. Supp. 2d 353, 378 (E.D.N.Y. 2000); *Chung v. City Univ. of N.Y.*, 605 F. App'x 20, 22 (2d Cir. 2015).

197.	Plaintiff engaged in protected activity when he objected during the Honor Code investigation and proceedings to being singled out for AI detection scrutiny on the basis of his national origin and non-native English speaker status.

198.	Plaintiff specifically complained to Dean Scully, Dean Tsung, and Professor Choi that the process unfairly targeted him, and raised these objections prior to and during key stages of the disciplinary process.

199.	Defendants had actual knowledge of these complaints. Plaintiff's concerns were raised directly to the decision-makers involved in the investigatory and adjudicatory process.

200.	Title VI protects against retaliation by any official acting on behalf of the institution. See *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011); *Littlejohn v. City of N.Y.*, 795 F.3d 297, 317 (2d Cir. 2015).

201.	Following Plaintiff's protected activity, the SOM Administration engaged in a pattern of escalating adverse actions. These included introducing a new, uncharged accusation of "not being forthcoming" without notice or opportunity to respond, contrary to the requirement in Yale's Policies that charges be properly noticed and referred. *Yale Sch. of Mgmt. Bull.* at 68–70.

202. The SOM Administration expanded the investigation beyond its original scope, targeting unrelated coursework in violation of Policy limits on the Committee's jurisdiction and process.

203. The SOM Administration imposed duplicative and excessive penalties without following required procedural safeguards, including failing to base penalties on consistent prior practice as required. *Id.* at 69.

204. The SOM Administration subjected Plaintiff to coercive tactics, including threats of deportation and career destruction, reflecting a retaliatory intent rather than adherence to fair process.

205. The SOM Administration further failed to provide over ninety (90) pages of exculpatory evidence, including GPTZero reports and other materials, as mandated by the Bulletin, impairing Plaintiff's ability to defend himself. *Id.* at 68–69.

206. These exculpatory materials were withheld from Plaintiff despite his direct request in correspondence on November 5, 2025 to Chair Choi asking if there were any other scans of his work using an AI detection tool other than the five (5) documents he had already been provided. Choi responded that he wasn't aware of any, which was a false statement.

207. Title VI retaliation claims require proof that the retaliatory conduct was undertaken with intentional retaliatory animus — that is, that the protected activity was a substantial or motivating factor in the adverse actions. See *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Papelino*, 633 F.3d at 91.

208. A plaintiff may demonstrate retaliatory intent through direct evidence or through circumstantial evidence that gives rise to an inference of unlawful motive, including temporal proximity between the protected activity and the adverse action, procedural irregularities, shifting

justifications, disparate treatment, or departures from established policies or practices. See *Littlejohn*, 795 F.3d at 318; *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

209.     In this case, Defendants acted with retaliatory animus as shown by the close temporal proximity between Plaintiff's complaints and the adverse actions taken, the procedural anomalies and irregularities that departed from Yale's own Policies, the excessive and duplicative penalties imposed, and shifting justifications for adverse measures.

210.     The introduction of the "not forthcoming" charge without proper referral, failure to provide timely evidence, inconsistent penalties, and coercive tactics all support an inference that Plaintiff's protected activity was a substantial or motivating factor in the SOM Administration's adverse actions.

211.     The totality of Defendants' conduct, including procedural anomalies, selective targeting, and deliberate departures from their own Policies and Procedures, demonstrates intentional retaliation in violation of Title VI.

212.     As a result of the foregoing, Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT V

### Intentional Infliction of Emotional Distress
**(Against All Defendants)**

213.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

214.     Under Connecticut law, to prevail on a claim of intentional infliction of emotional distress ("IIED"), a plaintiff must allege and prove that: (1) the defendant intended to inflict

emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff's distress; and (4) the plaintiff's distress was severe. See *Greenhouse v. Yale Univ.*, No. 3:05CV1429 (AHN), 2006 WL 473724, at *3 (D. Conn. Feb. 28, 2006); *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000).

