## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**THIERRY RIGNOL,**

*Plaintiff,*

v.

**YALE UNIVERSITY, YALE UNIVERSITY BOARD OF TRUSTEES, WENDY TSUNG in her individual and official capacity, K. GEERT ROUWENHORST in his individual and official capacity, JACOB THOMAS in his individual and official capacity, SHERILYN SCULLY in her individual and official capacity, JAMES CHOI in his individual and official capacity, and ANJANI JAIN in his individual and official capacity,**

*Defendants.*

Civil Action No. 3:25-cv-00159-SFR

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Thierry Rigno*
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Kimberly S. Courtney, Esq.

363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
sbernstein@nmllplaw.com
amiltenberg@nmllplaw.com
kcourtney@nmllplaw.com

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  FACTUAL BACKGROUND ................................................................... 1

III. THE MOTION TO DISMISS STANDARD ............................................ 3

IV.  ARGUMENTS AGAINST DISMISSAL ................................................ 5

  A. Plaintiff's Claims Do Not Implicate the Gupta Standard Because They Are Disciplinary, Not Academic ................................................................................................. 5

  1. Gupta Is Narrowly Confined to Academic Evaluations ................................ 5

  2. Disciplinary Proceedings Require Procedural Fairness and Are Subject to Judicial Review ................................................................................................................ 6

  3. Plaintiff's Claims Arise From Defendants' Breach of Specific Disciplinary Promises ..... 6

  4. Extending Gupta Here Would Grant Defendants Improper Immunity.............................. 7

  B. Even if *Gupta* Applies, Defendants' Actions Were Arbitrary, Capricious, and in Bad Faith 8

  1. Defendants Arbitrarily Expanded Charges Beyond the Initial Allegation ........................ 8

  2. Defendants Withheld Evidence in Violation of Its Own Rules ......................... 8

  3. Defendants Failed to Provide an Impartial Tribunal......................................... 9

  4. Defendants Imposed Sanctions Inconsistently and With Basis ........................ 9

  5. Defendants' Conduct Demonstrates Bad Faith and Pretext............................. 10

  C. Defendants' Disciplinary Process Violated the Requirement of Fundamental Fairness ..... 11

  1. Courts Consistently Require Fundamental Fairness in University Discipline.................. 12

  2. Defendants' Process Failed the Test of Fundamental Fairness ........................ 12

  3. Defendants' Breaches of Fairness Are Independently Actionable ................... 13

  D. Count I: Breach of Contract ........................................................................ 13

  E. Count II: Breach of Implied Covenant of Good Faith and Fair Dealing ............................ 15

  F. Count III: Title VI Discrimination .............................................................. 16

  1. Selective Scrutiny with Known-Biased AI Tool and Deliberate Indifference ................ 17

  2. Coercive Tactics Exploiting Foreign Status ................................................... 18

  3. Extensive Procedural Irregularities and Pretextual Justifications.................................... 19

  G. Count IV: Title VI Retaliation ................................................................... 19

  H. Count V: Intentional Infliction of Emotional Distress (IIED) ............................................ 25

  I.  Count VI: Negligent Infliction of Emotional Distress (NIED)............................................. 26

  J.  Count VII: Promissory Estoppel.................................................................. 27

  K. Count VIII: Connecticut Unfair Trade Practices Act (CUTPA)......................................... 28

  L.  Count IX: Defamation.................................................................................. 28

M. Count X: False Light Invasion of Privacy .................................................................. 31

    1. Publicity to a Significant Audience Directly Attributable to Yale ................................ 31

    2. False Light and Highly Offensive Portrayal ........................................................... 32

    3. Knowledge of Falsity or Reckless Disregard (Actual Malice) ..................................... 33

N. Claims for Declaratory Relief .............................................................................. 34

O. Dismissal of "Yale University Board of Trustees" ..................................................... 35

III. CONCLUSION ...................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Anderson News, LLC v. Am. Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012)..................................................................................... 4

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................................. 3

*Bass v. Miss Porter's Sch.,*
  738 F. Supp. 2d 307 (D. Conn. 2010)...................................................................... 5

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007).................................................................................................. 3

*Board of Curators of Univ. of Mo. v. Horowitz,*
  435 U.S. 78 (1978).................................................................................................... 6

*Cloud v. Trs. of Bos. Univ.,*
  720 F.2d 721 (1st Cir. 1983)................................................................................... 12

*Coveney v. President & Trs. of the Coll. of the Holy Cross,*
  445 N.E.2d 136 (Mass. 1983) ................................................................................ 10

*Doe v. Brandeis Univ.,*
  177 F. Supp. 3d 561 (D. Mass. 2016) ................................................................ 7, 10

*Doe v. Quinnipiac University,*
  404 F. Supp. 3d 643 (D. Conn. 2019)....................................................... 6, 9, 12, 13

*Doe v. Trs. of Bos. Coll.,*
  942 F.3d 527 (1st Cir. 2019)............................................................................... 7, 12

*Fellheimer v. Middlebury College,*
  869 F. Supp. 238 (D. Vt. 1994) ........................................................................ 10, 11

*Goss v. Lopez,*
  419 U.S. 565 (1975).................................................................................................. 6

*Greenberg v. The Gunnery, Inc.,*
  No. LLI-CV-21-6024306-S, 2022 WL 1019588 (Conn. Super. Ct. Feb. 8, 2022)..................... 7

*Greenhouse v. Yale Univ.,*
  No. 3:05CV1429 (AHN), 2006 WL 473724 (D. Conn. Feb. 28, 2006) ................................ 25

*Gupta v. New Britain General Hospital,*
  239 Conn. 574, 687 A.2d 111 (1996) ............................................................... passim

*Madej v. Yale Univ.,*
  No. 3:20-CV-133 (JCH), 2020 WL 1614230 (D. Conn. Mar. 31, 2020) ................................ 6

*McNeil v. Yale Univ.,*
  436 F. Supp. 3d 489 (D. Conn. 2020)......................................................... 6, 9, 12

*Nash v. Middlebury Coll.,*
  389 A.2d 31 (Vt. 1978) .......................................................................................... 10

*Pacella v. Tufts Univ. Sch. of Dental Med.,*
  66 F. Supp. 2d 234 (D. Mass. 1999) ...................................................................... 11

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,*
   507 F.3d 117 (2d Cir. 2007).................................................................................................... 4

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 1, 3, 4, 16

## I.    PRELIMINARY STATEMENT

Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (ECF 102) should be denied. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the court to accept all well-pleaded facts in the complaint as true. Defendants, however, improperly argue facts and present their own version of disputed events, failing to adhere to this standard. Plaintiff's Second Amended Complaint, far from being "conclusory," provides a comprehensive factual basis that far exceeds the pleading standard for each cause of action.

## II.    FACTUAL BACKGROUND

Plaintiff Thierry Rignol, an accomplished entrepreneur, investor, and French national, was an outstanding Executive MBA student at the Yale School of Management ("SOM") and was on track to graduate first in his class, distinguishing himself through academic excellence, professionalism, and leadership (SAC ¶¶ 1, 2, 18-23). Yale School of Management's EMBA program was ranked 16th in the country in 2024 (SAC ¶ 7). Plaintiff invested approximately $208,500 in tuition for his EMBA program (SAC ¶ 23).

This action seeks redress for the Defendants' ("SOM Administration") "wrongful, discriminatory, and procedurally lawless suspension" of Plaintiff, following a disciplinary process that violated the SOM Administration's own rules, federal law, and basic principles of fairness (SAC ¶ 1). Plaintiff's final exam was the only one, out of over seventy students, singled out for scrutiny using GPTZero (SAC ¶¶ 2, 40, 167, 197). GPTZero is an unreliable AI detection tool that the SOM Administration itself had repudiated as inaccurate, biased, and unfit for academic discipline (SAC ¶¶ 181, 182, 190). GPTZero's known bias against non-native English speakers like Plaintiff amplified this injustice (*Id*.). Despite the SOM Administration's own published

1

policy prohibiting reliance on AI detection tools, Defendants used these flawed reports as their "primary evidence" in his Honor Code proceedings (SAC ¶ 56).

