**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| THIERRY RIGNOL, | : | CASE NO. 3:25-cv-00159-SFR |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, ET AL., | : | |
|     Defendants. | : | JULY 15, 2026 |
| | : | |

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 12, Defendants respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Third Amended Complaint (ECF 124).  The Court should grant Defendants' Motion.

### I.     PRELIMINARY STATEMENT

Plaintiff's Third Amended Complaint does not add any meaningful facts to avoid dismissal of this entire civil action.  Plaintiff added a new but baseless claim, and further exaggerated the alleged "facts" that the Court is already aware of and reflected on during the argument on Plaintiff's Motion for a Preliminary Injunction.  Plaintiff's primary claim, for breach of contract, is subject to the extremely high standard in *Gupta v. New Britain General Hospital*, 239 Conn. 574, 687 A.2d 111 (1996).  Plaintiff must prove that the actions at issue were arbitrary or that a specific contractual provision was breached.  *Id.*  Plaintiff can do neither.  The  decisions at issue were fully rational.  The University followed the provisions in the alleged contract, the School of Management's Bulletin (the "Bulletin"). And even if there were alleged deviations, the Bulletin expressly permitted deviations.

Plaintiff has not plead any plausible facts supporting his claims of national origin discrimination or retaliation under Title VI.  Nor has he come close to pleading facts meeting the

extraordinarily high standard for intentional infliction of emotional distress. Plaintiff's negligent infliction of emotional distress claim is precluded by *Gupta*. Plaintiff's defamation claim is based on alleged statements that are privileged and that Plaintiff's own Complaint establishes are true or at least substantially true. Plaintiff's CUTPA claim is barred by well-established precedent prohibiting CUTPA claims over academic matters. Plaintiff's new claim, based on a "political speech" theory, is barred by *Gupta* and other caselaw and is not plausible. That claim is undercut by Plaintiff's own allegations. The Court should dismiss all of Plaintiff's claims with prejudice.

## II.    THE ALLEGED WELL-PLEADED FACTS

Plaintiff asserts that he is an accomplished professional who has been educated in the United States since at least high school and obtained dual degrees from Rice University before his admission to Yale's Executive Master of Business Administration Program ("EMBA" or the "Program") in September 2023. (*E.g.*, ECF 124 ("Cmplt.") ¶¶ 29, 34, 36.)

In June 2024, a teaching assistant grading a final exam suspected that Plaintiff cheated by using artificial intelligence ("AI"). (*E.g.*, Cmplt. ¶ 94.) The teaching assistant brought the suspicion to the two professors teaching the course. (*E.g.*, Cmplt. ¶ 94.) Plaintiff admits that the professors' suspicions were based on multiple indications, including "substantial overlap" between "[a]t least one" of Plaintiff's answers and "answers to [similar] simple prompts on ChatGPT"; the "near perfect punctuation and grammar and elaborate formatting" in Plaintiff's exam, despite a four-hour limit; Plaintiff's "relatively poor[]" performance "on [a] question[] where AI tools were the least helpful"; and the finding of the AI detection software, ChatGPTZero, that there was a high likelihood that Plaintiff used AI. (*E.g.*, Cmplt. ¶ 94.) Plaintiff thus admits that there was ample basis for the professors' suspicions that he cheated. Plaintiff also admits he was not accused of using AI on every exam question. (Cmplt. ¶ 94.) To the contrary, the allegation was that

2

"[s]ome answers" suggested potential AI use while others did not.  (Cmplt. ¶ 94. ("[Plaintiff] performed relatively poorly on question 5, where AI tools were the least helpful.").)

Plaintiff admits that he was unaware of these suspicions until later.  (Cmplt. ¶ 92.)

The professors referred the matter to the Honor Committee (the "Committee") (*E.g.*, Cmplt. ¶ 93), which "considers instances of academic infractions and other serious violations" of policy.  (**Exhibit A** ("Bulletin") at 67.[1])  The Committee "collect[s] facts pertaining to such infractions and violations, mak[es] judgments about them, and determin[es] punishment where appropriate."  (Bulletin at 67; *see also* Bulletin at 67 ("The [C]ommittee will collect the facts relevant to each complaint under consideration and make judgments on whether an infraction or violation has been committed and on its seriousness to the community.  Based on these judgments, the [C]ommittee will choose a punishment that it deems appropriate to the offense.").) The Committee consists of at least eleven (11) individuals:  "[F]our faculty members (one of whom [is the] [C]hair), six [School of Management] students . . . , and the [D]ean of [S]tudents (who [] act[s] as secretary to the [C]ommittee and shall be nonvoting)."  (Bulletin at 67; Cmplt. ¶ 49.)

The Bulletin provides that "the [] steps" for a typical [] Committee process "*are customary*" but that "*deviations may be taken* by the [C]hair when appropriate."  (Bulletin at 67 (emphasis added).)  The process generally begins with the Chair "request[ing] a written statement [from the student] and copies of any other relevant materials pertinent to the complaint."  (Bulletin at 68.)

---

[1] The Court may consider the Bulletin because it is integral to and incorporated in Plaintiff's Complaint. Plaintiff extensively cites the Bulletin (*e.g.*, Cmplt. ¶ 42) and the Bulletin is the basis for Plaintiff's breach of contract claim. *E.g.*, *Gabriel v. Albany Coll. of Pharmacy & Health Scis. - Vermont Campus*, No. 2:12-CV-14, 2012 WL 4718678, at *7 n.5 (D. Vt. Oct. 3, 2012) (explaining that an Honor Code was integral to an Amended Complaint filed by a disciplined student because the Honor Code's "terms form[ed] the basis of [plaintiff's] breach of contract claim"). The Court can also consider many of the documents Defendants submitted in their Opposition to Plaintiff's Motion for a Preliminary Injunction (ECF 41) because those documents are integral to Plaintiff's claims and/or the Court can take judicial notice of them.  For example, Plaintiff's final exam and the evidence against Plaintiff are integral to Plaintiff's claims that he did not cheat.  The video of Plaintiff speaking perfect English is the subject of judicial notice and relevant to Plaintiff's claims regarding a purported language barrier.

"Based on th[o]se materials, the [C]hair [typically] will decide whether the offense, if the charge is true, would be of sufficient seriousness to warrant the attention of the [C]ommittee." (Bulletin at 68.)  If the Chair "deem[s] [the complaint] sufficiently serious, the [C]hair or the [C]hair's designee [typically] inform[s] the student[.]" (Bulletin at 68.)  The student is also generally advised "to review the Committee Policies and Procedures" to apprise them of their rights, which ordinarily include the opportunity "to examine any and all written materials being provided to the [C]ommittee as soon as possible, and ordinarily at least forty-eight hours in advance of the meeting" the student has with the Committee.  (Bulletin at 68.)  While members of the Committee are generally "invited to excuse themselves from the case if there is a conflict of interest," there is no requirement that they do so.  (Bulletin at 69.)  A student is typically given the opportunity to "object" to the inclusion of a Committee member on the basis that the member "is prejudiced." (Bulletin at 70.)  If the student objects, the Chair ordinarily decides "whether the member should be recused" and the student can usually appeal a "decision of the [C]hair not to recuse the challenged member" "to the cognizant academic dean," whose decision is final.  (Bulletin at 70.) There is thus no obligation to recuse Committee members—the Bulletin gives the University discretion to decide whether recusal is appropriate.  The Committee then generally meets with the student to discuss the case.  (Bulletin at 68.)  The Committee decides the case and may impose sanctions, including expulsion, "[s]uspension of one or more terms [and] [a] mandatory F in [the] course," or "other sanctions of intermediate severity."  (Bulletin at 68–69.)

A student may appeal an adverse decision to the Faculty Review Board.  (Bulletin at 70.) "The cognizant academic dean will [generally] offer any student against whom an infraction or violation is found the opportunity to meet with the cognizant academic dean . . . to raise any objections to the proceedings on the grounds of procedural irregularity or prejudice.  (Bulletin at

70.)  "If objection is raised, the [] dean will investigate the objection and may remand the matter to the [C]ommittee to correct [any] procedural irregularity . . . ."  (Bulletin at 70.)  An "appeal . . . can result in a sanction more severe than the one originally imposed."  (Bulletin at 70.)

Plaintiff admits he was repeatedly informed of the allegations against him prior to the Chair referring the matter to the Committee.  Plaintiff alleges that his professors "informed [him] that his final exam paper was 'flagged' for possible use of Artificial Intelligence ('AI') technology in completing [his] exam," which if true would be a "violation of the exam rules and the Yale Honor Code."  (*E.g.*, Cmplt. ¶ 111.)  Plaintiff also admits that he discussed the allegations against him with Deans Wendy Tsung and Sherilyn Scully on July 24, 2024.  (Cmplt. ¶ 116.)

The Chair of the Committee, Professor James Choi, attempted to obtain the file Plaintiff used to create his final exam, which could have shed light on whether Plaintiff used AI tools.  (*E.g.*, Cmplt. ¶ 122; **Exhibit B**.[2])  On August 10, 2024, for example, Professor Choi emailed Plaintiff: "Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced [the] PDF file you submitted for the exam.  I am now asking you directly."  (Exhibit B; *see also, e.g.*, Cmplt. ¶ 122 (selectively quoting that email).)  And on August 16, 2024, Professor Choi email Plaintiff stating:  "I am asking you to send us the Word file from which the PDF was produced."  (Exhibit B; *see also, e.g.*, Cmplt. ¶ 125 (selectively quoting that email).)

Professor Choi repeatedly put Plaintiff on notice in those emails that Plaintiff's refusal to produce the requested document would likely be viewed by the Committee as demonstrating a lack of candor/not being forthcoming and would likely lead to severe sanctions.  Professor Choi wrote:

---

[2] Plaintiff makes it appear as though Professor Choi did not request documents from Plaintiff until Plaintiff's meeting with the Committee on November 8, 2024.  (*See* Cmplt. ¶ 122.)  Plaintiff does that by selectively quoting emails he exchanged with Professor Choi in August 2024.  The entire emails are integral to Plaintiff's claims and incorporated into Plaintiff's Complaint in light of Plaintiff's reliance on portions of what Professor Choi wrote.  (*E.g.*, Cmplt. ¶¶ 122, 125.)  Plaintiff cannot selectively quote Professor Choi out of context to support his claims while precluding review of the full emails.  Indeed, as discussed below, Professor Choi's emails are integral to the decision that Plaintiff was not forthcoming and are thus integral to Plaintiff's challenge to that decision.  (*See, e.g.*, *infra*.)