215.    The conduct of the SOM Administration went far beyond mere procedural irregularities or mistakes. It included specific, targeted, and deeply offensive actions that meet the legal standard for extreme and outrageous behavior, especially in the context of an academic tribunal charged with fairness, integrity, and adherence to published procedures.

216.    The *Greenhouse* case exemplifies how the context of what is said and done matters. In *Greenhouse*, the conduct occurred during a drama class exercise, where all participants knew that they were in a drama class, the court found a lack of the requisite outrageousness when in that context. Here, on the other hand, the Yale SOM Honor Committee is an august deliberative body, where any joke or demeaning language used against Plaintiff would be outrageous. The Policies and Procedures of the disciplinary process are designed to safeguard Plaintiff's future and reputation, and any deliberate violation of those rules in this setting renders Defendants' conduct extreme and outrageous.

217.    The SOM Administration also fabricated a charge of "not being forthcoming" solely to impose punishment after failing to substantiate the original Honor Code charge. This charge was introduced without notice, without an opportunity to respond, without disclosure of evidence, and without a hearing as to that charge, all in direct violation of Yale's own Policies. See *Yale Sch. of Mgmt. Bull.* at 68–70.

218.     The SOM Administration, including Dean Scully, made statements suggesting Plaintiff could be deported as a consequence of the disciplinary process. These threats exploited Plaintiff's foreign national status, were inherently demeaning, and were calculated to coerce, humiliate, and terrify.

219.     The SOM Administration expanded the investigation beyond its authorized scope, singled Plaintiff out for unreliable AI detection scrutiny, and withheld exculpatory materials in violation of their Policies. This conduct was designed to maximize Plaintiff's distress rather than adhere to fair process.

220.     The forced separation from his cohort, uncertainty about his academic future, imposition of duplicative and excessive penalties, and stigma of wrongful accusations combined to inflict severe and lasting emotional harm.

221.     The SOM Administration's cumulative actions—misrepresenting facts, issuing threats, fabricating charges, violating procedural protections, and selectively enforcing disciplinary measures—were extreme, outrageous, and calculated to inflict emotional distress. See *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119, 126 (2003).

222.     Plaintiff suffered severe emotional distress as a direct result. This distress included anxiety, humiliation, sleep disturbance, difficulty concentrating on professional responsibilities, loss of reputation among Yale peers and faculty, loss of reputation in Plaintiff's professional endeavors, and fear of future wrongful accusations.

223.     The severity of Defendants' conduct, especially in light of the formal safeguards they pledged to uphold, arouses community resentment and exclamations of "outrageous!" in the sense described by Connecticut law.

224. Plaintiff's distress was foreseeable and of such severity that it could result in bodily harm or illness. See *Appleton*, 254 Conn. at 210, 757 A.2d at 1063.

225. Accordingly, Plaintiff seeks compensatory and punitive damages, prejudgment interest, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT VI

### Negligent Infliction of Emotional Distress
### (Against All Defendants)

226. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

227. Under Connecticut law, a plaintiff may recover for negligent infliction of emotional distress ("NIED") upon proof that: (1) the defendant's conduct created an unreasonable risk of causing emotional distress; (2) the distress was foreseeable; (3) the distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. See *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446, 815 A.2d 119, 127 (2003); *Montinieri v. S. New Eng. Tel. Co.*, 175 Conn. 337, 345, 398 A.2d 1180, 1184 (1978); *Perodeau v. Hartford*, 259 Conn. 729, 751, 792 A.2d 752, 765 (2002).