The Honor Committee and its administrators repeatedly violated the SOM Administration's written policies and Plaintiff's contractual rights, failing to provide timely or complete notice of charges, withholding critical evidence—including exculpatory materials—denying Plaintiff the ability to challenge biased Committee members, and introducing fabricated charges without notice or opportunity to respond. Defendants manipulated the process to ensure an outcome that would justify punishing him (SAC ¶ 3). At no point did the SOM Administration make a finding that Plaintiff cheated. (SAC ¶¶ 34, 113, 237, 271, 285). Instead, the SOM Administration invented a new charge—'not being forthcoming'—to impose a one-year suspension and later added a failing grade, in blatant violation of their own procedures (SAC ¶¶ 104, 109, 145, 159, 199, 201, 216, 217, 231, 271, 285). These actions destroyed Plaintiff's academic standing, damaged his reputation, derailed his professional prospects (SAC ¶ 6, 150), and inflicted severe emotional harm Plaintiff seeks to rectify the SOM Administration's bad faith, discriminatory, and retaliatory conduct (SAC ¶ 5, 6).

The SOM Administration's Honor Committee's responsibilities include "protecting the privacy of individuals involved" and making judgments "as promptly as is consistent with the need to establish the facts of the case and to come to judgments based on these facts" (SAC ¶ 30). Summaries of cases that came before the Honor Committee "may be published, but only if they contain anonymized case summaries that avoid revealing or encouraging speculation about identities" (SAC ¶ 38). Students have the right to examine materials "as soon as possible, and ordinarily at least forty-eight hours in advance of the meeting," to ensure they have "ample opportunity to question or refute them" (SAC ¶ 34).

Plaintiff refers the Honorable Court to the additional facts contained in the Second Amended Complaint ("SAC"), and detailed below in support of each legal claim.

## III.    THE MOTION TO DISMISS STANDARD

The Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (ECF 102) should be denied as it fundamentally misapplies the well-established legal standards governing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), is governed by critical principles derived from *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). These foundational Supreme Court decisions instruct that when considering such a motion, the Court *must* accept all facts contained within the complaint as true. Furthermore, the Court must draw all reasonable inferences in favor of the Plaintiff, who is the non-moving party in this proceeding. This standard ensures that the plaintiff's factual assertions are taken as accurate for the purpose of assessing the legal sufficiency of the claim, without engaging in premature fact-finding or weighing the truthfulness of those facts.

The central requirement for a complaint to withstand a Rule 12(b)(6) motion is that it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard does not require "detailed factual allegations," but it demands more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The plaintiff's allegations need only be sufficient "to give the defendant fair notice of

3

what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Crucially, at the motion to dismiss stage, courts in the Second Circuit "will not weigh competing inferences against the facts in the complaint". The judicial inquiry is not whether there exists a "more plausible alternative to the plaintiff's theory," but rather "whether there are sufficient factual allegations to make the plaintiff's claims plausible" (citing *Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012)*). This means that defendants cannot introduce their "spin on what are otherwise alleged 'facts'" or argue alternative explanations to render the plaintiff's claims implausible at this early stage. Such arguments improperly ask the Court to weigh evidence and resolve factual disputes, a task reserved for later stages of litigation.

Furthermore, a court generally limits its consideration on a 12(b)(6) motion to the factual statements directly within the complaint, any documents attached as exhibits, and any documents explicitly incorporated by reference. The Defendants' attempt to introduce new facts or their version of disputed events in their Motion to Dismiss is inappropriate and fails to adhere to this strict standard.

Far from being "conclusory recitations of elements of causes of actions without support from actual, well-pleaded facts," as characterized by the Defendants (Defendant's Memorandum of Law in Support of Motion to Dismiss ("Def. Memo."), p. 41, Plaintiff's Second Amended Complaint provides a comprehensive and detailed factual basis that far exceeds the required pleading standard for each cause of action. The Complaint meticulously lays out a timeline of events, specific actions taken by individual defendants, and direct violations of the SOM Administration's own policies and procedures, establishing a robust factual picture supporting

each claim. When accepting these detailed factual statements as true and drawing all reasonable inferences in Plaintiff's favor, the complaint clearly states plausible claims for relief.

Below Plaintiff demonstrates how the factual statements in the Second Amended Complaint, when accepted as true and with all reasonable inferences drawn in Plaintiff's favor, satisfy the plausibility standard and withstand the Defendants' arguments for dismissal for each of Plaintiffs legal claims.

## IV.    ARGUMENTS AGAINST DISMISSAL

### A. Plaintiff's Claims Do Not Implicate the Gupta Standard Because They Are Disciplinary, Not Academic

The SOM Administration's reliance on *Gupta v. New Britain General Hospital*, 239 Conn. 574, 687 A.2d 111 (1996) in regards to all of Plaintiff's legal claims is misplaced. *Gupta* limits judicial review of academic judgments—such as whether a student has demonstrated sufficient mastery of a subject—but does not shield disciplinary proceedings from judicial scrutiny. Plaintiff's legal claims in the Second Amended Complaint challenge the Defendants' disciplinary procedures, contractual breaches, and misconduct adjudication, *not* academic evaluation.

#### 1. Gupta Is Narrowly Confined to Academic Evaluations

The Connecticut Supreme Court in *Gupta* emphasized that courts lack competence to reassess "academic evaluations of a student's performance," limiting judicial review to whether such decisions were arbitrary, capricious, or made in bad faith. *Id*. at 592. But *Gupta* expressly distinguished these "academic" matters from enforceable contractual promises, holding that universities remain liable where they breach "specific contractual promise[s] distinct from any overall obligation to offer a reasonable program." *Id*. at 593.

Subsequent cases underscore this limitation. See *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 323 (D. Conn. 2010) (applying *Gupta* only to claims of "educational malpractice

challenging the quality and value of the education received"); *Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at *10 (D. Conn. Mar. 31, 2020) (rejecting broad application of *Gupta* where specific disciplinary procedures were alleged).

### 2. Disciplinary Proceedings Require Procedural Fairness and Are Subject to Judicial Review

The U.S. Supreme Court draws a sharp line between academic judgments and disciplinary sanctions. *Board of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978), explained that academic dismissals warrant deference, but disciplinary expulsions are "qualitatively different" and require more robust procedural protections. Similarly, *Goss v. Lopez*, 419 U.S. 565, 574–75 (1975), held that disciplinary suspensions implicate due process because they stigmatize and punish.

Courts in this District recognize the same distinction. In *Doe v. Quinnipiac University.*, 404 F. Supp. 3d 643, 657–58 (D. Conn. 2019), the court held that breach of contract claims arising from misconduct proceedings are cognizable and not barred by *Gupta*. Likewise, in *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 531 (D. Conn. 2020), the court enforced specific contractual promises concerning disciplinary procedures.

### 3. Plaintiff's Claims Arise From Defendants' Breach of Specific Disciplinary Promises

The Second Amended Complaint makes clear that Plaintiff challenges misconduct adjudication, not academic grading. The SOM Administration accused Plaintiff of the actual charge of "improper use of AI" (SAC ¶ 41-42), then added a charge of "not being forthcoming" (SAC ¶ 4), and another charge of "violation of the exam rules" (SAC ¶ 121). The gravamen of Plaintiff's claims is that the SOM Administration's procedures departed from its own Bulletin and contractual commitments:

- **Failure to Provide Timely Evidence:** The SOM Administration promised students access to "all written materials being provided to the Committee … ordinarily at least forty-eight hours in advance" (SAC ¶ 34). Plaintiff was denied timely access to evidence, including screenshots and internal reports (SAC ¶¶ 59, 60, 86, 87, 93, 95, 139).
- **Improper New Charge Without Notice:** Plaintiff was initially accused of "improperly utilized AI" but the Committee expanded charges to include "not being forthcoming," without prior notice or opportunity to respond (SAC ¶¶ 5, 6, 69, 77, 105, 108, 138, 145).
- **Denial of Right to Challenge Biased Committee Members:** The SOM Administration's Bulletin allowed students to object to panelists for prejudice, yet conflicted members remained on the Committee (SAC ¶¶ 32, 79, 80, 81, 82, 140).
- **Inconsistent and Arbitrary Sanctions:** The SOM Administration promised consistency in sanctions by informing the Committee of prior punishments, yet sanctions were arbitrarily escalated in his case (SAC ¶¶ 6, 37, 114, 143).