> Through Dean Wendy Tsung, I have twice asked you to send us the Microsoft Word file that produced [the] PDF file you submitted for the exam.  I am now asking you directly.
>
> *I remind you that when a student has been found by the Honor Committee to have lied to or not been forthcoming with the Committee, the most common punishment is permanent expulsion from Yale.*

(Exhibit B (August 10, 2024 Email) (emphasis added).)

> I am asking you to send us the Word file from which the PDF was produced.  You seem to be weighing whether you will cooperate or not.  It's your choice, but if history is a guide, *failure to cooperate would be viewed by the Honor committee as an extraordinary violation of the Honor Code.*

(Exhibit B (August 16, 2024 Email) (emphasis added).)

Plaintiff admits he did not produce the files until after his meeting with the Committee on November 8, 2024, approximately three months after Professor Choi's emails.  (Cmplt. ¶ 166.)

Professor Choi "'expanded [his] investigation into [Plaintiff's] case to deliverables [Plaintiff] submitted for other courses.'"  (Cmplt. ¶ 126.)  The Bulletin allowed this because it authorized Professor Choi to collect "any [] relevant materials pertinent to the complaint." (Bulletin at 68.)  Plaintiff's submissions in other courses were relevant because, among other reasons, they might have shown a pattern of AI use.  Professor Choi asked Plaintiff to submit the file he had used to create an exam submission in another course (Investor).  (Exhibit B.)  Plaintiff was aware that Professor Choi's expansion concerned Plaintiff's final examination in another course.  (*E.g.*, Cmplt. ¶ 126; Exhibit B (Professor Choi requesting file for that exam).)

On September 8, 2024, the Committee provided Plaintiff with an "official notification letter" specifying that he was accused of a violation by "'improperly utiliz[ing] AI on the final exam in [his] course.'"[3] (Cmplt. ¶ 130; **Exhibit C**.)  As that letter and various other integral

---

[3] Plaintiff's allegations about purported subsequent policy changes permitting the use of AI do not change the fact that, as Plaintiff admits, AI was not permitted in the manner and at the time he was accused of using it.

documents make clear, the allegation was that Plaintiff violated examination rules by using AI. (*E.g.*, Exhibit C.)  Plaintiff admits that that letter also notified him of his rights by, for example, referring him to "'[a] list of the student [] Committee members and faculty members,'" which Dean Tsung noted would "'be updated very soon once the new [C]ommittee members have been selected.'" (Cmplt. ¶ 132; *see also* Exhibit C.[4])  The Committee provided Plaintiff with a link and told him to check it when it was updated for recusals.  (Exhibit C.)  Regardless, Plaintiff did in fact seek the recusal of all of the Committee members and Professor Choi subsequently re-sent Plaintiff the link to the Committee members and told Plaintiff he could "request that a member be recused" and that Professor Choi would determine whether to grant any recusal request.  (**Exhibit D**.[5])

On October 14, 2024, the Committee produced to Plaintiff documents related to the case. (Cmplt. ¶ 139; Exhibit C.)  Plaintiff admits that occurred well before his meeting with the Committee, which had previously been rescheduled for November 8, 2024.  (Cmplt. ¶ 161.)

Plaintiff claims that the documents produced to him were incomplete because supposedly there were six ChatGPTZero scans but only five scans were produced.  (Cmplt. ¶ 151.)  However, the supposed sixth scan had no impact on Plaintiff because he "ran [the question at issue] through [Chat]GPTZero himself" and received the scan result he was purportedly missing.  (Cmplt. ¶ 158.) Plaintiff also claims that "Defendants withheld over ninety (90) pages of written materials and evidence, including exculpatory evidence."  (Cmplt. ¶ 160.)  Plaintiff does not describe those documents, other than to assert in conclusory fashion that they were "exculpatory."  As Plaintiff

---

[4] Dean Tsung's email is integral to and incorporated in Plaintiff's Complaint in light of the claims Plaintiff makes based on that email and the fact that he selectively quotes from it.  (*See, e.g.*, Cmplt. ¶ 132.)  The email shows that Plaintiff was directed to review the Bulletin to ensure that he was apprised of his rights.  (*See* Exhibit C; *see also* Memorandum And Order on Plaintiff's Motion for a TRO/PI (ECF 89) at 8 (noting as much).)

[5] Plaintiff's emails seeking recusals are integral to Plaintiff's claims in light of Plaintiff's assertion that he "was stripped of his right to challenge the members of the [C]ommittee."  (Cmplt. ¶ 135.)  It is incredulous for Plaintiff to allege he was unable to challenge Committee members when he did exactly that.

7

concedes, these documents were produced in discovery in this case in conjunction with Plaintiff's Motion for a Preliminary Injunction.  (*E.g.*, Cmplt. ¶ 157.)  The Committee did not have these documents.  (*See, e.g.*, Cmplt. ¶ 139 (admitting that Complainant received the documents the Committee had), ¶ 142; Exhibit C (establishing the Committee documents were sent to Plaintiff).)  Plaintiff was not entitled to these documents because the Committee did not have them.  The Bulletin provides that only documents provided to the Committee are produced to the student (Bulletin at 68.)  Regardless, these documents provide additional evidence of Plaintiff's AI use.  (**Exhibit E** (many 100% chance of AI use scans, a 99% chance of AI use scan, two 92% chance of AI use scans, an 87% chance of AI use scan).[6])  A small number of documents showed a low likelihood of AI use *on certain responses*, but these documents were not exculpatory because Plaintiff was not accused of using AI to write every word on his exam.  (*E.g.*, Cmplt. ¶ 94.)

Plaintiff met with the Committee on November 8, 2024.  (Cmplt. ¶ 161.)  He was well aware of the allegations against him and that one issue before the Committee was whether he had been forthcoming.  (*E.g.*, Cmplt. ¶¶ 122, 130; Exhibit B (August 16, 2024 email stating:  "[F]ailure to cooperate would be viewed by the Honor committee as an extraordinary violation of the Honor Code.").)  Plaintiff defended himself, including by assailing the reliability of AI detection tools and disputing the allegation that he had not been forthcoming, but Plaintiff did not argue that he was targeted because of his "political speech" and does not allege that he was.  (*E.g.*, Cmplt. ¶ 162, ¶ 164 ("Plaintiff asserted his innocence to charges of AI use.").)  During the Committee meeting, Professor Choi again "asked Plaintiff for the underlying 'Microsoft Word' files used to produce the PDF files." (Cmplt. ¶ 164.)  For the first time, Plaintiff disclosed "that he did not use Microsoft Word" to create his exam submission but instead he used a different word processing program,

---

[6] These documents are integral to Plaintiff's claims, including his claim that they were exculpatory.

Apple Pages. (Cmplt. ¶ 98.) In other words, Plaintiff's defense for failing to produce the requested files was that he did not have to respond to Professor Choi for weeks; he had no obligation of candor to correct Professor Choi that he used Apple Pages; and he did not have to produce the files because the Committee asked for a "Microsoft Word" file but he used "Apple Pages."

Despite repeated requests for the "file that produced [the] PDF file [Plaintiff] submitted for [his] exam," dating back to at least August, Plaintiff did not produce that file until after the Committee meeting on November 8, 2024. (*E.g.*, Cmplt. ¶ 122; Exhibit B.)

The Committee asked that Plaintiff return to it with his personal laptop. (Cmplt. ¶ 169.) Nothing prohibited the Committee from asking Plaintiff to return (Bulletin), and the Committee's request was well-founded: Plaintiff admits he disclosed significant information (the Pages documents) to the Committee after the meeting and the Committee wanted to examine his laptop. (Cmplt. ¶¶ 164, 169.) Plaintiff claimed he was unable to return. (Cmplt. ¶ 169.)

The Committee concluded that Plaintiff had not been forthcoming and suspended him for one year. (Cmplt. ¶¶ 148, 171.) Plaintiff had been on notice that his candor was at issue. (*E.g.*, Cmplt. ¶ 122; Exhibit B.) There was more than ample basis for the Committee's decision: The Committee repeatedly asked Plaintiff to provide the "file that produced [the] PDF file [Plaintiff] submitted for [his] exam." Professor Choi warned Plaintiff that the failure to do so "would be viewed by the Honor committee as an extraordinary violation of the Honor Code." Plaintiff ignored repeated warnings and chose not to provide the files until after his meeting with the Committee. (*E.g.*, Exhibit B; Cmplt. ¶ 122.)

Plaintiff appealed the Committee's decision. (Cmplt. ¶ 181.) Plaintiff argued, among other things, that "a determination [that a student has not been forthcoming] is not a basis for punishment on its own without a finding of a violation of the Honor Code" (*i.e.*, the Committee had to find

9

him responsible for cheating before it could find him not forthcoming).  (Cmplt. ¶ 181.)  The Faculty Review Board denied Plaintiff's appeal but Dean Anjani Jain remanded the case to the Committee for it to "'continue deliberating'" on the allegation that Plaintiff cheated by using AI ("violat[ed] [] the examination rules" (**Exhibit F**)).[7]  (Cmplt. ¶¶ 183, 184.)

The Committee concluded that Plaintiff had cheated (*i.e.*, that he violated exam rules by using AI).[8]  (Cmplt. ¶ 193.)  That was not a new charge:  The charge all along had been that Plaintiff had violated exam rules by using AI.  (Exhibit B; Exhibit C; Cmplt. ¶ 130.)  Ample evidence supported the Committee's conclusion.  Among other things, Plaintiff's professors found "substantial overlap" between "a[t] least one [of Plaintiff's] answer[s]" and "answers to simple prompts on ChatGPT;" Plaintiff's exam was very lengthy and contained "near perfect punctuation and grammar and elaborate formatting" (even when compared to the other high achieving students in Plaintiff's class) that caused the professors to "question[]" "whether" it was possible to complete the exam without improper assistance in the four-hour time limit; and Plaintiff "performed relatively poorly" on a question "where AI tools were the least helpful."  (Cmplt. ¶ 94.)

The Committee gave Plaintiff an "F" in the course for cheating.  (Cmplt. ¶ 196.)  The Bulletin expressly provided for the imposition of an "F" and a one-year suspension.  (Bulletin at 69 (permitting, *inter alia*, a "[s]uspension of one or more terms + mandatory F in course").)

Plaintiff appealed the imposition of the "F."  (Cmplt. ¶ 199.)  The Faculty Review Board denied Plaintiff's appeal.  (Cmplt. ¶ 201.)  Plaintiff then filed this action.

---

[7] Dean Jain's letters that are integral to Plaintiff's claims of procedural error and Plaintiff selectively quotes from Dean Jain's letters.  (*E.g.*, Cmplt. ¶ 184.)  (*See* Exhibit F.)