228. The SOM Administration owed Plaintiff a duty as a matriculated student in the EMBA program to conduct disciplinary proceedings with fairness, consistency, and adherence to Yale's established Policies and Procedures. This duty included an obligation not to subject Plaintiff to arbitrary, capricious, or recklessly harmful conduct that foreseeably risked causing severe emotional distress. See *Shore v. Stonington*, 187 Conn. 147, 151, 444 A.2d 1379, 1382 (1982); *Zides v. Quinnipiac Univ.*, No. CV020470131S, 2006 WL 463182, at *7 (Conn. Super. Ct. Feb. 7, 2006).

229.     The SOM Administration breached this duty by engaging in conduct that created an unreasonable risk of severe emotional distress. Defendants failed to provide Plaintiff with timely notice of the charges, as required by Yale's Policies, failed to provide timely disclosure of evidence, failed to disclose the names of Committee members for purposes of conflict objections, and failed to act promptly as required. See *Yale Sch. of Mgmt. Bull.* at 68–70.

230.     The SOM Administration improperly relied on GPTZero, an unreliable AI detection tool that Yale itself disavowed for disciplinary use, as the sole basis for accusing Plaintiff of misconduct.

231.     The SOM Administration fabricated the charge of "not forthcoming" without notice or an opportunity for Plaintiff to defend against it, after failing to secure a finding of responsibility on the original charge.

232.     The SOM Administration denied Plaintiff access to exculpatory evidence, including missing GPTZero reports and related materials, in violation of the Bulletin.

233.     The SOM Administration threatened Plaintiff with deportation, exploiting his foreign national status in a manner calculated to cause fear and distress.

234.     The SOM Administration expanded the investigation beyond its proper scope and allowed false and prejudicial statements by the Honor Committee chair to prime committee members against Plaintiff.

235.     Such conduct foreseeably created an unreasonable risk of severe emotional distress. As Connecticut courts have recognized, NIED claims are viable where the alleged conduct "can be found to have unreasonably subjected the plaintiff to the risk of severe emotional distress beyond that which would reasonably be expected in the circumstances." See *Olson v. Bristol-*

*Burlington Health Dist.*, 87 Conn. App. 1, 6–7, 863 A.2d 748, 752 (2005); *Cohen v. Yale-New Haven Hosp.*, No. CV075017420S, 2008 WL 5481220, at *4 (Conn. Super. Ct. Dec. 10, 2008).

236.    A reasonable person subjected to wrongful accusations of academic dishonesty, threats to immigration status, and a fundamentally flawed disciplinary process would suffer severe emotional distress, including anxiety, reputational harm, fear for professional and immigration future, and physical symptoms associated with stress.

237.    The distress Plaintiff suffered was not the ordinary consequence of lawful academic discipline but flowed directly from Defendants' negligent acts and omissions. The distress was severe enough that it might result in illness or bodily harm.

238.    A claim for NIED is viable even where the plaintiff was not physically present during the negligent acts. It is sufficient that Plaintiff later learned of Defendants' conduct and suffered the severe emotional distress alleged herein. See *Montinieri*, 175 Conn. at 345; *Cohen*, 2008 WL 5481220, at *4; *Watts v. Chittenden*, 301 F.3d 231, 242 (2d Cir. 2002).

239.    Accordingly, Plaintiff seeks compensatory damages, prejudgment interest, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT VII

### Promissory Estoppel
**(Against All Defendants)**

240.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

241.    The SOM Administration, through their official publications, written policies, and communications to students, made clear and unambiguous promises to Plaintiff and other students, including but not limited to the following:

242.     The SOM Administration explicitly informed students, including Plaintiff, in writing and through official university policies, that it would no longer use AI surveillance or detection tools, such as Turnitin, because such tools are unreliable for determining whether students cheated on exams or assignments.

243.     The SOM Administration promised Plaintiff procedural fairness, integrity, and adherence to the Policies and Procedures set forth in Yale's Honor Code and Bulletin, including specific commitments that: students would receive timely notice of charges; students would have access to all evidence at least forty-eight hours before the hearing; disciplinary decisions would be based solely on facts presented; and penalties would be consistent with prior practice. See *Yale Sch. of Mgmt. Bull.* at 66–72 (2024–2025).