These facts do not seek for the Court to assess whether Plaintiff's answers on the exam demonstrated academic mastery; they ask the Court to enforce the SOM Administration's specific contractual promises of procedural fairness. That is precisely the type of claim *Gupta* allows. See *Gupta*, 239 Conn. at 593.

### 4. Extending Gupta Here Would Grant Defendants Improper Immunity

The SOM Administration's attempt to cloak disciplinary proceedings under *Gupta* would improperly grant it absolute immunity from judicial review, even where it disregards its own written procedures. Courts have rejected such overbroad applications. See *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) (disciplinary proceedings are contractual and subject to judicial scrutiny); *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019) (recognizing enforceable contract rights in misconduct proceedings). Connecticut courts have likewise refused to extend academic deference to disciplinary decisions, holding that misconduct proceedings are subject to judicial review. See *Greenberg v. The Gunnery, Inc*., No. LLI-CV-21-6024306-S, 2022 WL 1019588, at 5 (Conn. Super. Ct. Feb. 8, 2022).

Plaintiff's claims arise from the SOM Administration's breaches of specific, enforceable promises in its disciplinary process, as pleaded in the Second Amended Complaint (SAC ¶¶ 65–87). They do not implicate *Gupta*'s narrow doctrine of academic deference. Accordingly, Defendants' motion to dismiss on *Gupta* grounds must be denied.

## B.  Even if *Gupta* Applies, Defendants' Actions Were Arbitrary, Capricious, and in Bad Faith

Even if, *arguendo*, this Court were to apply the deferential *Gupta* standard, dismissal is still improper. *Gupta* permits judicial review where the university acts "arbitrarily, capriciously, or in bad faith." *Id*. at 592. Plaintiff's Second Amended Complaint pleads detailed facts showing that Defendants' disciplinary actions were not grounded in academic judgment but in arbitrary and bad-faith departures from its own rules.

### 1. Defendants Arbitrarily Expanded Charges Beyond the Initial Allegation

Plaintiff was initially investigated for alleged "improperly utilized AI" on a take-home exam (SAC ¶ 77). Without notice or opportunity to respond, the SOM Administration expanded the charge to include "not being forthcoming" (SAC ¶¶ 104). This new charge was not presented in the original referral and was never specified as a violation under the SOM Administration's policies. Such shifting allegations—devised mid-process—reflect arbitrariness and bad faith, not reasoned academic judgment.

### 2. Defendants Withheld Evidence in Violation of Its Own Rules

The SOM Administration's Bulletin requires that students "ordinarily" receive *all* materials provided to the Committee "at least forty-eight hours in advance" (SAC ¶ 34). The Bulletin explicitly states that a student charged with an honor code violation has the right:

> "to examine any and all written materials being provided to the committee as soon as possible, and ordinarily at least forty-eight hours in advance of the

meeting, so that the student may have ample opportunity to question or refute them."

> *Id*.; SAC, Ex. A, Yale SOM Bulletin at 68

However, rather than providing Plaintiff with all materials, Defendants Choi, Tsung and Scully, who were members of the Honor Committee *and* part of the "investigative team", selectively chose only five (5) pages out of the over ninety (90) pages of evidence against Plaintiff to produce to him and the rest of the members of the Honor Committee prior to his committee hearing (SAC ¶¶ 86, 93, 95, 139). Any reasonable person would interpret the plain language of the Bulletin – "provided to the committee" to mean each and every member of the Committee.

That excluded evidence was particularly relevant to Plaintiff's proceeding and his own defense because it included exculpatory evidence (SAC ¶ 3, 91, 95). Plaintiff was denied timely access to critical evidence, including reports, and other materials (*Id.*). Withholding evidence contrary to the University's own rules is arbitrary and capricious under any standard. See *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 531 (D. Conn. 2020) (recognizing claims based on university's failure to follow disciplinary procedures).

### 3. Defendants Failed to Provide an Impartial Tribunal

The SOM Administration's Bulletin allows students to challenge committee members for prejudice, with appeal to the Dean if denied (SAC ¶ 32). Plaintiff states in the Second Amended Complaint that conflicted Committee members remained despite his objections (SAC ¶¶ 3, 82, 249, 290). Denying a student an impartial tribunal while maintaining the appearance of bias constitutes bad faith. See *Doe v. Quinnipiac University*, 404 F. Supp. 3d 643, 657–58 (D. Conn. 2019) (upholding claims where student alleged unfair disciplinary process).

#### 4. Defendants Imposed Sanctions Inconsistently and With Basis

The SOM Administration failed to uphold its promises that any sanctions imposed on students will be chosen based on reasoned judgments and consistency with prior outcomes. Sanctions in Plaintiff's case were escalated arbitrarily, with harsher treatment than similarly situated students. Such inconsistency, without legitimate justification, is the essence of arbitrary and capricious decision-making. See *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) (finding unfairness where disciplinary outcomes lacked consistency).

#### 5. Defendants' Conduct Demonstrates Bad Faith and Pretext

The SOM Administration's process was infected by bias and predetermined hostility toward Plaintiff. Courts have made clear that although universities retain broad discretion in disciplinary matters, they are not free to disregard their own published procedures or to impose arbitrary sanctions. In *Fellheimer v. Middlebury College*, the court explained that while Middlebury reserved "a great deal of latitude in the administration of its disciplinary proceedings," it nonetheless was obligated to provide hearings that were fundamentally fair and not arbitrary or capricious. *Fellheimer v. Middlebury College,* 869 F. Supp. 238, 244 (D. Vt. 1994). In that case, the college's failure to notify the student that he faced a separate "disrespect of persons" charge— beyond the sexual assault charge he defended—was a deviation from its handbook requirements that rendered the process "fundamentally unfair." *Id.* at 246–47. See also *Coveney v. President & Trs. of the Coll. of the Holy Cross*, 445 N.E.2d 136, 138 (Mass. 1983) (disciplinary decisions are contractual in nature and must comply with institutional procedures); *Nash v. Middlebury Coll.*, 389 A.2d 31, 34 (Vt. 1978) (college bound to substantially adhere to procedures set forth in student handbook).

The federal district court in Massachusetts recognized that disciplinary processes infected by bad faith, predetermined outcomes, or procedural deficiencies are arbitrary and subject to

judicial review. See *Pacella v. Tufts Univ. Sch. of Dental Med.*, 66 F. Supp. 2d 234, 241–42 (D. Mass. 1999) (allowing claims to proceed where disciplinary action was alleged to be pursued in bad faith and contrary to school policies). These authorities underscore that institutions cannot cloak disciplinary action in vague handbook language or deviate from their own procedures without violating the fundamental fairness owed to students.

Here, Plaintiff's allegations mirror these precedents. The SOM Administration imposed a predetermined outcome—a one-year suspension and an "F"—after conceding that it could not sustain the actual charge of "improperly utilizing AI." Instead, administrators shifted to punishing him for allegedly being "not forthcoming," despite never charging him with that violation, never providing notice, and never affording him a hearing on it. Defendants' reliance on stray emails referencing candor (Def. MOL pp. 6, 26) cannot substitute for formal notice of an independent charge, just as in *Fellheimer* a passing reference to handbook language could not justify imposing a new sanction.

Defendants' further attempt to re-characterize the Committee's decision in this litigation—claiming after the fact that the Committee actually found Plaintiff guilty of cheating via AI (Def. MOL pp. 9–10)—is contradicted by the decision itself and unsupported by evidence. At most, such factual disputes are for a jury to resolve. At the pleading stage, Plaintiff's allegations must be taken as true, and they easily state claims of arbitrary, capricious, and bad-faith conduct. Even under *Gupta*'s deferential standard, the SOM Administration's actions cannot justify dismissal at this stage.

### C. Defendants' Disciplinary Process Violated the Requirement of Fundamental Fairness

Independent of *Gupta*, courts require that private universities conducting disciplinary proceedings provide students with a process that is *fundamentally fair*. This obligation arises both from contractual principles and from the common law.

#### 1. Courts Consistently Require Fundamental Fairness in University Discipline

The District of Connecticut has repeatedly recognized that student disciplinary proceedings must meet the standard of fundamental fairness. In *Doe v. Quinnipiac University*, the court explained that "a plaintiff may bring a contract claim against a university where the disciplinary procedures employed were not fundamentally fair." *Doe v. Quinnipiac University,* 404 F. Supp. 3d 643, 657 (D. Conn. 2019). Similarly, in *McNeil v. Yale University*, the court allowed claims to proceed where the plaintiff plausibly stated facts that "the University's disciplinary procedures were not fundamentally fair." *McNeil v. Yale University*, 436 F. Supp. 3d 489, 531 (D. Conn. 2020).