[8] The Committee cleared Plaintiff of using AI on the other final examination under review (the Investor final).  (Cmplt. ¶ 121.)  Plaintiff was aware his conduct on the Investor final was under review.  (Cmplt. ¶ 89; Exhibit B.)

### III.    BRIEF PROCEDURAL HISTORY

Plaintiff sought a preliminary injunction at the outset of this case.  (ECF 16.)  The Court held oral argument on Plaintiff's request.  (ECF 82.)  The Court made several important observations regarding Plaintiff's original claims during that oral argument.

First, the Court acknowledged that in order to prevail on his  State law claims, Plaintiff must establish that Defendants acted "arbitrarily, capriciously[,] or in bad faith" or that they "fail[ed] to fulfill [a] specific contractual promise distinct from any overall obligation to offer a reasonable program."  (ECF 82 15:13–22 (referencing *Gupta*); 26:7–9 ("I have to find that it was arbitrary and capricious and supported by essentially no rational basis.").)

Second, the Court noted serious problems with Plaintiff's claims even putting aside the extremely high standard that governs them.  For example, the Court said:

> I think the challenge of the contract claim is the fact that the contract or the Bulletin itself talks about deviations from the provisions being permissible.  So it is not stated in a sort of be-all end-all mandatory no exception way.  So I do think that's a challenge for your contract claim. . . .
>
> [T]he Bulletin which sets for[th] the process for Honor Code [procedures] says although deviations may be taken by the Chair when appropriate in a case, the following steps are customary.  It is th[e] overall view that this is what we do in most cases but deviations may be taken.  So it does present a challenge for you that I should enforce a contract claim and issue an injunction on that basis.

ECF 82 34:5–21; *see also, e.g.*, ECF 82 30:6–11 ("This is a contract claim and I have the contract in front of me and the contract says that deviations can be taken . . . .").

The Court also expressed doubt that Plaintiff could satisfy *Gupta*.  For example:

- Regarding the continued deliberations that led to Plaintiff's "F", the Court said:  "Wouldn't a logical response be, okay, I guess we'll have to make [a decision on the underlying charge because Plaintiff claims he can't be punished for not being forthcoming absent such a decision] if you are right on that, we can't have one without the other, I guess we'll have to make a charge determination."  (ECF 82 32:14–17.)

11

- Regarding Plaintiff's claim that he lacked notice of and an opportunity to defend himself regarding not being forthcoming, the Court said: "Didn't he have an opportunity at the hearing? Wasn't he on notice that that was a concern of the [C]ommittee?" (Oral Argument Transcript 38:22–24.) It also said: "So all of that [*i.e.*, the requests for the file] preceded along with the warning about not being forthcoming is a problem. *I'm wondering how when he gets to the hearing, he's not on notice that there's a concern he hasn't been forthcoming.*" (ECF 82 40:3–6 (emphasis added).)

- Regarding Plaintiff's claim that he couldn't be found responsible for not being forthcoming, the Court said: "Wouldn't a reasonable professional person who was trying to be cooperative with a proceeding upon getting not just one email but many emails asking for the underlying document that was used to create a PDF say oh, I didn't use Word. I used Pages, a different word processing [program]? (ECF 82 41:8–13.)

## IV.   LEGAL STANDARD AND RELEVANT LAW

"Any claim that fails 'to state a claim upon which relief can be granted' will be dismissed." *Raymond v. Manchester Police Dep't*, No. 3:24-CV-1098 (VAB), 2024 WL 5010489, at *2 (D. Conn. Dec. 6, 2024) (quoting Fed. R. Civ. P. 12(b)(6)) (granting motion to dismiss). Motions to dismiss are subject to the well-known *Iqbal* plausibility standard. (*See, e.g.*, ECF 106-1 at 11.) "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## V.   ARGUMENT

### A.  Plaintiff's Breach Of Contract Claim Fails

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Bradley v. Yovino*, 218 Conn. App. 1, 23, 291 A.3d 133, 149 (2023) (quotation marks omitted).

The Court has correctly observed that in order to succeed on his breach-of-contract claim, Plaintiff must establish Defendants acted "arbitrarily, capriciously[,] or in bad faith" or that they "fail[ed] to fulfill [a] specific contractual promise distinct from any overall obligation to offer a reasonable program." (ECF 82 (referencing *Gupta*, 239 Conn. at 574) at 15:13–22, 26:7–9 ("I have to find that it was arbitrary and capricious and supported by essentially no rational basis.").) Indeed, this academic dishonesty case fundamentally revolves around a university's conclusion that a student cheated and was not forthcoming in its efforts to address misconduct. This case thus implicates the core principles of non-interference that underlie *Gupta* and its progeny, including the deference courts give to academic institutions to address academic matters. *See, e.g.*, *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2022 WL 2656787 at *6 (D. Conn. July 8, 2022) ("Connecticut courts seek to "limit judicial intrusion into educational decision making" by requiring student plaintiffs to establish "nonperformance of a special promise . . . .") (quoting *Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 230 (D. Conn. 2010)); *see also, e.g.*, *Lotto v. Hamden Bd. of Educ.*, No. CV-05-4010436, 2006 WL 618361, at *4 (Conn. Super. Ct. Feb. 21, 2006) (granting motion to strike claim challenging expulsion for possession of alcohol). "In addition, strict compliance [with purported procedural and contractual provisions] on the part of the institution is not necessary; instead, its obligation is one requiring substantial compliance," and "a technical breach of the terms of a contract is excused." *Wesleyan*, 2022 WL 2656787 at *6.

"A 'specific contractual promise' must be narrow enough that a factfinder could determine whether it has been violated." *Madej v. Yale Univ., No. 3:20-CV-133 (JCH)*, 2020 WL 1614230, at *10 (D. Conn. Mar. 31, 2020). "Not all of a College's statements constitute a 'specific contractual promise.'" *Id.* An alleged promise to a student that she would receive "many credits" for her prior studies is *not* a specific contractual promise. *Faigel v. Fairfield University*, 75 Conn.

App. 37, 41, 815 A.2d 140, 143 (2003); *see also, e.g.*, *Bass ex rel. Bass*, 738 F. Supp. 2d at 325 (concluding that the "implied promise Plaintiff alleges Porter's to have made is '*too imprecise* to qualify for consideration as a "specific contractual promise."'" (emphasis added) (quoting *Faigel*, 75 Conn. App. at 43)); *Hope Acad. v. Friel*, No. CV030081183S, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004) ("To qualify as a 'specific contractual promise,' the promise or promises relied on must be precise and grounded on specific contractual terms or provisions." (citing *Faigel*, 75 Conn. App. at 42)). Thus, in *McNeil v. Yale University*, the Court dismissed a breach of contract claim, holding that "general language" in "Yale's Equal Opportunity Statement, Undergraduate Regulations, and Sexual Misconduct Policies cannot result in specific contractual promises" because construing general statements as sufficient under *Gupta* "would involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." 436 F. Supp. 3d 489, 531 (D. Conn. 2020) (quotation marks omitted), *aff'd in part, vacated in part on other grounds sub nom. in McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639-CV, 2021 WL 5286647 (2d Cir. Nov. 15, 2021).[9]

### 1. Plaintiff's Claim Fails Because The Bulletin Allows For Deviations

Plaintiff cannot establish a breach because the Bulletin provides that the "steps" in the Committee Process "are customary" and "deviations may be taken by the [C]hair when appropriate to a given case."[10] (Bulletin at 67.) There can be no breach—much less a breach of a specific

---

[9] Federal law, including Supreme Court precedent, also instructs that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). "[A] student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [the university's] disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by [a] Court." *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 331 (D.R.I. 2016).

[10] This Court previously noted as much. (ECF 82 30:6–11 ("This is a contract claim and I have the contract in front of me and the contract says that deviations can be taken by the Chair where appropriate in the given case and the following steps are customary."); *see also, e.g.*, ECF 82 34:5–21.)

14

provision—when the purported contract says that the University can deviate from the process summarized and that that process is merely customary.[11]   This is particularly true here, where Plaintiff has not plausibly alleged he was materially prejudiced due to a purported deviation.

### 2. Plaintiff's Claim Is Largely Based On Generic, Inactionable Language

Generalized, aspirational language cannot support claims—claims must instead be based on specific language.  *E.g.*, *McNeil*, 436 F. Supp. 3d at 531 (holding that language was too generalized); *Gupta*, 239 Conn. at 593.  Plaintiff largely bases his claim on generic statements that cannot support a claim.  For example, Plaintiff alleges that the University breached a purported contract by allegedly "fail[ing] to act promptly," citing a purported provision requiring the Committee to "act 'as promptly as is consistent with the need to establish the facts of the case'" (Cmplt. ¶ 144.)  Plaintiff cannot base a claim on an assertion that the University did not act "as promptly as is consistent with the need[s]" of the case because any such alleged promise is insufficiently specific and "would 'involve the judiciary in the awkward tasks of defining what constitutes" the needs of a student discipline matter in contravention of *Gupta*'s prohibition on Courts second-guessing decisions by educational institutions.  *McNeil*, 436 F. Supp. 3d at 531 (quoting *Gupta*, 239 Conn. at 591).  Similarly, Plaintiff cannot base his claims on a provision that the University protect confidentiality "'so far as possible'" or otherwise assert claims based on an alleged promise to provide "fair and impartial [] proceedings."  (Cmplt. ¶ 208, ¶ 213.)  Plaintiff's new "political speech" theory is not based on any contractual provision but rather on aspirational

---

[11] *See Michel v. Yale Univ.*, 547 F. Supp. 3d 179, 190 (D. Conn. 2021) (dismissing claim because "decision to suspend in-person education in light of [] COVID-19 [] represent[ed] an exercise of authority expressly reserved to the University, and the exercise of that authority cannot constitute a breach" and provision regarding refunds "expressly commit[ted] the decision of whether to issue a refund to the University's discretion"); *Gabriel v. Albany Coll. of Pharmacy & Health Scis. - Vermont Campus*, No. 2:12-CV-14, 2012 WL 4718678, at *7 (D. Vt. Oct. 3, 2012) (dismissing discipline claim because of, *e.g.*, "'[d]eviation' provision" in Honor Code); *Moffett v. Kimberly-Clark Corp.*, No. 3:97CV1390(WWE), 1998 WL 698760 (D. Conn. Aug. 6, 1998) (dismissing claim based on Handbook's "permissive phrases" because phrases "demonstrate that such a determination is left to the defendant's discretion").

language. For example, he cites to language about freedom to "engage in activism and advocacy on current issues" and "the fullest degree of intellectual freedom." But these are not contractual promises. These are aspirational statements similar to the atmospheric statements the Court refused to deem contractual in *McNeil*, 436 F. Supp. 3d at 531 ("The general language relied on by Plaintiffs from Yale's Equal Opportunity Statement, Undergraduate Regulations and Sexual Misconduct Policies cannot result in specific contractual promises. Indeed, Plaintiffs' breach of contract claim, requiring the enforcement of an alleged promise to, *inter alia*, 'eradicate sexual misconduct at the University,' would 'involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached.'" (quoting Yale's policies and *Gupta*, 239 Conn. at 591)). Generalized, aspirational language cannot form the basis of a breach of contract claim and Plaintiff's claim fails.