244.     The SOM Administration also explicitly promised, in the written "charging" email correspondence from Dean Tsung, that specific Policies and Procedures would be followed, which were then violated.

245.     The SOM Administration remanded Plaintiff's disciplinary matter for further deliberations on yet another, and vague, charge, in direct conflict with the Policies and Procedures, even after Plaintiff directly pointed out those rules.

246.     Plaintiff reasonably and foreseeably relied upon these promises when he applied to, enrolled in, and paid substantial tuition and fees for Yale's Executive MBA program. See *Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104, 837 A.2d 736, 741 (2003); *Arcidiacono v. Fairfield Univ.*, 967 F.2d 13, 16 (2d Cir. 1992).

247.     Plaintiff chose to invest significant time, resources, and trust in Yale's educational program, believing that Yale would uphold the procedural protections and fair practices it had promised.

248. Plaintiff's reliance on these promises was to his significant detriment. In direct contradiction of its clear promises, Yale used an unreliable AI detection tool (GPTZero) to accuse Plaintiff of academic dishonesty, despite its prior assurances that it would not rely on such technology.

249. The SOM Administration further failed to provide the procedural fairness it promised, including: failing to provide timely and complete notice of charges; failing to provide timely access to evidence, including GPTZero reports and other key materials; failing to provide notice of the names of Honor Committee members so Plaintiff could challenge members for bias; introducing new charges without referral or notice; and failing to ensure decisions were made solely on the facts presented.

250. As a result of his detrimental reliance on Defendants' promises, Plaintiff must bring this matter before this Court, seeking redress for his damages.

251. Plaintiff has lost his standing as the top student in his class.

252. Plaintiff will suffer the significant and harmful consequence of having to graduate with a subsequent class comprised of students with whom he did not study or build relationships.

253. Plaintiff has suffered damage to his reputation, career prospects, and emotional well-being, among other detriments.

254. It would be unjust and inequitable to permit Defendants to avoid liability for the harm caused by their failure to honor the promises on which Plaintiff reasonably relied. See *Arcidiacono*, 967 F.2d at 16; *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995).

255. Accordingly, Defendants are liable based on a claim of promissory estoppel.

256.     Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as any other relief that this Court deems just and proper.

## COUNT VIII

### Violation of the Connecticut Unfair Trade Practices Act (CUTPA)
### Conn. Gen. Stat. § 42-110a et seq.
### (Against All Defendants)

257.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

258.     The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Conn. Gen. Stat. § 42-110b(a).

259.     The SOM Administration, in providing educational services for significant tuition and fees, engaged in trade or commerce within the meaning of Conn. Gen. Stat. § 42-110a(4). See *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 595–96, 687 A.2d 111, 122 (1996) (noting CUTPA applies where a commercial relationship exists, even in educational and professional contexts); *Haynes v. Yale Univ.*, No. 3:19-cv-1098 (MPS), 2020 WL 1698796, at *8 (D. Conn. Apr. 8, 2020) (denying motion to dismiss CUTPA claim where student alleged university engaged in unfair trade practices relating to provision of educational services).

260.     The SOM Administration engaged in unfair and deceptive acts or practices, including but not limited to:

261.     Representing to Plaintiff and other students that Yale would no longer use unreliable AI surveillance or detection tools like Turnitin to determine whether students cheated

on exams or assignments, and then secretly using such tools (including GPTZero) against Plaintiff despite knowledge of their unreliability;

262. Promising procedural fairness, integrity, and adherence to stated policies and procedures in disciplinary matters, but failing to provide those promised protections;

263. Withholding exculpatory evidence, introducing new charges without notice, and imposing penalties without following Yale's published policies or providing fair process;

264. Coercing Plaintiff under threat of false consequences (including deportation and harsher penalties) to confess to misconduct he did not commit.