Persuasive authority is in accord. The First Circuit has long held that courts review disciplinary proceedings under a standard of fundamental fairness. *Cloud v. Trs. of Bos. Univ*., 720 F.2d 721, 724–25 (1st Cir. 1983) (private university discipline must be fundamentally fair); *Doe v. Trs. of Bos. Coll*., 942 F.3d 527, 533 (1st Cir. 2019) (disciplinary process must afford "basic fairness"). These cases reflect the settled principle that, while universities retain discretion in discipline, they must follow their own procedures and ensure a process free of arbitrariness and bias.

#### 2. Defendants' Process Failed the Test of Fundamental Fairness

Plaintiff's factual statements establish multiple ways in which Defendants denied him fundamental fairness:

- **Lack of Notice and Surprise Charges:** Plaintiff only ever charged with "improperly utilized AI" but the Committee proceeded instead to make a decision that Plaintiff was "not being forthcoming" without prior notice or opportunity for him to respond (SAC ¶¶ 1-5, 77, 104).
- **Failure to Provide Evidence:** The SOM Administration promised students access to all evidence at least forty-eight hours in advance, yet Plaintiff was denied timely access to screenshots, reports, and other materials (SAC ¶¶ 34, 59, 60, 86, 87, 93, 95, 139).
- **Biased Tribunal:** Plaintiff was entitled to challenge Committee members for prejudice, but conflicted members remained despite his objections (SAC ¶¶ 32, 82, 249, 290).
- **Arbitrary Sanctions:** The SOM Administration promised consistency in sanctions but imposed punishment on Plaintiff more severe than in comparable cases (SAC ¶¶ 6, 37, 114, 143).

Each of these failures undermines the basic fairness of the process. Denial of notice, access to evidence, impartial adjudicators, and consistent sanctions violates the very core of fundamental fairness.

### 3. Defendants' Breaches of Fairness Are Independently Actionable

Even apart from the breach of specific promises, these unfair practices state a claim under the doctrine of fundamental fairness. As *Quinnipiac* makes clear, courts may review whether a disciplinary proceeding was fundamentally fair, and dismissal is inappropriate where a plaintiff pleads facts showing unfairness. *Quinnipiac,* 404 F. Supp. 3d at 657–58. Plaintiff has more than met that burden here.

Plaintiff's claims arise from disciplinary proceedings, not academic judgments, and therefore fall outside *Gupta*. Even if *Gupta* applied, the SOM Administration's conduct was arbitrary, capricious, and in bad faith. Independently, the SOM Administration's disciplinary process violated the standard of fundamental fairness recognized by courts in this District and elsewhere. For all of these reasons, Defendants' motion to dismiss must be denied.

### D. Count I: Breach of Contract

In regards to Plaintiff's claim for breach of contract, Defendants assert that judicial review is limited to arbitrary or bad faith actions, and that their procedures are merely "customary"

allowing for deviations. As discussed above, that argument is misplaced in this context, because the principle of "educational deference" established in *Gupta* primarily applies to academic judgments, not disciplinary decisions, or situations where the challenge is to the fairness and process employed.

Plaintiff's claims focus on whether Defendants adhered to their own established rules and procedures, a matter courts are competent to review. The "specific contractual promise" requirement in Connecticut law dictates that general fairness language is unenforceable, but explicit, precise provisions are. Here, the Second Amended Complaint identifies explicit Bulletin provisions that the SOM Administration ignored.

The Bulletin's clause stating that "deviations may be taken by the chair when appropriate to a given case" should be construed as an exigent circumstance exception, not a blanket permission for unilateral changes to contract terms or procedures without notice. This is particularly true when the actions were taken by individuals beyond just the Chair, forming part of the "SOM Administration". If this provision allows for unilateral modification of the contract, then the contract itself might be unenforceable as a matter of law, meaning the student would not be bound by its standards, rendering the suspension improper. The procedural notices provided to Plaintiff, such as the September 14, 2024, email, further delineate the promised process, which was subsequently violated. The existence of differing interpretations of the contract language demonstrates a dispute of facts, necessitating the denial of the motion to dismiss.

The Second Amended Complaint contains facts detailing numerous specific breaches of Defendants' contractual obligations under its Honor Code, Bulletin, and Honor Committee Procedures. These include the failure to provide timely and complete disclosure of evidence, failure to notify Plaintiff of Honor Committee members, failure to base disciplinary decisions

14

solely on facts, failure to protect confidentiality, failure to act with consistency, unlawful expansion of charges, threat of deportation, coercion of false confession, improper remand, and retaliation for asserting his rights and pursuing an appeal.

In regards to Defendants' breach of contract for the handling of the charge of "not being forthcoming", Defendants contend that Plaintiff was "repeatedly put on notice" about his lack of candor via Professor Choi's emails threatening "permanent expulsion" for "not being forthcoming" or "failure to cooperate" (Def. Memo., p. 6). Defendants argue that Plaintiff defended this at the hearing (Def. Memo., p. 9). Although such warnings existed (SAC ¶ 69), formal *charges* require specific notice and a dedicated opportunity to defend against *that specific charge*, which did not occur for the "not being forthcoming" charge as a standalone offense that resulted in a suspension (SAC ¶¶ 105, 108, 145). The warnings were about *consequences for non-cooperation*, not a formal charge of "not being forthcoming" as an Honor Code violation itself that would be independently adjudicated with due process. This distinction is key.

The actions above, being disciplinary rather than purely academic, required strict compliance with promised procedures, making judicial review appropriate to ensure Defendants' decisions were not arbitrary, capricious, or made in bad faith.

### E.  Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's implied covenant claim rests on the premise that Defendants implicitly guaranteed honesty, fairness, and adherence to Defendants' Policies and Procedures in any Honor Code investigation, hearing, and appeal. Defendants breached this covenant through acts of bad faith and by frustrating Plaintiff's reasonable expectations under the contract.

The bad faith actions include failure to provide timely and complete evidence disclosure, denying Plaintiff access to critical and exculpatory evidence, allowing Committee members with conflicts of interest to participate, fabricating charges without proper referral (specifically "not

being forthcoming"), depriving Plaintiff of notice and a fair opportunity to respond, misusing discretion by failing to base decisions solely on facts presented at the hearing (instead relying on speculation and unsupported accusations), failure to protect confidentiality of Plaintiff's proceedings, imposing excessive, arbitrary, and inconsistent penalties, engaging in coercion and threats to force a false confession, improperly retaliating by imposing penalties inconsistent with prior assurances (such as a grade penalty), delaying and withholding evidence, improperly remanding Plaintiff's disciplinary matter, and singling out Plaintiff for AI scanning without cause. These actions reflect an abuse of discretion, evasion of the contract's spirit, and a deliberate frustration of Plaintiff's justified expectations.

### F.  Count III: Title VI Discrimination

Defendants' "Alternate Explanations" are disputed factual issues not ripe for dismissal, and their actions demonstrate deliberate indifference. The Defendants' argument that courts "may consider whether more likely or alternate explanations for the alleged conduct exist" to deem Plaintiff's Title VI claims "implausible" fundamentally misconstrues the Rule 12(b)(6) standard.

At this stage, the Court must accept all well-pleaded factual statements as true and draw all reasonable inferences in Plaintiff's favor; it does not weigh competing inferences or determine if a "more plausible alternative" exists. Instead, the inquiry is whether the Plaintiff's claims are plausible based on the facts stated in the Complaint. Plaintiff's Second Amended Complaint presents detailed factual statements that, when accepted as true, create a plausible inference of intentional discrimination based on national origin, including through Defendants' deliberate indifference, thereby rendering their "alternate explanations" disputed factual issues unsuitable for resolution on a motion to dismiss.

Crucially, the coercive tactics employed by the SOM Administration during disciplinary proceedings powerfully support an inference of intentional discrimination. During a pivotal

meeting on July 24, 2024, Dean Sherilyn Scully explicitly threatened Plaintiff with deportation, stating that his F1 visa could be revoked and he could be deported as a result of the investigation (SAC ¶ 64, 146). Plaintiff, a French national on an E2 investor visa, immediately corrected her (SAC ¶ 64). Plaintiff's own research subsequently confirmed that Dean Scully's statements regarding visa revocation and deportation were incorrect. This incident is characteristic of "confession" meetings specifically targeting international students and exploiting the fear of deportation, which unequivocally made Plaintiff's 'foreignness front of mind' and constitutes a demeaning and discriminatory act designed to coerce a false confession.