Plaintiff's "political speech" theory fails independent of *Gupta* because the aspirational statements he cites have been held to be too generic to be contractual even putting *Gupta* aside. In *Lee v. Yale University*, 624 F. Supp. 3d 120, 136 (D. Conn. 2022), *aff'd*, No. 22-2634, 2023 WL 4072948 (2d Cir. June 20, 2023), the Court dismissed breach of contract and implied covenant claims after holding that the University's "stated commitment to academic freedom" as reflected in various policy documents, including the Woodward Report, "are simply too vague to create a contractual commitment." The Second Circuit affirmed, agreeing that the statements "relie[d] on as the genesis for th[e] alleged contract" including the Woodward Report, "reduce merely to generalized support for academic freedom." *Lee v. Yale Univ.*, No. 22-2634, 2023 WL 4072948, at *2 (2d Cir. June 20, 2023). These statements do not create a contract. That is particularly true because as in *Lee* there are contrary provisions providing for the disciplinary process at issue.

16

Plaintiff's "political speech" theory also fails because he never raised it and therefore failed to exhaust his administrative remedies regarding this claim. *Neiman v. Yale Univ.*, 270 Conn. 244, 255, 851 A.2d 1165, 1172 (2004) ("[T]he exhaustion of remedies doctrine applies to the internal grievance processes provided by academic institutions."). Plaintiff cannot raise this theory.

Regardless, Plaintiff's theory is not plausible. Plaintiff's exam was flagged by a teaching assistant (not the professors) based on objective criteria, including its length, elaborate formatting, and near perfect punctuation and grammar. (Cmplt. ¶ 94.) The University did not "target" Plaintiff. Plaintiff admits that an initial review revealed further evidence he cheated, including from ChatGPTZero scans that obviously did not know about or consider Plaintiff's alleged "political speech." (Cmplt. ¶ 94; *see also* **Exhibit E**.) Plaintiff then refused to produce requested documents and that led to his primary punishment (his suspension). (*E.g.*, **Exhibit B**; Cmplt. ¶ 164.) Plaintiff's admission that he did not produce relevant documents alone belies Plaintiff's "political speech" theory: Plaintiff engaged in serious misconduct. Plaintiff was also given an "F" for cheating, but he was not expelled. (*E.g.*, Cmplt. ¶ 196.) Plaintiff's punishment thus ensured that Plaintiff would remain at the University for a full additional year and that Plaintiff would have to remediate the class. Plaintiff's theory that the University wanted him "gone" makes no sense. *See, e.g.*, *L-7 Designs, Inc.*, 647 F.3d at 430 (discussing obvious alternate explanations).

Plaintiff's theory cannot explain how a litany of ChatGPTZero scans reported with 100% and 99% certainty that he cheated. (**Exhibit E**.) Those scans did not consider his purported speech. Nor can Plaintiff's focus on the allegation that the head of the Faculty Review Board donated to Democratic candidates create a plausible theory. The Faculty Review Board was not even involved until *after* Plaintiff's suspension was imposed. (Cmplt. ¶ 178.) Plaintiff's other allegations fare no better and support the University. For example, Plaintiff alleges a professor

told him he thought the University would have found a way to dismiss him. (Cmplt. ¶ 78.) The University had more than ample cause to dismiss Plaintiff for not being forthcoming on top of cheating. If it wanted him gone, it would have expelled him. Plaintiff's theory is implausible.

### 3. Plaintiff's Allegedly Specific Claims Fail

Plaintiff's purported specific breaches fail for various reasons. Many claimed procedural violations are not, in fact, breaches of contract. Other claims are belied by Plaintiff's own allegations or have no well-pleaded facts supporting them. Many claimed breaches are also trivial and/or not connected to cognizable damages and thus fail. *Wesleyan*, 2022 WL 2656787 at *6.

- *The Alleged Failure To Provide Timely And Complete Evidence* (Cmplt. ¶ 210): Plaintiff alleges he "receive[d] the sixteen documents that the Committee intended to use as evidence against him [on] October 14, 2024," (Cmplt. ¶ 139; Exhibit C), well more than forty-eight hours before the November 8, 2024 meeting, (Bulletin at 68). Plaintiff was not entitled to additional documents—he was only entitled to what the Committee was going to use. (Bulletin at 68.) Plaintiff's allegations establish the Committee did not have the ninety-plus pages of documents he claims were withheld. (*E.g.*, Cmplt. ¶ 159.) Plaintiff's assertion that these documents were exculpatory is conclusory and not well pled. These documents were inculpatory (most showed Plaintiff used AI) not exculpatory (a few suggested only that Plaintiff did not use AI to write certain passages, which was not exculpatory) and any failure to turn over these documents was therefore a trivial and inactionable violation. That is particularly true because Plaintiff was suspended for not being forthcoming and because Plaintiff admits he challenged the reliability of AI detection scans, which would include the allegedly withheld scans. (Cmplt. ¶ 161; Exhibit E.)

- *The Purported Conflicts Of Interest And Inability To Seek Recusals* (Cmplt. ¶ 211): Plaintiff alleges no *facts*, never mind well-pleaded facts, that any Committee member had an actual conflict. Plaintiff sought recusals and his claim that he was unable to do so is false. (Exhibit D.) In any event, there is no requirement that Committee members recuse themselves. (Bulletin at 69.) Dean Tsung told Plaintiff in September where to find a list of Committee members, which would be posted soon. (Exhibit C.) Professor Choi sent Plaintiff the link to the list of Committee members again before the meeting. (Exhibit D.)

- *The Alleged Reliance On Facts Outside Of Evidence* (Cmplt. ¶ 212): Plaintiff does not allege any facts, never mind well-pleaded facts, establishing that the Committee relied on evidence outside of the record in deciding Plaintiff's case. And the allegations themselves show there was ample support for the Committee's findings.

- *The Alleged Failure To Protect Confidentiality* (Cmplt. ¶ 213): The statement that "summaries [of cases] shall not identify the students involved and *so far as possible* avoid contextual information that would reveal or encourage speculation about the identity of

individual students," (Bulletin at 71), is far too generic to be actionable. Regardless, Plaintiff makes no factual allegations regarding the summary of his case, never mind allegations sufficient to plausibly explain why that summary violates the provision at issue.

- *The Alleged Imposition Of An Excessive Penalty* (Cmplt. ¶ 214): The Bulletin reserves the question of what penalty to impose to the University. (Bulletin at 67 (allowing Committee to "make judgments") and 70 (allowing for appeal of penalty Committee imposes and decision on that appeal, which is final).) Regardless, any request for this Court to second-guess the penalty imposed is improper under *Gupta*. The Handbook also states: "To provide for *some* consistency in reactions to offenses year by year, the [C]ommittee [C]hair shall study the files and inform the [C]ommittee . . . of punishments meted out in certain classes of cases in prior years." (Bulletin at 69 (emphasis added).) But that is not a specific promise guaranteeing a specific penalty. To the contrary and as noted, the Bulletin allows the University to determine the penalty and expressly allows for penalties more severe than Plaintiff received (including expulsion). (Bulletin at 69.) Moreover, Plaintiff's allegations establish that his punishments were at least consistent with the Committee's finding that he was not forthcoming, if not light. (*E.g.*, Cmplt. ¶ 122 ("[T]he most common punishment [for not being forthcoming] is permanent expulsion[.]"); ¶ 125 ("extraordinary violation").) Plaintiff's argument to the contrary (that his penalty was harsh) is entirely conclusory.

- *The Alleged Failure To Act Promptly* (Cmplt. ¶ 215): In addition to being an insufficiently vague provision, Plaintiff has not adequately alleged the Committee failed to act promptly. He has alleged the opposite. (*E.g.*, Cmplt. ¶ 171 (implying the Committee acted too quickly by issuing a decision on the same day as the meeting).) The Committee's actions were prompt, particularly in light of the fact that Plaintiff did not provide requested documents.

- *The Alleged Expansion Of Charges* (Cmplt. ¶ 216): The claim that the University expanded charges because "violating exam rules" was a new "charge" is baseless. As set forth above, the allegation all along was that Plaintiff violated the exam rules by using AI. (*E.g.*, Cmplt. ¶ 94; Exhibit C.) Plaintiff was repeatedly informed, long before the meeting, that his candor and submission on the Investor final were in question. (*E.g.*, Cmplt. ¶¶ 122, 125, 126; Exhibit B.) There was nothing wrong with purportedly "expand[ing] the investigation"—the Bulletin provides that the Committee will "collect the facts relevant," and evidence of cheating in other classes was relevant to the question of whether Plaintiff cheated as it would establish a pattern of cheating. (Bulletin at 67.) The contention that the Committee initiated the complaint "without any complaint or referral from a . . . complainant" (Cmplt. ¶ 216) is belied by Plaintiff's allegations (*e.g.*, Cmplt. ¶ 94.)

- *The Alleged Attempt To Coerce A Confession* (Cmplt. ¶ 217): Plaintiff's claims of alleged "coercion" are based on his allegations about Dean Scully purportedly raising the prospect of immigration implications. (Cmplt. ¶ 260.) The Bulletin does not prohibit the University from discussing potential implications of disciplinary proceedings with students. This is simply not a breach of any alleged contract. That is particularly true when Plaintiff's sensational characterizations of this purported comment, which are not facts, are stripped away, as they must be. Plaintiff cites no Bulletin provision for this claim.

19

- *The Allegedly Improper Remand* (Cmplt. ¶ 218):  The Bulletin provides that a student may "raise any objections to the proceedings on the grounds of procedural irregularity or prejudice" and that, "[i]f objection is raised, the cognizant academic dean will investigate the objection and may remand the matter to the [C]ommittee to correct the procedural irregularity."  (Bulletin 70.)  Plaintiff admits he raised a procedural challenge to the Committee's decision. (Cmplt. ¶ 181 ("Plaintiff [argued] . . . [that] 'not being forthcoming' is not a basis for punishment on its own without finding of a violation of the Honor Code[.]").)  The University was therefore authorized to remand the matter to the Committee for further adjudication.  This is true even though Plaintiff claims he also attempted to rescind his procedural argument.  Plaintiff cannot have it both ways.