265. These acts offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff, satisfying the test for unfair practices under CUTPA. See *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 120 (2d Cir. 2004) (applying Connecticut unfair trade practice standards in federal court); *Cheshire Mortgage Serv., Inc. v. Montes*, 223 Conn. 80, 105–07, 612 A.2d 1130, 1144–45 (1992) (describing CUTPA's "cigarette rule" standard for unfairness).

266. Plaintiff reasonably relied upon Yale's representations about the fairness and integrity of its disciplinary process, as well as its promises not to use unreliable AI detection tools, when he enrolled and paid substantial tuition and fees to participate in Yale's EMBA program.

267. As a result of Defendants' unfair trade practices, Plaintiff has suffered actual damages, including loss of academic standing, delayed graduation, reputational harm, emotional distress, and significant financial losses. See *Haynes*, 2020 WL 1698796, at *8; *Fabri*, 387 F.3d at 120.

268.     As a result of the foregoing, Plaintiff is entitled to actual damages, punitive damages, attorneys' fees, and costs pursuant to Conn. Gen. Stat. § 42-110g(a)–(d), as well as any other relief this Court deems just and proper.

## COUNT IX

### Defamation
**(Against All Defendants)**

269.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

270.     The SOM Administration, acting individually and collectively, made and published false and defamatory statements about Plaintiff, both orally and in writing, to third parties, including but not limited to faculty members, administrative staff, and other students at Yale University and the Yale School of Management ("SOM").

271.     Specifically, the SOM Administration communicated publicly to third parties that Plaintiff "improperly utilized AI on the final exam," "violated the rules of the Sourcing and Managing Funds final exam," and was "not forthcoming" with the Honor Committee, among other communications — each of which falsely implied or directly stated that Plaintiff had committed academic dishonesty. Despite the fact that *there was never a finding against Plaintiff of using AI to cheat on his exam*. The only decisions made by the Honor Committee against Plaintiff were that he was suspended for one (1) year for not being forthcoming, and that he would receive an F in his course for vaguely violating the exam rules.

272.     Nevertheless, there have been many publications stating that Plaintiff was actually found to have improperly used AI on his exam, directly echoing the SOM Administration's false characterization of the actual findings and sanctions against him, including in Bloomberg Law,

Poets and Quants, and the Yale Daily News. The SOM Administration publicized the false assertions against Plaintiff with knowledge that they were false.

273.     In addition, one or more of the Honor Committee members publicly disclosed confidential information regarding the deliberations and proceedings against Plaintiff directly to Plaintiff's classmates, which quickly spread throughout the rest of the school.

274.     Dean Tsung even stated in an affidavit publicly filed in this Court in regards to a motion for a temporary restraining order, that Plaintiff was being stripped of his Class Marshal top honors as a direct result of the mere accusations against him of misconduct.

275.     These statements were false, not supported by credible or reliable evidence, and were made without observing the procedural safeguards required by Yale's Policies and Procedures.

276.     The SOM Administration made these statements despite failing to provide Plaintiff with timely and complete notice of charges, failing to provide access to evidence, failing to base determinations solely on facts presented, and introducing new charges without proper referral — all in violation of the *Yale School of Management Bulletin*. See *Yale Sch. of Mgmt. Bull.* at 68–70.

277.     To the extent such statements were circulated within the Yale SOM faculty and/or student community, either verbally or in writing, or to any prospective recommender, academic evaluator, faculty member, or administrator, they were published to third parties. See *Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 27–28, 662 A.2d 89, 103 (1995); *Martin v. Griffin Hosp.*, 19 Conn. App. 35, 40, 561 A.2d 429, 432 (1989), aff'd, 210 Conn. 593, 556 A.2d 1192 (1989).