Defendants' attempts to dismiss this critical factual allegation by characterizing it as mere 'characterization' or a benign 'discussion of potential consequences' improperly disregard the motion to dismiss standard, which mandates that all well-pleaded factual statements be accepted as true and all reasonable inferences drawn in Plaintiff's favor, without engaging in premature fact-finding or weighing the truthfulness of those factual statements. The explicit invocation of deportation, a severe consequence directly tied to Plaintiff's foreign status, demonstrates deliberate indifference and discriminatory intent, reinforcing that this conduct was not accidental but calculated to exploit his national origin for a predetermined outcome.

The SAC details a pattern of conduct that, viewed holistically, makes a claim of Title VI discrimination more than plausible, directly challenging any non-discriminatory "alternative explanation" offered by Defendants:

### 1. Selective Scrutiny with Known-Biased AI Tool and Deliberate Indifference

Plaintiff, a French national and non-native English speaker, was the "only one, out of over seventy students, singled out for scrutiny using GPTZero". This kind of unreliable AI detection tool was one Yale itself had "repudiated as inaccurate, biased, and unfit for academic discipline". Crucially, Yale's own policy (and independent research) acknowledged that AI detection tools

"unfairly target non-native English speakers". The initial suspicions, such as "near perfect punctuation and grammar and elaborate formatting," directly correlate with Plaintiff's non-native English background and exceptional academic performance, not necessarily cheating.

The GPTZero reports used as "primary evidence" against Plaintiff also explicitly contained disclaimers warning against their use for student punishment. Defendants' reliance on this known-biased tool despite awareness of its flaws demonstrates discriminatory intent or deliberate indifference. Title VI intentional discrimination can be established where a defendant acts with deliberate indifference to known or obvious risks that its conduct will result in unlawful discrimination. Here, Defendants knew or were deliberately indifferent to the fact that using GPTZero created a foreseeable and substantial risk of discrimination against non-native English speakers. Yale's own policies explicitly acknowledged that AI detection tools are unreliable and unsuitable for academic integrity determinations, particularly given their propensity to misidentify formal, structured writing—a common trait among non-native English speakers—as AI-generated.

The Administration was aware of widespread academic literature, internal discussions, and public warnings regarding these tools' biases and inaccuracies. Despite this knowledge, Defendants selectively applied GPTZero only to Plaintiff's exam, out of more than seventy students, without providing any neutral justification or procedural safeguards to contest its use or reliability. This selective enforcement and the use of a tool known to unfairly target individuals based on traits correlated with national origin, without adequate safeguards, constitutes deliberate indifference to discriminatory impact.

### 2. Coercive Tactics Exploiting Foreign Status

During a meeting, Dean Scully escalated the pressure by invoking the fear of deportation, stating Plaintiff's F1 visa could be revoked if he did not confess. Plaintiff states that these "confession" meetings are "common practice at Yale," specifically "targeting international

students and exploiting the fear of deportation". These statements directly link Plaintiff's "foreignness" to the disciplinary process, indicating discriminatory animus and a deliberate exploitation of his national origin status. Plaintiff's refusal to falsely confess under these intimidating circumstances is interpreted as an objection to discriminatory pressure, constituting protected activity.

### 3. Extensive Procedural Irregularities and Pretextual Justifications

The disciplinary process was rife with stated violations that undermine any claim of neutral, non-discriminatory action. These include, but are not limited to:

- **Withholding Evidence:** As detailed above, Plaintiff was repeatedly denied timely access to materials, including exculpatory evidence such as a GPTZero report showing a 96% probability of human authorship for one flagged question, and over ninety pages of other materials.
- **Fabrication of Uncharged Offense:** As detailed above, the Honor Committee fabricated a charge of "not being forthcoming" without notice, an opportunity to respond, disclosure of evidence, or a hearing on that specific charge, solely to impose punishment after failing to substantiate the original AI use charge.
- **Improper Expansion of Investigation & Retaliatory Penalties:** As detailed above, the investigation was expanded to include an unrelated exam (Investor course) and a new, uncharged offense ("violation of the examination rules") without proper notice or due process. This led to a grade of "F" in the Sourcing and Managing Funds course, contradicting prior assurances that there would be no grade penalty. These procedural anomalies, selectively deployed tools, and coercive threats tied to Plaintiff's national origin permit an inference of intentional discrimination.

These detailed allegations, when accepted as true at the motion to dismiss stage, illustrate a pattern of arbitrary, capricious, and bad faith conduct, including deliberate indifference, that undermines the Defendants' alternative explanation of non-discriminatory disciplinary action and supports a plausible inference of Title VI discrimination.

### G. Count IV: Title VI Retaliation

Plaintiff's Second Amended Complaint states that Defendants retaliated against Plaintiff for complaining of national origin discrimination during the Honor Code investigation and proceedings, which is prohibited under Title VI. Plaintiff engaged in protected activity by

19

objecting to being singled out for AI detection scrutiny based on his national origin and non-native English speaker status. These concerns were raised directly to decision-makers, including Dean Scully, Dean Tsung, and Chairman Choi, demonstrating actual knowledge of his complaints.

Following Plaintiff's protected activity, the SOM Administration engaged in a pattern of escalating adverse actions, demonstrating a clear causal connection and retaliatory animus. These actions include introducing a new, uncharged accusation of "not being forthcoming" without notice or opportunity to respond, expanding the investigation beyond its original scope to unrelated coursework, imposing duplicative and excessive penalties without following required procedural safeguards or consistent prior practice, subjecting Plaintiff to coercive tactics, and failing to provide documents and exculpatory evidence.

The close temporal proximity between Plaintiff's complaints and these adverse actions, combined with procedural anomalies, inconsistent penalties, and coercive tactics, further demonstrates retaliatory intent. Plaintiff engaged in protected activity prior to and during key stages of the disciplinary process by complaining to Dean Scully, Dean Tsung, and Chairman Choi. Defendants argue that Plaintiff's protected activity for his Title VI retaliation claim is limited to an email sent on November 3, 2024, to Dean Tsung and Professor Choi (Def. Memo., p. 24). They contend that most of the retaliatory acts occurred before this date, thereby lacking temporal proximity and failing to establish a causal connection for retaliation claims (Def. Memo., p. 24-25).

However, the Second Amended Complaint contains specific factual statements that demonstrate Plaintiff raised concerns about being unfairly targeted due to his national origin and non-native English speaker status much earlier than November 3, 2024. These earlier events directly contradict the Defendants' restrictive interpretation of the protected activity's timing and

significantly bolster the argument for temporal proximity concerning retaliatory acts that transpired prior to the November 3rd email.

Firstly, the initial scrutiny of Plaintiff's final exam, beginning on June 11, 2024, directly implicated his non-native English speaker status and formed the foundational discriminatory context. Plaintiff's exam was "unfairly singled out for additional scrutiny" on this date (SAC ¶ 40, 41). Professor Rouwenhorst's referral letter to the Honor Committee highlighted observations about Plaintiff's writing style, specifically noting "near perfect punctuation and grammar and elaborate formatting" and his "distinctive writing style as a non-native English speaker" (SAC ¶ 41-42). The Plaintiff maintains that these observations, rather than indicating impropriety, actually reflected his "exceptional performance" and unique writing style as a non-native English speaker (SAC ¶ 41-42).

Furthermore, the SAC explicitly states that AI detection tools like GPTZero, which were employed against the Plaintiff, are known to unfairly target non-native English speakers and writers such as Plaintiff (SAC ¶ 48-56). Defendants' own policy even acknowledges the inherent unreliability and potential bias of these tools (SAC ¶ 48). While the initial flagging of his exam constituted the discriminatory *action* that initiated the investigation, the Second Amended Complaint frames this event as the underlying basis for Plaintiff's subsequent "objection... to being singled out for AI detection scrutiny on the basis of his national origin and non-native English speaker status," which the Plaintiff defines as protected activity (SAC ¶ 197). The direct connection between his national origin/writing style and this initial discriminatory scrutiny was established from the very beginning of the investigation (SAC ¶ 41-46). This established a clear discriminatory context that permeated all subsequent interactions and actions taken against him.