- *The Alleged "Retaliation" For Appealing* (Cmplt. ¶ 219):  Plaintiff alleges no facts that the University "retaliated" against him by deciding whether Plaintiff violated the exam rules by using AI (*i.e.*, what Plaintiff had been accused of in June).  He also does not cite any Bulletin provision prohibiting what he complains of.  The Bulletin provides that an "appeal . . . can result in a sanction more severe than the one originally imposed."  (Bulletin at 70.)  Plaintiff's claim is baseless.  That is also true of any claim related to purported statements Dean Tsung made to Plaintiff about the impending results of the Committee proceedings.  The Bulletin makes clear that the Committee, not anyone else, makes decisions. (Bulletin at 68–69.)  The Bulletin also does not prohibit University employees from speaking to students about proceedings or offering them advice or their thoughts.

All of Plaintiff's claims of breach are baseless and should be dismissed.  The University complied, or at absolute minimum substantially complied, with its process.  Plaintiff is grasping at straws to invent gripes with the process.  But Plaintiff's gripes have no basis in the Bulletin and are refuted by it.  Even if that was not the case, Plaintiff's claims are not connected to damages.

### 4. Plaintiff's Claim Fails Against The Individual Defendants

Even if Plaintiff had stated a proper breach-of-contract claim against the University, which he has not, Plaintiff cannot state a breach of contract claim against any Individual Defendant because any purported contract was only between Plaintiff and Yale.  *E.g.*, *Gabriel*, 2012 WL 4718678, at *7 (dismissing claims against individual defendants on this ground).

### B.  Plaintiff's Implied Covenant Claim Fails

"To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract *must have been taken in bad faith*."  *Landry v.*

20

*Spitz*, 102 Conn. App. 34, 42, 925 A.2d 334, 342 (2007) (alteration omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Bad faith means more than mere negligence; it involves a dishonest purpose." *Id.* "[B]ecause the covenant of good faith and fair dealing only requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *O & G Indus., Inc. v. Am. Home Assurance Co.*, 204 Conn. App. 614, 632, 254 A.3d 955, 967 (2021) (alterations and quotation marks omitted).

Plaintiff's implied covenant claim fails because the grievances he asserts do not implicate his alleged contractual rights. The implied covenant claim merely repeats the same theories of breach that, as just discussed, are not a breach. Plaintiff received everything he was allegedly entitled to receive (and more). Plaintiff also does not properly allege fraud or a design to mislead or deceive. That is particularly true when Plaintiff's conclusory characterizations are stripped away and only well-pleaded facts are left. As discussed above and below, Plaintiff is inventing purported errors and adding sensational characterizations. That is not sufficient. It is simply not true that Plaintiff did not have notice that his candor would be at issue, for example.

There is also no basis for an implied covenant claim against the Individual Defendants.

### C. Plaintiff's Title VI And § 46a-58 Discrimination Claims Fail

"In order to establish a claim [under Title VI], [a plaintiff] must show that a defendant discriminated against him on the basis of [national origin], (2) that the discrimination was intentional, and (3) that the discrimination was a substantial or motivating factor for the defendant's actions." *Gabriel*, 2012 WL 4718678 at *5. Thus, an "Amended Complaint must

21

allow the Court to reasonably infer that [the plaintiff] was treated differently from others due to unlawful and intentional discrimination." *Id.* "[T]hat inference *must be supported by allegations of specific facts* indicating a deprivation of rights" (*i.e.*, intentional discrimination). *Id.* (emphasis added). "[I]n assessing the plausibility of [the plaintiff's] claims, the Court . . . *may consider whether more likely or alternate explanations for the alleged conduct exist*." *Id.* (emphasis added). "Title VI claims are subject to the burden-shifting framework" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Joy v. Crime Victims Treatment Ctr.*, No. 23-CV-11177 (MMG), 2025 WL 326521, at *6 (S.D.N.Y. Jan. 29, 2025) (internal quotation marks omitted).[12]

In *Gabriel*, 2012 WL 4718678, the Court dismissed a Title VI discrimination claim filed by a student disciplined by his college.[13] The plaintiff claimed he was discriminated against because he was Egyptian-American and alleged as evidence of national origin discrimination that other students who cheated were not punished but he was and that his professor initially refused to offer him a makeup date when his exam conflicted with his citizenship ceremony, among other allegations. *Id.* at *2, *5. The Court found those allegations insufficient. The Court noted that "an obvious alternate explanation for the . . . [d]efendants' alleged conduct is that [the plaintiff] made significant use of un-cited materials in violation of the college's Honor Code." *Id.* at *6. The Court also explained that the plaintiff failed to allege specific facts supporting discrimination:

> There is little in the Amended Complaint, beyond [plaintiff's] repeated references to his Egyptian heritage and his choice of religion, to suggest intentional discrimination. While direct evidence of discrimination is not required, a pleading must nonetheless allege "circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf*, 35 F.3d at 713. Beyond [plaintiff's] repeated assertions that he was the victim of discrimination, the pleadings in this case give no support for such an inference.

---

[12] Plaintiff's § 46a-58 claims are derivative of his Title VI claims because § 46a-58 makes it "a discriminatory practice . . . to subject . . . any [] person . . . to [certain] deprivation of [] rights, privileges or immunities secured or protected by the . . . laws of . . . the United States . . . on account of . . . national origin." Conn. Gen. Stat. § 46a-58. (*See* Cmplt.)

[13] The plaintiff filed a claim under Title VII, but the Court construed it as a claim under Title VI. *Id.* at *5.

What little circumstantial evidence [plaintiff] submits is insufficient to set forth a plausible discrimination claim. Denial of a bathroom break during an exam may have been harsh, but it did not constitute actionable discrimination, and provides scant support for a broader claim. *See, e.g., Hamilton v. City College of City Univ. of New York,* 173 F.Supp.2d 181, 185 (S.D.N.Y.2001) (denial of calculator during exam was insufficient to support claim that professor had violated plaintiff's Constitutional rights). Similarly, reluctance to re-schedule an exam, followed by the professor's agreement to assign a new date, does not create an inference of intentional discrimination. Finally, punishment for alleged plagiarism when lesser violators escaped sanction does not, without additional supporting facts, suggest discriminatory intent.

In sum, the Amended Complaint and its many exhibits do not support a plausible claim that [plaintiff] was mistreated because of either his national origin or his religion. The [] motion to dismiss [the] discrimination claim is [] GRANTED.

*Id.* at \*6; *see also id.* at \*9 (dismissing "entirely conclusory" claim against other defendants).

Plaintiff's Title VI claims are conclusory. The only alleged "fact" that Plaintiff cites to support discrimination is that he "was the only student among more than seventy (70) in his class whose exam was subjected to AI detection software scrutiny." (Cmplt. ¶ 282.) That comes nowhere close to suggesting national origin discrimination, particularly when Plaintiff's Complaint admits the Professors had ample suspicions about his exam and that Plaintiff is a longtime U.S. resident. (Cmplt. ¶¶ 34, 35, 94.) Plaintiff also alleges that Dean Sherilyn Scully referenced possible deportation in a meeting he had with her, (Cmplt. ¶ 117[14]), but Plaintiff's Complaint establishes that Dean Scully played no role in the initial decision to review Plaintiff's exam (because that decision was made by the course professors) and that Dean Scully played no role in the Committee's decision. (*E.g.*, Cmplt. ¶ 94 (the TA flagged the exam), ¶ 113 n.40 (**Exhibit G**) (citing to an article from July 2024 establishing that Dean Scully was retiring).)

---

[14] Plaintiff's assertion that "Dean Scully escalated the pressure by invoking the fear of deportation" is certainly not a well-pleaded fact. That is Plaintiff's characterization.

23

There are simply no sufficient allegations supporting national origin discrimination.  There were more allegations of discrimination in *Gabriel*, 2012 WL 4718678, including an allegation that the plaintiff's professor refused to reschedule his examination when it conflicted with his citizenship ceremony, yet the Court still found those allegations insufficient.  Plaintiff has not come close to alleging sufficient facts to state a claim for discrimination under Title VI.

This case closely resembles *Gabriel*, where the court found that the plaintiff's "significant use of un-cited materials in violation of the college's Honor Code" was "an obvious alternate explanation for the . . . [d]efendants' alleged conduct" that rendered an inference of discrimination implausible.  2012 WL 4718678, at *6.  The inference that Defendants took the actions they did because they suspected and then concluded that Plaintiff engaged in misconduct is far "more likely" than the unsupported and implausible theory that Defendants all decided to intentionally discriminate against Plaintiff because he is from France.  Indeed, Plaintiff admits that the Committee included at least eleven (11) people, but Plaintiff does not plead *facts* showing those individuals (never mind all or even a majority of them) knew (or even had "reason to know") of his alleged national origin.[15]  (Cmplt. ¶ 19; *see also generally* Cmplt.; Bulletin 67.)  Plaintiff cannot prove that alleged national origin discrimination "was a substantial or motivating factor for the defendant's actions" when he does not even allege all or most of them knew his national origin.

Plaintiff cannot establish a prima facie case of discrimination.  Even if he could, he cannot possibly show that the University's legitimate concerns about his actions were pretextual.  It simply is not believable that the decisions of two professors and ten faculty members and students on the Committee were based on anti-French animus, rather than academic dishonesty.

---

[15] The allegations related to Dean Tsung, who was not a voting member of the Committee and acted as the Secretary for purposes of Plaintiff's case, are discussed below.  (*See* Cmplt. ¶ 19; Bulletin 67.)

Even if the Complaint stated a Title VI discrimination claim against the University, which it does not, Title VI does not allow for individual liability and Plaintiff has alleged no *specific* facts of intentional national origin discrimination against any Individual Defendant. *See, e.g.*, *Fields v. City of Bridgeport*, No. 3:23-CV-01608 (KAD), 2025 WL 562651, at *7 (D. Conn. Feb. 20, 2025).

### D. Plaintiff's Title VI And § 46a-58 Retaliation Claims Fail

To establish a Title VI retaliation claim, a plaintiff "must allege that []he engaged in protected activity, the [defendant] knew about h[is] protected activity, []he suffered an adverse action, and there was a causal connection between the protected activity and the adverse action." *Bloomberg v. New York City Dep't of Educ.*, 119 F.4th 209, 214–15 (2d Cir. 2024) (internal quotation marks omitted). Plaintiff's retaliation claim is also subject to *McDonnell-Douglas*. *Joy*, 2025 WL 326521, at *6 (noting as much and discussing burden-shifting framework). As noted above, Plaintiff's § 46a-58 claim is derivative of his Title VI claim. *See, e.g.*, *supra*.