278.     The SOM Administration acted with negligence, and in some cases actual malice, in making these false statements. They knew these statements were untrue or acted with reckless

disregard for their falsity. See *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991); *Goodrich v. Waterbury Republican-Am., Inc.*, 188 Conn. 107, 112, 448 A.2d 1317, 1320 (1982).

279. As a direct and proximate result of the defamatory statements, Plaintiff has suffered reputational harm, emotional distress, humiliation, and economic damages, including damage to his professional and academic prospects.

280. Defamatory statements falsely accusing someone of dishonesty in their profession or education constitute defamation per se. See *Gould v. Stamford*, 331 F. App'x 61, 63 (2d Cir. 2009); *Torosyan*, 234 Conn. at 35–36; *Biro v. Conde Nast*, 807 F.3d 541, 546–47 (2d Cir. 2015).

281. Additionally, the statements at issue are not protected by any qualified privilege because Defendants failed to adhere to proper procedures, acted in bad faith, and lacked any legitimate academic purpose for publishing false charges of misconduct. See *Hopkins v. O'Connor*, 282 Conn. 821, 841–42, 925 A.2d 1030, 1044 (2007); *Martin*, 19 Conn. App. at 42.

282. Accordingly, Plaintiff is entitled to presumed and actual damages, punitive damages, and such other relief as the Court deems just and proper.

## COUNT X

### False Light Invasion of Privacy
(Against All Defendants)

283. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

284. The SOM Administration, individually and collectively, gave publicity to matters concerning Plaintiff that placed him before the public—including Yale faculty, administrators, students, and potentially others—in a false light. The false light created by Defendants' statements

implied that Plaintiff had engaged in dishonest conduct, including academic cheating and failure to cooperate with disciplinary authorities.

285. Specifically, as discussed more fully above, the SOM Administration communicated publicly to third parties that Plaintiff "improperly utilized AI on the final exam," "violated the rules of the Sourcing and Managing Funds final exam," and was "not forthcoming" with the Honor Committee, among other communications — each of which falsely implied or directly stated that Plaintiff had committed academic dishonesty. Despite the fact that *there was never a finding against Plaintiff of using AI to cheat on his exam*. The only decisions made by the Honor Committee against Plaintiff were that he was suspended for one (1) year for not being forthcoming, and that he would receive an F in his course for vaguely violating the exam rules.

286. Nevertheless, there have been many publications stating that Plaintiff was actually found to have improperly used AI on his exam, directly echoing the SOM Administration's false characterization of the actual findings and sanctions against him, including in Bloomberg Law, Poets and Quants, and the Yale Daily News. The SOM Administration publicized the false assertions against Plaintiff with knowledge that they were false.

287. In addition, one or more of the Honor Committee members publicly disclosed confidential information regarding the deliberations and proceedings against Plaintiff directly to Plaintiff's classmates, which quickly spread throughout the rest of the school.

288. Dean Tsung even stated in an affidavit publicly filed in this Court in regards to a motion for a temporary restraining order, that Plaintiff was being stripped of his Class Marshal top honors as a direct result of the mere accusations against him of misconduct.

289. The false light in which the SOM Administration placed Plaintiff would be highly offensive to a reasonable person. It implied that Plaintiff's academic achievements were fraudulent

and that he had engaged in dishonest and unethical conduct. See *Goodrich*, 188 Conn. at 131–32; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

290.     The SOM Administration's portrayal of Plaintiff occurred in the context of a disciplinary process in which they failed to provide basic procedural protections, including timely and complete notice of charges, access to evidence, fair opportunity to challenge Honor Committee membership, or decisions based solely on facts presented. See *Yale Sch. of Mgmt. Bull.* at 68–70.

291.     Defendants made or authorized these statements with knowledge of their falsity or with reckless disregard for whether they were false, satisfying the actual malice standard applicable to false light claims. Defendants' reliance on unreliable AI detection tools, fabrication of charges, and failure to follow their own Policies support the finding of malice. See *Time, Inc. v. Hill*, 385 U.S. 374, 387–88 (1967); *Goodrich*, 188 Conn. at 132.