Secondly, a pivotal event occurred on July 24, 2024, during a meeting between Plaintiff and Deans Tsung and Scully to discuss the Honor Code charge (SAC ¶ 63-64). In this meeting, Dean Scully "escalated the pressure by invoking the fear of deportation," suggesting that Plaintiff's F1 visa could be revoked and he could face deportation as a consequence of the investigation (*Id.*). Plaintiff, a French national holding an E2 investor visa, immediately corrected her regarding his actual visa status (SAC ¶¶ 7, 64). The Second Amended Complaint characterizes these "confession" meetings as a tactic specifically designed for "targeting international students and exploiting the fear of deportation" (SAC ¶ 67). Dean Scully's comment made his 'foreignness front of mind' and constitutes a coercive, demeaning act, further demonstrating discriminatory intent. This interaction, which took place months before November 3, 2024, unequivocally linked Plaintiff's "foreign status"—an integral aspect of his national origin—to coercive disciplinary tactics (*Id.*). Plaintiff's refusal to succumb to pressure and falsely confess under these deeply intimidating circumstances can unequivocally be interpreted as an objection to discriminatory pressure, thereby constituting protected activity well before the Defendants' proposed date.

Thirdly, the *expansion* of the investigation by Chairman Choi on August 16, 2024, beyond the scope of the examination in question, serves as another significant instance of retaliation occurring prior to the Defendants' proposed date. On this date, Chairman Choi informed the Plaintiff that he had "expanded [his] investigation into [Plaintiff's] case to deliverables [Plaintiff] submitted for other courses" (SAC ¶ 73). This expansion specifically included a request for files related to Plaintiff's Investor final exam (SAC ¶ 89). Plaintiff expressly states that this expansion was "improper... and appeared to be retaliatory, aimed at pressuring Plaintiff for refusing to falsely confess to cheating" (SAC ¶ 73).

This action, occurring substantially before November 3, 2024, is presented within the broader context of Defendants' pattern of procedural irregularities, selective targeting, and reliance on flawed AI evidence—combined with coercive tactics that exploited Plaintiff's foreign status (including threats of deportation)—support an inference of intentional discrimination in violation of Title VI. The expansion of the investigation, particularly after Plaintiff's steadfast refusal to falsely confess despite earlier pressure tactics explicitly tied to his foreign status, can reasonably be construed as an adverse action taken in direct response to Plaintiff's earlier resistance and implicit objections to discriminatory pressure. The Second Amended Complaint explicitly lists this expansion as one of the "escalating adverse actions" that followed Plaintiff's protected activity (SAC ¶ 202).

Furthermore, Chairman James Choi's actions extend beyond mere expansion of the investigation and contribute significantly to the pattern of coercion and retaliation. Plaintiff's refusal to comply with the threats constituted protected activity, and in response to this refusal, Chairman Choi expanded his investigation to other courses, directly aligning with the Second Amended Complaint's assertion that this expansion was improper and appeared to be retaliatory and an escalating adverse action (SAC ¶¶ 73, 145, 202). Additionally, Chairman Choi withheld over ninety (90) pages of exculpatory and other evidence despite direct requests. (SAC ¶¶ 94- 95). This suppression of evidence, while not explicitly dated in the SAC, constitutes a significant procedural impropriety and an adverse action that further hindered the Plaintiff's ability to defend himself, demonstrating continued prejudicial conduct in violation of fair process.

The actions of Dean Anjani Jain also highlight further policy violations and adverse actions. Dean Jain improperly directed the Honor Committee to 'continue deliberating' on a new, uncharged allegation of 'violation of the examination rules' after Plaintiff appealed (SAC ¶¶ 116,

132). This directive is presented as a violation of the SOM Administration's policies and ultimately led to an "F" grade for the Plaintiff, which contradicted "prior assurances". This demonstrates a continuation of adverse actions, not only against Defendants' own stated policies but also in direct contradiction to prior assurances, contributing to the pattern of escalating punitive measures and procedural irregularities described in the Second Amended Complaint.

Moreover, the discrepancy regarding the Plaintiff's grade further solidifies the argument for policy violations and a pattern of detrimental actions. Dean Wendy Tsung had stated multiple times, including in writing, that Plaintiff's grade would not be impacted by disciplinary proceedings (SAC ¶¶ 110, 119). This aligns with the Second Amended Complaint's description of initial assurances given to the Plaintiff during the process (*Id*.). However, this assurance was later contradicted by the imposition of an 'F' grade (SAC ¶¶ 131, 133). This inconsistency represents a significant breach of trust and a direct financial and academic detriment to the Plaintiff, adding another layer to the pattern of adverse actions taken against him throughout the disciplinary process.

In summary, these detailed factual statements collectively demonstrate that the Plaintiff's protected activity, understood as his objections to being unfairly targeted based on his national origin and non-native English speaker status, commenced with the initial discriminatory scrutiny of his exam. This protected activity was overtly implicated and acted upon as early as July 24, 2024, through the direct exploitation of his foreign status via threats of deportation and coercive "confession" meetings. His continued refusal to confess, coupled with Chairman Choi's subsequent expansion of the investigation on August 16, 2024, his withholding of exculpatory evidence, Dean Jain's improper directives leading to an "F" grade, and Dean Tsung's contradicted assurances regarding the grade, all illustrate a clear timeline of adverse actions that followed, and

were arguably in response to, his protected activity, long before the November 3, 2024, email. These combined actions, including coercion, withholding of evidence, and policy violations, paint a picture of a systematic effort to penalize the Plaintiff in response to his resistance and objections.

### H. Count V: Intentional Infliction of Emotional Distress (IIED)

Plaintiff's Second Amended Complaint states that the SOM Administration's conduct was extreme and outrageous, intended to inflict severe emotional distress or knowing it was the likely result. The SOM Administration's actions went far beyond mere procedural irregularities. Including fabricating the "not being forthcoming" charge, and exploiting foreign national status. Dean Scully's statements suggesting Plaintiff could be deported were "extreme and outrageous," "inherently demeaning," and "calculated to coerce, humiliate, and terrify". This conduct is particularly egregious in the context of an "august deliberative body" like the Honor Committee, distinguishing it from cases where a less formal context might negate outrageousness.

Defendants' reliance on *Greenhouse v. Yale Univ.*, No. 3:05CV1429 (AHN), 2006 WL 473724 (D. Conn. Feb. 28, 2006) to assert that the stated conduct was not "outrageous" is fundamentally misguided and, in fact, underscores Plaintiff's argument. In *Greenhouse*, the court found that simulated masturbation in a drama class, while offensive, was not "outrageous" given the context of an acting exercise among drama students. By stark contrast, the Yale School of Management Honor Committee is a venerable and "august deliberative body", entrusted with the solemn responsibility of upholding academic integrity and adjudicating serious disciplinary matters.

Within this solemn and formal context, actions such as threatening a student with deportation, fabricating a charge of "not being forthcoming" without due process, coercing a false confession, and demeaning or belittling an accused student are not merely inappropriate but rise to the level of "extreme and outrageous" behavior. The deliberate exploitation of Plaintiff's foreign

national status and the manipulation of disciplinary procedures in such an institutional setting would "arouse his resentment against the actor" and lead to an exclamation of "outrageous!" from an average member of the community. Whether the Defendants' conduct, when "viewed in the context in which it occurred", was extreme and outrageous is a disputed factual issue. At the motion to dismiss stage, the Court must accept Plaintiff's well-pleaded facts that these actions were "extreme, outrageous, and calculated to inflict emotional distress" as true, and draw all reasonable inferences in Plaintiff's favor, without engaging in premature fact-finding or weighing the truthfulness of these allegations.

The SOM Administration's actions were "extreme, outrageous, and calculated to inflict emotional distress". Defendants either intended to inflict emotional distress or knew, or should have known, that it was a likely result of their conduct, especially given Plaintiff's status as a top student and foreign national. The forced separation from his cohort, uncertainty about his academic future, imposition of duplicative and excessive penalties, and the stigma of wrongful accusations inflicted severe and lasting emotional harm. Plaintiff's distress was foreseeable and severe enough to result in illness or bodily harm.