The sole protected activity that Plaintiff claims he engaged in was allegedly "complain[ing] to Dean Scully, Dean Tsung, and Professor Choi that the process unfairly targeted him." (Cmplt. ¶ 304.) As previously discussed, Plaintiff does not allege Dean Scully was involved in Committee proceedings (only that she met with Plaintiff during the summer, before proceedings began). (*E.g.*, Cmplt. ¶ 113 n.40.) Dean Tsung was not a voting member of the Committee and Professor Choi was one of at least eleven (11) people on the Committee. (*E.g.*, Cmplt. ¶¶ 19, 49; Bulletin 67.) Plaintiff makes no allegation that the nine (9) or more other people on the Committee were even aware of his alleged protected activity. Nor does he allege that others whose decisions he challenges, such as Dean Jain's remand decision, were aware. Plaintiff cannot establish retaliation, never mind meet the pretext standard, when he has not alleged the decision makers, including at least nine (9) out of eleven (11) Committee members, were aware of alleged protected activity.

Moreover, Plaintiff does not properly allege when he raised his alleged gripe to Dean Tsung or Professor Choi (he makes only the conclusory allegation that he did so "prior to and during key stages of the [] process." (Cmplt. ¶ 304).) Plaintiff sent his email to Dean Tsung and Professor Choi, which is integral to his claims, on November 3, 2024. (Exhibit D.) That was after most of the events Plaintiff claims were retaliatory. (*E.g.*, Cmplt. ¶¶ 307, 308, 309.) Actions allegedly taken before Plaintiff purportedly made his complaint cannot have been retaliatory. And as previously discussed, Plaintiff's Complaint and the documents integral to it establish that much of what Plaintiff claims was retaliatory is based on false facts. Again, it is not true that "violation of exam rules" was a new "charge"—Plaintiff was all along accused of violating exam rules by using AI. The "charges" were one in the same. (*E.g.*, Cmplt. ¶ 94; Exhibit B; Exhibit C.)

Plaintiff also has not adequately alleged *facts* supporting a causal connection between his purported complaint and the claimed retaliation. In addition to the flaws already discussed, including the fact that Plaintiff has not adequately alleged that relevant decision makers were on notice of his alleged complaint, Plaintiff's claim also fails because there is once again an obvious alternate explanation. *See Gabriel*, 2012 WL 4718678, at *6. The University suspected Plaintiff cheated; determined he did, in fact, cheat; and found that he was not forthcoming.

Assuming without conceding that Plaintiff has nevertheless stated a plausible retaliation claim, which he has not, Title VI does not permit individual liability. *E.g.*, *Fields*, 2025 WL 562651, at *7. And Professors Thomas and Rouwenhorst cannot have retaliated against Plaintiff because he did not lodge any complaint until after they referred the matter to the Committee.

### E. Plaintiff's IIED Claim Fails

"To prevail on an intentional infliction of emotional distress claim [], [a plaintiff] must allege and prove that (1) the [defendant] intended to inflict emotional distress or that it knew or

26

should have known that emotional distress was the likely result of its conduct; (2) the [defendant's] conduct was extreme and outrageous; (3) the [defendant's] conduct was the cause of [the plaintiff's distress; and (4) the emotional distress [the plaintiff] sustained was severe." *Greenhouse v. Yale Univ.*, No. 3:05CV1429 (AHN), 2006 WL 473724, at *3 (D. Conn. Feb. 28, 2006); Cmplt. ¶ 212.

"Liability for intentional infliction of emotional distress requires conduct *exceeding all bounds usually tolerated by a decent society*, of a nature which *is especially calculated to cause and does cause mental distress of a very serious kind . . . .*" *Muniz v. Kravis*, 59 Conn. App. 704, 708 (2000) (emphasis added). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, '*outrageous!*'" *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (emphasis added). Even conduct that is insulting or taunting or results in hurt feelings is insufficient to support an IIED claim. *Greenhouse*, 2006 WL 473724, at *3 (citing *Appleton*, 254 Conn. at 211, where the Connecticut Supreme Court held that questioning a teacher's "vision and ability to read" in front of her co-worker, stating that Plaintiff "'had been acting differently'" and "should take a few days off from work" was insufficient to support an IIED claim). In light of the very high standard for IIED claims, "[t]he [C]ourt has an important gatekeeper function" to determine whether the high standards for IIED claims are met. *Id.* at *3.

In *Greenhouse*, the Court dismissed an IIED claim alleging that an instructor told several students to simulate masturbation and orgasm next to the purported visibly distressed plaintiff. *Id.* at *2. The Court held that the allegations were insufficient to support an IIED claim. *Id.* at *4.

Plaintiff's allegations do not come close to satisfying the incredibly high standard for IIED. Plaintiff's allegations amount to nothing more than his disagreement with his disciplinary process and its outcome. They do not allege "outrageous" conduct or anything close to it.

As previously discussed, most of Plaintiff's purported "facts" supporting this claim (and others) are false according to Plaintiff's own Complaint.  It is not true that the University "fabricated a charge of 'not being forthcoming' solely to impose punishment after failing to substantiate the original Honor Code charge" or that this "charge was introduced without notice, without an opportunity to respond, without disclosure of evidence, and without a hearing as to that charge." (Cmplt. ¶ 322.)  Plaintiff was repeatedly given written notice that his decision not to be forthcoming would be an issue that would likely lead to severe punishment long before the meeting to determine whether Plaintiff violated exam rules occurred.  (*E.g.*, Cmplt. ¶¶ 122, 125.)  Plaintiff defended his lack of candor by asserting he did not produce the files the Committee had requested because the Committee asked for Microsoft Word files but "he had not used Microsoft Word [and instead used] Apple Pages" to create the files.  (Cmplt. ¶ 164.)  Plaintiff's characterization of Dean Scully's discussion with Plaintiff about potential immigration consequences as involving "threats" is not a well-pleaded fact.  (Cmplt. ¶ 260.)  There is nothing outrageous about a Dean discussing potential consequences of disciplinary proceedings with a student.  Nor is there anything outrageous about any alleged "expansion" of the investigation:  A review of Plaintiff's other coursework was warranted to determine if it established a pattern of AI use.

What Plaintiff alleges is not remotely comparable to, for example, an instructor allegedly telling male students to simulate masturbation and orgasm around a female student while a male student purportedly tries to physically prevent the female student from leaving—and that was still insufficient to state an IIED claim.  *See Greenhouse*, 2006 WL 473724, at *3.

Plaintiff also cannot show that Defendants "intended to inflict emotional distress or that it knew or should have known that emotional distress was the likely result of its conduct." *Id.*  The idea that anyone would intend to inflict emotional distress or knew that it was likely to result from

28

calling out a student for not being forthcoming is ludicrous. Schools are supposed to ensure that their students adhere to the principles of candor that they expect.

Plaintiff's IIED claim is also an impermissible attempt to circumvent *Gupta* (and analogous federal law, including *Davis*) by having this Court second-guess the University's decisions. That is a classic attempt to have this Court sit as a super-appellate tribunal to review what the University did without satisfying *Gupta*'s narrow exceptions to the general prohibition on "judicial intrusion into educational decision making." *Brown Univ.*, 210 F. Supp. 3d at 331.

As with Plaintiff's other claims, there are no allegations against the Individual Defendants that come close to stating a valid IIED claim. The Court should therefore dismiss this claim as to the Individual Defendants even if, despite the foregoing, it finds that a valid claim exists.

### F. Plaintiff's NIED Claim Fails

"To prevail on a claim for NIED under Connecticut law, 'the plaintiff is required to prove that (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.'" *Henry v. Oluwole*, 108 F.4th 45, 61–62 (2d Cir. 2024) (quoting *Hall v. Bergman*, 296 Conn. 169, 182 n.8, 994 A.2d 666 (2010) (internal quotation marks omitted)).

Thus, the plaintiff must prove, among other things, "that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Hamer v. Byrne*, 231 Conn. App. 53, 80 (2025) (quoting *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 446, 815 A.2d 119 (2003)).

In *Henry*, 108 F.4th at 61–62, the Second Circuit held that an NIED claim failed under Connecticut law "because the complaint alleges only intentional conduct," because the complaint

29

did "not describe a negligent act by [the defendant] that would cause foreseeable distress," and because "the allegations underlying the NIED claim fail[ed] to establish causation." The Court explained that the NIED claim was based on purportedly intentional conduct (sexual misconduct) and that there were "no remaining allegations that establish conduct by [the defendant] that caused [the plaintiff] emotional distress so severe as to cause bodily harm." *Id.* at 62.

Courts have held that NIED claims are subject to *Gupta*. *See Bass*, 738 F. Supp. 2d at 327.

Plaintiff's NIED claim is an improper attempt to evade *Gupta*. It fails because the Complaint's allegations themselves show there were rational bases for the conduct Plaintiff challenges. It was rational, for example, to examine Plaintiff's submission in another course to see if it established a pattern of AI use. (Cmplt. ¶ 307.) Plaintiff acknowledges there was ample cause for investigation and discipline. (*E.g.*, Cmplt. ¶ 94.)

Plaintiff's claim also fails because he relies on purported intentional misconduct. Plaintiff alleges, for example, that the University "fabricated" a charge. (*E.g.*, Cmplt. ¶ 322.)

Plaintiff also cannot show that Defendants "should have realized that [the] conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Hamer*, 231 Conn. App. at 80. If he could, every student who faces discipline could assert an NIED claim and *Gupta* would be meaningless. That is particularly true because, as previously discussed, Plaintiff's own Complaint and the documents integral to it refute Plaintiff's allegations. (*E.g.* Cmplt. ¶¶ 111, 122, 125, 130 (establishing notice).)

Plaintiff also fails to establish causation. Plaintiff cannot separate purported stress from the process itself from stress from the actions he challenges as wrongful. Even if he could, it defies logic to believe that stress so severe that it might result in illness or bodily injury was caused by what Plaintiff challenges instead of other aspects of the process that Plaintiff does not challenge.

30

As with Plaintiff's other claims, there is nothing to state a claim for NIED against the Individual Defendants even if, despite the foregoing, the Court finds an NIED claim against Yale.