292.     Defendants' acts and omissions caused Plaintiff severe emotional distress, reputational harm, humiliation, and other damages. The publicity surrounding the false accusations of dishonesty harmed Plaintiff's relationships with classmates, faculty, and future professional contacts, and caused lasting emotional and professional injury.

293.     Accordingly, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, as well as such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

> (i)      on the first cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, damages to reputation, and loss of future career prospects;

(ii)     on the second cause of action for breach of an implied covenant of good faith and fair dealing, a judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, damages to reputation, and loss of future career prospects;

(iii)     on the third cause of action for discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iv)     on the fourth cause of action for retaliation for Plaintiff's complaint of discrimination against Defendants based on his national origin, in violation of Title VI of the Civil Rights Act of 1964, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)     on the fifth cause of action for intentional infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vi)     on the sixth cause of action for negligent infliction of emotional distress, judgment awarding Plaintiff damages in an amount to be determined at trial, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vii)     on the seventh cause of action for promissory estoppel, judgment awarding Plaintiff damages in an amount to be determined at trial, including without limitation, compensation for past and future economic losses, loss of educational and career opportunities, loss of future career prospects, damage to reputation, and any other relief the Court deems just and proper; together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(viii) On the eighth cause of action for violation of the Connecticut Unfair Trade Practices Act (CUTPA), judgment awarding Plaintiff actual damages, punitive damages, attorneys' fees, costs, and expenses pursuant to Conn. Gen. Stat. § 42-110g(a)–(d), in amounts to be determined at trial, including without limitation, compensation for past and future economic losses, loss of educational and career opportunities, loss of future career prospects, damage to reputation, and such other relief as this Court deems just and proper;

(ix) On the ninth cause of action for defamation, judgment awarding Plaintiff presumed damages, actual damages, punitive damages, and such other relief as

this Court deems just and proper, including without limitation compensation for past and future economic losses, damage to reputation, loss of educational and career opportunities, loss of future career prospects, emotional distress, attorneys' fees, costs, and expenses;

(x) On the tenth cause of action for false light invasion of privacy, judgment awarding Plaintiff compensatory damages, punitive damages, and such other relief as this Court deems just and proper, including without limitation compensation for past and future economic losses, damage to reputation, loss of educational and career opportunities, loss of future career prospects, emotional distress, attorneys' fees, costs, and expenses; and

(xi) a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the sanction of a grade of "F" and suspension for one year should be reversed; (ii) Plaintiff is immediately reinstated as a student in good standing and permitted to begin classes immediately upon commencement of the next semester; (iii) Plaintiff's reputation is to be restored; (iv) Plaintiff's disciplinary record at Yale is to be expunged; (v) the record of Plaintiff's suspension and grade of "F" is to be removed from his academic record and education file at Yale; (vi) any record of the proceeding regarding the conduct of Plaintiff is to be permanently destroyed; and (vii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: June 19, 2025
      New York, New York

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**

*/s/ Kimberly S. Courtney*
**Kimberly S. Courtney**
**(admitted pro hac vice)**
**Andrew T. Miltenberg**
**(*pro hac vice* admission pending)**
**Stuart Bernstein, Esq.**
**(*admitted pro hac vice*)**
**363 Seventh Avenue, 5th Floor**
**New York, New York 10001**
**212-736-4500 (telephone)**
**kcourtney@nmllplaw.com**
**amiltenberg@nmllplaw.com**
**sbernstein@nmllplaw.com**

**KOFFSKY & FLESEN, LLC**

**_/s/ Audrey Felsen_**
**Audrey A. Felsen, Esq.  (ct20891)**
**1261 Post Road, Suite 202B**
**Fairfield, Connecticut 06824**
**203-327-1500**
**audrey@koffskyfelsen.com**

**_Attorneys for Plaintiffs_**