## I.  Count VI: Negligent Infliction of Emotional Distress (NIED)

Plaintiff states in his Second Amended Complaint that the SOM Administration owed him a duty as a matriculated student to conduct disciplinary proceedings with fairness, consistency, and adherence to established Policies and Procedures, and not to subject him to arbitrary or recklessly harmful conduct that foreseeably risked causing severe emotional distress. Defendants breached this duty, creating an unreasonable and foreseeable risk of severe emotional distress. The breaches of duty that created this unreasonable risk include the procedural failures, the improper reliance on biased AI detection tools, the fabrication of charges, the withholding of evidence, threats and coercion, and the improper expansion of the investigation.

Such conduct foreseeably created an unreasonable risk of severe emotional distress. A reasonable person subjected to wrongful accusations, immigration threats, and a fundamentally flawed disciplinary process would suffer severe emotional distress. The distress Plaintiff suffered flowed directly from Defendants' negligent acts and omissions, and was severe enough to result in illness or bodily harm.

### J.  Count VII: Promissory Estoppel

Plaintiff's Second Amended Complaint states that the SOM Administration made clear and unambiguous promises in its official publications, written policies, and communications, upon which he reasonably and foreseeably relied to his significant detriment, necessitating enforcement to avoid injustice. The clear and unambiguous promises include a policy against the use of AI detection tools, procedural fairness, adherence to specific procedures, and exigent circumstances required for changes to procedures (rather than the universal right to change contract terms or procedures without notice).

Plaintiff reasonably and foreseeably relied upon these promises when he applied to, enrolled in, and paid substantial tuition and fees for Yale's EMBA program. His reliance was to his significant detriment, as the SOM Administration directly contradicted its promises by using unreliable GPTZero to accuse him of dishonesty and by failing to provide the promised procedural fairness (e.g., timely notice, evidence access, unbiased committee members, proper handling of new charges, fact-based decisions). As a result, Plaintiff lost his standing as the top student in his class, will graduate with a subsequent class, and suffered damage to his reputation, career prospects, and emotional well-being. It would be unjust and inequitable to permit Defendants to avoid liability for the harm caused by their failure to honor the promises on which Plaintiff reasonably relied.

27

### K. Count VIII: Connecticut Unfair Trade Practices Act (CUTPA)

Plaintiff states that Defendants engaged in unfair and deceptive acts or practices in the course of "trade or commerce" (provision of educational services), causing him ascertainable loss. CUTPA claims are viable in educational settings when they implicate the financial aspects or deceptive practices. The unfair and deceptive acts include misrepresentations regarding Defendants' non-use of biased AI detection tools, false promises of procedural fairness, integrity, and adherence to stated policies and procedures in disciplinary matters, promises to produce exculpatory evidence, promises not to introduce new charges without notice and opportunity to defend, promises not to impose penalties without following the SOM Administration's published policies or providing fair process, and promises not to coerce Plaintiff to falsely confess to misconduct under threat of false consequences.

These acts offended public policy, were immoral, unethical, oppressive, and unscrupulous, causing substantial injury to Plaintiff, thus satisfying the test for unfair practices under CUTPA. Plaintiff reasonably relied upon Defendants' representations about the fairness and integrity of its disciplinary process and its promises not to use unreliable AI detection tools when he enrolled and paid substantial tuition and fees. As a direct result, Plaintiff suffered actual damages, including loss of academic standing, delayed graduation, reputational harm, emotional distress, and significant financial losses.

### L. Count IX: Defamation

Plaintiff's Second Amended Complaint plausibly states a strong claim for defamation, as Defendants made and published false and defamatory statements about Plaintiff to third parties, both orally and in writing, implying academic dishonesty, despite the absence of an actual finding that he improperly used AI to cheat on his exam. The Defendants' assertions that their statements are true, privileged, or lack specificity are inappropriate at the motion to dismiss stage, as they

involve disputed factual issues that must be resolved through discovery and trial. Crucially, the direct disclosure of confidential information by Honor Committee members (SAC ¶ 273), directly attributable to Yale, forms a strong basis for a defamation claim.

The Second Amended Complaint specifically states that "one or more of the Honor Committee members publicly disclosed confidential information regarding the deliberations and proceedings against Plaintiff directly to Plaintiff's classmates, which quickly spread throughout the rest of the school". This action directly contravenes Yale's own stated policies mandating the protection of individuals' privacy and the anonymization of case summaries to prevent speculation about identities. Such disclosures, especially when emanating from members of the body tasked with upholding integrity, carry a strong implication of wrongdoing and directly injure Plaintiff's reputation within his academic and professional community. While Defendants attempt to dismiss this by asserting a lack of specificity, the statement that "one or more" Committee members made such disclosures to "classmates" is sufficiently specific to give Defendants fair notice of the claim and its grounds, particularly at the pleading stage. Further details regarding the identity of the Committee member(s) and the precise scope of dissemination will be fully disclosed during discovery.

Moreover, the SOM Administration, acting individually and collectively, communicated publicly that Plaintiff "improperly utilized AI on the final exam," and "violated the rules of the Sourcing and Managing Funds final exam," when in fact, there was never a finding against Plaintiff specifically for "improperly using AI to cheat on his exam". The Honor Committee's initial decision merely found Plaintiff liable for "not being forthcoming" and later, without proper notice or due process, imposed an "F" grade for vaguely "violating the exam rules". The Defendants' attempt to equate "violating the rules of the Sourcing and Managing Funds final exam" with

"improperly utilizing AI" is a factual dispute that mischaracterizes the actual findings and is inappropriate for resolution at the motion to dismiss stage. At this juncture, the Court must accept Plaintiff's well-pleaded fact that no finding of AI cheating was made (which is evidence from the record of those proceedings), rendering the Defendants' public statements to that effect false and defamatory.

These false and defamatory statements, directly attributable to the SOM Administration, were "echoed" in prominent secondary publications such as Bloomberg Law, Poets & Quants, and the Yale Daily News, further amplifying the harm to Plaintiff's reputation. While Defendants argue that they are not responsible for media publications, the complaint states that the SOM Administration "publicized the false assertions against Plaintiff with knowledge that they were false," establishing a plausible link between Defendants' actions and the broader dissemination of defamatory information, constituting publication to a "public at large". Whether the extent of this publication is sufficient to meet the "public at large" standard for defamation, as opposed to a "small, private community" as argued by Defendants, is a factual dispute that cannot be resolved on a motion to dismiss.

Furthermore, Dean Wendy Tsung's public affidavit, filed in this Court in response to a motion for a temporary restraining order, stated that Plaintiff was being stripped of his Class Marshal top honors as a direct result of mere accusations of misconduct. While statements made in judicial proceedings may be subject to litigation privilege, this affidavit serves as compelling evidence of the SOM Administration's intent and the false narrative it propagated regarding Plaintiff's alleged misconduct and its consequences. This supports an inference of malice and bad faith in the broader context of the defamation claim, even if the affidavit itself is not a standalone defaming act.

The statements falsely accusing Plaintiff of academic dishonesty and lack of candor, particularly given his status as a top student and professional, constitute defamation per se as they impute dishonesty in his profession and education. Defendants' actions were undertaken with negligence and, in some cases, actual malice, demonstrating a reckless disregard for the falsity of the publicized matter. Any assertion of qualified privilege fails because Defendants failed to adhere to proper procedures, acted in bad faith, and lacked a legitimate academic purpose for publishing false charges of misconduct. The Defendants' conduct was not only a departure from Yale's policies but also a calculated effort to harm Plaintiff's reputation, causing severe emotional distress and significant economic damages. For these reasons, Plaintiff has met the pleading standard for defamation, and Defendants' motion to dismiss must be denied.

### M. Count X: False Light Invasion of Privacy

Plaintiff's Second Amended Complaint plausibly states a claim for false light invasion of privacy, stating that Defendants gave publicity to matters concerning Plaintiff that placed him before the public in a false light, which would be highly offensive to a reasonable person, and that Defendants acted with knowledge of or reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed. Unlike defamation, which primarily focuses on injury to reputation, false light centers on the subjective emotional distress and offense caused by a public portrayal that is inaccurate or misleading, even if individual statements are not, in isolation, provably false. This claim draws on the same core facts as the defamation claim but emphasizes the unique elements of public portrayal and inherent offensiveness.