### G.  Plaintiff's Promissory Estoppel Claim Fails

"To recover on a theory of promissory estoppel, a plaintiff must plead and prove four elements: 1) the promisor made a clear and definite promise; 2) the promisee reasonably relied on the promise; 3) the promise induced the action taken by the promisee; and 4) injustice can be avoided only by enforcement of the promise." *Adair v. Pfizer, Inc.*, 245 F. Supp. 2d 437, 444–45 (D. Conn. 2003) (disposing of claim for much the same reasons breach of contract claim failed); *see also, e.g.*, *Gunn v. Penske Auto. Grp., Inc.*, No. 3:17-CV-757(AWT), 2018 WL 7374285, at *7 (D. Conn. Mar. 30, 2018) (dismissing promissory estoppel claim).  ("[A] plaintiff cannot use the theory of promissory estoppel to add terms to a contract that are entirely inconsistent with those expressly stated in it." *E.g.*, *Michel v. Yale Univ.*, 110 F.4th 551, 560–61 (2d Cir. 2024).

Plaintiff's promissory estoppel claim fails according to his own allegations that the Bulletin and other documents he invokes constitute an enforceable contract.  The Bulletin expressly reserves to the University the right to deviate from the customary procedures therein.  (Bulletin at 67.)  Plaintiff improperly seeks to use a promissory estoppel claim to add terms inconsistent with that provision and other provisions, including provisions giving discretion to the Committee.

Regardless, Plaintiff's promissory estoppel claim is based on the purported policy prohibiting AI use and the same claims of alleged procedural unfairness previously addressed. (*E.g.*, Cmplt. ¶ 351.)  This claim fails for the same reasons as Plaintiff's breach of contract claim, including because it is precluded by *Gupta* (including because Plaintiff's "political speech" theory is based on general aspirational language), and for additional reasons.  *E.g.*, *Scalzi v. Mead Sch.*

31

*for Hum. Dev.*, No. XO5CV 950148213S, 1999 WL 391917, at \*4 (Conn. Super. Ct. June 4, 1999) (*Gupta* applies to any claim that implicates the policies articulated therein).

The policy Plaintiff cites does not establish a blanket ban on AI use. (Cmplt. ¶ 99.) It certainly does not do so clearly and definitely. All it does is explain why the University chose to disable a certain AI detection tool. Promises of a fair process are not sufficiently clear and definite to support a promissory estoppel claim. Plaintiff's Complaint and the documents integral to it establish that Plaintiff received a more than fair process. Any specific provisions, such as a requirement of timely notice of charges, were complied with, as previously discussed.

Regardless, Plaintiff cannot show reasonable reliance or that the University induced him to take action by its actions. The University did not, for example, induce Plaintiff to use AI because it disabled AI detection tools. Any reliance on the Poorvu Center policy in order to cheat was not reasonable. Plaintiff makes no allegations about any change in position he made vis-à-vis his disciplinary process based on anything he complains about. Any such change would be patently unreasonable because the purported promises at issue were never made or not broken.

Plaintiff also cannot establish that an injustice can be avoided only by enforcement of the promise. Assuming without conceding that Plaintiff could establish a clear and definite promise leading to inducement and reasonable reliance, Plaintiff complains of alleged trivial violations that do not change the fact that, according to Plaintiff's own allegations and documents integral to them, Plaintiff received a fair process. He cannot show that anything he complains about would have changed the result. He therefore cannot show any injustice.

And as with Plaintiff's other claims, there are no allegations supporting a promissory estoppel claim against any Individual Defendant. To the contrary, the basis for this claim is largely University policies from the Poorvu Center and the Bulletin. (Cmplt. ¶¶ 345–48.)

### H.  Plaintiff's CUTPA Claim Fails

"To state a claim for a violation of CUTPA, a plaintiff must establish that (1) the defendant was acting in trade or commerce; (2) that the defendant engaged in unfair or deceptive acts; and (3) that such unfair or deceptive acts caused the plaintiff to suffer an ascertainable loss." *Edwards v. McMillen Cap., LLC*, 574 F. Supp. 3d 52, 70 (D. Conn. 2021), *aff'd*, No. 21-1024-CV, 2022 WL 16984534 (2d Cir. Nov. 17, 2022).  "While the Connecticut Supreme Court has not expressly excluded claims in an educational setting, the cases where such claims are viable are limited to the financial aspects of a school's operations." *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2021 WL 664010, at *14 (D. Conn. Feb. 19, 2021).  "Courts have [thus] permitted CUTPA claims to go forward where the challenged conduct implicated the financial aspects of the academic institution, such as false promises of licensures, or eviction from student housing without summary process." *Id.* (citations omitted).  In *Doe v. Wesleyan*, the Court dismissed the plaintiff's CUTPA claim for failure to state a claim because the "[p]laintiff's claim that [the defendant university] mishandled its academic misconduct investigation d[id] not implicate conduct analogous to deprivation of a non-academic service, a false promise of professional licensure, or otherwise a non-academic 'trade or commerce' engaged in by an academic institution." *Id.*

In this case, Plaintiff's claim fails for the same reason the claim in *Doe v. Wesleyan* failed: Plaintiff's CUTPA claim alleges the University mishandled his academic misconduct investigation and is therefore not cognizable.  (*E.g.*, Cmplt. ¶ 368 (claiming a purported representation about not using AI detection tools violated CUTPA) (making a procedural fairness claim).)

Regardless, Plaintiff's CUTPA claim is another attempt to have the Court improperly second guess the University's academic decisions and is therefore barred by *Gupta*.  *See, e.g.*, *Wightwood Sch. v. Fritz*, No. 410060, 1999 WL 240727, at *3 (Conn. Super. Ct. Apr. 9, 1999).

Moreover, when Plaintiff's conclusory allegations are disregarded and the Court analyzes the facts established by the integral documents, there is no unfair or deceptive practice here. *Michel*, 547 F. Supp. 3d at 193–94 (dismissing CUTPA claim where plaintiff made "no factual allegations that support[ed] his conclusory assertion that Yale 'falsely represent[ed] and pass[ed] off' that its online education 'has the same value as in-person education.'") To the contrary and for example, Plaintiff gripes about the University being direct with him (rather than deceptive) by raising potential immigration consequences. (Cmplt. ¶ 10.) Plaintiff received a fair process.

### I.  Plaintiff's Defamation Claim Fails

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 679 (D. Conn. 2022) (dismissing claim).

"A claim of defamation must be pleaded with specificity, as the precise meaning and choice of words employed is a crucial factor in any evaluation of falsity. The allegations should set forth facts sufficient to apprise the defendant of the claim made against him."[16] *Fraser v. Franco*, No. 3:22CV01014(SALM), 2022 WL 4367576, at *6 (D. Conn. Sept. 21, 2022) (internal quotation marks omitted). "In order to meet this pleading standard, a complaint "must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom.

---

[16] *See also, e.g.*, *Denmark v. Elmore Cnty. Sheriff Dep't*, No. 2:20-CV-100-RAH-SMD, 2020 WL 5650411, at *2 (M.D. Ala. Aug. 5, 2020), *report and recommendation adopted*, No. 2:20-CV-100-RAH, 2020 WL 5648320 (M.D. Ala. Sept. 22, 2020) (explaining that allegations were not well-pleaded because "[w]ell-pleaded facts are the basic five W's: who, what, where, when, why; and how.").

Imprecise pleading is not permitted in the context of alleged defamation." *Id.* (internal quotation marks omitted); *see also id.* (dismissing defamation claim for lack of specificity).[17]

Specificity is required because defamation claims are subject to defenses that depend on exactly what was said, by whom, to whom, and in what context. *Croslan v. Hous. Auth. for City of New Britain*, 974 F. Supp. 161, 170–71 (D. Conn. 1997) ("[Plaintiff's] failure to plead the defamation action with sufficient specificity makes it impossible for defendant to identify and present, and for the court to evaluate, specific defenses which might be available for each particular statement."). For example, the litigation privilege bars defamation claims related to statements made in the course of judicial proceedings. *See, e.g.*, *Moorman v. Bremm*, No. 3:21-CV-1300(OAW), 2022 WL 5186182, at *7 (D. Conn. Oct. 5, 2022) (dismissing defamation claim). As another example, the intra-corporate communications privilege generally shields statements within an organization, and that "privilege applies to [a] report produced from [an] internal investigation." *Kleftogiannis v. Inline Plastics Corp.*, 411 F. Supp. 3d 216, 226 (D. Conn. 2019).

It is axiomatic that truth and substantial truth are absolute defenses to defamation. *E.g.*, *Pierce v. Town of Simsbury*, No. 3:20-CV-1766 (VAB), 2024 WL 665917, at *17 (D. Conn. Feb. 16, 2024); *see also, e.g.*, *El Omari v. Buchanan*, No. 22-55-CV, 2022 WL 4454536, at *3 (2d Cir. Sept. 26, 2022) (affirming dismissal of defamation claim and noting that dismissal is appropriate where plaintiff's pleadings establish truth of allegedly defamatory statements). Opinions are also absolutely protected. *Murphy v. Rosen*, 351 Conn. 120, 329 A.3d 913 (2025) (holding that calling someone a "white supremacist" constitutes an inactionable opinion).

---

[17] *See also, e.g.*, *Alvarado v. PBM, LLC*, No. 3:21CV01481(SALM), 2022 WL 3566630, at *5 (D. Conn. Aug. 18, 2022) (dismissing claim where plaintiff did not allege, *e.g.*, who statements were made to); *Stubbs v. Gerken*, No. 3:21CV01525(SALM), 2022 WL 4585296, at *11 (D. Conn. Sept. 29, 2022) (dismissing claims); *Nitti v. Doosan Fuel Cell Am., Inc.*, No. 3:17-CV-838(AWT), 2018 WL 8731550, at *2 (D. Conn. Mar. 14, 2018) ("This [defamation] count must be dismissed because the plaintiff has failed to allege whether any allegedly defamatory statements were made orally or in writing, who made the statements, or to whom the statements were allegedly made.").

Here, Plaintiff's defamation claim depends on assertions that documents integral to the Complaint establish are false. Plaintiff's claim is that the purported statements were defamatory because, according to Plaintiff, "*there was never a finding against Plaintiff of using AI to cheat on his exam*." (Cmplt. ¶ 378.) As previously discussed, that is baseless: Plaintiff was accused of violating the exam rules by "improperly utiliz[ing] AI on the final exam" (Cmplt. ¶ 94; Exhibit C) and was found responsible for that (Cmplt. ¶ 193; **Exhibit H** ("The [C]ommittee determined that you violated the rules of the Sourcing and Managing Funds final exam.").) His entire claim is based on the fiction that these were two different "charges" because the Committee's decision used the phrase "violated the rules" instead of also saying "by improperly utilizing AI." Plaintiff was found to have used AI to cheat. Any statements that he did so are true or at least substantially true because even Plaintiff concedes he was found to have violated exam rules. (Cmplt. ¶ 193.) Plaintiff was also found to not be forthcoming and statements to that affect are thus also true. (Cmplt. ¶ 150.) Statements such as these are also protected opinion—individuals heard evidence against Plaintiff, concluded he cheated and was not forthcoming, and allegedly expressed that opinion. *Murphy*, 351 Conn. at 120 (calling someone a "white supremacist" is protected opinion).