#### 1. Publicity to a Significant Audience Directly Attributable to Yale

Defendants placed Plaintiff in a false light through multiple, interconnected acts of publicity that originated from and were perpetuated by Yale and its representatives.

31

- The Second Amended Complaint specifically states that "one or more of the Honor Committee members publicly disclosed confidential information regarding the deliberations and proceedings against Plaintiff directly to Plaintiff's classmates, which quickly spread throughout the rest of the school" (SAC ¶ 273). This direct and deliberate disclosure by individuals acting under the aegis of the Honor Committee, itself a Yale body, immediately introduced a false and damaging perception within Plaintiff's crucial academic and professional sphere. This community, particularly in an EMBA program, represents a significant portion of Plaintiff's professional network whose perceptions directly influence his career and future prospects. Such disclosures directly contravene Yale's own stated policies mandating the protection of individuals' privacy and the anonymization of case summaries to prevent speculation about identities.
- Beyond these direct disclosures, the SOM Administration, acting individually and collectively, communicated publicly that Plaintiff "improperly utilized AI on the final exam" and "violated the rules of the Sourcing and Managing Funds final exam". These communications further propagated the false narrative, given that there was never an actual finding against Plaintiff specifically for "improperly using AI to cheat on his exam" (SAC ¶¶ 104, 125, 128, 165, 271, 272).
- These false assertions were then "echoed" in prominent secondary publications such as Bloomberg Law, Poets & Quants, and the Yale Daily News, further amplifying the harm to Plaintiff's image (SAC ¶ 272).While Defendants argue that they are not responsible for media publications (Def. MOL, p. 35), the complaint states that the SOM Administration "publicized the false assertions against Plaintiff with knowledge that they were false," establishing a plausible link between Defendants' actions and the broader dissemination of the false light (SAC ¶ 284).

Collectively, these actions placed Plaintiff before an audience sufficiently broad—extending from his immediate academic and professional network to the wider public through media reports—satisfying the "publicity" element, or at minimum, raising a factual dispute precluding dismissal. The argument that this audience constitutes merely a "small, private community" ignores the professional and interconnected nature of an EMBA program and the subsequent, attributable wider media coverage that flowed from Yale's initial public statements.

### 2. False Light and Highly Offensive Portrayal

Defendants placed Plaintiff in a false light by portraying him as academically dishonest—specifically, as having improperly used AI to cheat on an exam and as "not being forthcoming" with the Honor Committee. This portrayal was false and misleading. The Honor Committee's only formal decisions were for "not being forthcoming" and vaguely "violating the exam rules," never

a specific finding of "improperly using AI to cheat on his exam" (SAC ¶¶ 104, 125, 165). The implication that Plaintiff engaged in academic fraud and lacked integrity, particularly for a student on track to be Valedictorian and an accomplished professional, is profoundly damaging.

Such a portrayal would be "highly offensive to a reasonable person". It directly impugns Plaintiff's core professional and academic integrity, implying that his achievements were fraudulent and that he is unethical. For a student in a prestigious EMBA program, such accusations carry severe stigma, undermining his standing among peers, faculty, and future professional contacts, making this portrayal deeply injurious to his personal and professional identity. This offensive portrayal occurred within a disciplinary process where Defendants demonstrably failed to provide basic procedural protections, further exacerbating the offensiveness.

### 3. Knowledge of Falsity or Reckless Disregard (Actual Malice)

Plaintiff has plausibly stated that Defendants acted with knowledge of the falsity of the publicized matter or with reckless disregard for it. This is evidenced by:

- Defendants' reliance on GPTZero, an unreliable AI detection tool that Yale itself had repudiated as unfit for academic discipline and known to be biased against non-native English speakers like Plaintiff (SAC ¶¶ 4, 47, 54, 55, 175). This demonstrates a reckless disregard for the accuracy of the accusations from the outset of the investigation.
- The fabrication of the "not being forthcoming" charge without proper notice or opportunity to defend, after failing to substantiate the original AI cheating allegation (SAC ¶¶ 6, 105, 107, 108, 138, 145, 159, 217).
- The numerous procedural irregularities, including failure to provide timely notice and access to exculpatory evidence, as well as the improper change of charges. (SAC ¶ 86, 92-95, 115-116, 125, 126, 139, 145). These repeated departures from their own policies demonstrate a reckless indifference to the truth and fairness of the process, which directly led to the false portrayal.
- While Dean Tsung's public affidavit filed in this Court (stating Plaintiff was stripped of honors due to mere accusations) may be subject to litigation privilege for the purpose of a direct defamation claim, it serves as compelling evidence of the SOM Administration's knowledge of the narrative being propagated and its intent or reckless disregard in creating and maintaining that false light (SAC ¶ 274). It directly illustrates that the administration was actively shaping a public perception based on unproven allegations, thereby supporting the inference of actual malice in the broader false light claim.

These allegations collectively demonstrate sufficient grounds to infer actual malice at the pleading stage, especially given the continuous pattern of actions taken by the SOM Administration. Plaintiff has met the pleading standard for false light invasion of privacy, and Defendants' motion to dismiss must be denied.

### N.  Claims for Declaratory Relief

Plaintiff seeks a declaratory judgment to reverse the sanction of an "F" grade and one-year suspension, reinstate him as a student in good standing, permit immediate return to classes, restore his reputation, expunge his disciplinary record, remove the suspension/F from his academic record, and permanently destroy records of the proceeding.

Defendants' arguments against declaratory relief are unconvincing (Def. Memo, p. 39-40). Plaintiff is not "second-guessing" academic decisions, as Defendants contend. Plaintiff is asking the Court to remedy arbitrary, capricious, or bad faith actions and breaches of specific contractual promises. The "not being forthcoming" charge, in particular, is a disciplinary matter, not an academic one, and thus squarely within the court's purview.

Plaintiff asserts legal rights to the requested remedies as a result of the breaches of contract, federal law violations, and tortious conduct. The remedies sought, such as expungement of internal records, are appropriate to undo the harm caused by Defendants' wrongful actions. While the suspension period may conclude, the "F" grade and disciplinary record will persist, causing ongoing harm to Plaintiff's academic standing, reputation, and professional prospects. The requested relief aims to address these continuing harms. And while it is accurate that public court records cannot be destroyed, the SOM Administration's internal records can be expunged or destroyed as a remedy for the misconduct, which will significantly impact Plaintiff's future. Given

the public nature of the facts at hand, such a remedy is warranted to genuinely restore Plaintiff's standing and reputation within the Yale community and beyond.

### O.  Dismissal of "Yale University Board of Trustees"

Plaintiff opposes the dismissal of "Yale University Board of Trustees." The Second Amended Complaint defines the "SOM Administration" as collectively referring to the named individual defendants and states that the "SOM Administration" breached the contract. The actions of these individual defendants, acting in their official capacities as part of the SOM Administration, constitute the breaches of contract and the implied covenant of good faith and fair dealing. While Defendants may argue the Board is not a legal entity, the complaint explicitly names it as a defendant alongside Yale University. The substantive factual statements in the Second Amended Complaint against the collective "SOM Administration" are intended to encompass the actions of those in governance.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

Motion to Dismiss.


Dated: August 27, 2025                                  Respectfully submitted,
New York, New York

                                                       **NESENOFF & MILTENBERG, LLP**

                                                       */s/ Andrew Miltenberg*
                                                       **Andrew T. Miltenberg, Esq.**
                                                       **(admitted pro hac vice)**
                                                       **Kimberly S. Courtney, Esq.**
                                                       **(admitted pro hac vice)**
                                                       **Stuart Bernstein, Esq.**
                                                       **(admitted pro hac vice)**
                                                       **363 Seventh Avenue, 5th Floor**
                                                       **New York, New York 10001**
                                                       **212-736-4500 (telephone)**
                                                       **kcourtney@nmllplaw.com**
                                                       **sbernstein@nmllplaw.com**
                                                       **amiltenberg@nmllplaw.com**

                                                       **Audrey A. Felsen, Esq.**
                                                       **Koffsky & Felsen, LLC**
                                                       **1261 Post Road, Suite 202B**
                                                       **Fairfield, CT 06824**
                                                       **(203) 327-1500**
                                                       **Federal Bar No.: ct20891**
                                                       **audrey@koffskyfelsen.com**

                                                       *Attorneys for Plaintiffs*