Regardless, Plaintiff's defamation claims are barred by other well-established defenses and/or are subject to dismissal because they are inadequately pleaded. For example, Plaintiff asserts a claim based on Dean Tsung's affidavit in Opposition to Plaintiff's Motion for a Preliminary Injunction in this case. (Cmplt. ¶ 381.) That claim is barred by the litigation privilege. Plaintiff also improperly seeks to hold Defendants liable for news coverage of this case. (Cmplt. ¶ 379.) *See Yout*, 633 F. Supp. 3d at 679 (noting requirement that defendant publish statement – a requirement that is not met when the media publishes an article about judicial proceedings); *see also* **Exhibit I** (articles Plaintiff identifies showing that articles comment on Court filings).

36

These examples demonstrate the importance of Plaintiff identifying the allegedly defamatory statements specifically and specifying the person who allegedly made the statements, the context they made those statements in, and who they made the statements to.  Indeed, it is unclear whether other allegedly defamatory statements are pulled from Defendants' filings. (*Compare* Cmplt. ¶ 378 (alleging statement that Plaintiff was "not forthcoming" was defamatory), *with* ECF 41 at 1 ("Plaintiff was not forthcoming . . . .").)  Even if those statements are not inactionable because they are from Defendants' filings or for other reasons (such as the fact that they are protected by the intra-corporate communication doctrine), Plaintiff provides nowhere near the specificity required to defend the claims.  (*E.g.*, Cmplt. ¶ 380 ("[O]ne or more [] Committee members publicly disclosed confidential information regarding the deliberations and proceedings against Plaintiff directly to Plaintiff's classmates . . . .").  As an example, Plaintiff alleges that "the SOM Administration" (it is unclear who) said that Plaintiff "improperly utilized AI on the final exam." (Cmplt. ¶ 378.)  It is true that an administrator wrote those words, but the full sentence in which those words appeared reads:  "The allegation is you improperly utilized AI on the final exam in the course." (Exhibit C.)  That statement is indisputably true.  (*E.g.*, Cmplt. ¶ 94.)

Plaintiff has also failed to state a claim against any Individual Defendant because he has failed to identify statements by them, except for Dean Tsung, whose affidavit is privileged.

### J.  Plaintiff's False Light Claim Fails

"[L]iability [for false light claims] may be imposed where a defendant gives publicity to a matter concerning another that places the other before the public in a false light if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Chiaravallo v. Middletown Transit Dist.*, 561 F.

Supp. 3d 257, 291 (D. Conn. 2021) (alteration and internal quotation marks omitted).  "To recover under a theory of false light invasion of privacy, however, a plaintiff must show that the matter was made public, either to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* (quotations omitted).

Plaintiff's false light claim merely repeats the same allegations as his defamation claim. (*Compare* Cmplt. ¶¶ 377–92, *with* Cmplt.  ¶¶ 394–406.)  This claim fails for many of the same reasons as Plaintiff's defamation claim:  Statements that Plaintiff was found to have violated exam rules by using AI and was not forthcoming are true because, as Plaintiff's own Complaint admits and integral documents confirm, Plaintiff was found to have done those things.  (*E.g.*, Cmplt. ¶¶ 171, 193.)  Statements to that effect certainly did not recklessly disregard the truth.  Plaintiff's gripes with the University's decisions are also inactionable under *Gupta*, even under a false light theory.  *E.g.*, *Scalzi*, 1999 WL 391917, at *4 (*Gupta* applies to any claim that implicates the policies of deference and non-interference articulated therein).  Any statements in this case, including in Dean Tsung's affidavit, are absolutely privileged.  (Cmplt. ¶ 381.)  And the University cannot be liable for media coverage of Plaintiff's own lawsuit – it did not publish these articles.

Plaintiff's false light claim fails for the additional reasons that the alleged statements were not highly offensive nor made to a sufficiently public audience.  It is not highly offensive to allegedly say that Plaintiff violated exam rules by using AI and was not forthcoming when the University concluded that is what Plaintiff did.  (*E.g.*, Cmplt. ¶¶ 171, 193.)  Plaintiff alleges the University made statements to certain "Yale faculty, administrators, students, and potentially others." (Cmplt. ¶ 394.)  That is not the public at large.  It is a small, private community.

38

Plaintiff also has not alleged any facts supporting a false light claim against any Individual Defendant.  The only individual he identifies as making a statement is Dean Tsung, whose alleged statement is absolutely protected by the litigation privilege.  (Cmplt. ¶ 398.)

### K.  There Is No Claim For Wrongful Discipline In Violation Of Public Policy

There is a heavily circumscribed claim for termination in violation of public policy in certain *employment* cases as a narrow exception to the employment at-will rule.  *See, e.g.*, *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 408–09, 142 A.3d 227, 243 (2016).  That claim has not been extended to cases involving students.  Even if it had been, the claim is for *discharge*, not discipline and thus does not apply here.  *E.g.*, *id.*  Plaintiff has not exhausted his remedies nor plausibly alleged wrongful discipline for all the reasons noted above in any event:  He was primarily punished for refusing to timely produce documents he admits he did not timely produce.

### L.  Plaintiff's Claims For Declaratory Relief Are Improper And Fail

The Court should dismiss Plaintiff's claim for declaratory relief.

First, Plaintiff's asks this Court to do what the law prohibits it from doing:  second-guessing the University's decisions by, for example, "revers[ing]" his "F."  *E.g.*, *Wesleyan*, 2022 WL 2656787, at *7 ("Considering that this was a decision [] to enter a specific grade [], an evaluation of whether it was appropriate is beyond the scope of *Gupta*'s exception.").[18]  Federal courts have "discretion to decline to hear a declaratory judgment action" "[e]ven if federal jurisdiction exists and the requirements for a declaratory judgment are met."  *Consol. Edison Co. of New York v. United States*, 30 F. Supp. 2d 385, 390 (S.D.N.Y. 1998); *e.g.*, *Oxford Health Ins., Inc. v. Motherly Love Home Care Servs., Inc.*, 237 F. Supp. 3d 25, 35 (E.D.N.Y. 2017).  The Court should decline to adjudicate Plaintiff's requested relief in light of the deference owed to the University.

---

[18] *See Hope Academy v. Friel*, No. CV030081183S, 2004 WL 1888909 (Conn. Super. July 22, 2004) ("The court is not in a position to [] analyze the allegations regarding . . . whether a student was appropriately evaluated. . . .")

Second, "a plaintiff may not use the Declaratory Judgment Act to create legal rights that do not [] exist." *HK Cap. LLC v. Fed. Deposit Ins. Corp.*, 734 F. Supp. 3d 288, 295 (S.D.N.Y. 2024) (internal quotation marks omitted). That is exactly what Plaintiff seeks to do, however. Plaintiff has no legal right to, for example, his "disciplinary record at Yale [being] expunged."

Third, Plaintiff's request for declaratory relief is largely moot. *E.g.*, *Sudler v. City of New York*, 689 F.3d 159, 177–78 (2d Cir. 2012) (claim that could affect length of sentence moot where prisoners had been released). Plaintiff returned from his suspension long ago and has graduated.

Fourth, Plaintiff largely seeks relief that is impossible or otherwise unwarranted. As this Court noted, Plaintiff's "lawsuit describing [his] disciplinary record is public record." (ECF 89 at 22.) This Court can therefore not "permanently destroy[]" "any record of the proceedings regarding the conduct of Plaintiff." Even if it could, there is no basis for the Court to do that.

### M. The Court Should Dismiss "Yale University Board Of Trustees"

Finally, the Court should dismiss "Yale University Board Of Trustees" because it is not a legal entity. Yale's legal name is Yale University.[19] There is no entity called "Yale University Board Of Trustees." Plaintiff has not made any substantive allegations against "Yale University Board Of Trustees."[20] (Cmplt.) Plaintiff's claims are subject to dismissal for those reasons.[21]

---

[19] *See* Connecticut Secretary of State, Yale University, *available* here. The Court can take judicial notice of that website. *E.g.*, *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (taking judicial notice).

[20] The Complaint's sole allegation regarding "Yale University Board Of Trustees" is an allegation "[u]pon information and belief" that "Defendant Board of Trustees is the principal governing body of Yale University." That is inaccurate.

[21] *E.g.*, *Byrd v. Rochester Hous. Auth.*, No. 6:17-CV-06248(MAT), 2018 WL 2739790, at *4 (W.D.N.Y. June 7, 2018) ("This is not an actual entity, let alone one that is capable of being sued. . . . Plaintiff, moreover, has included no allegations against this non-existent entity. Accordingly, it must be dismissed as a party."); *see also, e.g.*, *Gash v. Rosalind Franklin Univ.*, 691 F. Supp. 3d 858, 860 n.1 (N.D. Ill. 2023), *aff'd*, 117 F.4th 957 (7th Cir. 2024) (dismissing "the Board of Trustees" in lawsuit against university filed by Plaintiff's counsel's firm because the University "contend[ed] [it was] not a proper defendant" and the plaintiff "offer[ed] no response").

## VI.    CONCLUSION

Plaintiff's Third Amended Complaint is nothing more than the classic formulaic, conclusory recitations of elements of causes of actions without support from actual, well-pleaded *facts*.  Plaintiff's claims are also barred by well-established law.  These are the exact situations Rule 12(b)(6) was made for.  The Court should dismiss Plaintiff's claims with prejudice.

THE DEFENDANTS,
YALE UNIVERSITY, YALE
UNIVERSITY BOARD OF TRUSTEES,
WENDY TSUNG, K. GEERT
ROUWENHORST, JACOB
THOMAS, SHERILYN SCULLY,
JAMES CHOI, AND ANJANI JAIN

By: */s/ Brendan N. Gooley*
    James M. Sconzo (ct04571)
    Brendan N. Gooley (ct30584)
    CARLTON FIELDS, P.C.
    One State Street, Suite 1800
    Hartford, CT  06103-3102
    Telephone:(860) 392-5000
    Facsimile: (860) 392-5058
    E-mail:    jsconzo@carltonfields.com
               bgooley@carltonfields.com

Its Attorneys

41

42

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 15th day of July, 2026, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

*/s/ Brendan N. Gooley*
Brendan N. Gooley